IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | |
|---|---|
| Gary Peterson, Chris Nakashima, John English, Jaquetta English, LT-1 Exchange Trust,  LT-2 Exchange Trust, LT-3 Exchange Trust,  LT-4 Exchange Trust,  LT-5 Exchange Trust,  LT-6 Exchange Trust,  LT-7 Exchange Trust,  LT-8 Exchange Trust, LT-9 Exchange Trust,  LT-12 Exchange Trust,  LT-14 Exchange Trust,  LT-15 Exchange Trust,  LT-17 Exchange Trust, LT-18 Exchange Trust,  LT-19 Exchange Trust,  LT-20 Exchange Trust, on their own behalf and on behalf of all others similarly situated, | Civil Action File No. _____ |
| | |
| Plaintiffs, | Jury Trial Demanded |
| | |
| v. | |
| | To the Honorable Alia Moses, Chief United States District Judge: |
| David R. Jones, Elizabeth Carol Freeman, The Law Office of Liz Freeman, PLLC, Jackson Walker, LLP, and Porter Hedges, LLP, | |
| | |
| Defendants, | |

## PLAINTIFFS' ORIGINAL COMPLAINT; ALTERNATIVE CLASS ACTION COMPLAINT

# TABLE OF CONTENTS

Introduction .................................................................................................. 1

Parties ......................................................................................................... 11

Jurisdiction and Venue ................................................................................ 14

Factual Allegations ...................................................................................... 16

    I.   David Jones ordains himself the nation's leading mega-bankruptcy judge. ...... 16

    II.   Freeman and Jones start an intimate, live-in relationship, and co-own a home. ...
    ............................................................................................................. 17

    III.   Freeman joins Jackson Walker and the Firm's bankruptcy practice before
Judge Jones skyrockets. .......................................................................... 18

    IV.   Jackson Walker and Freeman collect millions of dollars in cases and
mediations before Jones without anyone disclosing the intimate relationship. ........ 20

    V.   Jackson Walker claims it learned of the relationship in March 2021, but as with
Freeman, continues hiding the relationship in ongoing bankruptcies. ..................... 22

    VI.   Communications among Jackson Walker attorneys indicate knowledge of the
relationship and an effort to cover it up. ...................................................... 25

    VII. Freeman remains at Jackson Walker after March 2021 while still living with and
in an intimate relationship with Jones—nobody discloses anything. ......................... 28

    VIII. As a firm, Jackson Walker admits it knew of the ongoing nature of the Jones-
Freeman relationship by March 2022; yet the parties continue to profit from the
arrangement without disclosing it. ................................................................ 29

    IX. Formed in 2006, GWG grows into a $2 billion company. .................................. 32

    X.   A rogue SEC investigation results in the need for GWG to pursue Chapter
11 bankruptcy, unwittingly making it a victim of the Enterprise. .............................. 35

    XI.   The SEC investigation was fraught with aggressive overreach beyond its
statutory authority. .................................................................................. 40

    XI. The SEC dismisses the investigation. .......................................................... 40

XII.    GWG files for bankruptcy at the height of the Enterprise and Judge Isgur is assigned the case. ........................................................................................ 41

XIII.    Jackson Walker moves to appoint Jones as mediator while Freeman is still at the firm without anyone disclosing the Jones-Freeman relationship..................... 44

XIV. Jones announces GWG will be liquidated. ........................................... 45

XV.    Jones, Freeman, and Jackson Walker arrange for Freeman to serve in the lucrative position of Wind Down Trustee..................................................... 47

XVI. Freeman commences a fire sale of GWG's assets................................ 48

XVII. Jackson Walker moves for fees, including fees for Freeman's work on the mediation before Jones. ...................................................................... 52

XVIII. Jones finally admits to the intimate relationship with Freeman..................... 54

XIX. Judge Jones resigns after the Fifth Circuit finds "probable cause to believe [he] engaged in misconduct[.]"............................................................... 55

XX. The U.S. Trustee files an opposition to Jackson Walker's final fee application in the GWG bankruptcy. ..................................................................... 56

XXII. Defendants failed to satisfy their obligations to disclose the Jones-Freeman relationship and disqualify Judge Jones from serving as a judicial mediator............. 57

Standing and Motion for Special Limited Appointment or for Derivative Standing .. 62

Class Action Allegations ..................................................................... 68

Claims for Relief ............................................................................. 73

COUNT I:  Violation of Title 18 US.C. § 1962(c): Conducting the Affairs of the Enterprise Through a Pattern of Racketeering Activity (Against Defendants Jones, Freeman, Freeman PLLC, and Jackson Walke ............................. 73_Toc200639275

COUNT II:  Conspiracy to Engage in a Pattern of Racketeering Activity in Violation of Title 18 US.C. § 1962(D) (Against Defendants Jones, Freeman, Freeman PLLC, and Jackson Walker) ......................................................... 97

COUNT III:  Common Law Fraud (Against Defendants Jones, Freeman, Freeman PLLC, and Jackson Walker) ........................................................... 99

COUNT IV:  Breach of Fiduciary Duty (Against All Defendants) ........................ 104

COUNT V:  Aiding and Abetting Breach of Fiduciary Duty (Against All Defendants) ............................................................................................ 116

COUNT VI:  Negligent Misrepresentation (Against All Defendants) ................... 117

COUNT VII:  Professional Negligence (Against Defendants Jackson Walker, Freeman, Freeman PLLC, and Porter Hedges) ........................................... 122

COUNT VIII:  Common Law Civil Conspiracy (Against Jackson Walker, Freeman, Freeman PLLC, and Jones) ..................................................... 126

COUNT IX: Unjust Enrichment (Against All Defendants) ................................... 129

Respondeat Superior and/or Agency Liability ............................................. 131

Prayer for Relief ..................................................................................... 132

Demand for Jury Trial ............................................................................. 133

Come now Plaintiffs, Gary Peterson, Chris Nakashima, John English, Jaquetta English, LT-1 Exchange Trust,  LT-2 Exchange Trust, LT-3 Exchange Trust,  LT-4 Exchange Trust,  LT-5 Exchange Trust,  LT-6 Exchange Trust,  LT-7 Exchange Trust, LT-8 Exchange Trust, LT-9 Exchange Trust,  LT-12 Exchange Trust,  LT-14 Exchange Trust,  LT-15 Exchange Trust,  LT-17 Exchange Trust,  LT-18 Exchange Trust,  LT-19 Exchange Trust,  LT-20 Exchange Trust, by and through counsel, on their own behalf and on behalf of all others similarly situated, bring this Complaint, or alternatively, Class Action Complaint against the above-named Defendants, David R. Jones ("Jones"), Elizabeth Carol Freeman ("Freeman"), The Law Office of Liz Freeman, PLLC, ("Freeman PLLC"), Jackson Walker, LLP ("Jackson Walker"), and Porter Hedges, LLP, ("Porter Hedges") (collectively, "Defendants") and respectfully state:

## **INTRODUCTION**

1.      This lawsuit addresses unprecedented and systemic corruption in the Bankruptcy Court in the Southern District of Texas, with grave financial consequences for individuals and entities nationwide. For years, David R. Jones, the (now resigned) Chief Bankruptcy Judge, plotted with his live-in girlfriend and former clerk Elizabeth Freeman and her firms, Jackson Walker and Freeman PLLC (hereinafter "RICO Defendants"), to work together to prey upon distressed entities for their own financial gain. Never once across more than thirty mega-bankruptcies did they ever disclose the relationship between Jones and Freeman even though the law demanded it.

1

2.     Typically, they carried out their scheme by ensuring cases were assigned to Jones. That allowed Jones to award Jackson Walker, Freeman, and indirectly himself millions of dollars in attorneys' fees while keeping interested parties in those bankruptcies unaware of the disqualifying conflict. Even in cases where Jones was not presiding, the group arranged for him to serve as a judicial mediator, ensuring liquidation of distressed entities for their pecuniary gain.

3.     Jones, Freeman, Jackson Walker, and others deliberately kept this long-term and ongoing relationship secret from those interested in the various bankruptcy proceedings,[1] while using it to bolster prestige and collect millions of dollars in fees at the expense of those affected by the bankruptcies. In this case, the Enterprise targeted GWG Holdings, Inc.[2]—a multi-billion-dollar business—to provide Freeman with a "golden parachute" for her quiet, planned separation from Jackson Walker; a separation

---

[1] Plaintiffs were forced to file this complaint as quickly as possible because Jackson Walker recently began filing for approval of settlements with administrators in connection with a miscellaneous proceeding by the U.S. Trustee for the claw-back of attorneys' fees. *See 4E Brands North America*, No. 22-50009, ECF No. 715-1 at ¶ 5 (Apr. 7, 2025); *Basic Energy Services, Inc*, No. 21-90002, ECF No. 1884-1 ¶5 (Apr. 4, 2025). On May 22, 2025, Jackson Walker's counsel announced in court a proposed settlement was in process with the GWG Litigating Trust. No details were provided, but it is presumed the terms will be nearly identical to those other settlements presented to the Court. The releases in the settlements are not limited to the claw-back of attorneys' fees. Instead, they broadly purport to cut off Jackson Walker's liability (and even Freeman's) for any and all actions, direct or indirect, pertaining to the relationship between Jones and Freeman. *See id*. Meanwhile, the settlements do not even recoup all attorneys' fees, much less address the conduct alleged in this Complaint.
[2] GWG, as referenced herein, includes GWG Holdings, Inc., and its affiliated entities, GWG Live, LLC, and GWG Life USA, LLC. *See In re GWG Holdings, Inc.*, No. 22-90032, ECF No. 1 (S.D. Tex.)(Voluntary Petition for Non-Individuals Filing for Bankruptcy).

designed to avoid strict disclosure requirements that the Defendants by then could no longer delude themselves into avoiding if Freeman remained a partner at the firm.

4.      In 2021, GWG was a healthy public financial services company that purchased life insurance policies on the secondary market. It held over $2 billion in assets with a promising expansion plan, and had approximately 27,000 bondholders who benefitted from the company's years of reliable market-rate interest payments. The company issued "L Bonds," which were high yield, privately issued debt instruments to raise capital and purchase life insurance policies in the secondary market. Over 100 brokerage firms sold GWG's L-Bonds, with some brokers holding the bonds themselves.

5.      However, in April 2022, the company was forced to file Chapter 11 bankruptcy after the SEC conducted a lengthy and overreaching investigation during which SEC officers took action to choke off the company's cash flow. Although the baseless investigation against GWG and its officers and directors was ultimately dropped with no recommendations of an enforcement action, the ultra vires conduct of the SEC officers and the costs of investigation required it to pursue restructuring. Unfortunately for GWG, it did so in the midst of RICO Defendants' unprecedented corruption of the bankruptcy system. Unlike some other cases that were part of the scheme, the GWG bankruptcy was assigned to Judge Isgur.

6.      As happened with many other corporations, GWG was advised to hire Jackson Walker as local counsel and file for restructuring in Houston. At the time, Jackson Walker had made the decision that rather than disclose the relationship and jeopardize

3

its lucrative bankruptcy practice, it would simply remove—perhaps nominally—Freeman from formal employment with the firm.

7.      In anticipation of Freeman's departure from Jackson Walker in December 2022 to start her "solo" practice, Defendants orchestrated a coup to squeeze out GWG's leadership to orphan the company for a transition from reorganization to liquidation under Freeman's control.

8.      The Defendants moved for and obtained an order from Judge Isgur appointing Jones, his long-time friend, as a judicial mediator. Then, without warning at the mediation, Jones advised the parties and stakeholders that there would no longer be a reorganization. Despite the promise of a reorganization that management believed would recover 100% to the bondholders, the company would be liquidated and none other than newly "solo" attorney Freeman would be appointed as Wind Down Trustee. The liquidation plan meant that Freeman (and indirectly Jones) would receive over a million dollars in fees from the GWG estate, as well as millions of dollars in fees to Jackson Walker, Mayer Brown, Porter Hedges, and other bankruptcy professionals.

9.      Indeed, Freeman has already collected at least $1 million as Wind Down Trustee and (because she somehow continues to serve in this position), she projects she will receive at least $665,000 in the future.[3] Additionally, Jackson Walker paid her more than

---

[3] *See GWG*, No. 20-90032, ECF No. 2570-1 (S.D. Tex.)(exhibit to GWG Wind Down Trust Budget).

$200,000 to serve as co-counsel in the months before her appointment became effective, between January and July 2023.[4]

10.     Unlike some other cases, Jackson Walker cannot argue in the GWG bankruptcy, filed on April 20, 2022, that it learned of the Jones-Freeman relationship after-the-fact. Jackson Walker knew from the inception of the bankruptcy. It admits it knew of the intimate nature of the relationship by March 2022;[5] and by April and May 2022 the firm was conferring with Freeman's counsel and an ethics expert regarding appropriate disclosures.[6] Jackson Walker indisputably knew about the intimate nature of the Jones-Freeman relationship but did not disclose it:

- on October 6, 2022, when it filed a supplemental declaration in support of retention in GWG identifying no conflicts with bankruptcy judges in the Southern District;[7]

---

[4] *See GWG*, No. 20-90032, ECF No. 2158 Ex. 3 (listing Jackson Walker's expenses for the Freeman Law Firm as $205,157.81).

[5] *Old Copper Company Inc. v. Jackson Walker LLP*, No. 25-02002, ECF No. 12-1 (Referral Letter of Judge Marvin Isgur to Chief Judge Randy Crane stating "On March 29, 2022 (56 days after its partner affirmatively learned of the ongoing relationship), Jackson Walker again asked Ms. Freeman of the relationship. The next day, Ms. Freeman confirmed the existence of the ongoing relationship. Jackson Walker still made no disclosure to its clients, the Court or opposing counsel."); *Old Copper*, ECF No. 12-2 (Jackson Walker partner Matthew Cavenaugh testifying "I learned that she had, uh, resumed a relationship with Judge Jones that is also in March of 2022 when I learned about, uh, the right of survivorship for the house that she lived in –").

[6] *Old Copper*, No. 25-02002, ECF No. 12-12.

[7] *GWG*, No. 22-90032, ECF No. 829, Schedule 1(n).

- on November 30, 2022, when it filed its motion to appoint Jones as mediator in GWG with Freeman still at the firm;[8]

- on January 30–31, 2023, while it participated in mediation sessions before Jones (with Freeman serving as its co-counsel);[9]

- on February 27–28, 2023, while it participated in additional mediation sessions before Jones with Freeman again serving as its co-counsel;[10]

- on October 6, 2022, when Jackson Walker filed its first interim fee application and included time for its partners working with Freeman while at the firm;[11]

- on March 13, 2023, when Jackson Walker filed its second interim fee application and included time for its partners working with Freeman while at the firm;[12]

- on June 6, 2023, when it filed its third interim fee application and included Freeman's billing while a partner at Jackson Walker in November 2022[13] and on

---

[8] *GWG*, No. 22-90032, ECF No. 1128. Freeman's agreement to withdraw from Jackson Walker was signed on November 29, 2022, and provided that her last date of employment was December 1, 2022. *See In re Professional Matters Concerning the Jackson Walker Law Firm*, 23-00645, ECF No. 600-8 PDF page 196–98.
Of note, Jackson Walker filed its motion to appoint Jones as mediator on November 30, 2022, the day before Freeman's last day as partner at Jackson Walker.
[9] *GWG*, No. 22-90032, ECF No. 2158 PDF p. 177 (Jackson Walker partner Kristhy Peguero billing for participating in mediation on January 30–31, 2023), PDF pp. 179–80 (Freeman billing for participating in mediation on January 30–31, 2023).
[10] *Id.* PDF p. 193 (Jackson Walker Matthew Cavenaugh billing for participating in mediation on February 27–28, 2023), PDF p. 195 (Freeman billing for participating in mediation on February 27–28, 2023).
[11] *GWG*, No. 22-90032, ECF No. 829 at PDF pp. 17, 24–27, 41, 43, 53–54.
[12] *GWG*, No. 22-90032, ECF No.  at 1521 PDF pp. 15, 48, 51–52.
[13] Of note, Freeman billed .9 hours on November 21, 2022 in the amount of $945 for "Work on disclosure items for professionals." *GWG*, No. 22-90032, ECF No. 1878 at PDF p. 25.

a contract basis in January and February 2023 (which Jackson Walker billed as an expense), including time billed by Freeman for participating in mediation before Jones;[14]

- on August 21, 2023, when it filed its fourth and final fee application which included time for its partners working with Freeman as well as Freeman's work on a contract basis for March through June 2023 (which Jackson Walker again billed as an expense).[15]

11.    Despite Jackson Walker's actual awareness of the intimate, domestic relationship between Jones and Freeman the entire time, and over the advice of its ethics expert, it never uttered a word about the relationship to those interested in the bankruptcy. In fact, it set about—and contractually bound itself—to affirmatively cover up the relationship.

12.    Once Freeman's appointment as Wind Down Trustee became effective in August 2023,[16] she recklessly commenced a fire sale of GWG's interests, ensuring available funds for her and her live-in boyfriend to share, along with her former law firm. She discarded and devalued GWG's primary assets, leaving bondholders and other

---

[14] *GWG*, No. 22-90032, ECF No. 1878 at PDF pp. 21, 23, 25–26, 30–31 (Freeman billing as a Jackson Walker partner); 48–50, 66–68 (Jackson Walker The Law Office of Liz Freeman).
[15] *GWG*, No. 22-90032, ECF No. 2158 at PDF pp. *passim*.
[16] The plan's effective date was August 1, 2023. *GWG*, No. 22-90032, ECF No. 2079.

stakeholders with little more than worthless paper. The Enterprise put their own financial interests ahead of any stakeholders.

13.    Jones had previously explained that "due to the sheer volume of cases and the issues involved, the bankruptcy process in the Southern District of Texas is heavily dependent upon the honesty and integrity of the lawyers that participate in the process."[17] It is critical then to "protect[] the integrity of the bankruptcy process itself against those who seek to take advantage through deception or nondisclosure."[18]

14.    Unfortunately, Jones did not hold himself to his own words. Jones, Freeman, and Jackson Walker deceived the public and interested parties in numerous bankruptcies, including Plaintiffs here, by failing to disclose their relationship and taking millions from distressed entities for their own benefit.

15.    Despite now-admitted knowledge as well as advice from its ethics attorney, Jackson Walker never disclosed the relationship, causing Judge Isgur to observe that Jackson Walker "defiled the very temple of justice" it had profited from inhabiting.[19] The same is true of both Jones and Freeman.

---

[17] *In re Decloutte*, No14-35557, 2018 Bankr. LEXIS 1869, *1 (Bankr. S.D. Tex. June 20, 2018) (J. Jones).
[18] *In re Edwards*, 510 B.R. 554, 558 (Bankr. S.D. Tex. Apr. 9, 2014) (J. Jones).
[19] *See* September 20, 2024 letter from the Hon. Marvin Isgur to Chief United States District Judge Randy Crane Re: Referral of Jackson Walker LLP at 4.

16.    These are not mere ethical lapses, nor are they omissions that can be fully redressed by the U.S. Trustee's efforts to claw back attorneys' fees.[20] As described herein, Jackson Walker filed numerous misleading and dishonest federal court papers without disclosing the Jones-Freeman relationship, amounting to bankruptcy fraud, honest services fraud, mail and wire fraud, and obstruction of justice—actionable under the Racketeer Influenced and Corrupt Organizations Act ("RICO"). Further, Jackson Walker, Freeman, and Jones breached their fiduciary duties to the bondholders and other interested parties in the bankruptcies, committed fraud, engaged in a civil conspiracy, and were unjustly enriched. ***Shockingly***, Freeman continues to serve as Wind Down Trustee to this day, compounding her ethical breaches without any challenge to her ongoing role in the GWG bankruptcy.

17.    As Wind Down Trustee, Freeman owes fiduciary duties directly to the Wind Down Trust Interest holders, including Plaintiffs, independent and non-derivative of claims the debtor or post-confirmation entity have against the Defendants. Indeed, the Wind Down Trust agreement expressly recognizes her fiduciary duty.[21] Plaintiffs seek actual damages, the forfeiture of attorneys' fees, statutory damages, compensatory

---

[20] Since the GWG bankruptcy is still pending, the U.S. Trustee filed an opposition to Jackson Walker's final fee application rather than a Rule 60 motion seeking to claw back fees. *See GWG*, No. 20-90032, ECF No. 2415. The Trustee has not made any effort to claw back compensation to Freeman as Wind Down Trustee.

[21] *See GWG* , No. 22-90032, ECF No. 1887 ¶ 1.4 (describing the "Wind Down Trustee's powers" as "exercisable solely in a fiduciary capacity….").

damages, and other damages in connection with Defendants' violations of RICO and breaches of fiduciary duties, among other causes of action.[22]

18.     Plaintiffs also seek damages against Porter Hedges, one of the law firms that represented the Official Committee of Bondholders ("Bondholder Committee"). Porter Hedges is the same firm where Jones was a partner and Freeman an associate prior to their transition to judge and clerk, respectively, and where their relationship started. Freeman's ex-husband, Nicholas Simms, a then and current partner at Porter Hedges, knew of the relationship between Freeman and Jones at all times relevant to this Complaint. Simms' knowledge of the continuing relationship is imputed to Porter Hedges.23 Despite knowledge of this concealed relationship and conflict, Porter Hedges, on behalf of the Bondholder Committee: (1) never disclosed the relationship; (2) did not challenge the request to appoint Jones as mediator; and (3) did not challenge Freeman's appointment as Wind Down Trustee or seek her removal. As such, Porter Hedges breached its fiduciary duty to the bondholders.

19.     As a result of the foregoing conduct of all Defendants, as detailed more fully below, GWG sustained billions of dollars in losses and Plaintiffs have suffered significant damages. Specifically, Plaintiffs are former Bondholders of GWG who had their interests in GWG significantly devalued and wasted through the conversion of

---

[22] Plaintiffs reserve the right to amend their pleadings to include additional Defendants to the extent it is revealed that other professionals had knowledge of the secret Jones-Freeman relationship.

GWG's bankruptcy proceeding from reorganization into liquidation and the reckless and improper fire sale of GWG's assets that was devised solely to provide short-term gains and dividends for the bankruptcy professionals, including Jackson Walker as counsel and Freeman as both counsel and later as Wind Down Trustee. As a result of Defendants' misconduct, the Bondholder Plaintiffs', and others', interests have been rendered entirely or nearly worthless—a loss of at least 96% of the value of their bonds.

## **PARTIES**

20.    Plaintiff Gary Peterson is a natural person and is a citizen and resident of the State of Idaho. Plaintiff Peterson held Public L Bonds issued by GWG in 2018 and 2019, with face values of approximately $25,000, $51,000, and $218,000, respectively, with seven-year terms at an interest rate of 8.5%. Plaintiff Peterson's Public L Bonds have been replaced by a quantity of WDT Interests pursuant to Wind Down Trust Agreement[24] and the Confirmation Order.[25]

21.    Plaintiff Chris Nakashima is a natural person and is a citizen and resident of the State of California. Plaintiff Nakashima held Public L Bonds issued by GWG in November 2020 with a face value of approximately $64,000, with a seven-year term and an interest rate of 8.5%. Plaintiff Nakashima's Public L Bonds have been replaced by a

---

[24] *See GWG* , No. 22-90032, ECF No. 1887 ¶ 2.2.
[25] *See GWG* , No. 22-90032, ECF No. 1952.

quantity of WDT Interests pursuant to Wind Down Trust Agreement[26] and the Confirmation Order.[27]

22.    Plaintiffs John and Jaquetta English are natural persons and are citizens and residents of the State of California. The English Plaintiffs held Public L Bonds issued by GWG in May 2020 with face values of approximately $80,000 and $127,000. The English Plaintiffs' Public L Bonds have been replaced by a quantity of WDT Interests pursuant to Wind Down Trust Agreement[28] and the Confirmation Order.[29]

23.    Plaintiffs LT-1 Exchange Trust,  LT-2 Exchange Trust, LT-3 Exchange Trust, LT-4 Exchange Trust,  LT-5 Exchange Trust,  LT-6 Exchange Trust,  LT-7 Exchange Trust,  LT-8 Exchange Trust,  LT-9 Exchange Trust,  LT-12 Exchange Trust,  LT-14 Exchange Trust,  LT-15 Exchange Trust,  LT-17 Exchange Trust,  LT-18 Exchange Trust,  LT-19 Exchange Trust,  LT-20 Exchange Trust, (collectively, "Trust Plaintiffs") are trusts formed and existing under the laws of the State of Delaware. Collectively, the trusts held a variety of bonds issued by GWG with an aggregate face value of over $300 million. The Trusts' bonds have been replaced by a quantity of WDT Interests pursuant to Wind Down Trust Agreement[30] and the Confirmation Order.[31]

---

[26] *See GWG*, No. 22-90032, ECF No. 1887 ¶ 2.2.
[27] *See GWG*, No. 22-90032, ECF No. 1952.
[28] *See GWG*, No. 22-90032, ECF No. 1887 ¶ 2.2.
[29] *See GWG*, No. 22-90032, ECF No. 1952.
[30] *See GWG*, No. 22-90032, ECF No. 1887 ¶ 2.2.
[31] *See GWG*, No. 22-90032, ECF No. 1952.

24.     Defendant David R. Jones is a natural person. Jones is the former Chief Judge of the Bankruptcy Court for the Southern District of Texas. He can be served with process at ███████████████████████. Additionally, the United States government can be served by certified mail upon the civil process clerk at the U.S. Attorney's Office and by certified mail to the Attorney General of the United States in Washington D.C.

25.     Defendant Elizabeth Carol Freeman is a natural person, licensed Texas attorney, former partner at Jackson Walker, LLP, and owner of The Law Office of Liz Freeman, PLLC in Houston, Texas. Freeman is an individual and a citizen and resident of Harris County, Texas, and may be served with process at █████████████████████

26.     Defendant The Law Office of Liz Freeman, PLLC, is a professional limited liability company formed and existing under the laws of the State of Texas with its principal place of business in Houston, Texas. It may be served through its registered agent and President, Elizabeth C. Freeman, at ███████████████████████ ██████.

27.     Defendant Jackson Walker, LLP is a limited liability partnership incorporated and existing under the laws of the State of Texas with its principal place of business at 2323 Ross Avenue, Suite 600, Dallas, Texas 75201. It may be served through any of its general partners, including C. Wade Cooper, at 2323 Ross Avenue, Suite 600, Dallas, Texas 75201.

28.     Defendant Porter Hedges, LLP, is a limited liability partnership incorporated and existing under the laws of the State of Texas with its principal place of business at 1000 Main Street, 36th Floor, Houston, Texas 77002. It may be served through any of its 74 general partners, including Co-Managing Partners, E. James Cowen and Joyce Kao Soliman, at 1000 Main Street, 36th Floor, Houston, Texas 77002.

29.     Upon information and belief, certain individuals or entities other than the listed Defendants may have been involved in the misconduct alleged herein. Those Defendants, being currently unknown to Plaintiff, are designated as John Does.

## JURISDICTION AND VENUE

30.     This Court has original federal question jurisdiction over this action under 28 U.S.C. § 1331 because Plaintiffs brings claims under RICO, which is a federal statute. 18 U.S.C. §§ 1961, *et seq.*

31.     The Court also has original jurisdiction over this Class Action under the Class Action Fairness Act, 28 U.S.C. § 1332(d) ("CAFA"), because this is a class action in which: (1) there are more than one hundred (100) members in the proposed class; (2) various members of the proposed class are citizens of states different from where Defendants are citizens; and (3) the amount in controversy, exclusive of interest and costs, exceeds $5,000,000 in the aggregate.

32.     The Court also has subject matter jurisdiction pursuant to 18 U.S.C. § 1964(c), which provides that "[a]ny person injured in his business or property by reason of a violation of section 1962 of this chapter may sue therefor in any appropriate United

States district court." Plaintiff seeks recovery for injuries to business or property caused by violations of RICO (18 U.S.C. §§ 1961, *et seq.*); he suffered "economic injur[ies]" that as described *infra*, are "concrete and particular and not speculative." *Soto v. Vanderbilt Mortg. & Fin., Inc.*, No. C-10-66, 2010 LEXIS 87951, at *43 (S.D. Tex. 2010).

33.     This Court also has supplemental jurisdiction over Plaintiffs' state law claims under 28 U.S.C. §1367. Plaintiffs' state law claims are so related to their claims under RICO (18 U.S.C. §§ 1961, *et seq*) that they form part of the same case or controversy.

34.     Venue is proper in this District under 18 U.S.C. 1965(a) because it is where Defendants Jones, Freeman, and Jackson Walker reside, are found, and transact their affairs.

35.     In addition, venue is proper in this District under 28 U.S.C. § 1391 because a substantial part of the events or omissions giving rise to this claim occurred in this District. Venue is proper because Defendants do business in this District and the causes of action arose, in substantial part, in this District.

36.     Venue is additionally proper in this District under 28 U.S.C. § 1391 because Jones and Freeman are residents of this District for venue purposes and conduct business in this District. Additionally, Jackson Walker, LLP, is a corporation organized under the laws of this State.

## FACTUAL ALLEGATIONS

### I.     David Jones ordains himself the nation's leading mega-bankruptcy judge.

37.     In 2015, Judge Jones was appointed Chief Judge of the Bankruptcy Court for the Southern District of Texas. In a few years, he transformed it into the nationwide center for high-dollar[32] complex Chapter 11 bankruptcies.[33] Jones signed a General Order in 2018 directing all complex Chapter 11 cases filed in the Southern District, across all divisions, to two judges—himself and Judge Marvin Isgur.[34]  He also set up a "complex advisory" committee of bankruptcy attorneys, including the head of Kirkland & Ellis LLP's bankruptcy practice, who is not admitted to practice in Texas.[35]

38.     "In the years after the creation of the complex case system, Houston quickly attracted large bankruptcies that previously might have landed in Delaware or New York."[36] Thanks to Jones' efforts "Houston went from being a bankruptcy backwater to becoming the single most popular destination for large, public company bankruptcy filings."[37] Just in 2023, for example, "of the 54 large Chapter 11 cases filed, twenty-five landed in SDTX, where only two judges, including Jones, oversaw large restructurings.

---

[32] Sujeet Indap, The downfall of the judge who dominated bankruptcy in America, THE FINANCIAL TIMES (Nov. 21, 2023), accessible at https://www.ft.com/content/574f0940-d82e-4e4a-98bd-271058cce434 (last visited Jun. 12, 2025).

[33] *See* Adam J. Levitin, Judge Shopping in Chapter 11 Bankruptcy, 323 ILL. L. REV. 351, 372 (2013).

[34] *See* General Order 2018-1 (Jan. 29, 2018).

[35] *See* General Order 2018-6, (Bankr. S.D. Tex. June 29, 2018) (listing James Sprayregen on the committee).

[36] Indap, *supra* note 32.

[37] Levitin, *supra* note 33 at 374.

This near majority was more than those total bankruptcy filings in the traditional stalwarts, Delaware and New York, combined."[38]

39.    Jones executed his plan with the "guaranty of case assignment to one of two judges who want to attract mega-cases and understand the need to 'sell' the venue to debtors."[39]

## II.    Freeman and Jones start an intimate, live-in relationship, and co-own a home.

40.    Freeman first worked together with Jones at Porter Hedges. In 2011, Jones left the firm to accept appointment as bankruptcy judge in the Southern District of Texas and Freeman followed as his clerk. Freeman clerked for Jones for six years,[40] between 2011 and 2018. By at least 2011 (and probably earlier), the pair started a romantic relationship. In a deposition, Jones' ex-wife identified Freeman's extra-marital relationship with Jones as one of the reasons for their divorce in 2012; she testified she learned of the relationship by December 2011.

41.    Perhaps as early 2013 or 2014,[41] but at least by 2017, the two were living together and remained living together continuously. On June 26, 2017, they executed a

---

[38] Indap, *supra* note 32.
[39] Levitin, *supra* note 33 at 373.
[40] https://lizfreemanlaw.com/about.html, last visited Apr. 28, 2025.
[41] Jones' former housekeeper Rosa Lozano testified by deposition in the miscellaneous proceeding brought by the U.S. Trustee that Freeman moved into Jones' house a year and a half after the divorce, which again was in 2012.

survivorship agreement as co-owners of a million dollar-plus home in Houston. Freeman paid property taxes on the shared home.[42]

42.     Jones purchased another million-dollar home in Coldspring, Texas, on September 1, 2016.[43] On information and belief, Freeman had been living in that house since 2007.[44]

43.     Further, on information and belief, Freeman's parents moved into the house in Coldspring in approximately 2020.[45] Jones still owns that house as well.[46] Freeman also formed the Freeman Family Coldspring Real Estate Holdings, LLC in February 2023, and lists herself as registered agent at ████████████████████████████, less than two miles from the home purchased by Jones.

### III.    Freeman joins Jackson Walker and the Firm's bankruptcy practice before Judge Jones skyrockets.

44.     As Jones became "the busiest bankruptcy judge in the United States,"[47] Freeman left her six-year clerkship[48] to join the bankruptcy section at Jackson Walker's Houston office.[49] Jackson Walker announced Freeman as a partner in 2018, highlighting her

---

[42] *See Professional Fee Matters*, No. 23-00645, ECF No. 600-1 at 19.
[43] *See Van Deelen v. Jones*, No. 23-cv-3729, ECF No. 1-1, App. A, at 5—6.
[44] *See id.* at 6.
[45] *See id.*
[46] *See id.* at 5.
[47] Tom Hals, Exclusive-Law Firm Tied to Bankruptcy Judge Resignation Did Not Make Conflict Disclosures-Data Analysis, Reuters (Oct. 30, 2023), https://www.usnews.com/news/top-news/articles/2023-10-30/exclusive-law-firm-tied-to-bankruptcy-judge-resignation-did-not-make-conflict-disclosures-data-analysis, last visited Apr. 28, 2025.
[48] https://lizfreemanlaw.com/about.html, last visited Apr. 28, 2025.
[49] Chief Judge Priscilla Richman of the Fifth Circuit stated in her written order that Freeman "was a partner in the Jackson Walker LLP law firm, it appears from at least 2017 until December 2022."

former position as "permanent law clerk to the Chief Bankruptcy Judge for the U.S. Bankruptcy Court for the Southern District of Texas."[50]

45.    With Freeman's arrival, Jackson Walker began securing appointments in myriad large Chapter 11 cases, frequently serving as local counsel with Kirkland & Ellis, Mayer Brown, or other major, nationwide firms as lead.[51]

46.    By 2019, Jackson Walker was "the leading counsel firm for corporate debtors filing for bankruptcy in Houston."[52] And by 2022 and in 2023, Jackson Walker was number one in the nation in local counsel appointments in large bankruptcies.[53]

47.    Indeed, Jackson Walker managing partner Wade Cooper explained that "[i]n an awful lot of the [Chapter 11] cases [a major nationwide firm filed] filed, we are either local counsel or co-counsel to help with conflicts[.]"[54] Among other attributes of the Firm, Cooper boasted, "[w]e know a lot about the local politics[.]"[55] In fact, the Financial Times reported that a lawyer from a large bankruptcy firm stated that "Jackson Walker was useful as a back channel to Houston's two judges; Freeman had

---

[50] https://www.jw.com/news/jackson-walker-expands-bankruptcy-reorganization-wealth-planning-and-white-collar-defense-practices/, last visited Apr. 28, 2025.
[51] *See* Brenda Sapino Jeffries, Kirkland's Bankruptcy Partnership With Jackson Walker Could Be a Sign of Things to Come, The American Lawyer (Online) (Aug. 25, 2020), accessible at https://www.law.com/americanlawyer/2020/08/25/kirklands-bankruptcy-partnership-with-jackson-walker-could-be-a-sign-of-things-to-come/, last visited Jun. 5, 2025.
[52] Hals, *supra* n. 47.
[53] The American Lawyer: Jackson Walker is Nation's Top Local Counsel in Large Bankruptcies, as Bankruptcy and Restructuring Filings Rebound (Aug. 4, 2023), accessible at https://www.jw.com/news/mention-bankruptcy-top-local-counsel-american-lawyer/, last visited Jun. 5, 2025.
[54] *Id.*
[55] *Id.*

previously been a clerk to Jones while another bankruptcy partner, Matthew Cavenaugh, had clerked for Isgur."[56]

48.     During this time, Jackson Walker appeared frequently before Jones or moved to appoint Jones as mediator without ever disclosing the ongoing relationship. While Jackson Walker has stated previously that Freeman did not appear at hearings before Jones due to her prior clerkship, billing records that Jackson Walker submitted to Jones for approval included fees for Freeman's attendance at hearings or other matters before Jones.

### IV.     Jackson Walker and Freeman collect millions of dollars in cases and mediations before Jones without anyone disclosing the intimate relationship.

49.     Jones presided over at least 26 cases in which he awarded Jackson Walker more than $12 million in attorneys' fees and expenses while Freeman was a partner at Jackson Walker and while Freeman and Jones were living together and having an intimate relationship.[57] This includes approximately $1 million in fees billed directly by Freeman herself.[58] Jones also served as a mediator in cases in which Jackson Walker and Freeman served as local counsel, including in the GWG bankruptcy. In fact, Jackson Walker

---

[56] Indap, *supra* n. 32.
[57] Motion for Relief for Judgment in *In re 4E Brands NorthAmerica LLC*, filed on November 3, 2023, No. 22-50009, ECF No. 517 at Ex. 6A–B. Plaintiff respectfully moves for this Court to take judicial notice of all federal court filings referenced in this amended complaint.
[58] *Id.*

specifically filed the motions or other documents necessary to appoint Jones as mediator.[59]

50.    Of course, "at all times when Elizabeth Freeman was a Jackson Walker LLP partner, and regardless of whether she provided services or advice in a case, there is a reasonable probability that [she], as a partner in that firm, obtained a financial benefit from, or had a financial interest in, fees approved by Judge Jones."[60] As co-owner of a shared home with Freeman, Jones also benefitted from the fees he awarded to her as well. In fact, Freeman shared expenses on the home, including paying a portion of real property taxes.

51.    Jones did not recuse or disqualify himself in any of these cases, nor did he disclose his relationship with Freeman to the parties, their counsel, or those otherwise affected by the bankruptcies.[61] In the GWG bankruptcy, Jones was disqualified under the applicable rules as a mediator and was obligated to disclose his relationship with Freeman and her firm, but did not. Meanwhile, under the rules governing bankruptcy proceedings for a law firm to be employed by a debtor or debtor-in-possession, the firm must show that it is *disinterested* and must disclose all "connections[.]" 11 U.S.C. §§

---

[59] *See e.g., GWG*, No. 22-90032, ECF No. 1128 (Nov. 30, 2022) (motion for entry of an order appointing a judicial mediator); *In re HONX, Inc.*, No. 22-90035, ECF No. 209 (joint stipulation and agreed order appointing co-mediators); *In re Altera Infrastructure, LP*, No. 22-90130, ECF No. 247 (joint stipulation and agreed order appointing a mediator).

[60] Complaint Identified by the Chief Judge of the Fifth Circuit Court of Appeals Against United States Bankruptcy Judge David R. Jones, Southern District of Texas, Under the Judicial Improvement Act of 2002, Complaint No. 05-24-90002 (5th Cir., Oct. 13, 2023) at 2.

[61] *Id.*

101(14), 327; Fed. R. Bankr. P. 2014 (requiring "a verified statement of the person to be employed setting forth the person's connections with the debtor, creditor, or any other party of interest"). Yet, neither Freeman, nor Jackson Walker, nor any other lead counsel disclosed the relationship in any of the cases.[62]

52.     As will be described *infra*, the GWG bankruptcy was filed in April 2022, *after* Jackson Walker's admitted acknowledgement of an existing, ongoing relationship between Jones and Freeman. Yet neither Jackson Walker nor Freeman ever disclosed the intimate relationship. Instead, they actively sought to involve Jones in a case that wasn't even pending before him, all while keeping the relationship secret from those interested in the bankruptcy. The firm went so far as affirmatively listing "N/A" for the section concerning Bankruptcy Judges for the Southern District of Texas in its declaration of disinterestedness.[63]

### V.    Jackson Walker claims it learned of the relationship in March 2021, but as with Freeman, continues hiding the relationship in ongoing bankruptcies.

53.     Jackson Walker knew of the intimate, live-in relationship between Jones and Freeman for the entirety of the GWG case filed in April 2022. For background purposes, Jackson Walker claims it first learned of the Jones-Freeman relationship in

---

[62] Hals, *supra* n. 47.
[63] *GWG*, No. 20-90032, ECF No. 828 at schedule 1(n) (pdf p. 20).

March 2021[64] even though Freeman was in the relationship and living with Jones during her entire employment at Jackson Walker, and the firm's increased appointments in Judge Jones' court coincided precisely with her arrival. According to Jackson Walker, after it made the discovery, it conducted an inquiry, consulted outside ethics counsel, and instructed Freeman to stop working and billing on any case assigned to Jones.[65] As it turns out, texts messages uncovered in the proceeding initiated by the U.S. Trustee indicates that at least some attorneys in the firm knew of the nature of the Jones-Freeman relationship long before March 2021.[66]

54.    Of course, Freeman, a partner at Jackson Walker, unquestionably knew of her ongoing intimate relationship with Jones, that they lived together, and co-owned a home. As an attorney and partner in Jackson Walker, Freeman's "[k]nowledge and actions are said to be imputed to all members of a firm[.]"[67]

---

[64] Alexander Gladstone, Justice Department Watchdog Disputes Texas Firm's Fees Over Lawyer's Relationship with Judge, Wall Street Journal (Nov. 3, 2023), accessible at https://www.wsj.com/articles/doj-watchdog-seeks-to-reverse-some-fees-paid-to-law-firm-jackson-walker-7b50a000?tpl=br, last visited Jun. 5, 2025.

[65] Alexander Gladstone, et al., Bankruptcy Judge Jones to Stop Handling Major Cases After Relationship with Lawyer Revealed, Wall Street Journal (Oct. 14, 2023), https://www.wsj.com/articles/bankruptcy-judge-jones-to-stop-handling-complex-cases-after-relationship-with-lawyer-revealed-fad88b0c?tpl=br, last visited Jun. 5, 2025.

[66] *See e.g., Old Copper Company Inc.*, 25-02002, ECF No. 1-1 at 10.

[67] *In re Bradley*, 495 B.R. 747, 791 (Bankr. S.D. Tex. 2013) (citing *In re Depugh*, 409 B.R. 125, 141 (Bankr. S.D. Tex. 2009); *In re Anderson*, 330 B.R. 180, 187 (Bankr. S.D. Tex. 2005) (finding that knowledge and actions impute from one attorney at a firm to all other attorneys with whom they work)); *see also In re Corrugated Container Antitrust Litigation*, 659 F.2d 1341, 1346 (5th Cir. 1981) ("knowledge is imputed to partners of the lawyer disqualified, even if the partnership is later dissolved") (citations omitted).

55.    Jackson Walker acknowledged the risk that the relationship posed to the firm in communications with its ethics counsel in 2021, noting that "[t]he firm, for its part, had concluded and has advised Elizabeth that any romantic, intimate, or sexual relationship between a firm lawyer and a federal judge would create too much risk of disqualification to be compatible with any lawyer in the firm continuing to appear before that judge."[68]

56.    Regardless, what Jackson Walker (and Freeman/Jones) indisputably did not do for the period between March 2021, when the firm admitted to knowing about the relationship, and December 2022, when Freeman left, is disclose the relationship in the bankruptcy proceedings or correct any of its declarations of disinterestedness omitting the relationship. Nor did Jackson Walker, Freeman, or Jones disclose it in GWG when Freeman assumed the position of Wind Down Trustee under the plan that flowed from the mediation before Jones. This despite the fact that "[t]he Fifth Circuit has uniformly held that under Rule 2014(a), full disclosure is a continuing responsibility, and an attorney is under a duty to promptly notify the court if any potential for conflict arises." *Beirne, Maynard & Parson, L.L.P. v. Cypresswood Land Partners*, 2010 U.S. Dist. LEXIS 146549, *25-26 (citing *In re W. Delta Oil Co.*, 432 F.3d 347, 355 (5th Cir. 2005)).

57.    In this case, yet another law firm—Porter Hedges—knew of the relationship but kept it secret while collecting more than $2 million in fees. Porter Hedges represented

---

[68] *In re J.C. Penney Direct Mktg. Servs., LLC*, No. 20-20184, ECF No. 1244 (Bankr. S.D. Tex. Nov. 13, 2023).

the Bondholder Committee and, by keeping this information from bondholders like Plaintiffs, breached its fiduciary duties.

## VI.    Communications among Jackson Walker attorneys indicate knowledge of the relationship and an effort to cover it up.

58.    In May 2021, Jackson Walker attorney Vernoica Polnick texted Freeman suggesting that both Polnick and fellow Jackson Walker attorney Genevieve Graham in fact knew the relationship was continuing because it "quasi came out in McDermott."[69] Specifically, Polnick stated that "[Graham] obviously knows you have a relationship with Jones and she now knows that it quasi came out in McDermott and that there's high level firm shit going on."[70]

59.    Messages between partners also suggest recognition of the need to address previously filed declarations in bankruptcies. Cavenaugh texted on March 9th that he spent three hours the day before re-reading his declarations in prior cases.[71] Additionally, messages between Cavenaugh and Polnick show that almost immediately after the Van Deelen accusations in March 2021, Jackson Walker knew the significance of the relationship, which threatened their lucrative practice:

> Veronica Polnick (March 7, 2021, 9:23 p.m.) "This is literally [F]reeman's worst nightmare. She's the most private person I know."

---

[69] *Professional Fee Matters*, 23-00645, ECF No. 600-2 PDF pp. 86–87.
[70] *Id.* at 87
[71] *Old Copper Company Inc.*, 25-02002, ECF No. 1-1 at 5.

Matthew Cavenaugh (March 7, 2021, 9:24 p.m.) "I know. I feel so terrible. But if we want to protect her, this is the route. It's gonna be [fine.]"

Veronica Polnick (March 7, 2021, 9:25 PM) "You think we get out of this with 1) freeman still at JW, 2) Jones still on the bench and panel, and 3) still working with KE?"

Matthew Cavenaugh (March 7, 2021, 9:25 PM) "All 3[.]"

Veronica Polnick (March 8, 2021, 8:58 p.m.) "There's going to be some embarrassment. But it's going to be ok. Make sure she knows that."

Matthew Cavenaugh (March 8, 2021, 8:56 p.m.) "Ok. Do you believe that?"

Veronica Polnick (March 8, 2021, 8:56 p.m.) "More today than yesterday, yes."

Veronica Polnick (March 8, 2021, 8:56 p.m.) "Mainly Bc Isgur is ok[.]"

"Doesn't mean it's not gonna suck for a bit[.]"

Matthew Cavenaugh (March 8, 2021, 8:57 p.m.) "Yup. Just FYI, the firm is going to have a reaction, regardless of what the court does. It will probably mean that Liz can't work on DRJ cases until the dust settles. So we need to be prepared for that[.]"

Veronica Polnick (March 8, 2021, 8:56 p.m.) "Yup. Not surprised. Like walled off you mean. It'll be ok. We can handle that."

Matthew Cavenaugh (March 8, 2021, 8:58 p.m.) "Yes[.]"

Vernoica Polnick (March 8, 2021, 8:58 p.m.) "We know what he'll do, we can cover until that passes."

26

Matthew Cavenaugh (March 8, 2021, 8:59 p.m.) [Liked Polnick's prior message][72]

60.    The text messages also indicate that several senior Jackson Walker partners, including its former General Counsel (Patrick Cowlishaw), knew about the relationship at least as early as March 7, 2021, and collaborated on a strategic response:

Veronica Polnick (March 7, 2021) "How's Bruce [Ruzinsky]?[73]

Matthew Cavenaugh (March 7, 2021) "He's good. It's been a day. Just so you know, the circle includes Bruce, [C]hip, and Cowlishaw."

Matthew Cavenaugh (March 7, 2021, 9:23 p.m.) "They are all good[.]"

Matthew Cavenaugh (March 7, 2021, 9:23 p.m.) "They are also signed off on the plan[.]"[74]

61.    Further, messages between Freeman and Polnick a year earlier, in May 2020, offer a glimpse into Jones's, Freeman's, and Jackson Walker's scheme to control the process. Three days before Jackson Walker filed Chapter 11 bankruptcy for JCPenney, Freeman texted Polnick, "Talked to Jones. He's got us."[75] Freeman told Polnick that there were "too many fights" in the JCPenney case and that they couldn't afford a "process hawk," referring to Judge Isgur.[76] Judge Isgur would instead get the

---

[72] *Old Copper Company Inc.*, 25-02002, ECF No. 1-1 at 9.
[73] https://www.jw.com/people/bruce-ruzinsky/.
[74] *Old Copper Company Inc.*, No. 25-02002, ECF No. 12-9 at 4-5.
[75] *Id.* ECF No. 12 at 6, 12-7 at 3–4 (pdf pp. 90–91).
[76] *Id.* ECF No. 12-7 at 3 (pdf p. 90).

bankruptcy of Ultra Petroleum Corp., Freeman told Polnick.[77] Ultra, represented by Kirkland and Jackson Walker, filed for Chapter 11 the day before JCPenney, and was assigned to Isgur, just as Freeman said. Freeman explained that "[t]hey know Jones will cut through the bullshit," and it was "[n]ot so much a case of dodging Isgur[.]"[78] Freeman also told Polnick that "Jones has been softening up for this for a month."[79] Finally, Freeman instructed Polnick, "[w]e are keeping this down looooooooowww[.]"[80] Polnick replied, "Got it[.]"[81]

### VII. Freeman remains at Jackson Walker after March 2021 while still living with and in an intimate relationship with Jones—nobody discloses anything.

62.     Despite Jackson Walker's knowledge of the relationship by March 2021, and at least some partners' knowledge of it before then, it continued not to disclose what it knew in any bankruptcy. Freeman continued to work on cases assigned to or involving Jones behind the scenes between March 2021 and December 2022, and as a contract attorney after her nominal departure from Jackson Walker. During this time, Jackson Walker continued to benefit from the Jones-Freeman relationship, filing at least nine applications to be appointed counsel in bankruptcy cases before Jones.[82] In two of those

---

[77] *Id.*
[78] *Id.* ECF No. 12-7 at 3–4 (pdf. pp. 90–91).
[79] Id. ECF No. 12-7 at 4 (pdf p. 91).
[80] *Id.*
[81] *Id.*
[82] *Seadrill Limited*, No. 21-30427, ECF No. 250 (Mar. 8, 2021) (application to employ Jackson Walker as Co-Counsel and Conflicts Counsel); *Brilliant Energy, LLC*, No. 21-30936, ECF No. 68 (Apr. 13,

cases, Jackson Walker listed Jones as a potential party in interest, but affirmatively represented that it searched his name against internal records and did not find any connections involving him.[83]

## VIII. As a firm, Jackson Walker admits it knew of the ongoing nature of the Jones-Freeman relationship by March 2022; yet the parties continue to profit from the arrangement without disclosing it.

63.    In February or March 2022, a Jackson Walker partner received information from a colleague that, despite Freeman's prior representations, her relationship with Jones was anything but over. Upon questioning, Freeman claimed that the relationship had been "rekindled." Shockingly, Jackson Walker again took no action to disclose the relationship in any proceeding despite advice from ethics counsel at Holland & Knight that the relationship *should* be disclosed. Jackson Walker initially worked with their

---

2021) (application to employ Jackson Walker LLP as special counsel); *Katerra Inc.*, No. 21-31861, ECF No. 289 (Jun. 29, 2021) (application to employ Jackson Walker as co-counsel and conflicts counsel for the debtors and debtors in possession); *Basic Energy Services, Inc.*, No. 21-90002, ECF No. 809 (Dec. 13, 2021) (Jackson Walker's application as counsel for the debtors); *Strike LLC*, No. 21-90054, ECF No. 363 (Jan. 6, 2022) (Jackson Walker's application as co-counsel and conflicts counsel); *Seadrill New Finance Limited*, No. 22-90001, ECF No. 94 (Feb. 8, 2022) (Jackson Walker application for co-counsel and conflicts counsel); *4E Brands Northamerica LLC*, No. 22-50009, ECF No. 72 (Mar. 24, 2022) (Jackson Walker application as counsel for debtor and debtor in possession); *Sungard AS New Holdings*, No. 22-90018, ECF No. 211 (May 10, 2022) (Jackson Walker application for co-counsel and conflicts counsel to the debtors); *LaForta Gestao e Investments*, No. 22-90126, ECF No. 67 (Jul. 15, 2022) (Jackson Walker application for counsel for debtor and debtor in possession); *see also* Alexander Gladstone, Texas Law Firm Didn't Disclose Possible Conflict Involving Bankruptcy Judge, The Wall Street Journal (Oct. 27, 2023), accessible at https://www.wsj.com/articles/texas-law-firm-didnt-disclose-possible-conflict-involving-bankruptcy-judge-3761ffe0, last visited Jun. 12, 2025.
[83] *See In re Strike, LLC, et al.*, 21-90054, ECF No. 363 Ex. B at ¶¶ 4–5, 15, Schedule 1 (Jan. 6, 2022); *In re Katerra Inc., et al.*, 21-31861, ECF No. 289 Ex. B at ¶¶ 4–5, 15, Schedule (June 29, 2021).

expert and Freeman's attorney (Kirkendall) on an appropriate disclosure because "[t]he law firm knew the status quo was not appropriate[.]"[84]

64.    In an April 2022 email exchange with fellow Jackson Walker attorneys, managing partner Wade Cooper described some of the firm's concerns over questions that would follow any disclosure:

> How are Liz, Judge Jones, and the Firm going to address press and other inquiries that may follow the making of such a disclosure, e.g., "what is meant by 'close personal relationship'"?, Does this disclosure mean that Mr. Van Deelen's allegations of a romantic relationship were correct? Or that such a relationship now exists? If so, why wasn't this disclosure made earlier? Has this relationship been a factor, or the driving factor, in the rise to prominence of JW's bankruptcy practice in Houston?[85]

65.    Rather than face these uncomfortable questions and jeopardize Jackson Walker's profitable bankruptcy practice, the firm decided to continue hiding the relationship. Besides collaborating with Freeman and ethics counsel, Jackson Walker (through Cavenaugh) actually met with Jones himself regarding proposed disclosures. According to Jackson Walker, during that meeting Jones "insinuated that he was unhappy with JW's insistence on a full and complete disclosure and Ms. Freeman's exit."[86] According to Jackson Walker, Jones handed Cavenaugh his own proposed disclosure, said it

---

[84] *In re Neiman Marcus Group LTD LLC, et al.*, ECF No. 3234, ¶ 50.
[85] *In re Professional Matters Concerning the Jackson Walker Law Firm*, 23-00645, ECF No. 600-6 PDF page 178.
[86] *In re Neiman Marcus Group LTD LLC, et al.*, ECF No. 3234 ¶55.

"need[ed] to make this happen[,]"[87] but the firm found it to be "insufficient, inadequate, and misleading[.]"[88] Indeed, Jones' proposed disclosure provided no discussion of the intimate, live-in relationship, and deceptively buried disclosure of a "close personal relationship" with Freeman by surrounding it with similar discussion of Jones' and Judge Isgur's social relationships with other Jackson Walker attorneys.[89] Dissatisfied with the lack of completeness or candor in Jones' proposed disclosure, Jackson Walker opted to disclose nothing.

66.    Jackson Walker's ethics counsel issued a memorandum on May 31, 2022 advising it to disclose the relationship.[90] According to Jackson Walker's expert, "[i]t is believed that several JW attorneys in the bankruptcy group have known about the Relationship for some time, but have failed to make any disclosures on the record that JW has a conflict in appearing before Judge Jones."[91] He concluded that "[b]ecause of the Relationship, JW is required to disclose the Relationship to both its clients with cases before Judge Jones as well as on the record in those cases before Judge Jones."

67.    Ultimately, despite Jackson Walker's recognition and its own ethics counsel's emphatic explanation of the need for "full and complete" disclosure, Jackson Walker never disclosed anything. Nor did any Defendant. By June 2022, it "believed Ms.

---

[87] *Id.* ¶56.
[88] *Id.* ¶57.
[89] *Id.* ¶56.
[90] *Old Copper*, No. 25-02002, ECF No. 12-12 at p. 26–30.
[91] *Id.* ECF No. at 29.

Freeman's departure from the law firm was the only path forward."[92] Accordingly, Jackson Walker and Freeman began a months-long process of negotiating Freeman's departure from the firm, presumably to bury the firm's connection to the relationship and avoid disclosure.[93]

### IX. Formed in 2006, GWG grows into a $2 billion company.

68.    GWG was organized in February 2006 and incorporated in Delaware in 2008. It was formed for the purpose of buying and holding life settlements—life insurance policies purchased from named insureds and held until maturity. Initially, GWG acquired a face amount of approximately $200 million of such policies from an insurance company. GWG sought to grow its portfolio by raising funds through the capital markets via both equity and debt. GWG accomplished this first through equity offerings, and later, in 2012, by its first public debt offering.

69.    GWG's life settlements portfolio grew in face amount and carried life

---

[92] *Neiman Marcus*, ECF No. 3234 ¶53.

[93] Even then, this "separation" was window-dressing to create an appearance of propriety; a fig-leaf for an improper relationship that Jackson Walker knew about and wanted to continue for its own profit. Freeman's firm website (which now appears to be deactivated) does not identify a physical address, listing a P.O. Box in downtown Houston at a U.S. Post Office location. *See* https://lizfreemanlaw.com/contact.html, last visited Dec. 4, 2023. Even after the so-called "separation," Freeman continued to use Jackson Walker offices to conduct work, collaborate with Jackson Walker lawyers, and even held mediations there through at least March 2023. *See* Indap, *supra* n. 32 ("After leaving Jackson Walker, Freeman established the Law Office of Liz Freeman. Business was immediately brisk; Jackson Walker has hired her as a contract attorney or co-counsel on multiple occasions in 2023, even letting her occasionally use a conference room, according to a person familiar with the matter."). Freeman, Jackson Walker, and Judge Jones all profited from their secret, all at the expense of creditors, shareholders, and others, not to mention the integrity of the United States bankruptcy system.

expectancies that could range from five to almost forty years, that being the duration GWG would need to pay policy premiums and manage the portfolio before it realized all the cash from all policies. While credit risk was practically non-existent (with the policies underwritten by highly rated insurance companies), the maturity of policies was a complex variable to account for and required most of management's time.

70.     After 2011, growth in GWG's capital base came primarily from the sale of bonds. GWG issued L Bonds, which again are high yield, privately issued debt instruments to raise capital and purchase life insurance policies in the secondary market. L Bonds were registered, but not publicly traded. Consequently, investors had to hold the bonds until maturity. The life policy assets were successfully growing but were mostly illiquid, so the bonds became GWG's primary source for working capital. Their proceeds were used to run the business, including paying operating expenses, premiums on policies, paying principal and interest on maturing bonds, and purchasing new policies. All these objectives were disclosed in the company's public registration statements and its initial public debt offering.

71.     GWG built a network of brokerage firms to sell its bonds. Starting with just a few firms, by 2021 GWG had 145 brokerage firms approved to sell its bonds; although a dozen firms sold 90% or more. All these financial services companies had undertaken extensive due diligence of GWG. This process of growing the brokerage network was complex, time-consuming and expensive to build. GWG had to maintain its SEC disclosures on a timely basis to maintain continuity of information for investors. It took

over twelve years and the retention of well-respected accounting and law firms to build this network for sale of the L Bonds, all while providing timely and regular disclosures on which investors could rely.

72.     In April 2019, GWG hired a new CEO, Murray Holland, who had worked as an advisor to Beneficient Company Group, L.P ("Ben"), a company in which GWG made a large investment in 2018. At that time, GWG purchased approximately $600 million of Ben equity and debt. The companies were well postured for a symbiotic relationship as GWG was in the business of owning alternative assets and Ben specialized in lending against alternative assets.

73.     After that investment, GWG continued raising capital from the sale of bonds. All bonds were paid in full and on time. By then, the face value of GWG's life policy portfolio had grown to nearly $2 billion and cash flow from the portfolio was expected to extend beyond 2040. Both GWG's business lines were complex to manage and required many inside and outside experts.

74.     Ben's partnership accounting raised complex issues; particularly, the accounting presentation of loans made and to be made by Ben. On February 10, 2021, GWG management determined to request a ruling on two accounting questions from the Officer of Chief Accountant of the SEC, which represented that decisions were generally rendered 1–3 weeks after request. The February timing of the request afforded GWG ample time to adjust its financial reporting in advance of its upcoming March 31 Form 10-K filing date. But OCA did not issue its opinion on the request for almost six

months, finally rendering its advice in late July 2021, long after the March Form 10-K was due.

75.    Because the company's financial statements had become "stale" while waiting for the OCA opinion, GWG could not file a Form 10-K until new financial statements were made public. As a result, GWG determined to suspend its issuance of L Bonds for over six months. As cash from bond sales stopped flowing, GWG pivoted to use its cash reserves during this period, resulting naturally in a reduction of those reserves while a revised audit was prepared. The company issued a Restatement of its Consolidated Balance Sheet in November of 2021 consistent with OCA comments. This change affected presentation only and did not change net assets, did not change income to common shareholders, and did not negatively impact the value of the assets or the creditworthiness of GWG. Once the Restatement was issued and a new Form 10-K was filed, the company immediately began the process to resume the issuance of new bonds to raise cash for operations and debt service.

## X.    A rogue SEC investigation results in the need for GWG to pursue Chapter 11 bankruptcy, unwittingly making it a victim of the Enterprise.

76.    Meanwhile, in the fall of 2020, the SEC unexpectedly commenced a wide-ranging investigation of GWG and its principals. Although the genesis seemed to be accounting reviews, the focus of the investigation was never clear but covered everything about the company. GWG was forced to retain the services of additional lawyers and accountants. Subpoenas were issued and GWG cooperated, with its officers and directors providing

the SEC over 100,000 pages of documents. Over the four-year investigation, GWG spent around $46 million in legal, accounting, and other professional fees to comply with subpoenas. Certain officers and directors testified – some multiple times. As an example of the abnormal extent of the investigation, even though CEO Holland had, at the time, only been with GWG for a year, the SEC demanded ten years of his personal bank statements and all his social media data.

77.     In the Spring of 2021, despite a decade-long history of selling bonds and making timely bond payments, SEC staff attorney Scott Tandy informed GWG's attorneys that he had "determined" GWG was essentially running an illegal "Ponzi scheme," an unsupportable conclusion allegedly based on the company's use of L Bond proceeds to service existing debt from previously issued bonds, while ignoring GWG's substantial assets.

78.     The SEC's "Ponzi scheme" conclusion was based solely on GWG's use of L Bond proceeds to retire existing debt, without consideration of GWG's substantial business operations and the enormous value of the assets shown on its financial statements. And the issuance of corporate bonds to retire existing debt is a time-tested and nearly universal corporate practice. Like a homeowner refinancing a mortgage to pay off an existing mortgage, approximately 70% of public companies issuing corporate bonds in the U.S. use this very strategy. SEC attorney Tandy's fundamental misunderstanding of these practices—and the concept itself of a "Ponzi scheme"—is difficult to square with the agency's purported expertise in corporate finance. Although

that fateful allegation was wildly misplaced, it would ultimately result in the need for GWG's reorganization under Chapter 11.

79.     But even when the SEC may have legitimate reason to suspect a company is engaging in violative practices, the agency has a singular, legally-sanctioned tool at its disposal—going to court to prove its case. Instead, Tandy and other SEC attorneys in the Chicago Regional Office waited as GWG resolved its accounting dispute and issued the November 2021 Restatement, knowing that GWG would quickly resume its L Bond sales. Then, rather than pursuing legal action, they began threatening the broker-dealers who sold GWG's bonds to the investing public, exploiting the SEC's leverage as the broker-dealers' regulator, to destroy the market for the bonds. These acts had the intended effect of quickly suffocating and driving GWG to an otherwise unnecessary bankruptcy filing.

80.     In November 2021, Tandy demanded GWG provide ten days' advance notice of any resumption in L Bond sales. Although this was an unauthorized request, GWG management capitulated, notifying Tandy in late November 2021 that L Bond sales would recommence in ten days.

81.     During that ten-day window, SEC attorneys called and emailed the top twelve brokerage firms which marketed GWG's L Bonds. Those firms historically accounted for over 90% of L Bond sales. The SEC attorneys levied a list of demands that would make it impossible for a brokerage firm to continue selling the bonds. They "advised" the brokers to avoid selling GWG bonds and threatened that if these brokers sold any

more GWG L Bonds the brokers themselves would be placed under investigation, would be required to disclose amounts and identities of the brokers' customers to the SEC, and those customers purchasing GWG's L Bonds would also be placed under investigation.

82. The lengths that the SEC officers went to in their investigation caused serious disruption to GWG's business. For example, in November 2021, the SEC issued a subpoena requiring one brokerage firm to disclose all GWG L Bond trading activity on a daily basis—what that brokerage firm described as an "unusually onerous" requirement. Nevertheless, in light of the subpoena and Tandy's threats, it never resumed sales of GWG L Bonds.

83. Likewise, another firm received a telephone call from Tandy indicating that if it resumed the sale of GWG L Bonds, it would be subpoenaed to report daily all activity and documentation in connection with the purchase or renewal of GWG's L Bonds. Tandy followed through on that threat. Faced with this Hobson's Choice, the firm capitulated and declined to ever sell GWG's L Bonds again.

84. A third firm had long sold GWG's L Bonds, considering them such an "attractive and reliable financial product because GWG had a consistent record of performance." That firm received a threat from Tandy and another SEC lawyer in late 2021, issuing similar "demands and threats" resulting in that firm declining to resume the sales of GWG's L Bonds. The firm's general counsel stated that "it was clear to me that the SEC attorney was trying to stop sales of [GWG's] L Bonds" and observed that "the

SEC's cutting off the cash flow was the key event that led to the GWG bankruptcy."

85.    A fourth firm faced with the same threats was advised by Tandy that it could simply "disregard all these requirements if [it] committed to cease selling the L Bonds." This firm's general counsel recognized that the firm "had no practical choice but to cease the selling of GWG L Bonds…."

86.    A fifth firm had pending customer orders for L Bonds in the aggregate amount of approximately $1 million and sold approximately $1.5 million in December 2021. However, Tandy contacted the firm in January 2022 levying the same threats. According to the firm's CEO, "because of these statements by Tandy and the issuance of the subpoena, [the firm] decided that it could not afford to continue to offer the purchase of GWG L Bonds to our customers," and indeed the firm "never again sold any GWG L Bonds." This despite comments from the firm's CEO that "GWG had a flawless history of performance for a dozen years," having "never missed an interest or redemption payment…."

87.    Other firms received similar communications from the SEC and consequently never sold L Bonds again. The calls and threats continued, through the end of December and into early January 2022. All in all, there were at least 13 brokerage firms contacted and given similar threats. This widespread overreach impaired sufficient bond sales needed to provide the cash flow that GWG required to continue operations.

88.    When it attempted to resume its L Bond sales at the end of 2021, GWG had expected to sell in excess of $50 million in L Bonds during December 2021 alone. As a

result of the SEC investigation and threatening phone calls, however, the vast majority of these twelve brokerage firms sold *no* L Bonds in December 2021 or ever again.

## XI.   The SEC investigation was fraught with aggressive overreach beyond its statutory authority.

89.    The SEC's enforcement power is strictly limited to filing enforcement actions against suspected violators. *See* 15 U.S.C. §78u(d)(1). The SEC is decidedly *not* authorized to pick "winners" and "losers" by choosing to arbitrarily attack an ongoing company via threats, coercion, and extortion. Like all government agencies, the SEC is required to operate within its statutory boundaries rather than run roughshod over the rights of the citizenry.

90.    With GWG, the SEC did just that, targeting a public company and the investments of approximately 27,000 bondholders—the very people the agency is charged with protecting. SEC staff attorneys failed to follow the statutorily-prescribed procedures. Simply put, the SEC—acting outside its authority—rendered GWG insolvent by starving the company of capital, which quickly forced the company into bankruptcy.

## XI. The SEC dismisses the investigation.

91.    After being presented with affidavits from the brokerage firms on the SEC actions, the SEC's leadership ultimately dropped the investigation as to GWG and its officers and directors with no enforcement action recommended on July 1, 2024. After four years, the investigation cost approximately $46 million of company funds,

materially impacting the interests of the bondholders. And by the time the SEC dropped the investigation, GWG had been cannibalized into oblivion, as outlined herein, by a corrupt bankruptcy judge, his paramour, and her former law firm, leaving the company and its hapless bondholders with no hope for any meaningful recovery.

### XII.   GWG files for bankruptcy at the height of the Enterprise and Judge Isgur is assigned the case.

92.    The saga of the SEC investigation left GWG a distressed entity, making it an ideal victim for the Enterprise. GWG first contacted Mayer Brown, LLP, to serve as lead counsel in a proposed bankruptcy restructuring. Despite being a Dallas-headquartered company, Mayer Brown partner Tom Kiriakos insisted to the GWG Board that they file bankruptcy in the Southern District of Texas and hire Jackson Walker as local counsel.

93.    GWG and two affiliates filed Chapter 11 bankruptcy on April 20, 2022.[94] The rogue SEC actions that led GWG to bankruptcy were described in the Declaration of Timothy Evans, Chief Financial Officer of GWG Holdings, in Support of First Day Motions.[95] Here, the Enterprise diverges slightly from its pattern—and for reasons that will be as apparent as they are appalling. Unlike many other bankruptcy cases caught up by the Enterprise, this case was assigned to Jones' mentor, former partner, and longtime friend Judge Marvin Isgur.

---

[94] *GWG*, No. 20-90032, ECF No. 1.
[95] *GWG*, No. 20-90032, ECF No. 17.

94.     On May 11, 2022, Mayer Brown applied to be retained as lead debtor's counsel and on May 19, 2022, Jackson Walker applied to be retained as local and conflicts counsel at a time when it indisputably knew about the intimate nature of the Jones-Freeman relationship. No mention of the relationship was ever made to GWG management or Board. Jackson Walker attorney Peguero submitted a verified statement of disinterestedness on May 19, 2022, in support of the application without disclosing the Jones-Freeman relationship. Peguero's declaration specifically acknowledged a continuing duty to update and supplement with newly discovered or developed conflicts. Jackson Walker's application was approved on June 15, 2022. Jackson Walker submitted a supplemental declaration on October 6, 2022, again through Peguero, this time specifying that no conflicts were identified with "U.S. Bankruptcy Judges (S.D. TX – Houston Division)."[96]

95.     As the GWG proceeding progressed, Jackson Walker and Freeman were negotiating her departure from the firm to seek to avoid disclosure requirements and to avoid publicizing Jones' and Freeman's relationship. Freeman officially left Jackson Walker on December 1, 2022,[97] but was nearly immediately retained for work on GWG in her solo firm role as a contract attorney. The retention order appointing Jackson

---

[96] *Id.* ECF No. 829, Schedule 1(n).
[97] *See Professional Fee Matters*, No. 23-00645, ECF No. 600-8 at PDF pp. 196–98. The withdrawal agreement provides that "both before and after December 1, 2022, you, together with Bruce Ruzinsky and/or Matt Cavenaugh, may discuss with current and prospective clients the possibility of your working as co-counsel with JW following your withdrawal, so that your continued involvement might be as seamless as possible." *Id.* at PDF p. 198.

Walker provided that the firm "shall ensure that" any contract attorneys it hires would be subject to all of the same conflict checks and disclosures.[98] No disclosures filed by Jackson Walker or the Law Office of Liz Freeman ever identified Freeman's relationship with Jones. Likewise, no disclosures were made to any officer or director of GWG. Indeed, they protected against this by including a confidentiality provision in the termination agreement providing "all preceding discussions between you and JW, regarding your relationship with Judge Jones ("Covered Matters") are confidential and shall not be disclosed or revealed to any third party, except as provided below."[99]

96.    During 2022, GWG prepared a reorganization plan whereby the bonds would be converted into preferred stock with the same yield and preference as the existing bonds. Existing preferred stock and common stock would be subordinate to the new preferred stock. GWG Management projected that GWG investors and bondholders would retain all of the value of their investment. Newly elected director and Chief Restructuring Officer Jeff Stein submitted the reorganization as GWG's proposed plan for exiting bankruptcy.

97.    In November 2022, the existing management who had created and sponsored the reorganization plan that would retain 100% value for the bondholders were forced

---

[98] *GWG*, No. 20-90032, ECF No. 410 at ¶4.
[99] *Old Copper*, 25-02002, ECF No. 12 at 16; *see Professional Fee Matters*, No. 23-00645, ECF No. 600-8 at PDF p. 197.

to resign during a board meeting managed by Jackson Walker and Freeman. Notably, this coup was orchestrated essentially on the eve of mediation efforts.

## XIII. Jackson Walker moves to appoint Jones as mediator while Freeman is still at the firm without anyone disclosing the Jones-Freeman relationship.

98.     Although Jones was not the judge overseeing the GWG bankruptcy, the Enterprise could not resist petitioning for his involvement, particularly at the time Freeman was preparing to part ways—at least on paper—with Jackson Walker and begin her solo practice. On November 30, 2022, the day before Freeman officially left the firm and shortly after GWG's pre-petition management was squeezed out, Jackson Walker filed a motion to appoint Jones as a judicial mediator in the GWG bankruptcy. Despite the admitted knowledge of a continuing relationship and months of pearl clutching and negotiations between Jones, Jackson Walker, Freeman, and her attorney Kirkendall, no mention of the continuing relationship was raised in the motion to appoint Jones.[100] Nor did Jackson Walker update its declaration of disinterestedness. At a hearing on the mediation motion, Freeman vocally advocated for Jones' appointment,

---

[100] According to Harvard bankruptcy professor Jared Ellias, this conflict should have been disclosed "to protect the integrity of the mediation process." Alexander Gladstone, Trustee Assignment Went to Bankruptcy Lawyer Who Lived With Mediating Judge, Wall Street Journal (Nov. 3, 2023), accessible at https://www.wsj.com/articles/trustee-assignment-went-to-bankruptcy-lawyer-who-lived-with-mediating-judge-f495b362?gaa_at=eafs&gaa_n=ASWzDAgiV6ndvGhoEX55-ogXwlHNk0dok3FKNPSnXVuOlR3V6OVIVVrr3qcW&gaa_ts=684b4562&gaa_sig=3jttfHInFY9za1DByrfufhUamIj1nLf-k46l3i3oKh-xvl94LZXb5oOfSAnrvo-E8wBEFuNSaZb_2t8cB8TmgA%3D%3D (last visited Jun. 12, 2025).

stating that she "take[s] comfort in the fact that we have jones as our mediator, because I know that he is keenly aware of those issues and I think will help keep everybody within the guardrails that would be appropriate."[101] Judge Isgur appointed Jones mediator on January 5, 2023.[102]

99.     Porter Hedges, appointed as co-counsel for the Bondholder Committee on July 5, 2022, also knew of the Jones-Freeman relationship when Jackson Walker moved for Jones to serve as mediator, but did not disclose the relationship in the bankruptcy or inform the bondholders whom it represented.

### XIV. Jones announces GWG will be liquidated.

100.    The mediation commenced on January 29, 2023, in New York City.[103] At that time, all parties expected to discuss the reorganization plan and hopefully find a path for its implementation. During the first few months of the bankruptcy, GWG prepared a reorganization plan whereby bonds would be converted to preferred stock with the same yield and preference as the existing bonds (a full recovery), and the pre-existing preferred stock would be subordinate to these converted bonds. This plan would have also provided immediate liquidity to the bondholders who were thus far holding relatively illiquid bonds. The plan would also pave the way for the development of two

---

[101] *GWG*, No. 20-90032, ECF No. 1272 at 23
[102] *GWG*, No. 20-90032, ECF No. 1323 at 2.
[103] Freeman both participated and billed on behalf of the debtor. In its interim fee applications, Jackson Walker submitted billing from the Law Office of Liz Freeman, including tens of thousands of dollars to Freeman for days of mediation as well as expenses for travel to New York and hotel stays. *See GWG*, No. 20-90032, ECF No. 2158 at PDF pp. 179–80, 195.

expansions: large-scale management of life settlement portfolios for pension funds and a Bermuda life insurance company that would operate as a global re-insurance company. Although pre-bankruptcy management was squeezed out by Jackson Walker in November 2022 with a range of threats, the newly elected director, Jeff Stein, was appointed Chief Restructuring Officer and put forward this reorganization plan.

101.    The GWG saga took a surprising and unforeseen turn (at least to the debtors and other interested parties). Though mediation was scheduled for two days, it lasted less than four hours. There was no meaningful discussion of the reorganization plan. Jones swept in like a firestorm, informing the parties that the GWG proceeding was no longer going to be directed toward the goal of reorganization. Instead, GWG was going to be liquidated. Before any party could inquire or argue in response, Jones advised that the judge overseeing the GWG case, Judge Isgur, was an old, dear friend who would do whatever Jones suggested. The dismayed parties left that afternoon knowing there was no longer going to be any chance of a full recovery for the bondholders, investors, of GWG's promising business prospects. Instead, there would be no Chapter 11 reorganization, nor a formal conversion to a Chapter 7—but a new form of liquidation.

102.    Judge Jones' failure to disclose his intimate relationship with Freeman was a non-judicial, administrative matter required of all individuals and parties to the bankruptcy proceeding. His participation in the enterprise consisted of other non-judicial acts, including orchestrating a scheme to ensure that he would either preside over or mediate mega-bankruptcies filed by Jackson Walker, while maintaining the intimate relationship

with Freeman, which allowed him, Jackson Walker, and Freeman to profit and cement their place as stalwarts in mega-bankruptcy practice. Jones acted in the absence of jurisdiction by presiding over this case when circumstances required his dismissal.

### XV.    Jones, Freeman, and Jackson Walker arrange for Freeman to serve in the lucrative position of Wind Down Trustee.

103.    As if Jackson Walker's machinations to have Jones appointed judicial mediator were not galling enough, Jones' insistence on liquidation was followed by the appointment—as one of Jones' personal suggestions—of none other than Freeman as the Wind Down Trustee for the liquidating estate. Jackson Walker, Freeman, and Jones engineered an immensely valuable golden parachute for Freeman to launch her new solo career, allowing her to collect $100,000 per month for the first six months and $50,000 per month thereafter.[104]

104.    As Jones predicted, the settlement he mediated resulted in the plan that was confirmed by Judge Isgur. The plan provides for the creation of two trusts, the Wind Down Trust and the Litigation Trust. Freeman is the trustee of the Wind Down Trust, which is the beneficiary of the Litigation Trust. The terms of the Wind Down Trust Agreement specifically impose a fiduciary duty upon Freeman.[105] The plan was ultimately confirmed by the Court on June 20, 2023, approving (among other things) Freeman to serve as Wind Down Trustee.[106]

---

[104] Hals, *supra* n. 47.
[105] *GWG*, No. 22-90032, ECF No. 1887 at ¶1.4.
[106] *Id.* ECF No. 1952.

105.    Although Ms. Freeman was a partner at Jackson Walker at the time it moved to appoint Jones, and later co-counsel with the firm working in tandem on behalf of the debtor, there was no disclosure to this Court of the Jones-Freeman relationship. Nor was there any disclosure when Jackson Walker and Jones decided she would be made Wind Down Trustee under the Plan. Again, neither Jackson Walker, nor Freeman, nor Judge Jones disclosed the intimate relationship. Nor did Jackson Walker amend its declaration of disinterestedness supporting appointment, which in the schedule of searched parties, listed "N/A" for the section concerning Bankruptcy Judges for the Southern District of Texas.[107]

### XVI. Freeman commences a fire sale of GWG's assets.

106.    As Wind Down Trustee, Freeman commenced irreparable damage to GWG as well as other business entities. Upon filing bankruptcy in April 2022, GWG's had two primary assets—the life settlements portfolio and equity holdings and interests in Beneficient ("Ben"), another company involved in the life settlements industry. The life settlements portfolio was valued at nearly $800 million and the Ben holdings were valued at approximately $1.7 billion. These assets were sufficiently valued to return full value to the bondholders if professionally and appropriately managed. However, with all of the pre-bankruptcy management squeezed out, there was no one at the helm who knew how to manage GWG's assets. On June 8, 2023, Ben went public with a market

---

[107] *GWG*, No. 20-90032, ECF No. 828 at schedule 1(n) (pdf p. 20).

capitalization of $4 billion and a stock price of $10 a share. This would value the 170 million Ben shares owned by GWG at a value of $1.7 billion. This is what Freeman inherited as Trustee and fiduciary to the bondholders. Instead of protecting GWG's largest asset, the value of the Ben stock, Freeman immediately began placing GWG's Ben shares on the nascent public market—filing an emergency motion to do so the very day of Ben's IPO—broadcasting to the investing public in neon lights that Freeman was planning to cut the legs out from under Ben and sending GWG's largest asset into the gutter. It would be akin to cutting off their nose to spite their face if the quick cash grab had not been their very intent. In violation of stock lock up agreements between GWG and Ben and in contradiction to SEC regulations Freeman began recklessly unloading Ben stock. Typically, large shareholders might sell 1-2% of daily trading volume to minimize market impact and, even then, must file SEC forms when selling significant portions of their holdings. Under SEC Rule 144, an affiliate (which GWG was for Ben) would be limited to selling 1% of outstanding shares every three months or the average weekly trading volume during the preceding four weeks. For someone with 90% ownership, it would likely take years to completely divest without significantly impacting the stock price. Freeman dumped 90% of Ben's stock in less than a year.



107.　Freeman's actions in rapidly and recklessly unloading massive amounts of Ben

stock in batches had the effect of both tanking the stock price, but also further devalued

the remaining shares held by GWG in the meantime. On top of the sell-offs resulting

in declining stock price, every quarter that Ben stock declined, it had to write off a

percentage of goodwill, turning into quarterly loss numbers, and scaring investors who

might have been purchasers of the Ben stock being sold off by Freeman. She had set a

chain reaction in motion that had no exit ramps until she had dumped every last Ben share GWG held.

108.    To make matters worse for the Bondholders, Freeman refused to talk with market professionals or Ben management to strategize how to liquidate such significant and concentrated stock holdings without diluting the market or devaluing GWG's assets. In fact, Freeman wholly refused to entertain offers from Ben to buy back its stock at higher-than-market prices or even meet with Ben's management. Instead, Freeman sent an agent to present a proposal to Ben's board that Ben's management resign and wholly redirect its own business practices in violation of SEC regulations requiring large shareholders (like GWG was of Ben) to file plans with the SEC before presentation to the Board.

109.    Freeman and the Enterprise likewise took the $760 million life settlements portfolio and $33 million cash (against only $382 million in senior debt) and, with no industry knowledge and having jettisoned all GWG's experienced pre-petition management, wasted away GWG's assets, increasing debt by $277 million and realizing only $10 million through the sale of the life settlements portfolio. The only benefit of operating in this fashion was to obtain quick and easy cash to pay the fees for Freeman and other bankruptcy professionals—while the bondholders, creditors, and other interested parties were lucky to receive little if anything. On her way down from Jackson Walker's ivory tower in her golden parachute, the Enterprise ensured Freeman would be endeared to bankruptcy professionals as she settled onto her own two feet in her

new "independent" solo practice. GWG's assets were doled out like monopoly money to the various bankruptcy professionals: $21.5 million to Akin Gump;[108] $28 million to Mayer Brown;[109] $17 million to Katten;[110] $2 million to Porter Hedges;[111] $1 million to Jackson Walker,[112] and more than $1 million in fees to Freeman (both as Wind Down Trustee and as co-counsel for the Debtor-in-Possession).

110.　Starting with approximately $2 billion in assets, Defendants have drained the GWG estate completely. Now the only hope to distribute anything to the bondholders and other stakeholders is pursuing adversary litigation of dubious merit.

### XVII. Jackson Walker moves for fees, including fees for Freeman's work on the mediation before Jones.

111.　Jackson Walker submitted three interim fee applications in October 2022,[113] March 2023,[114] and June 2023.[115] Judge Isgur awarded these fees in orders dated November 8, 2022,[116] May 1, 2023,[117] and June 29, 2023.[118] Jackson Walker filed a final fee application in August 2023.[119] In this final fee application, Jackson Walker moved

---

[108] *GWG*, No. 20-90032, ECF No. 2283.
[109] *Id.* ECF No. 2281.
[110] *Id.* ECF No. 2299.
[111] *Id.* ECF No. 2396.
[112] *Id.* ECF No. 2158 ($861k in fees and expenses in interim awards, $450k in fees and expenses outstanding to which UST has objected).
[113] *Id.* ECF No. 829.
[114] *Id.* ECF No. 1521.
[115] *Id.* ECF No. 1878.
[116] *Id.* ECF No. 1046.
[117] *Id.* ECF No. 1724.
[118] *Id.* ECF No. 2011.
[119] *GWG*, No. 20-90032, ECF No. 2158.

for $1.3 million in attorneys' fees and expenses, for an aggregate total of $2,172,487.69 in fees and expenses across all applications.[120] This included $23,415 for time billed by Freeman while a partner at Jackson Walker.[121] While working under the Office of Liz Freeman, she billed $205,207.78 in fees and expenses between December 2022 and July 2023, which Jackson Walker ostensibly paid and submitted as expenses.[122] Judge Isgur postponed ruling on these fees pending an objection raised by the U.S. Trustee. Freeman continues to work and bill in the GWG Holdings case.

112.    On September 5, 2023, after dissolution of the Bondholder Committee, the five individuals who made up the committee mailed a letter to the Bankruptcy Court complaining of excessive professional fees.[123] This letter was not filed by counsel for the Bondholder's Committee; it was mailed by the former individual constituents of the dissolved committee. The complaint had the effect of placing Freeman in the position of having to negotiate fee reductions (ranging from 2–5%) from the various

---

[120] *Id.* ECF No. 2158 at 2 (listing $1,311,282.28 as total fees requested in application and $861,205.41 as total fees and expenses awarded in all prior applications).

[121] *Id.* ECF No. 2158 at PDF pp. 1, 135, 137, 139–40, 144–45, 275.

[122] *Id.* ECF No. 2158, Ex. 3 PDF p. 273. Similarly, "[o]n November 11, a month after her relationship with Jones was [publicly] revealed, Freeman submitted a fee request for $257,000 for work on IEH Auto Parts' bankruptcy. [Judge] Isgur, overseeing the case, assigned Jones to lead a New York City mediation session in April for which she billed her time at $750 per hour, plus travel expenses. Her application attested to her 'disinterestedness' — and still made no mention of her relationship with David R. Jones." Indap, *supra* n. 32; *In re IEH Auto Parts Holding LLC, et al.*, No. 23-90054, ECF No. 181 (application to appoint Jackson Walker as counsel); ECF No. 183 (application to employ the Law Office of Liz Freeman, PLLC as Co-Counsel and Conflicts Counsel); ECF No. 356 (order appointing Judge Jones as mediator); ECF No. 991 (final fee application for The Law Office of Liz Freeman seeking $255,150 in fees, including fees and expenses from mediation before her intimate partner).

[123] *Id.*, ECF No. 2182.

professionals in the bankruptcy.[124] From Plaintiffs' counsels' review of the docket, however, it does not appear that Freeman negotiated a reduction or return of any fees from either Jackson Walker or herself.

## XVIII. Jones finally admits to the intimate relationship with Freeman.

113.    In October 2023, after a lawsuit filed by Van Deelen, Jones finally admitted to the press his intimate relationship with Freeman and that he has shared a home with her for years.[125] Remarkably, he maintained he had no duty to disclose because the couple was unmarried and, according to him, no economic benefit flowed to him.[126] In fact, while Jones was awarding Freeman fees, she was sharing household expenses. According to Jones, he and Freeman agreed years before that she would never appear in his courtroom.[127] This too was fiction. Freeman billed for appearances before him.[128] And she billed for participating in mediation in the GWG bankruptcy with Jones serving as the mediator.[129] Ultimately, Jones felt there was no need to disclose because, in his words, "I just simply think I'm entitled to a certain degree of privacy."[130]

---

[124] *GWG*, No. 20-90032, ECF No. 2256.
[125] Alexander Gladstone & Andrew Scurria, Bankruptcy Judge Jones Named in Lawsuit Over Romantic Relationship with Local Lawyer, Wall Street Journal Pro, (Oct. 7, 2023).
[126] *Id.*
[127] *Id.*
[128] *See, e.g., In re Bouchard Transp. Co.*, 20-34682, ECF No. 686 at p. 51 of PDF (Freeman billing for "attend[ing] the status conference" on November 17, 2020), at p. 69 of PDF (Freeman billing for "attend[ing] the sale hearing" on December 2, 2020).
[129] *GWG*, No. 22-90032, ECF No. 2158 at PDF pp. 179–180, 195.
[130] *Id.*

## XIX. Judge Jones resigns after the Fifth Circuit finds "probable cause to believe [he] engaged in misconduct[.]"

114.    On October 13, 2023, Judge Priscilla Richman of the Fifth Circuit entered a written order identifying a complaint against Jones.[131] Judge Richman found "probable cause to believe that misconduct by Jones has occurred."[132]

115.    Judge Richman observed that "Judge Jones is in an intimate relationship with Elizabeth Freeman. It appears that they have cohabited (living in the same house or home) since approximately 2017."[133] She further recognized that Jones had awarded substantial attorneys' fees payable to Jackson Walker for services performed by Freeman.[134] Even in cases in which it does not appear Freeman provided legal services or advice, "there is a reasonable probability that Elizabeth Freeman, as a partner in that firm, obtained a financial benefit from, or had a financial interest in, fees approved by Judge Jones.[135]

116.    Judge Richman disagreed that disclosure was unnecessary because Jones and Freeman were unmarried. Considerations for recusal "applicable to a judge's spouse

---

[131] Complaint Identified by the Chief Judge of the Fifth Circuit Court of Appeals Against United States Bankruptcy Judge David R. Jones, Southern District of Texas, Under the Judicial Improvement Act of 2002, Complaint No. 05-24-90002 (5th Cir., Oct. 13, 2023).
[132] *Id.* at 1.
[133] *Id.*
[134] *Id.* at 2.
[135] *Id.*

should also be considered with respect to a person other than a spouse with whom the judge maintains both a household and an intimate relationship."[136]

117.    On October 15, 2023, two days after the Fifth Circuit's written order finding probable cause of misconduct, Judge Jones submitted his resignation, effective November 15, 2023.

### XX. The U.S. Trustee files an opposition to Jackson Walker's final fee application in the GWG bankruptcy.

118.    Since the GWG bankruptcy is not closed and Jackson Walker's final fee application has yet to be ruled on, the U.S. Trustee filed an opposition to the fee application rather than a Rule 60(b)(6) motion as it had in other cases.[137] The opposition seeks a return of all fees awarded to Jackson Walker, but does not seek return of money paid to Freeman while at the Law Office of Liz Freeman or return of fees paid to her as Wind Down Trustee.[138]

### XXI. Jackson Walker begins settling cases through administrators and negotiates grossly overbroad releases.

119.    In April and May 2025, Jackson Walker recently began noticing potential settlement of claims with administrators in connection with the miscellaneous proceeding by the U.S. Trustee for the claw-back of attorneys' fees. *See 4E Brands North America*, No. 22-50009, Dkt. 715-1 at ¶ 5 (Apr. 7, 2025); *Basic Energy Services, Inc*, No. 21-

---

[136] *Id.* at 4 (citing Commentary to Canon 3C of the Code of Conduct for United States).
[137] *GWG*, No. 22-90032, ECF No. 2415.
[138] *Id.* at 50–51.

90002, Dkt. 1884-1 ¶5 (Apr. 4, 2025). The settlement releases do not limit themselves to the claw-back of attorneys' fees. To the contrary, they broadly purport to cut off Jackson Walker's liability (and even Freeman's) for any and all actions, direct or indirect, pertaining to the relationship between Jones and Freeman. *See id.* Meanwhile, the settlements do not recoup all attorneys' fees.

## XXII. Defendants failed to satisfy their obligations to disclose the Jones-Freeman relationship and disqualify Judge Jones from serving as a judicial mediator.

120.    Under Local Rule 16.4.I(1) for the Southern District of Texas, mediators "are subject to disqualification pursuant to standards consistent with those set forth in 28 U.S.C. § 455(1988)." S.D. Tex. L.R. 16.4.I(1). The bankruptcy rules also provide that a "bankruptcy judge shall be governed by 28 U.S.C. § 455[.]" Fed. R. Bankr. P. 5004.

121.    Under Section 455(a), a judge shall disqualify himself "in any proceeding in which his impartiality might reasonably be questioned." 28 U.S.C. §455(a); *see also* Code of Conduct for United States Judges, Cannon 3(C)(1). Meanwhile, section 455(b) mandates that a judge "shall . . . disqualify himself" if the judge's "spouse . . . its acting as a lawyer in the proceeding" or has "an interest that could be substantially affected by the outcome of the proceeding." 28 U.S.C. § 455(b)(5)(ii), (iii).

122.    Both subsections (a) and (b) required disqualification. It goes without saying that Jones' impartiality as a mediator would reasonably be questioned with his live-in girlfriend and her firm serving as counsel in the mediation. Further, Freeman is the equivalent of a spouse for purposes of judicial disqualification. During the mediation

(and throughout the litigation) Freeman was living with Judge Jones in a house they jointly owned and had an ongoing romantic relationship. As the Fifth Circuit observed, "[r]ecusal considerations applicable to a judge's spouse should also be considered with respect to a person other than a spouse with whom the judge maintains both a household and an intimate relationship." *See also Conflicts Arising Out of a Lawyer's Personal Relationship with Opposing Counsel,* ABA Comm. On Ethics & Pro. Resp., Formal Op. 494 (July 9, 2020).

123.    Just as Jones was disqualified from presiding over cases and awarding attorneys' fees to Freeman and her law firm, he was also disqualified serving as a judicial mediator for the GWG bankruptcy with Freeman and her firm serving as counsel. Indeed, among the bases for finding "probable cause to believe that Judge Jones has engaged in misconduct," the Fifth Circuit specifically cited the fact that Judge Jones was a mediator in a case in which Freeman participated without disclosing the relationship.

124.    Freeman and Jackson Walker (and Jones himself) were required to disclose the Jones-Freeman relationship in connection with the mediation. Local Rule 16.4.I(2) required their disclosure of any potential conflicts of interest possessed by a mediator in the case; Bankruptcy Rule 2014 and the fiduciary duties of estate counsel required their disclosure of any facts relevant to the bankruptcy court's determination of eligibility to be retained under 28 U.S.C. § 327; and the Texas Disciplinary Rules of Professional Conduct, applicable under the Southern District's Local Rules, required their utmost duty of candor.

125. Mediators "serve a vital role in our litigation process." *CEATS, Inc. v. Cont'l Airlines, Inc.*, 755 F.3d 1356, 1362 (Fed. Cir. 2014). "Courts must feel confident that they are referring parties to a fair and effective process when they refer parties to mediation. And parties must be confident in the mediation process if they are to be willing to participate openly in it." *Id.*

126. "Because parties arguably have a more intimate relationship with mediators than with judges, it is critical that potential mediators not project any reasonable hint of bias or partiality." *Id.*; *see also* Kenneth R. Feinberg, *Mediation—A Preferred Method of Dispute Resolution*, 16 Pepperdine L. Rev. S5, S29 (Spring, 1989) ("[T]he mediator must be perceived by the parties as completely neutral and impartial. This is necessary not only to ensure openness, but also to preserve the integrity of the mediation process.").

127. Freeman's conflict of interest was particularly acute in GWG because the mediation led to her lucrative appointment as the Wind Down Trustee. At no stage did Jackson Walker amend any of its filings, including its declarations of disinterestedness, motion to appoint Jones as mediator, fee motions, or other filings to disclose that its partner was in a longstanding, live-in romantic relationship with the mediator. Nor did Freeman—either while at Jackson Walker when the firm filed declarations of disinterestedness and moved to appoint Jones, while working for her own firm with Jackson Walker filing her billing for work in the mediation, or once appointed Wind Down Trustee under the plan that resulted from the mediation before Jones. And of course, Jones kept the relationship silent as well.

128.    These proceedings and malfeasance by Defendants caused Plaintiffs significant damages. As a result of Defendants' misconduct, bonds issued by GWG to the Bondholder Plaintiffs have been rendered completely or nearly worthless. Defendants have depleted and devalued GWG's assets and rewarded themselves handsomely for doing so.

129.    At the time GWG filed bankruptcy in April 2022, there were outstanding bonds totaling $1,626,741,210—not accounting for expected but unrealized interest.[139] These bonds represent just one facet of financial interests in GWG; they do not include interests held by shareholders, owners, or other creditors.

| Breakdown of Bonds (Principal Only) | Funded Debt |
|---|---|
| Public L Bonds | $1,259,045,830 |
| Liquidity Bonds | $803,440 |
| Seller Trust L Bonds | $366,891,940 |
| *Total Bond Debt* | *$1,626,741,210* |

[140]

130.    Following the liquidation of assets by the Wind Down Trust, it is projected that by July 31, 2026—before any distributions are made to the approximately 27,000 bondholders, the Wind Down Trust will have estimated assets of $9.575 million.[141]

---

[139] *GWG*, No. 22-90032, ECF No. 17 at 18
[140] *Id.*
[141] *Id.* ECF No. 2570-1.

131.    The Litigation Trustee has filed motions for approval of four proposed settlements: [142]

- D&O Adversary Proceeding          $50,500,000
- Whitney Penn, LLP                 $8,500,000
- Sabes Defendants                  $2,300,000
- Mayer Brown, LLP                  $30,000,000

132.    Combined, these tentative settlements propose to bring $59,825,384.16 in net assets to the Wind Down Trust.[143] Including the existing budget projections, the aggregate amount potentially available for distribution would be approximately $69 million.[144] Again, this is before consideration of any other class of creditors or interested parties who also stand in line to collect their share of scraps. Even if all these assets are distributed directly to the bondholders, they would at best realize less than a 4% recovery on their losses—losses that the Enterprise continues to blame on others.

---

[142] To the extent that Mayer Brown supported and advocated for the retention of Jackson Walker as local counsel for GWG, Plaintiffs intend to seek discovery regarding Mayer Brown's knowledge of the Jones-Freeman relationship and reserve the right to amend their Complaint to include claims or allegations against Mayer Brown that may be uncovered as facts are developed. The Litigation Trustee has moved for approval of a settlement with GWG. On the same day as the filing of this Complaint, Plaintiffs intend to advise the Bankruptcy Court that to the extent the parties intend to release claims involving non-disclosure of the Jones-Freeman relationship, the matter must be addressed by this Court because the claims relate to claims against Jones and the Jackson Walker fee dispute. *See* ECF Nos. 2572, 2574. Additionally, there has been no express notice that the settlement purports to release claims concerning non-disclosure of the Jones-Freeman relationship.

[143] *In re GWG Holdings, Inc.*, ECF No. 2582

[144] The most recent status report filed by Freeman indicate that there are two additional outstanding adversary proceedings, one arbitration proceeding, and tolling agreements with other third parties, but no estimate of potential or expected recovery to the estate is provided. *GWG*, No. 22-90032, ECF No. 2618, at 6-7.

## STANDING AND MOTION FOR SPECIAL LIMITED APPOINTMENT OR FOR DERIVATIVE STANDING

133.    Plaintiffs have both Article III and prudential standing. For Article III purposes, Plaintiffs suffered injuries in fact that are fairly traceable to Defendants' misconduct and are likely redressable by a favorable court decision. Plaintiffs owned bonds issued by GWG at a face value and represented debt owed by GWG to the bondholders at an expected rate of return and maturity date.

134.    Plaintiff Peterson held Public L Bonds with a face value of approximately $294,000, with seven-year terms at an interest rate of 8.5%.

135.    Plaintiff Nakashima held Public L Bonds with a face value of approximately $64,000, with a seven-year term and an interest rate of 8.5%.

136.    The English Plaintiffs held Public L Bonds with a face value of approximately $207,000.

137.    The Trust Plaintiffs held a variety of bonds issued by GWG with an aggregate face value of over $300 million.

138.    All of Plaintiffs' L Bonds claims have been replaced by a quantity of WDT Interests pursuant to Wind Down Trust Agreement[145] and the Confirmation Order.[146]

139.    These bonds were rendered nearly worthless by Defendants' misconduct in liquidating GWG and wasting its assets. Additionally, Freeman (and Jones indirectly)

---

[145] *See GWG*, No. 22-90032, ECF No. 1887 ¶ 2.2.
[146] *See id.* ECF No. 1952.

took more than $1 million in attorneys' fees and Wind Down Trustee fees and Jackson Walker took more than $2 million in attorneys' fees—again without disclosing the Jones-Freeman relationship that put them in the position to collect the fees in the first place. Porter Hedges was also awarded millions in attorneys' fees without disclosing the Jones-Freeman relationship in the bankruptcy. As detailed above, even in a best-case scenario, Plaintiffs and other bondholders have lost at least 96% of the value of their bonds. These losses and fees wrongfully taken from the bankruptcy estate and/or Wind Down Trust can be redressed by damages awarded in a judgment.

140.   Plaintiffs also have prudential standing. Plaintiffs have personal, direct claims that belong to them and not GWG or the post-confirmation trusts. For example, as Wind Down Trustee, Freeman owes a fiduciary duty directly to the Bondholders (now WDT Interest holders) as beneficiaries of the Wind Down Trust.[147] *See In re Bernard L. Madoff Inv. Sec., LLC*, 2013 U.S. Dist. LEXIS 143956, *17-18 (S.D.N.Y. Sept. 30, 2013) ("[a] creditor's claim is non-derivative only if some direct legal obligation flowed from the defendants to the creditor") (citing *Bankers Trust Co. v. Rhoades*, 859 F.2d 1096, 1101 (2d Cir. 1988) (holding creditor's claims against officers of bankrupt corporation were not derivative since officers' fraudulent conduct directly caused creditor harm); *Medkser v. Feingold*, 307 Fed. Appx. 262, 265 (11th Cir. 2008) (holding claims alleging "direct

---

[147] *GWG*, No. 22-90032, ECF No. 1887 at ¶1.4. (describing the "Wind Down Trustee's powers" as "exercisable solely in a fiduciary capacity….").

injuries sustained by . . . plaintiffs" as a result of "intentional misrepresentations" were non-derivative)). As described herein, Freeman's misconduct (and the misconduct of her conspirators who, among other things, aided and abetted in her breach of fiduciary duties) substantially diminished the value of Plaintiffs' interests. Additionally, Porter Hedges, which represented the Bondholder Committee, owed a duty to the bondholders that is not derivative of the bankruptcy. Thus, Plaintiffs' claims for breach of fiduciary duty, aiding and abetting of breach of fiduciary duty, civil RICO, RICO conspiracy, and civil conspiracy, among others, involve direct harm to beneficiaries of the Wind Down Trust and the bondholders and are non-derivative of claims belonging to the bankruptcy estate.

141.   Additionally, although Plaintiffs assert claims for losses that arose in the context of the bankruptcy, those claims are direct (and non-derivative of the estate) because they are part of a larger fraudulent scheme outside any single bankruptcy.

142.   To the extent any of the Plaintiffs' claims or damages can be considered derivative, Plaintiffs intend to move for special appointment to assert claims against these Defendants on behalf of the GWG estate and/or the litigating trust. Plaintiffs specifically propose that this Court appoint Murray Holland as Special Administrator or Special Litigating Trustee for the limited purposes of litigating the claims stated herein on behalf of GWG. Mr. Holland is highly qualified to serve in the role because of his legal training, business experience, and extensive knowledge of the facts and transactions that have occurred with GWG and the bankruptcy, which give him the

strong incentive to work wisely and diligently to achieve recovery. Alternatively, Plaintiffs intend to move for derivative standing to assert these claims against Defendants on behalf of the GWG estate and/or the litigating trust. *See Louisiana World Exposition v. Fed. Ins. Co.*, 858 F.2d 233, 247 (5th Cir. 1988); *In re Cooper*, 405 B.R. 801, 809 (Bankr. N.D. Tex. 2009).

143.    Plaintiffs' claims are colorable. And the individual who could otherwise bring the claims, the Litigation Trustee, will never do so because he is hopelessly conflicted. First, not only has he not brought litigation against Freeman or Jones,[148] but he has also neglected to seek Freeman's removal as Wind Down Trustee despite the patent disqualifying conflict with Jones who along with Jackson Walker schemed to put her there in the first place, despite her clear breach of fiduciary duty to the bondholders in failing to disclose the conflict, and despite her unlawfully continuing to collect fees.

144.    Quite the contrary, the Litigation Trustee has pursued misguided and distracting adversary proceedings seeking to place the blame for GWG's financial losses elsewhere. The Litigation Trustee claimed that GWG transfer of funds to Ben were the cause of the bankruptcy—this is a sham. First, the prior Board of GWG approved the transaction in 2018 to buy Ben shares as a smart investment with knowledge that Ben

---

[148] To the extent the Litigation Trustee has reached settlement with Jackson Walker, he never filed any complaint against the firm, a tacit admission that he has no intention of bringing transparency to the process. Presumably, Jackson Walker has negotiated an overly broad release as in the other settlements that could theoretically wipe out Plaintiffs' claims. *See supra* n. 1.

owed senior debt to a party related to Ben and that GWG would have to fund Ben in the future. Starting in 2018, GWG made public statements to this effect. Had GWG failed to fund Ben, this would cause a breach of the bond indenture and result in a collapse of the entire company. Further, mutually beneficial funding transactions flowed both ways between Ben and GWG. Ben funded GWG $84 million, disregarded by the Litigation Trustee, meaning that aggregate funds transfers to Ben totaled only $140 million. To protect GWG, the Board always made sure that GWG would retain sufficient cash and borrowing capacity after each transfer. This cash availability never got below $240 million after any such transfer. There was no concern with financial stress from the transfers between Ben and GWG. The sole cause of the bankruptcy filing was the illegal SEC action and the litigation trustee's attempt to find blame elsewhere are a misguided distraction.

145.   Second, the Litigation Trustee is an essential witness for the claims against Freeman, Jones, and Jackson Walker. The plan negotiated by the RICO Defendants requires that "[t]he Litigation Trustee shall confer with the Wind Down Trustee with respect to the commencement of any litigation…." *GWG*, 22-90032, ECF No. 1924 at 42. To the extent the Litigation Trustee discussed commencing (or abstaining from) litigation against Jackson Walker, Jones, or Freeman, his testimony is relevant to the claims sought to be asserted herein. Third, under the Plan negotiated by the RICO Defendants, the Litigation Trustee was appointed by the Bondholder Committee, represented by a firm that knew of the conflict but did not disclose it. These incurable

conflicts prevent the Litigation Trustee from bringing litigation against these Defendants, as evidenced by the fact that he still has not, his continued non-opposition to Freeman serving as Wind Down Trustee and her ongoing collection of fees, and the continued absence of any disclosure of the disqualifying relationship.

146.    In light of this Court's prior orders withdrawing the reference to bankruptcy court for matters pertaining to the Jones-Freeman relationship, Plaintiffs make their request for special appointment and/or derivative standing directly to this Court in the first instance.

147.    Additionally, there is no creditor's committee and the bondholder's committee has been dissolved with two exceptions, neither of which is applicable.[149] As noted, even if it were still active, the Bondholder Committee is likewise deeply conflicted. First, the Bondholder Committee has failed to act on any of these claims for nearly two years. In addition, the Bondholder Committee was represented by Porter Hedges, a defendant in this suit and the same firm that employed both Freeman and Jones prior to their

---

[149] *See GWG,* No. 22-90032, ECF No. 1924 ¶XII(D) p. 82 ("On the Effective Date, any statutory committee appointed in the Chapter 11 Cases (including the Bondholder Committee) shall dissolve and members thereof shall be released and discharged from all rights and duties from or related to the Chapter 11 Cases; *provided, however*, that following the Effective Date, the Bondholder Committee will continue in existence and have standing and a right to be heard for the following limited purposes: (1) adjudication of any final fee applications Filed pursuant to sections 330 and 331 of the Bankruptcy Code in accordance with the Plan; and (2) any (a) appeals of the Confirmation Order, and (b) any appeals, prosecution, or defense of any Causes of Action or proceedings with respect to which the Bondholder Committee is a party as of the Effective Date. Following the completion of the Bondholder Committee's remaining duties set forth above, the Bondholder Committee will be dissolved, and the retention or employment of the Bondholder Committee's respective attorneys, accountants and other agents will terminate without further notice to, or action by, any Entity.").

transition to clerk and judge, respectively, and where their relationship started. Porter Hedges knew of the Jones-Freeman relationship (through its partner Simms, Freeman's ex-husband) at all times relevant to this Complaint. His knowledge of the relationship is imputed to Porter Hedges.[150] Despite knowledge of this concealed relationship and conflicts, Porter Hedges, on behalf of the Bondholder Committee: (1) never disclosed the relationship; (2) did not challenge the request to appoint Jones as mediator; and (3) did not challenge Freeman's appointment as Wind Down Trustee or seek her removal.

148.   If Plaintiffs are not permitted to pursue these claims through special appointment or derivative standing, as evidenced by the Litigation Trustee, no one will.

149.   To the extent Jackson Walker, Freeman, Porter Hedges, or any other defendant or potential defendant may claim to be protected by exculpation, release, injunction, or other bars to liability, the same should be and are void because of the permeating fraud perpetrated by Defendants in the enactment of such provisions

## CLASS ACTION ALLEGATIONS

150.   To the extent this Court grants Plaintiffs standing to pursue claims on behalf of the GWG Litigation Trust (by special appointment or derivatively), Plaintiffs' damages may be adequately redressed, and it may be unnecessary for Plaintiffs to pursue class certification.[151] However, Plaintiffs herein preserve their rights to bring them.

---

[151] Plaintiffs are not seeking duplicate recoveries through alternative means but instead seek alternative avenues to the same relief.

151.    Plaintiffs bring this Class Action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of themselves and all others similarly situated, consisting of all approximately 27,000 holders of GWG Bonds outstanding at the time GWG's bankruptcy petition was filed on April 20, 2022, and whose bond interests were wiped out and converted into WDT Interests in the GWG Wind Down Trust.

152.    This Action is properly maintainable as a class action.

153.    **Class Definition:** Plaintiffs bring this action pursuant to Federal Rule of Civil Procedure 23(b)(3) on behalf of themselves and a class of similarly situated persons, defined as follows:

> Any person or entity who was a holder of Public L Bonds, Liquidity Bonds, and Seller Trust L Bonds issued by GWG and outstanding at the time the GWG bankruptcy petition was filed on April 20, 2022, and whose bond interests have been converted into WDT Interests in the GWG Wind Down Trust.

154.    Excluded from each Class are: (1) any Judge or Magistrate presiding over this action and any members of their families; (2) Defendants, Defendants' subsidiaries, parents, successors, predecessors, and any entity in which Defendants or its parents have a controlling interest and their current or former employees, officers, and directors; (3) persons who properly execute and file a timely request for exclusion from the Class; (4) persons whose claims in this matter have been finally adjudicated on the merits or otherwise released; (5) Plaintiffs' counsel and Defendants' counsel; and (6) the legal representatives, successors, and assigns of any such excluded persons.

155. **Numerosity:** The Class is so numerous that joinder of all members is impracticable. There were approximately 27,000 holders of GWG Bonds who are now holders of WDT Interests and are thus beneficiaries of the Wind Down Trust.

156. **Commonality and Predominance**: As to the Class, this action involves common questions of law and fact, which predominate over any questions affecting individual class members. Such common questions include:

(1) Whether Defendants owed a duty to disclose the relationship between Jones and Freeman;

(2) Whether RICO Defendants negligently or intentionally concealed the Jones-Freeman relationship in order to benefit themselves financially and/or reputationally in the bankruptcy industry;

(3) Whether RICO Defendants' actions violated the RICO statute;

(4) Whether RICO Defendants' actions improperly caused the liquidation and termination of GWG as a going concern, resulting in financial or property harm to Plaintiffs;

(5) Whether RICO Defendants were unjustly enriched by wrongful, willful, malicious, or reckless conduct;

(6) Whether the Class of plaintiffs suffered damages proximately caused by RICO Defendants' conduct and Defendants' conduct;

(7) Whether Defendants breached their fiduciary duties to Plaintiffs as bondholders or WDT Interest holders.

157.    Defendants have acted on grounds generally applicable to the Class with respect to the matters alleged in this Complaint, thereby making appropriate the relief sought in this Complaint with respect to the Class as a whole.

158.    **Typicality:** Plaintiffs' claims are typical of other Class Members' claims because Plaintiffs and Class Members were subjected to the same allegedly unlawful and/or tortious conduct and damaged in the same way. Plaintiffs and Class Members were each harmed by Defendants' wrongful concealment of the Jones-Freeman relationship, which was effectuated by RICO Defendants for the purposes of enriching themselves financially and reputationally at the expense of Plaintiffs.

159.    **Adequacy of Representation:** Plaintiffs are adequate representatives of the Class because they are members of the Class and committed to pursuing this matter against Defendants to obtain relief for the Class. Plaintiffs have no conflicts of interest with the Class. Plaintiff have retained competent counsel experienced in litigation of this nature and will fairly and adequately represent and protect the interests of the Class.

160.    **Predominance and Superiority:** Plaintiffs anticipate that there will be no difficulty in the management of this litigation. Common issues, like those listed above, predominate over individual issues and maintaining this action as a class action is superior to other available methods for the fair and efficient adjudication of this controversy. Also, the damages suffered by the vast majority of the Class are relatively small individually compared to the burden and expense required to individually litigate their claims against Defendants. Thus, individual litigation by class members to

71

challenge Defendants' conduct would be impractical. Individual litigation would also strain the court system, create potential for inconsistent or contradictory judgments, increase delay and expense to all parties and the courts. Class action litigation, however, presents fewer difficulties and provides benefits of a single adjudication, economies of scale, and uniform, comprehensive supervision by one court.

161. **Risk of Prosecuting Separate Actions:** This case is appropriate for certification because prosecuting claims separately by individuals would create the risk of inconsistent, varying or contradictory adjudications, disparate and incompatible standards of conduct for Defendants, or would be dispositive of interests of members of the proposed Class.

162. **Ascertainability:** The Class is defined by objective criteria, namely holders of GWG Public L Bonds, Liquidity Bonds, Seller Trust L Bonds, now converted to holders of WDT Interests, and there is a feasible mechanism to identify and determine members of the Class.

163. Plaintiffs anticipate that there will be no difficulty in the management of this litigation. Common issues predominate over individual issues and maintaining this action as a class action is superior to other available methods for the fair and efficient adjudication of this controversy.

## CLAIMS FOR RELIEF

### COUNT I
### VIOLATION OF TITLE 18 US.C. § 1962(C):  CONDUCTING THE AFFAIRS OF THE ENTERPRISE THROUGH A PATTERN OF RACKETEERING ACTIVITY
*(Against Defendants Jones, Freeman, Freeman PLLC and Jackson Walker)*

164.    Plaintiffs incorporate by reference the factual allegations contained in the preceding paragraphs as though fully set forth herein.

165.    Plaintiffs assert this claim against Defendants Jones, Freeman, Freeman PLLC, and Jackson Walker ("RICO Defendants"), for violation of the RICO Act. Plaintiffs specifically claim that the RICO Defendants violated 18 U.S.C. § 1962(c).

166.    From the point that Freeman joined Jackson Walker in 2018 and continuing through present, RICO Defendants did unlawfully, knowingly, and intentionally conduct and participate, directly and indirectly, in the conduct, management, and operation of the affairs of the Enterprise, which was engaged in and affected interstate commerce through a pattern of racketeering activity consisting of numerous acts of racketeering in the State of Texas and elsewhere, indictable under Title 18 U.S.C. § 1503 (obstruction of justice), § 1341 (mail fraud), § 1343 (wire fraud), § 152 (bankruptcy fraud) and § 1346 (honest services fraud).

167.    At all relevant times, RICO Defendants were "persons" within the meaning of 18 U.S.C. § 1962(c) and as defined by the statute. 18 U.S.C. § 1961 (defining a culpable "person" to include "an entity capable of holding a legal or beneficial interest in

property"). RICO Defendants are each "persons" capable of holding legal or beneficial interests in property. *See* 18 U.S.C. § 1961.

168.   RICO Defendants constitute an association-in-fact enterprise with a clear common purpose, clear relationships between them and longevity sufficient to permit RICO Defendants to pursue the purpose of the Enterprise. Specifically, the purpose of the Enterprise was to increase the prestige and influence of each actor in bankruptcy practice, while enriching the RICO Defendants. This purpose was accomplished through multiple predicate acts, and without disclosing the Jones-Freeman intimate relationship to affected parties and creditors. The Enterprise carried out this purpose through bankruptcy fraud, mail fraud, wire fraud, obstruction of justice, and theft of honest services mail/wire fraud, corrupting bankruptcy practice in the Southern District of Texas in the process

169.   RICO Defendants are a group of business entities and individuals associated in fact ("the Enterprise"), which were engaged in, and the activities of which affected, interstate commerce. Each RICO Defendant participated in the operation and management of the Enterprise. As such, RICO Defendants collectively have constituted an "enterprise" as that term is defined in 18 U.S.C. § 1961 (4).

170.   RICO Defendants formed an ongoing structure of persons and entities that continually associated over an extended period of time for the shared purpose of enriching themselves and increasing their prestige and influence among bankruptcy lawyers and courts. RICO Defendants were in regular contact with one another via

email, phone and in-person communications for the purposes of securing appointments in and making decisions regarding bankruptcy cases, getting cases filed in the "friendly" court of Jones or ensuring that he was appointed as mediator, and using Jones—either directly as the presiding judge or indirectly as the mediator—to obtain favorable decisions and lucrative fees in those cases.

171.   The Enterprise was organized in a manner amenable to consensual decision-making between the RICO Defendants and hierarchical decisions or recommendations handed down by Jones. Further, the Enterprise members followed a uniform course of conduct in always denying and concealing the Jones-Freeman relationship.

172.   As described throughout this complaint, each of the RICO Defendants has played some part in directing the Enterprise's affairs. Jackson Walker made numerous decisions exhibiting participation in the Enterprise including but not limited to deciding to hire Freeman and make her a partner; deciding to file cases in the Southern District of Texas; seeking appointments as local counsel; assisting in the scheme to ensure mega-bankruptcies either landed before Jones or that he was appointed as mediator to control the outcomes; allowing Freeman to appear in cases before Jones without disclosing the Jones-Freeman relationship; filing pleadings and documents in Jones's court or moving to appoint Jones mediator without disclosing the Jones-Freeman relationship; discussing with Freeman and Jones possible disclosures of the Jones-Freeman relationship yet deciding to disclose nothing; moving for and receiving millions of dollars in attorneys' fees  (including fees for time billed by Freeman) without disclosing

the Jones-Freeman relationship; scheming to liquidate distressed entities to ensure sufficient funds to pay professional fees; concealing the Jones-Freeman relationship when Freeman was appointed Wind Down Trustee and when she collected fees as Wind Down Trustee.

173.   Freeman and Freeman PLLC made numerous decisions exhibiting participation in the Enterprise including but not limited to deciding to conceal her relationship with Jones from those interested in bankruptcies; assisting in the scheme to ensure mega-bankruptcies either landed before Jones or that he was appointed as mediator to control the outcomes; appearing and billing in cases before Jones or in cases in which he was appointed mediator without disclosing the relationship; discussing with Jackson Walker possible disclosures of the Jones-Freeman relationship yet deciding to disclose nothing; scheming to liquidate distressed entities to ensure sufficient funds to pay professional fees; Freeman failing to disclose her relationship with Jones while she was a partner at Jackson Walker and the firm filed a motion to appoint Jones as mediator; Freeman and Freeman PLLC failing to disclose her relationship with Jones after her withdrawal from Jackson Walker while remaining in the cases; participating in mediation before Jones without disclosing the Jones-Freeman relationship; and accepting the position of Wind Down Trustee without disclosing her relationship with Jones and accepting fees as Wind Down Trustee without disclosing her relationship with Jones.

174.   Jones made numerous decisions exhibiting participation in the Enterprise including but not limited to scheming to have mega-bankruptcies land before him either

as judge or mediator in cases in which his Freeman and Jackson Walker were involved; discussing possible disclosures of the Jones-Freeman relationship with Jackson Walker yet deciding to disclose nothing in any bankruptcy; communicating with Jackson Walker and Freeman regarding appointment as mediator; scheming to liquidate distressed entities to ensure sufficient funds to pay professional fees, including fees that benefitted Jones; and concealing the Jones-Freeman relationship when Freeman was appointed Wind Down Trustee and when she collected fees as Wind Down Trustee which benefitted Jones.

175.    In general, the Enterprise functioned as a continuing association-in-fact enterprise from approximately 2017 through present[152] since Freeman still serves and is collecting fees as Wind Down Trustee. Since Freeman procured her position as Wind Down Trustee through the involvement of the Enterprise, Plaintiff alleges open-ended continuity based on a series of related predicates extending over a substantial period— at least several years.

176.    The Enterprise consists of RICO Defendants Jones, Freeman, Freeman PLLC, and Jackson Walker, who associated together in fact and carried out their common

---

[152] While the existence of the Enterprise and the predicate acts overlap in time, "evidence establishing the enterprise and the pattern of racketeering may 'coalesce.'" *Allstate Ins. Co. v. Plambeck*, 802 F.3d 665, 673–74 (5th Cir. 2015) (quoting *Boyle v. U.S.*, 556 U.S., 938, 947 (2009)); *see Walker v. Beaumont Indep. Sch. Dist.*, 938 F.3d 724, 738 (5th Cir. 2019) (same). "The linchpin of enterprise status is the continuity or ongoing nature of the association." *Allstate*, 802 F.3d at 673 (citing *Calcasieu Marine Nat'l Bank v. Grant*, 943 F.2d 1453, 1462 (5th Cir. 1991)).

purpose by committing bankruptcy fraud, mail fraud, wire fraud, and theft of honest services mail/wire fraud.

177.   The Enterprise functioned to achieve the shared goals of increasing prestige and enriching RICO Defendants, which they accomplished both directly through approval of improper attorneys' fee awards and indirectly by elevating the status and demand for RICO Defendants Jackson Walker, Freeman, and Freeman PLLC as bankruptcy attorneys, and by securing favorable bankruptcy court appointments and rulings – including millions of dollars, if not tens of millions of dollars, awarded as attorneys' fees, as well as additional fees to Freeman as Wind Down Trustee - that were influenced by intimate relationships and self-interest and not based exclusively on the merits.

178.   RICO Defendants carried out the Enterprise through improper and unlawful acts including, but not limited to, the following:

   a.   securing the appointment of Jackson Walker, Freeman PLLC, and Freeman, on bankruptcy cases before Jones or in cases in which Jones was appointed judicial mediator despite Jones having a personal and financial interest in the outcome of the case;

   b.   influencing the assignment of bankruptcy cases involving clients of Jackson Walker and Freeman to Jones, or having Jones appointed as judicial mediator, despite Jones having a personal and financial interest in the outcome of the case;

c.    moving to appoint Jones as mediator at a time when Jackson Walker, Freeman, and Jones indisputably knew of the intimate, live-in nature of the relationship between Freeman and Jones;

d.    failing to recuse, or seek the recusal or disqualification of Jones;

e.    failing to inform the court, creditors, opposing parties, and others of the intimate relationship between Jones and Freeman;

f.    deceiving the public, the judiciary, and bankruptcy creditors such as Plaintiffs;

g.    withholding from Plaintiffs and the public facts material to federal bankruptcy court decisions;

h.    defrauding creditors such as Plaintiffs;

i.    influencing the orders issued in bankruptcy proceedings for the benefit of RICO Defendants (and clients represented by RICO Defendants) and to the detriment of creditors such as Plaintiffs;

j.    influencing the orders issued in bankruptcy proceedings, and railroading any litigant who opposed the designs of the Enterprise;

k.    enhancing the status, reputation and demand for the services of RICO Defendants Jackson Walker, Freeman, and Freeman PLLC as bankruptcy professionals by issuing recommendations and influencing rulings favorable to RICO Defendants;

l.   profiting from the issuance of bankruptcy court rulings or recommendations favoring RICO Defendants that were issued in violation of law;

m.   securing large awards of fees that directly benefitted Jackson Walker, Freeman, and Freeman PLLC, and indirectly benefitted Jones himself without disclosing the Jones-Freeman relationship;

n.   shielding themselves from public, judicial and governmental scrutiny of wrongful acts;

o.   covering up the existence, purpose, and acts of the Enterprise by concealing, failing to disclose, or denying the existence of an intimate relationship between Freeman and Jones;

p.   covering up the existence, purpose, and acts of the Enterprise by failing to disclose the existence of the intimate relationship when disclosure was required; and

q.   arranging through mediation before Jones for Freeman to be appointed to the lucrative position of Wind Down Trustee.

179.   The Enterprise has pursued a course of conduct of deceit, misrepresentation, and conspiracy to deceive and defraud Plaintiffs and the public, to withhold from Plaintiffs and the public facts material to federal bankruptcy court decisions, and to influence, issue, and secure favorable bankruptcy court rulings in violation of law.

180. The participants in this Enterprise have repeatedly and continuously engaged in a pattern of racketeering activities from approximately 2017 or 2018 through present. During that time, Jones presided over at least 34 cases as judge and/or judicial mediator, in which RICO Defendants Jackson Walker, Freeman and Freeman PLLC were awarded millions of dollars in attorneys' fees under 11 U.S.C. § 330 and § 331. The compensation awards occurred while Freeman was both a Jackson Walker partner and living with Jones in an intimate relationship. This includes approximately $1 million in fees billed by Freeman herself in 17 of those cases.

181. The RICO Defendants' wrongful conduct in furtherance of the Enterprise, including the predicate acts described herein, was a direct and substantial cause of injury to Plaintiffs. RICO Defendants intended to enrich themselves at the expense of the bankruptcy estate and creditors, such as Plaintiffs. As a foreseeable result of RICO Defendants' conduct, Plaintiffs were deprived of the opportunity to have bankruptcy proceedings determined on the merits free from the influence of interested parties. Additionally, as a foreseeable result of RICO Defendants' conduct, Plaintiffs' financial recovery as bankruptcy creditors was reduced because the bankruptcy estate (and Wind Down Trust assets in this case) available to pay creditors, including Plaintiffs, was diminished by the fees improperly awarded to Jackson Walker, Freeman, and Freeman PLLC, despite Jackson Walker moving to appoint Jones as mediator without disclosing what Defendants indisputably knew at the time—that Jones and Freeman were in an intimate, domestic relationship. Moreover, as a foreseeable result of RICO Defendants'

conduct, Plaintiffs' financial recovery was reduced because of exorbitant fees paid to Freeman as Wind Down Trustee, who was only appointed because of her relationship with Jones as mediator. Further, as a result of RICO Defendants' misconduct, the bonds held by Plaintiffs and others have been rendered nearly worthless. As detailed above, the aggregate amount potentially available for distribution would be approximately $69 million. If all of these assets are distributed directly to the bondholders, they will still have sustained at least a 96% loss on the value of their bonds proximately caused by RICO Defendants' misconduct.

182.   At all relevant times, the Enterprise engaged in interstate commerce and the activities of the Enterprise affected interstate commerce. RICO Defendants' conduct in furtherance of the goals of the Enterprise included, but was not limited to, the following actions affecting interstate commerce:

(1) Out-of-state litigants appeared before Jones in cases over which he presided or in cases in which the Enterprise arranged for him to operate as a mediator.[153]

(2) RICO Defendants represented out-of-state litigants in bankruptcy proceedings and/or mediations before Jones.[154]

---

[153] *See U.S. v. Stratton,* 649 F.2d 1066, 1075 fn. 12 (5th Cir. 1981) (finding "ample evidence" of a connection between racketeering acts involving bribery of judge and interstate commerce where, among other things, out-of-state-litigants appeared before the judge).
[154] *Id.*

(3) RICO Defendants caused the movement of money, including attorneys' fees and bankruptcy estate assets, from one state to another.

(4) RICO Defendants caused the transfer of services from one state to another.

183.    RICO Defendants' predicate acts were related to each other in that they involved the same pattern of using mail and wire communications to perpetuate the frauds that RICO Defendants were not interested parties in proceedings or mediations before Jones, that Jones was not subject to recusal or disqualification as judge or mediator in cases involving Defendants Jackson Walker and Freeman because of his intimate relationship with Freeman, and that positions, decisions, and funds were being awarded/approved to RICO Defendants Jackson Walker, Freeman, and Freeman PLLC solely on the evidence and merits and not due to influence and self-dealing.

184.    As described in this Complaint, RICO Defendants' pattern of racketeering activity includes, but is not limited to, two or more violations of 18 U.S.C. § 1503 (obstruction of justice), § 1341 (mail fraud), § 1343 (wire fraud), § 152 (bankruptcy fraud) and § 1346 (honest services fraud).

### Violations of 18 U.S.C. § 1503 (Obstruction of Justice)

185.    RICO Defendants have committed multiple instances of obstruction of justice in violation of 18 U.S.C. § 1503 which also constitutes racketeering activity within the meaning of 18 U.S. C. § 1961(1). Section 1503 prohibits any person from influencing,

obstructing, impeding or intimidating any officer of a federal court in the discharge of his duty.[155]

186.    RICO Defendants violated 18 U.S.C. § 1503(a) through acts of influence as set forth in this Complaint, which acts include, but are not limited to, the following:

    a.    Defendant Freeman used her intimate, personal relationship with Jones to influence favorable rulings or treatment in cases or mediations before Jones.

    b.    Defendant Jackson Walker used their knowledge of the relationship between Freeman and Jones to influence Jones to issue favorable rulings or proposals in cases or mediations before Jones.

    c.    Defendant Jackson Walker influenced Jones to make rulings or proposals that were favorable to Jackson Walker and its clients by offering lucrative payments and prestigious case assignments to Freeman that indirectly benefitted Jones.

    d.    RICO Defendants knowingly and deliberately concealed or failed to properly reveal the existence of an intimate, personal relationship between Freeman and Jones, thereby influencing officers of the bankruptcy court to permit the assignment of cases involving Defendants Freeman and/or Jackson Walker to Jones' court or to use Jones as a judicial mediator.

---

[155] 18 U.S.C. § 1503(a).

187.   Jones was an "officer in or of" a federal district court within the meaning of 18 U.S.C. § 1503 prohibiting influencing, impeding or intimidating any officer of a federal court in the discharge of his duty.

188.   These acts of influence obstructed justice and were at the heart of RICO Defendants' scheme to enrich and benefit themselves through the administrative process of ensuring Jones was in a place to influence or control appointments, decisions and rulings.

### Violations of 18 U.S.C. § 1341 (Mail Fraud)

189.   RICO Defendants have committed multiple instances of mail fraud in violation of 18 U.S.C. § 1341 which also constitutes racketeering activity within the meaning of 18 U.S. C. § 1961(1).

190.   For purpose of executing and attempting to execute their course of conduct, RICO Defendants would, and did, knowingly cause to be placed in any Post Office or authorized depository for mail, items to be sent and delivered by the United States Postal Services, including but not limited to: (i) matters used to communicate with each other as co-conspirators and to further the goals of the Enterprise, (ii) matters used to communicate with clients and potential clients regarding the favorable outcomes Defendants Freeman, Freeman PLLC, and/or Jackson Walker have and would be able to obtain in proceedings or mediations before Jones, (iii) matters containing misrepresentations or omissions regarding the relationship that existed between

Freeman and Jones, and (iv) invoices and billing materials reflecting fees sought and awarded to RICO Defendants.

191.   RICO Defendants' scheme to defraud was dependent upon information and documents passed by mail, in furtherance of Defendants' deceptive scheme, including, but not limited to, the following:

a.   Application to be Appointed as Co-Counsel and Conflicts Counsel for Debtors and Debtors in Possession prepared by Jackson Walker and signed by Jackson Walker partner, Kristhy M. Peguero, and filed in the United States Bankruptcy Court for the Southern District of Texas on or about May 19, 2022, in the GWG bankruptcy. A supplemental declaration of disinterestedness was filed on October 6, 2022, by Kristhy M. Peguero, stating simply "N/A" in response to potential conflicts or connections with "Bankruptcy Judges for the Southern District of Texas." Under the rules governing a bankruptcy proceeding, a firm seeking to be employed by a debtor or debtor in possession must show that it is disinterested and must disclose all connections. Jackson Walker submitted a declaration of disinterestedness disclosing conflicts of interest in the Firm's application for appointment; but did not disclose the intimate relationship between the Jackson Walker partner and a sitting bankruptcy judge. To the contrary, Jackson Walker affirmatively stated it was a disinterested party and in its supplemental declaration effectively represented that it had no potential

conflicts or connection with bankruptcy judges in the Southern District of Texas.

b. <u>Multiple Applications for Attorneys' Fees</u> filed on October 6, 2022, March 13, 2023, June 6, 2023, and August 21, 2023, by Peguero on behalf of Jackson Walker in the GWG bankruptcy. The applications requested an aggregate $2,172,487.69 in fees and expenses. The application did not disclose the intimate relationship between Jones and Jackson Walker partner, Freeman and did not trigger Jackson Walker to amend its declaration of disinterestedness.

c. <u>Motion to Appoint Jones as Judicial Mediator</u> filed on November 30, 2022, by Peguero, specifically requesting that Jones be appointed as a judicial mediator for the GWG bankruptcy. The motion alleged that Jones was "well-qualified to be the Mediator given his significant experience in similar matters" but made no disclosure or reference of the relationship between Jones and Freeman. The motion also stated that Jones represented to Jackson Walker and the Special Committee of the GWG Board of Directors that he was available to serve as mediator, again without disclosure or reference of the relationship between Jones and Freeman.

d. <u>Proposed Plan</u> filed on June 14, 2023, filed by Peguero proposing Freeman to serve as Wind Down Trustee following the mediation before Jones. The proposed plan, and subsequent efforts to have the plan approved and

Freeman's appointment confirmed, made no disclosure of the Jones-Freeman relationship.

192.    These mail communications were part and parcel of RICO Defendants' scheme to defraud Plaintiffs and benefit themselves through the issuance of rulings from Jones or influenced by Jones as mediator that favored his romantic and domestic partner, Freeman, and the firm for whom she worked, Jackson Walker.

**Violations of 18 U.S.C. § 1343 (Wire Fraud)**

193.    RICO Defendants have committed multiple instances of wire fraud in violation of 18 U.S.C. § 1343 which also constitutes racketeering activity within the meaning of 18 U.S. C. § 1961(1).

194.    For purpose of executing and attempting to execute their scheme to defraud creditors including Plaintiffs, through material deceptions, RICO Defendants would, and did, knowingly transmit and cause to be transmitted in interstate commerce by means of wire "transmissions" communications including but not limited to: (i) emails and telephone calls used to communicate with each other as co-conspirators and to further the goals of the Enterprise, (ii) emails and telephone calls used to communicate with clients and potential clients regarding the favorable outcomes RICO Defendants have and would be able to obtain in proceedings and/or mediations before Jones, (iii) electronic filings of documents containing misrepresentations or omissions regarding the relationship that existed between Freeman and Jones, and (iv) electronic invoices

and billing materials reflecting attorneys' fees or other professional fees sought by and awarded to RICO Defendants.

195.   RICO Defendants' scheme to defraud was dependent upon information and documents passed by wire in furtherance of RICO Defendants' deceptive scheme, including, but not limited to, the following:

     a.   Application to be Appointed as Co-Counsel and Conflicts Counsel for Debtors and Debtors in Possession prepared by Jackson Walker and signed by Jackson Walker partner, Peguero, and filed in the United States Bankruptcy Court for the Southern District of Texas on or about May 19, 2022, in the GWG bankruptcy. A supplemental declaration of disinterestedness was filed on October 6, 2022, by Peguero, stating simply "N/A" in response to potential conflicts or connections with "Bankruptcy Judges for the Southern District of Texas." Under the rules governing bankruptcy proceedings, a firm seeking to be employed by a debtor or debtor in possession must show that it is disinterested and must disclose all connections. Jackson Walker submitted a declaration of disinterestedness disclosing conflicts of interest in the Firm's application for appointment; but did not disclose the intimate relationship between the Jackson Walker partner and a sitting bankruptcy judge. To the contrary, Jackson Walker affirmatively stated it was a disinterested party and that it had no conflict with bankruptcy judges in the Southern District of Texas.

b. <u>Multiple Applications for Attorneys' Fees</u> filed on October 6, 2022, March 13, 2023, June 6, 2023, and August 21, 2023, by Peguero on behalf of Jackson Walker in the GWG bankruptcy. The applications requested an aggregate $2,172,487.69 in fees and expenses. They did not disclose the intimate relationship between Jones and Jackson Walker partner Freeman and did not trigger Jackson Walker to amend its declaration of disinterestedness to disclose the relationship even though the firm indisputably knew of the intimate nature of the relationship.

c. <u>Motion to Appoint Jones as Judicial Mediator</u> filed on November 30, 2022, by Peguero, specifically requesting that Jones be appointed as mediator for the GWG bankruptcy. The motion alleged that Jones was "well-qualified to be the Mediator given his significant experience in similar matters" but made no disclosure or reference of the relationship between Jones and Freeman at a time when Jackson Walker indisputably knew about the intimate nature of the relationship. The motion also stated that Jones represented to Jackson Walker and the Special Committee of the GWG Board of Directors that he was available to serve as mediator, again without disclosure or reference of the relationship between Jones and Freeman.

d. <u>Proposed Plan</u> filed on June 14, 2023, filed by Peguero, designating Freeman to serve as Wind Down Trustee following the mediation before Jones. The proposed plan, and in subsequent efforts to have the plan approved and

Freeman's appointment confirmed, made no disclosure of the relationship between Freeman and Jones even though Jackson Walker indisputably knew of the intimate nature of the relationship.

196. These wire communications were part and parcel of RICO Defendants' scheme to defraud Plaintiffs and benefit themselves through the issuance of improper rulings from Jones through the issuance of rulings from Jones or influenced by Jones as mediator that favored his romantic partner, Freeman, and the firms for which she worked, Jackson Walker and Freeman PLLC.

**Violations of 18 U.S.C. § 1346 (Honest Services Mail and Wire Fraud)**

197. RICO Defendants' scheme or artifice to defraud was designed and intended to deprive Plaintiffs and the public of the intangible right of honest services in violation of 18 U.S.C. § 1341 (mail fraud), § 1343 (wire fraud) and § 1346 (honest services fraud). Plaintiffs and all parties affected by the GWG bankruptcy were entitled to honest services from the attorneys representing the debtor and debtor-in-possession, the mediator appointed to the case, and the Wind Down Trustee.

198. RICO Defendants misused the intimate relationship between Jones and Freeman for personal gain and advantage. That is, RICO Defendants deprived Plaintiffs and the public of the intangible right of honest services by benefitting from the secret intimate relationship between Freeman and Jones. Defendants Jackson Walker, Freeman, and Freeman benefited directly or indirectly by receiving financial compensation, enhanced status as bankruptcy attorneys, and favorable rulings for their clients due to the

involvement of Jones' intimate partner, Freeman. Defendant Jones, in turn, benefitted indirectly from the financial payments and enhanced opportunities afforded to Freeman and Freeman PLLC by Jackson Walker and by the Wind Down Trust because of her involvement and influence in proceedings in his Court.

199.   RICO Defendants' repeated representations of disinterestedness and failure to disclose the intimate relationship between Jones and Freeman were material, false representations made as part of the scheme. Indeed, "[l]itigants in all of our courts are entitled to expect that the rules will be followed, the required disclosures will be made, and that the court's decisions will be based on a record that contains all the information applicable law and regulations require."[156]

200.   RICO Defendants' unlawful and unfair practices are actionable, particularly where they owed a fiduciary duty to Plaintiffs. As attorneys for the debtor-in-possession, Freeman, Freeman PLLC, and Jackson Walker owed a fiduciary duty to the bankruptcy estate and to Plaintiffs as bondholders/creditors of the bankruptcy estate. As Wind Down Trustee, Elizabeth Freeman owed a fiduciary duty to the beneficiaries of the Wind Down Trust, including Plaintiffs and other bondholders. Jones owed a fiduciary duty to the public and to the litigants whom he impacted by orchestrating (with Jackson Walker and Freeman) his appointment as mediator, including but not

---

[156] *Alix v. McKinsey & Co.*, 23 F.4th 196, 204 (2d Cir. 2022) (denying Rule 12(b)(6) motion to dismiss against RICO/bankruptcy fraud allegation concerning fraudulent disclosure statement).

limited to a duty to reveal conflicts of interest with litigants and/or their counsel, a duty to avoid self-dealing, including the duty to refrain from dealings benefitting people (such as Freeman) closely identified with the fiduciary, a duty to disqualify himself, either as the presiding judge or mediator, in a proceeding where his live-in, intimate partner was a lawyer in the case or where his impartiality might reasonably be questioned.

201.   RICO Defendants willfully participated in the scheme to deprive Plaintiffs and the public of the intangible right of honest services through multiple acts of mail fraud and wire fraud as outlined above. RICO Defendants' acts of honest services fraud were committed by use of the mail and wires as previously alleged.

## Violations of 18 U.S.C. § 152 (Bankruptcy Fraud)

202.   RICO Defendants have committed multiple instances of bankruptcy fraud in violation of 18 U.S.C. §§ 152(2), 152(3) and 152(6) each of which also constitute racketeering activity within the meaning of 18 U. S. C. § 1961(1).

203.   Under 18 U.S.C. § 152(2) a defendant commits bankruptcy fraud if he or she "knowingly and fraudulently makes a false oath or account in or in relation to any case under title 11." RICO Defendants committed acts of bankruptcy fraud by knowingly and fraudulently declaring that they were not interested parties in cases before Jones despite indisputable awareness of the relationship between Freeman and Jones. For example, Jackson Walker submitted May 19, 2022, and October 6, 2022, declarations of disinterestedness in the GWG bankruptcy stating it was a disinterested party, failing

to disclose the Jones-Freeman relationship, and in fact affirmatively representing the absence of any conflict with bankruptcy judges in the Southern District of Texas.

204.   Defendants Jackson Walker and Freeman also committed acts of bankruptcy fraud by continuing to file pleadings and documents, including multiple applications for attorneys' fees filed by Peguero, and the November 30, 2022 motion to appoint Jones as judicial mediator, and by continuing to engage in proceedings, including mediation before Jones, without disclosing the relationship and in fact affirmatively representing the absence of any conflict with bankruptcy judges in the Southern District of Texas.

205.   Under 18 U.S.C. § 152(3) a defendant commits bankruptcy fraud if he or she "knowingly and fraudulently makes a false declaration, certificate, verification or statement under penalty of perjury…in or in relation to any case under Title 11." Defendants Jackson Walker and Freeman committed acts of bankruptcy fraud by knowingly and fraudulently declaring that the firm was not an interested party in cases before Jones, failing to disclose the Jones-Freeman relationship in the declarations of disinterestedness as set forth in the preceding paragraphs, and fraudulently representing that it had no conflicts with bankruptcy judges in the Southern District of Texas, despite awareness of the relationship between Freeman and Jones. Defendants Jackson Walker and Freeman also committed acts of bankruptcy fraud by continuing to file or allowing to be filed pleadings and documents, as set forth in the preceding paragraphs, and continuing to engage in mediation proceedings before Jones without disclosing the relationship between Freeman and Jones.

206.    Jones committed acts of bankruptcy fraud by explicitly or implicitly representing or acknowledging that Jackson Walker and Freeman were disinterested parties despite knowledge of the relationship between himself and Freeman. Jones engaged in the non-judicial acts of orchestrating with Jackson Walker and Freeman for him to be appointed mediator in a case in which he was not the presiding judge so that he could ensure lucrative fees to Jackson Walker and Freeman, which benefitted Jones indirectly. As part of this scheme, Jones represented to Jackson Walker and the Special Committee of the GWG Board of Directors that he was available to serve as mediator, implicitly representing to them and to all those interested in the bankruptcy (through the motion to appoint Jones that recited Jones' representation of availability) that he had no disqualifying conflicts when in fact he was in an intimate, live-in relationship (and co-owned a home) with counsel for Debtor and subsequently the Wind Down Trustee.

207.    Under 18 U.S.C. § 152(6) a defendant commits bankruptcy fraud if he or she "knowingly and fraudulently gives, offers, receives, or attempts to obtain any money or property, remuneration, compensation, reward, advantage, or promise thereof for acting or forbearing to act in any cause under title 11." RICO Defendants committed acts of bankruptcy fraud by Jones knowingly giving Jackson Walker and Freeman favorable treatment at mediation and overseeing mediation of a Plan that provided for Freeman to serve in the lucrative position of Wind Down Trustee, with Jones, Freeman, and Jackson Walker all choosing not to make required disclosures concerning the relationship. Jackson Walker knowingly provided Jones remuneration indirectly

through compensation to Freeman while he continued to conceal the intimate, live-in relationship with Freeman that would prevent Jackson Walker from continuing to be retained as counsel and from retaining any attorneys' fees in the case. *See* 11 U.S.C. §§ 327, 328; Fed. R. Bankr. P. 5002.

208.   As described *supra*, RICO Defendants' racketeering activities described herein were the substantial and proximate cause of damages to Plaintiffs. As a result of RICO Defendants' activity, the aggregate amount potentially available for distribution would be approximately $69 million. If all these assets are distributed directly to the bondholders, they will have at least a 96% loss on the value of their bonds. Further, because RICO Defendants' conduct targeted the federal judiciary and the bankruptcy process in particular, the judiciary's responsibility to superintend the integrity of the bankruptcy process lessens the plaintiff's burden to show a direct injury, at least at the pleading stage.

209.   Plaintiffs are entitled to and respectfully request (1) three times their actual damages, (2) attorneys' fees, (3) pre-judgment and post-judgment interest, (4) costs, (5) disgorgement of profits and forfeiture of fees, (6) nominal damages, (7) any other damages permitted pursuant to 18 U.S.C. § 1964(c), and (8) such other and further relief as may be just and appropriate.

## COUNT II
## CONSPIRACY TO ENGAGE IN A PATTERN OF RACKETEERING ACTIVITY IN VIOLATION OF TITLE 18 US.C. § 1962(D)
*(Against Defendants Jones, Freeman, Freeman PLLC, and Jackson Walker)*

210. Plaintiffs incorporate by reference the factual allegations contained in the preceding paragraphs as though fully set forth herein.

211. RICO Defendants conspired and agreed, either directly or indirectly, to commit a substantive offense under 18 U.S.C. § 1962(c) as described above.

212. RICO Defendants acted in agreement by participating, either directly or indirectly, in the conduct of the affairs of said RICO enterprise through a pattern of racketeering activity, all in violation of 18 U.S.C. §§ 1962(b) and (d).

213. From approximately 2017 or 2018 through present, RICO Defendants cooperated jointly and severally in the commission of two or more of the predicate acts that are itemized at 18 U.S.C. §§ 1961(1) (A) and (B), in violation of 18 U.S.C. § 1962(d) as previously set forth in Count I. RICO Defendants committed these predicate acts as part of a continuous course of conduct that was a pattern of racketeering activities. Further, RICO Defendants were in regular contact with one another via email, phone and in-person communications for the purposes of securing appointments in and making decisions regarding bankruptcy cases, getting cases filed in Jones' "friendly" court or appearing before Jones as a specifically requested mediator, and obtaining favorable decisions, recommendations, and lucrative appointments and fees in those cases.

214.    RICO Defendants' conspiracy to engage in racketeering activity through the predicate acts set forth in Count I were the substantial and proximate cause of damage to Plaintiffs. RICO Defendants intended to enrich themselves at the expense of the bankruptcy estate, bondholders/creditors such as Plaintiffs, and the Wind Down Trust and its beneficiaries such as Plaintiffs. As a foreseeable result of RICO Defendants' conduct, Plaintiffs were deprived of the opportunity to have bankruptcy proceedings determined on the merits free from the influence of interested parties. Additionally, as a foreseeable result of RICO Defendants' conduct, Plaintiffs' financial recovery was reduced because the bankruptcy estate available to pay creditors, including Plaintiffs, was diminished by the fees improperly awarded to Jackson Walker and Freeman as debtor's counsel and Freeman as Wind Down Trustee. Further, as a foreseeable result of RICO Defendants' conduct, Plaintiffs' interest in the Wind Down Trust were diminished by Freeman's misuse, waste, and exorbitant fees as Wind Down Trustee, none of which would have occurred had RICO Defendants disclosed Freeman and Jones were in an intimate relationship and co-owned a home. As detailed above, the aggregate amount potentially available for distribution would be approximately $69 million. If all these assets are distributed directly to the bondholders, they will have at least a 96% loss on the value of their bonds.

215.    Additionally, because RICO Defendants' conduct targets the federal judiciary and the bankruptcy process in particular, "the judiciary's responsibility to superintend

the integrity of the bankruptcy process lessens the plaintiff's burden to show a direct injury, at least at the pleading stage."[157]

216.   Plaintiffs are entitled to and respectfully requests (1) three times their actual damages, (2) attorneys' fees, (3) pre-judgment and post-judgment interest, (4) costs, and (5) any other damages permitted pursuant to 18 U.S.C. § 1964(c), (6) disgorgement of profits and forfeiture of fees, (7) nominal damages, and (8) such other and further relief as may be just and appropriate.

**COUNT III**
**COMMON LAW FRAUD**
*(Against Defendants Jones, Freeman, Freeman PLLC, and Jackson Walker)*

217.   Plaintiffs incorporate by reference the factual allegations contained in the preceding paragraphs as though fully set forth herein.

218.   Plaintiffs allege common-law fraud against Defendants Jones, Freeman, Freeman PLLC, and Jackson Walker ("Fraud Defendants"). In Texas, the elements of common law fraud are: (1) that a material representation was made; (2) the representation was false; (3) when the representation was made, the speaker knew it was false or made it recklessly without any knowledge of the truth and as a positive assertion; (4) the speaker made the representation with the intent that the other party should act upon it; (5) the party acted in reliance on the representation; and (6) the party thereby suffered injury.

---

[157] *Alix*, 23 F.4th at 207 (cleaned up).

*Allstate Ins. Co v. Receivable Fin. Co. LLC*, 501 F.3d 398, 406 (5th Cir. 2007) (citing *In re FirstMerit Bank, N.A.*, 52 S.W.3d 749, 758 (Tex. 2001)).

219.    The details of Fraud Defendants' material misrepresentations are set forth in more detail in Count I and the preceding sections, which are incorporated herein by reference. Defendants Jackson Walker and Freeman committed common-law fraud by knowingly declaring that Jackson Walker was not an interested party and had no conflicts with bankruptcy judges of the Southern District of Texas in cases or mediations before Jones and/or failing to disclose the relationship in the declarations of disinterestedness.

220.    For example, Jackson Walker submitted a declaration of disinterestedness in the GWG bankruptcy, filed by Jackson Walker partner Peguero, purporting to disclose conflicts of interest in the Firm's application for appointment without disclosing the intimate relationship between their partner and another bankruptcy judge in the Southern District of Texas. In fact, they affirmatively and falsely represented the absence of a potential conflict with bankruptcy judges in the Southern District. For example, a declaration of disinterestedness prepared by Jackson Walker and signed by Jackson Walker partner, Peguero, and filed on May 19, 2022, in the GWG bankruptcy failed to disclose the Jones-Freeman relationship. A supplemental declaration of disinterestedness was filed by Jackson Walker partner Peguero on October 6, 2022, fraudulently stating "N/A" in response to potential conflicts or connections with "Bankruptcy Judges for the Southern District of Texas." Further, Jackson Walker fraudulently filed a motion to appoint Jones as a neutral judicial mediator without

disclosing the conflict. In doing so, the firm necessarily represented, falsely, that there was no disqualifying conflict between the judge and the firm. Jackson Walker also fraudulently filed four applications for attorneys' fees without disclosing the conflict involving their partner and Jones. Freeman, a partner at Jackson Walker, likewise committed fraud by failing to disclose the relationship between herself and Jones in any of the foregoing documents.

221.    Additionally, on June 14, 2023, Jackson Walker filed the Second Amended Joint Plan (again procured through the fraudulent mediation before Jones) specifically designating Freeman as Wind Down Trustee under the Plan without disclosing the Jones-Freeman relationship or that Freeman was only appointed to that lucrative position because her longtime boyfriend with whom she shares at least one home oversaw the mediation that led to the Plan.

222.    Freeman has filed numerous documents as Wind Down Trustee. Neither she, Jackson Walker, nor Jones ever disclosed that she was only appointed to that position because her longtime intimate, live-in partner who led mediation, in collaboration with Jackson Walker, arranged for it under the Plan. As late as April 9, 2025, Freeman reported that she, in addition to having already been paid more than $1 million in fees as Wind Down Trustee, is projected to receive at least $665,000 more,[158] without even considering her attorneys' fees through Jackson Walker and Freeman PLLC before the

---

[158] *See GWG*, No. 22-90032, ECF No. 2570-1 (exhibit to GWG Wind Down Trust Budget).

appointment. To this day, neither she, Jackson Walker, nor Jones have disclosed the relationship in filings or amended declarations in the case.

223.   These were all material representations in that the disclosures were required to secure and retain appointments, and to participate in mediation. Further, neither Freeman nor Jackson Walker were entitled to compensation in light of the undisclosed conflict which represented a breach of their fiduciary duties. At the time the representations were made, Jackson Walker, and of course Freeman and Jones, admittedly knew about the intimate, domestic relationship but nevertheless falsely held out Jackson Walker as disinterested and without conflict with respect to bankruptcy judges in the Southern District of Texas. Jackson Walker and Freeman made the representations with the intent that all parties to the bankruptcy, including Plaintiffs, would rely on them and not challenge their appointments, Jones' appointment as mediator, their awards of attorneys' fees, or Freeman's appointment and fees as Wind Down Trustee. All parties unaware of the Jones-Freeman relationship in the GWG bankruptcy, including Plaintiffs, relied on the false representation, and thereby suffered injury by, among other things, Jackson Walker and Freeman securing appointment and receiving attorneys' fees from the bankruptcy estate, Freeman being appointed and receiving fees as Wind Down Trustee, which has reduced the value of the Wind Down Trust, loss from waste and devaluation of assets of the Wind Down Trust, all without disclosure of the intimate, live-in relationship between the Jackson Walker partner and the mediator.

224.    Jones committed fraud through his non-judicial acts of scheming with Jackson Walker and Freeman for him to be appointed mediator in a case in which he was not the presiding judge. Jones represented to Jackson Walker and the Special Committee of the GWG Board of Directors that he was available to serve as mediator, implicitly representing to them and to all those interested in the bankruptcy (through the motion to appoint Jones that recited Jones' representation of availability) that he had no disqualifying conflicts when in fact he was in an intimate, live-in relationship (and co-owned a home) with counsel for Debtor, who would subsequently serve as Wind Down Trustee.

225.    Jones created and/or perpetuated the inference that he was disinterested to serve as a judicial mediator with the intent that all parties to the bankruptcy would rely on it and not challenge the appointment. All parties to the bankruptcy, including Plaintiffs, relied on the false representation, and thereby suffered injury when, among other things, Jackson Walker and Freeman were appointed and awarded attorneys' fees from the bankruptcy estate, Jones was appointed mediator, and Freeman was appointed Wind Down Trustee, all without disclosure of the intimate relationship.

226.    Jones made these representations with the intent that all parties to the bankruptcy would rely on them and not discover the scheme to have him wrest control of the case and have his girlfriend appointed as Wind Down Trustee. All parties to the bankruptcy, including Plaintiffs, relied on these false representation, and thereby suffered injury by, among other things, Jackson Walker and Freeman securing appointment and receiving

fees from the bankruptcy estate, Freeman being appointed and receiving fees as Wind Down Trustee, which has reduced the value of the Wind Down Trust and caused loss from waste and devaluation of assets of the Wind Down Trust, all without disclosure of the intimate, live-in relationship between the Jackson Walker partner and the mediator.

227. The foregoing misrepresentations were made willfully and with knowledge of their falsity when made. Alternatively, Fraud Defendants made these representations recklessly without any knowledge of the truth and as a positive assertion.

228. Plaintiffs are entitled to actual damages and exemplary damages based on Fraud Defendants' actions. Tex. Civ. Prac. & Rem. Code § 41.003(a). Plaintiffs also request disgorgement of profits and forfeiture of fees, nominal damages, and such other and further relief as may be just and appropriate.

## COUNT IV
## BREACH OF FIDUCIARY DUTY
*(Against All Defendants)*

229. Plaintiffs incorporate by reference the factual allegations contained in the preceding paragraphs as though fully set forth herein.

230. Plaintiffs intend to bring this Count against Jackson Walker, Freeman, and Freeman PLLC on behalf of the GWG estate or successor entity. either through special appointment or derivative standing. Plaintiffs also bring this Count against Freeman and Freeman PLLC directly for their actions taken while serving as Wind Down Trustee

104

and against Porter Hedges directly for its action taken while serving as co-counsel for Bondholder Committee.

**As Against Jackson Walker and Elizabeth Freeman**

231.   Upon the filing of a chapter 11 petition, the debtor becomes a debtor-in-possession ("DIP") with fiduciary duties to its creditors. *Barron & Newburger, P.C. v. Tex. Skyline, Ltd. (In re Woerner),* 783 F.3d 266, 271 (5th Cir. 2015) (citing 11 U.S.C. §§ 1101, 1106–08). Lawyers representing debtors-in-possession must have their employment approved by the bankruptcy court and must satisfy a host of obligations, including requirements to disclose all "connections" and to satisfy ethics standards, among others, prohibiting conflicts of interest. 11 U.S.C. §§ 101(14), 327.

232.   As attorneys for debtors-in-possession, Defendants Freeman and Jackson Walker owed a fiduciary duty to the bankruptcy estate and to Plaintiffs as creditors/bondholders of the bankruptcy estate and beneficiaries of the Wind Down Trust.

233.   Plaintiffs, as creditors and interested parties to the bankruptcy estate, reposed confidence and trust in Defendants Freeman and Jackson Walker as conflicts counsel and/or counsel for the debtor-in-possession, Jones as judicial mediator, and Freeman as Wind Down Trustee. Plaintiffs relied, directly or indirectly, on Defendants to carry out their function in a manner that enabled the fair resolution of bankruptcy proceedings and operation of the Wind Down Trust.

234.    Counsel for a debtor in possession owes a fiduciary duty to the estate and to creditors of the estate that includes, but is not limited to:

    a.  a duty to reveal known conflicts of interest with court professionals,

    b.  a duty to disclose acts of conversion, concealment, or misuse of estate property,

    c.  a duty to reveal matters having an adverse effect on the bankruptcy estate,

    d.  a duty to avoid actions that would wrongfully deplete the fund from which creditors are to be paid, and

    e.  a duty to avoid intentional wrongs.

235.    Additionally, as recognized explicitly in the Wind Down Trust agreement, the Wind Down Trustee owes a fiduciary duty to the beneficiaries of the wind down or liquidating trust. Those duties necessarily include:

    a.  a duty to reveal known conflicts of interest with court professionals, including mediators,

    b.  a duty to disclose acts of conversion, concealment, or misuse of estate property,

    c.  a duty to reveal matters having an adverse effect on the bankruptcy estate,

    d.  a duty to avoid actions that wrongfully deplete the fund from which creditors were to be paid, and

    e.  a duty to avoid intentional wrongs.

236.    Defendants Freeman and Jackson Walker knew or should have known that bondholders/creditors such as Plaintiffs relied on their good-faith oversight and preservation of the bankruptcy estate from which creditors were to be paid and to reveal any matters adversely impacting the fair, impartial handling of the bankruptcy estate.

237.    Plaintiffs relied on the false representations of Defendants Freeman and Jackson Walker as being disinterested parties in the bankruptcy proceedings. Plaintiffs relied on the representations of Defendants Freeman and Jackson Walker as operating in good faith and being free from conflict with the judge overseeing mediation, and in Defendants Freeman and Jackson Walker's representations of being lawfully entitled to fees paid from the bankruptcy estate and Wind Down Trust (which reduced the estate and/or Wind Down Trust that was available to pay bondholders/creditors and WDT beneficiaries such as Plaintiffs), and that such fees were not the product of an undisclosed, intimate relationship between the petitioning attorney and her firm and the judge overseeing the mediation.

**As Against Elizabeth Freeman for her conduct while appointed as Wind Down Trustee**

238.    As a Wind Down Trustee, Freeman owes a fiduciary duty to the beneficiaries of the Wind Down Trust, necessarily including:

    a.  a duty to reveal known conflicts of interest with court professionals,

    b.  a duty to disclose acts of conversion, concealment, or misuse of estate property,

    c.  a duty to reveal matters having an adverse effect on the bankruptcy estate,

    d.  a duty to avoid actions that would wrongfully deplete the fund from which

        creditors were to be paid, and

    e.  a duty to avoid intentional wrongs.

239.  Defendant Freeman, as Wind Down Trustee, knew or should have known that bondholders/creditors such as Plaintiffs relied on her good-faith oversight and preservation of the Wind Down Trust from which bondholders/creditors were to be paid and to reveal any matters adversely impacting the fair, impartial handling of the bankruptcy estate.

240.  Plaintiffs relied on the false representations of Defendant Freeman as being a disinterested party in the bankruptcy proceedings—both initially as counsel for the Debtor and later as Wind Down Trustee. Plaintiffs relied on the false representations of Defendant Freeman as operating in good faith and being free from conflict with the judge overseeing mediation, on Freeman's false representations of being lawfully entitled to both attorneys' fees from the estate and fees as Wind Down Trustee paid from the Wind Down Trust (which reduced the estate and Wind Down Trust that was available to pay bondholders/creditors such as Plaintiffs), on Freeman's false representations of her handling of the assets of the GWG liquidating trust in good faith and being free from conflict with the judge overseeing mediation, and on Freeman's false representations that such fees and actions were not the product of an undisclosed,

intimate relationship between the petitioning attorney and her former firm and the judge overseeing the mediation.

**As Against Jones**

241.    Jones owed a fiduciary duty to the public and to interested parties in bankruptcies in cases like GWG, where he conspired with Jackson Walker and Freeman to interject himself into the case as a supposedly neutral mediator. Jones owed a fiduciary duty to those interested in the bankruptcy proceedings not to manipulate the bankruptcy proceedings for the gain of his intimate, live-in partner, and indirectly for himself.

242.    Jones owed a fiduciary duty to the public and to the litigants whom he impacted by orchestrating (with Jackson Walker and Freeman) his appointment as mediator, including but not limited to:

    a.  a duty of candor,

    b.  a duty to reveal conflicts of interest with litigants and/or their counsel,

    c.  a duty of good faith and fair dealing,

    d.  a duty of loyalty, which encompasses impartiality,

    e.  a duty to avoid self-dealing, including the duty to refrain from dealings benefiting people (such as Freeman) closely identified with the fiduciary,

    f.  a duty to disqualify himself, either as the presiding judge or mediator, in a proceeding where his live-in, intimate partner was a lawyer in the case or where his impartiality might reasonably be questioned,

    g.  a duty to reveal matters having an adverse effect on the bankruptcy estate,

h.  a duty to avoid intentional wrongs.

243.  Jones knew or should have known that Plaintiffs, as bondholders/creditors of GWG, relied on him to be free from influence or self-interest in overseeing bankruptcy mediation proceedings, to aid in the good-faith oversight and preservation of the bankruptcy estate from which creditors were to be paid, and to reveal any matters adversely impacting the fair and impartial adjudication of the bankruptcy estate.

244.  Plaintiffs relied on Jones' implicit and explicit assurances that there were no undisclosed interested parties involved in the bankruptcy proceedings being mediated before him and that his recommendations and acts as mediator were taken in good faith and without a compromised relationship with one of the attorneys before him. Plaintiffs relied on Jones' representations—implicit and explicit—of his disinterest.

**As Against Porter Hedges**

245.  In the application to appoint Porter Hedges as co-counsel to the Bondholder Committee, the Committee outlined Porter Hedges' obligations, including "to assist, advise and represent the Committee in participating in the negotiation and formulation of a disclosure statement and plan of reorganization and to advise those represented by the Committee of the Committee's determinations as to any plan;" "communications with the Committee's constituents in furtherance of its responsibilities, including but not limited to, communications required under Bankruptcy Code section 1102;" "to assist, advise and represent the Committee in any manner relevant to preserving and protecting the Debtors' estates and the rights of creditors;" "to assist, advise and

110

represent the Committee regarding the evaluation of claims, preferences, fraudulent transfers and other actions[.]"[159]

246.   As attorneys for the Bondholder Committee, Defendant Porter Hedges owed a fiduciary duty to the Bondholder Committee as well as the approximately 27,000 bondholders represented by the Committee. In particular, when Jackson Walker moved to appoint Jones as mediator, Porter Hedges had a fiduciary duty to advise and communicate to the Committee and Plaintiffs that Jones was in an intimate, live-in relationship with Freeman, a partner at Jackson Walker. It also had a fiduciary duty to advise and communicate to the Committee and Plaintiffs about the relationship when, in connection with formulation of the Plan, it was revealed that Freeman would serve as Wind Down Trustee.

247.   Plaintiffs, as bondholders/creditors and interested parties to the bankruptcy estate, reposed confidence and trust in Defendant Porter Hedges as co-counsel for the Bondholder Committee. Plaintiffs relied, directly or indirectly, on Defendant Porter Hedges to carry out their function in a manner that enabled the fair resolution of bankruptcy proceedings and operation of the Wind Down Trust.

248.   Counsel for the Bondholder Committee further owed a fiduciary duty to the bondholders/creditors of the estate that includes, but is not limited to a duty to reveal

---

[159] *GWG*, No. 22-90032, ECF No. 37 at 5.

known conflicts of interest with court professionals and a duty to reveal matters having an adverse effect on the bondholders/creditors or bankruptcy estate.

249. Defendant Porter Hedges knew or should have known that bondholders/creditors such as Plaintiffs relied on their good-faith representation of the Bondholder Committee and the interests of the bondholders and their implicit representation that they were unaware of any disqualifying conflict between the mediator and Freeman. Upon information and belief, Defendant Porter Hedges did not disclose the Jones-Freeman relationship to the constituents of the Bondholder Committee or any of the bondholders.

250. Plaintiffs relied on Defendant Porter Hedges' failure to disclose the conflict in connection with the appointment of Jones as mediator and Freeman as Wind Down Trustee, and further relied on Defendant Porter Hedges' failure to disclose that these actors were not operating in good faith and free from conflict. Plaintiffs further relied on Defendant Porter Hedges' failure to disclose the Jones-Freeman relationship in connection with Freeman's and Jackson Walker's representations of being lawfully entitled to fees paid from the bankruptcy estate and Wind Down Trust (which reduced the estate and/or Wind Down Trust that was available to pay bondholders/creditors and WDT beneficiaries such as Plaintiffs), and that such fees were not the product of an undisclosed, intimate relationship between the petitioning attorney and her firm and the judge overseeing the mediation.

**As Against All Defendants**

251.    Defendants each breached their fiduciary duties by acts including, but not limited to:

    a.  securing the appointment of Defendants Freeman, Freeman PLLC, and Jackson Walker as attorneys on bankruptcy cases, including in the GWG bankruptcy, despite Jones, as mediator, having a personal and financial interest in the outcome of the case and without updating previously filed disclosures;

    b.  scheming to secure the appointment of Defendant Jones as judicial mediator in the GWG bankruptcy proceedings despite Jones having a personal and financial interest in the case through Freeman;

    c.  securing the appointment of Freeman as Wind Down Trustee for the GWG bankruptcy proceedings despite her undisclosed relationship with Jones;

    d.  providing false or misleading information for purposes of deceiving the public, the judiciary, and bankruptcy shareholders and creditors such as Plaintiffs;

    e.  withholding from Plaintiffs and the public facts material to federal bankruptcy court decisions;

    f.  Jones failing to refuse to serve as mediator and failing to recuse himself as mediator;

    g.  Jackson Walker and Freeman moving to appoint Jones as a mediator without disclosing the intimate, live-in relationship and in failing to move to disqualify him as a mediator;

h.  defrauding creditors and shareholders such as Plaintiffs;

i.  influencing the orders issued in bankruptcy proceedings for the benefit of the Defendants and to the detriment of bondholders/creditors such as Plaintiffs;

j.  enhancing the status, reputation, and demand for the services of Defendants Freeman and Jackson Walker as bankruptcy attorneys by securing rulings or results favorable to Defendants Freeman and Jackson Walker;

k.  wrongfully depleting and wasting the estate assets in the GWG proceeding;

l.  failing to take steps necessary to properly run GWG's business and/or to preserve and maximize the value of GWG's assets for the benefit of Plaintiffs and other creditors and interested parties;

m.  forcing a liquidation and resulting wasteful fire sale of GWG assets that realized only a small fraction of the value of those assets;

n.  assuming positions where their duties to Plaintiffs were in conflict with Defendants' responsibilities to others or materially limited by Defendants' personal interests;

o.  failing to provide appropriate disclosures and transparency;

p.  profiting from the issuance of bankruptcy court rulings favoring Defendants,

q.  acting to benefit their own self-interest to the detriment of Plaintiffs and other bondholders/creditors;

r.  shielding themselves from public, judicial and governmental scrutiny relating to the relationship between Freeman and Jones; and

s.  committing intentional wrongs.

252.    Defendants knew or should have known that creditors and bondholders, such as Plaintiffs, would be harmed by Defendants' actions in breach of Defendants' fiduciary duties.

253.    As a direct and proximate result of Defendants' breaches of their fiduciary duties, Jones improperly presided over the mediation of a case in which he was unquestionably disqualified to serve, Freeman was appointed as Wind Down Trustee, and Jackson Walker, Freeman, and Freeman PLLC were awarded attorneys' fees on behalf of the debtor and Freeman collected (and continues to collect) fees as Wind Down Trustee taken from the estate and Wind Down Trust, which caused Plaintiffs to suffer damages including but not limited to economic harm and monetary loss. As a foreseeable result of Defendants' conduct, Plaintiffs' financial recovery was drastically reduced because the bankruptcy estate available to pay bondholders/creditors, including Plaintiffs, was diminished by the fees improperly awarded to Jackson Walker and Freeman as debtor's counsel and by Freeman as Wind Down Trustee. Further, as a foreseeable result of Defendants' conduct, Plaintiffs' interest in the Wind Down Trust were diminished by Freeman's mishandling and waste of estate assets, and exorbitant fees as Wind Down Trustee, none of which would have occurred had Defendants disclosed Freeman and Jones were in an intimate relationship and co-owned a home.

254.    Plaintiffs are entitled to and respectfully request (1) compensatory damages, (2) punitive damages, (3) pre-judgment and post-judgment interest, (4) costs of suit, (5)

disgorgement of profits and forfeiture of fees, (6) nominal damages, and (7) such other and further relief as may be just and appropriate.

## COUNT V
## AIDING AND ABETTING BREACH OF FIDUCIARY DUTY
*(Against All Defendants)*

255.    Plaintiff incorporates by reference the factual allegations contained in the preceding paragraphs as though fully set forth herein.

256.    At all times, each Defendant was aware of the fiduciary duties owed by each of the other Defendants to the bondholders and, subsequently, beneficiaries of the Wind Down Trust, including Plaintiffs.

257.    Despite this knowledge, each Defendant was aided and abetted by the other Defendants in the breach of their fiduciary duties owed to the bondholders and, subsequently, beneficiaries of the Wind Down Trust, including Plaintiffs.

258.    As a direct and proximate result of Defendants' wrongful acts and omissions, including concealing the intimate, live-in relationship between Jones and Freeman, Plaintiffs suffered damages. In particular, Jones improperly presided over the mediation of a case in which he was unquestionably disqualified to serve, Freeman was appointed as Wind Down Trustee, and Jackson Walker, Freeman, and Freeman PLLC were awarded attorneys' fees on behalf of the debtor and Freeman collected (and continues to collect) fees as Wind Down Trustee taken from the estate and Wind Down Trust, which caused Plaintiffs to suffer damages including but not limited to economic harm and monetary loss. As a foreseeable result of Defendants' conduct,

116

Plaintiffs' financial recovery was drastically reduced because the bankruptcy estate available to pay bondholders/creditors, including Plaintiffs, was diminished by the fees improperly awarded to Jackson Walker and Freeman as debtor's counsel and collected by Freeman as Wind Down Trustee. Further, as a foreseeable result of Defendants' conduct, Plaintiffs' interest in the Wind Down Trust were diminished by Freeman's mishandling and waste of estate assets, and exorbitant fees as Wind Down Trustee, none of which would have occurred had Defendants disclosed Freeman and Jones were in an intimate relationship and co-owned a home.

259.    Plaintiffs are entitled to and respectfully request (1) compensatory damages, (2) damages for emotional distress and mental anguish, (3) punitive damages, (4) pre-judgment and post-judgment interest, (5) costs of suit, (6) disgorgement of profits and forfeiture of fees, (7) nominal damages and (8) such other and further relief as may be just and appropriate.

## COUNT VI
## NEGLIGENT MISREPRESENTATION
*(Against All Defendants)*

260.    Plaintiffs incorporate by reference the factual allegations contained in the preceding paragraphs as though fully set forth herein.

261.    Defendants Jackson Walker, Freeman, Freeman PLLC, and Porter Hedges, in the course of their business, and Jones, who had a pecuniary interest in the case through Freeman, provided misleading and false information and/or omitted information

117

regarding past or existing material facts relating to the intimate relationship between Freeman and Jones. The details of Defendants' material misrepresentations are set forth in more detail in Count I and the preceding sections, which are incorporated herein by reference. In general, Defendants Jackson Walker, Freeman, and Freeman PLLC negligently, carelessly, or without reasonable grounds for believing it to be true, misrepresented themselves as "disinterested" in the proceedings before Jones. Jones likewise misrepresented himself as "disinterested" for the purpose of serving as mediator.[160] Porter Hedges negligently, carelessly, or without reasonable grounds for believing it to be true, misrepresented that it did not know of any disqualifying conflicts involving the mediator and Freeman. *See GWG*, 22-90032, ECF No. 508 at 3 (requiring Porter Hedges to "review its files periodically during the pendency of the Chapter 11 Cases to ensure that no conflicts or other disqualifying circumstances exist or arise").

262.   Under the rules governing bankruptcy proceedings, for a firm to be employed by a debtor or debtor-in-possession, it must show that it is *disinterested* and must disclose

---

[160] The elements of a negligent misrepresentation claim are as follows: (1) the defendant made a representation in the course of the defendant's business; (2) the representation contains false information for the guidance of others in their businesses, (3) the defendant did not exercise reasonable care or competence in obtaining or communicating the representation, (4) the plaintiff justifiably relied on the representation, and (5) the defendant's negligent misrepresentation proximately caused the plaintiff's injury. *See McCamish, Martin, Brown & Loeffler v. F.E. Appling Interests*, 991 S.W.2d 787, 792 (Tex. 1999); *see also* Restatement (Second) of Torts § 552 ("(1) One who, in the course of his business, profession or employment, or in any other transaction in which he has a pecuniary interest, supplies false information for the guidance of others in their business transactions, is subject to liability for pecuniary loss caused to them by their justifiable reliance upon the information, if he fails to exercise reasonable care or competence in obtaining or communicating the information.").

all "connections[.]" 11 U.S.C. § 101(14), 327; Fed. R. Bankr. P. 2014 (requiring "a verified statement of the person to be employed setting forth the person's connections with the debtor, creditor, or any other party of interest"). Further, Defendants were required to disclose the Jones-Freeman relationship in connection with the mediation. Local Rule 16.4.I(2) required their disclosure of any potential conflicts of interest possessed by a mediator in the case; Bankruptcy Rule 2014 and the fiduciary duties of estate counsel required their disclosure of any facts relevant to the bankruptcy court's determination of eligibility to be retained under 28 U.S.C. § 327; and the Texas Disciplinary Rules of Professional Conduct, applicable under the Southern District's Local Rules, required their utmost duty of candor.

263.    None of the Defendants disclosed the intimate relationship between Freeman and Jones in the GWG case or in any other case in which they were participants.

264.    Defendants had a duty to the Court, to Plaintiffs and other bondholders/creditors and interested parties in the bankruptcy proceeding, and to the general public, to provide truthful, accurate and complete information about the intimate relationship between Freeman, an attorney in the case and Wind Down Trustee, and Jones, the mediator.

265.    Defendants failed to exercise reasonable care by failing to provide truthful, accurate, and complete information about circumstances -- the relationship between Freeman, as counsel for one of the parties and eventual Wind Down Trustee, and Jones,

as the requested and appointed judicial mediator-- that could reasonably bear on the impartiality of the bankruptcy proceeding.

266.    Defendants' misrepresentations included the following:

   (a) misrepresenting that Defendants Jackson Walker, Freeman, Freeman PLLC, and Jones were disinterested despite the intimate, live-in relationship between Freeman and Jones,

   (b) omitting disclosure of the intimate relationship between Freeman and Jones when such information called into question the impartiality of proceedings, and

   (c) failing to correct prior declarations or statements of disinterestedness to disclose the Jones-Freeman relationship.

267.    These were all material representations in that the disclosure were required to secure and retain appointment under the Bankruptcy Code, for Jones to be appointed mediator, and for Freeman to be appointed Wind Down Trustee. Neither Freeman, Freeman PLLC, Porter Hedges, nor Jackson Walker were entitled to compensation in light of the undisclosed conflict. Defendants failed to exercise reasonable care in making these representations and omissions.

268.    Jones failed to exercise ordinary care by failing to disclose the relationship between himself and Freeman. Jones' affirmative representation that he was available to serve as mediator without disclosing the conflict, and his silence and acceptance of the appointment of mediator necessarily and unreasonably represented that he was

disinterested to serve as a judicial mediator and further that the appointment of Freeman as Wind Down Trustee which came from the mediation was legitimate and untainted with his undue influence. Additionally, Jones committed negligent misrepresentation in advising Jackson Walker and the Special Committee of the GWG Board of Directors that he was available to serve as mediator without ever disclosing his intimate relationship with Freeman. Jones made these representations unreasonably and without the exercise of ordinary care.

269.    All parties unaware of the Jones-Freeman relationship in the GWG bankruptcy, including Plaintiffs, justifiably relied on these false representation and omissions, and thereby suffered injury by, among other things, Jackson Walker and Freeman securing appointment and receiving attorneys' fees from the bankruptcy estate, Freeman being appointed and receiving fees as Wind Down Trustee, which has reduced the value of the Wind Down Trust, and loss from waste and devaluation of assets of the Wind Down Trust, all without disclosure of the intimate, live-in relationship between the Jackson Walker partner and the mediator.

270. Further, as a direct and proximate cause of Defendants' negligent misrepresentations, Plaintiffs thereby suffered injury when, among other things, Jackson Walker, Freeman and Freeman PLLC were appointed and awarded attorneys' fees from the bankruptcy estate, Porter Hedges was awarded fees as counsel for Bondholder Committee, Jones was appointed as mediator, and Freeman was appointed as Wind Down Trustee and paid significant fees, all without disclosure of the intimate

relationship. Further, as a foreseeable result of Defendants' conduct, Plaintiffs' interest in the Wind Down Trust were diminished by Freeman's mishandling and waste of estate assets, as well as exorbitant fees as Wind Down Trustee. Plaintiffs suffered damages including but not limited to economic harm and monetary loss.

271.    Plaintiffs are entitled to and respectfully request (1) compensatory damages, (2) punitive damages, (3) pre-judgment and post-judgment interest, (4) costs of suit, (5) disgorgement of profits and forfeiture of fees, (6) nominal damages, and (7) such other and further relief as may be just and appropriate.

**COUNT VII**
**PROFESSIONAL NEGLIGENCE**
*(Against Defendants Jackson Walker, Freeman, Freeman PLLC, and Porter Hedges)*

272.    Plaintiffs incorporate by reference the factual allegations contained in the preceding paragraphs as though fully set forth herein.

273.    Defendants' acts and omissions as pled above constitute legal malpractice and professional negligence.

274.    Plaintiffs intend to bring this Count against Jackson Walker, Freeman, and Freeman PLLC on behalf of the GWG estate or successor entity, either through special appointment or derivative standing. Plaintiffs also bring this Count against Freeman and Freeman PLLC directly for their actions taken while serving as Wind Down Trustee and against Porter Hedges directly for its action taken while serving as co-counsel for Bondholder Committee.

275.   Defendants Jackson Walker, Freeman and Freeman PLLC undertook to provide professional legal services as co-counsel and conflicts counsel for Debtors and Debtors in Possession in connection with GWG's Chapter 11 bankruptcy proceedings. Porter Hedges undertook to provide professional legal services as co-counsel for the Bondholder Committee. Additionally, Freeman provided professional legal and financial services as Wind Down Trustee. At all relevant times, Jackson Walker, Freeman, Freeman PLLC, and Porter Hedges held themselves out as experts in the field of bankruptcy law.

276.   In the course of handling the bankruptcy matter for GWG, Defendants Jackson Walker, Freeman, Freeman PLLC, and Porter Hedges negligently, intentionally and/or fraudulently made representations to Plaintiffs that they were disinterested in the bankruptcy proceeding. In reliance upon these representations, Plaintiffs did not know, and had no reason to know, that Jones was involved in an intimate relationship with a partner at Jackson Walker. Accordingly, Plaintiffs were deprived of the opportunity to object to Jackson Walker's, Freeman's, and Freeman PLLC's representation of GWG and appurtenant fees, to object to Porter Hedges' fees for representation of the Bondholder Committee, to object to Jones as mediator or seek disqualification of Jones, or to object to Freeman's appointment as Wind Down Trustee and appurtenant fees.

277.   Plaintiffs aver that Defendants Jackson Walker, Freeman, Freeman PLLC, and Porter Hedges were negligent and/or committed malpractice in the following regards:

a. By failing to inform the Court, the Bondholder Committee, and bondholders, including Plaintiffs, that Jackson Walker partner, Freeman, was involved in an intimate relationship with Jones at all times Defendants were representing GWG and/or the Bondholder Committee, including when they moved for Jones' appointment as mediator and when Freeman was appointed Wind Down Trustee.

b. By affirmatively representing to the Court, litigants and public that Jackson Walker, Freeman, and Freeman PLLC were disinterested, despite the fact that Jackson Walker partner Freeman was involved in an intimate relationship with Jones at all times when Defendants were representing GWG and/or the Bondholder Committee in bankruptcy proceedings, including when they moved for Jones' appointment as mediator and when Freeman was appointed Wind Down Trustee.

c. By failing to correct prior declarations and statements of disinterestedness to disclose the Jones-Freeman relationship.

d. By moving for appointment of Jones as mediator without disclosing that he was in an intimate, live-in relationship with Freeman, a Jackson Walker partner.

e. By failing to properly carry out their duties as legal representatives of GWG and/or the Bondholder Committee.

      f.  By mismanaging the assets of GWG and acting in ways that diminished the value of GWG's assets and/or the assets of the Wind Down Trust.

278.  Defendants knew that as bondholders/creditors in GWG's bankruptcy proceeding, Plaintiffs were among a limited group that could reasonably have been expected to have access to Defendants' misrepresentations and could reasonably have been expected to act in reliance upon such misrepresentations.

279.  Each of the Defendants had a duty to provide professional services that a reasonable and prudent attorney or wind down trustee would have provided under the same or similar circumstances. Defendants failed to provide the legal services or the wind down trustee services that a reasonably prudent attorney or wind down trustee would have provided under the same or similar circumstances. Defendants' conduct constitutes professional negligence and legal malpractice.

280.  As a direct and proximate result of Defendants' negligence and/or malpractice, Plaintiffs suffered damages including but not limited to economic harm and monetary loss.

281.  Plaintiffs are entitled to and respectfully requests (1) compensatory damages, (2) punitive damages, (3) pre-judgment and post-judgment interest, (4) costs of suit, (5) disgorgement of profits and forfeiture of fees, (6) nominal damages, and (7) such other and further relief as may be just and appropriate.

## COUNT VIII
## COMMON-LAW CIVIL CONSPIRACY

*(Against Jackson Walker, Freeman, Freeman PLLC, and Jones)*

282.   Plaintiffs incorporate by reference the factual allegations contained in the preceding paragraphs as though fully set forth herein.

283.   Plaintiffs allege a civil conspiracy against Defendants Jackson Walker, Freeman, Freeman PLLC, and Jones ("Conspiracy Defendants") in connection with orchestrating Jones' appointment as mediator without disclosing the Jones-Freeman intimate relationship and while affirmatively representing disinterestedness. Jones conspired through administrative, non-judicial acts, including conferring with Freeman on how to manipulate the GWG bankruptcy despite not having been assigned to the case as presiding judge—arranging for Jackson Walker and Freeman to move for his appointment as mediator, which in turn would enable him to orchestrate a Plan that rewarded Freeman, and himself indirectly, with exorbitant fees as Wind Down Trustee.

284.   Once Conspiracy Defendants succeeded in their scheme to appoint Jones as mediator, they directed the GWG bankruptcy into liquidation and provided Freeman with the a "golden parachute" severance from Jackson Walker with a lucrative Wind Down Trustee role. Jackson Walker, Freeman and Freeman PLLC collected millions in attorneys' fees and Wind Down Trustee fees, with Jones benefitting financially through Freeman, and without any Conspiracy Defendant ever disclosing the Jones-Freeman relationship.

285.    The elements of civil conspiracy are (1) two or more persons; (2) an object to be accomplished; (3) a meeting of minds on the object or course of action; (4) one or more unlawful, overt acts; and (5) damages as the proximate result.[161]

286.    Conspiracy Defendants agreed to collect profit through the Jones-Freeman relationship by interjecting Jones into a case by moving for his appointment as mediator to accomplish their objectives (without ever disclosing the disqualifying conflict), with all Conspiracy Defendants profiting directly or indirectly from the arrangement. Conspiracy Defendants had a meeting of the mind on the object of the conspiracy— collecting millions in attorneys' fees and securing lucrative appointments; and on the course of action—failing to disclose the Jones-Freeman intimate relationship and affirmatively representing disinterestedness.

287.    These misrepresentations, including but not limited to the declaration of disinterestedness, the motion to appoint Jones as mediator, the Plan following mediation naming Freeman as Wind Down Trustee, and subsequent pleadings and participation in proceedings made without amending the disclosures are unlawful, overt acts.

288.    Conspiracy Defendants also committed civil conspiracy to breach their fiduciary duty to creditors including Plaintiffs and other interested parties to the GWG

---

[161] *United Biologics, L.L.C. v. Allergy & Asthma Network*, 819 F. App'x 204, 208 (5th Cir. 2020) (citing *Massey v. Armco Steel Co.*, 652 S.W.2d 932, 934 (Tex. 1983)).

bankruptcy by agreeing not to disclose the intimate Jones-Freeman relationship and to affirmatively represent disinterestedness while collecting unlawful profit. Defendants took one or more unlawful acts, including filing fraudulent declarations of disinterestedness and failing to amend them, filing a motion to appoint Jones as mediator without disclosing his intimate relationship with Freeman, and arranging for Freeman to be named to the lucrative Wind Down Trustee position without disclosing the intimate live-in relationship between the mediator and Wind Down Trustee. As a result of these acts, Plaintiffs and other interested parties were damaged as the proximate result.

289.    The bondholders/creditors, Plaintiffs, and other interested parties to the GWG bankruptcy suffered damages as a proximate result of the foregoing civil conspiracy, including but not limited to the improper appointment and award of attorneys' fees to Freeman, Freeman PLLC, and Jackson Walker, Freeman being appointed and receiving fees as Wind Down Trustee, which has reduced the value of the Wind Down Trust, and loss from waste and devaluation of assets of the Wind Down Trust, all without disclosure of the intimate, live-in relationship between the Jackson Walker partner and the mediator.

290.    Further, because Conspiracy Defendants' conduct targets the federal judiciary and the bankruptcy process in particular, "the judiciary's responsibility to superintend

the integrity of the bankruptcy process lessens the plaintiff's burden to show a direct injury, at least at the pleading stage."[162]

291.    Plaintiffs are entitled to and respectfully request damages including (1) compensatory damages, (2) punitive damages, (3) pre-judgment and post-judgment interest, (4) costs of suit, (5) disgorgement of profits and forfeiture of fees, (6) nominal damages, (7) exemplary damages, and (8) such other and further relief as may be just and appropriate.

**COUNT IX**
**UNJUST ENRICHMENT**
*(Against All Defendants)*

292.    Plaintiffs incorporate by reference the factual allegations contained in the preceding paragraphs as though fully set forth herein.

293.    Defendants enriched themselves at the expense of the bankruptcy estate, the Wind Down Trust, and bondholders/creditors of the GWG bankruptcy such as Plaintiffs. As a foreseeable result of Defendants' conduct, Plaintiffs' recovery as bondholders/creditors and Wind Down Trust beneficiaries was reduced because the bankruptcy estate and Wind Down Trust was diminished by the improper appointment and award of attorneys' fees to Freeman, Freeman PLLC, Porter Hedges, and Jackson Walker, by Freeman being appointed and receiving fees as Wind Down Trustee, which

---

[162] *Alix*, 23 F.4th at 207 (cleaned up).

has reduced the value of the Wind Down Trust, and loss from waste and devaluation of assets of the Wind Down Trust.

294.    Jackson Walker, Freeman, and Freeman PLLC used their positions as bankruptcy counsel for GWG (and also as Wind Down Trustee in the case of Freeman) to engage in self-dealing and generally improper conduct and were enriched by such conduct. Jackson Walker and Freeman received substantial fees, were able to retain large clients with promises of access to a friendly judge and enhanced their reputation as bankruptcy counsel because of their ability to manipulate the proceedings through the Jones-Freeman relationship. Porter Hedges, despite its position as counsel for the Bondholder Committee, acquiesced to the knowing concealment of conflicts for the purpose of ensuring non-opposition to the award of its fees for serving in that position.

295.    Defendants' wrongful and fraudulent conduct, as alleged in this Complaint, caused Defendants to become unjustly enriched and receive benefits that otherwise would not have been achieved at the expense of Plaintiffs.

296.    Jackson Walker has already taken $861,205.41 in attorneys' fees and expenses from the GWG bankruptcy, with an additional $1.3 million pending in its final motion for attorneys' fees. Those figures include $23,415 for time billed by Freeman while a partner at Jackson Walker. Further, while working under the Freeman PLLC, Freeman billed $205,207.78 in fees and expenses between December 2022 and July 2023, which Jackson Walker ostensibly paid and submitted as expenses. Freeman has also received more than $1 million in fees as Wind Down Trustee. Jones, as Freeman's intimate

partner and co-owner of a shared home, received indirect benefits as well. Porter Hedges was paid over $2 million in fees and expenses for service as co-counsel for the Bondholder Committee.

297.    Had Defendants not engaged in the wrongful conduct, particularly had they revealed the existence of an intimate relationship between Jones and Freeman who was a partner at Jackson Walker, Defendants Jackson Walker, Freeman, and Freeman PLLC would not have been appointed or would have been removed as counsel and Wind Down Trustee and would not have been entitled to compensation.

298.    In equity and fairness, Defendants Jackson Walker, Freeman, and Freeman PLLC must return the fees they wrongfully collected through fraud and concealing the Jones-Freeman relationship. Jones should likewise be required to return any indirect pecuniary benefits he received through Freeman. And Porter Hedges should be required to return fees that it recouped while failing to disclose the Jones-Freeman relationship.

### Respondeat Superior and/or Agency Liability

299.    Plaintiffs repeat and reallege each and every allegation contained in the paragraphs above as if set forth here in full.

300.    Jackson Walker, Freeman PLLC, and Porter Hedges are liable for the acts of their respective agents under the doctrine of respondent superior and/or under agency law and/or for the acts of its partners or employees.

301.    In the alternative, Jackson Walker, Freeman PLLC, and Porter Hedges and/or their respective employees, agents and ostensible agents engaged in joint ventures, joint enterprises, are liable under the direct corporate liability theory, conspiracy, and/or are liable under the theory of respondeat superior.

## **PRAYER FOR RELIEF**

302.    WHEREFORE, PREMISES CONSIDERED, Plaintiffs pray for the following relief:

  a.    An order finding that RICO Defendants' actions, as set out above, violate RICO (18 U.S.C. § 1962(a); constitute obstruction of justice (18 U.S.C. §1503), mail fraud (18 U.S.C. § 1341), wire fraud (18 U.S.C. § 1343), bankruptcy fraud (18 U.S.C. § 152), and honest services fraud (18 U.S.C. § 1346); and constitute a conspiracy to commit RICO violations (18 U.S.C. § 1962(d)).

  b.    An order finding Defendants breached their fiduciary duties and aided and abetted each other Defendant's breach of fiduciary duties,

  c.    An order finding the Fraud Defendants committed fraud,

  d.    An order finding the Conspiracy Defendants liable for civil conspiracy,

  e.    An order finding that all Defendants are liable for negligent misrepresentation and were unjustly enriched.

  f.    An order finding Jackson Walker, Freeman, Freeman PLLC, and Porter Hedges are liable for professional negligence.

g.   An order appointing Murray Holland as Special Administrator or Special Litigating Trustee, or in the alternative, granting Plaintiffs derivative standing to pursue claims against Defendants on behalf of all GWG Bondholders; or in the further alternative, an order certifying a class of bondholder plaintiffs to pursue direct claims.

h.   Enter judgment against Defendants for monetary, actual, consequential, and compensatory damages caused by Defendants unlawful conduct.

i.   Order the disgorgement of profits and forfeiture of fees obtained by Defendants through wrongful conduct;

j.   Award Plaintiffs statutory damages;

k.   Award Plaintiffs nominal damages;

l.   Award Plaintiffs costs and expenses of suit;

m.   Award Plaintiffs pre and post-judgment interest; and

n.   Award such other and further relief to which Plaintiffs may be entitled at law or in equity.

## **DEMAND FOR JURY TRIAL**

303.   Plaintiffs demand a trial by jury for all issues so triable.

Respectfully submitted,

By: __/s/ *Mikell A. West*_____

Mikell A. West
Texas State Bar No. 24070832
S.D. Tex. Bar No. 1563058
Robert W. Clore
Texas State Bar No. 24012436
S.D. Tex. Bar No. 2032287
BANDAS LAW FIRM, P.C.
555 Carancahua Street, Suite 1200
Corpus Christi, Texas 78401
Telephone: (361) 698-5200
Facsimile: (361) 698-5222
mwest@bandaslawfirm.com
rclore@bandaslawfirm.com

Shelby A. Jordan
Texas State Bar No 11016700
Jordan & Ortiz, P.C.
500 N. Shoreline Blvd. Suite 804
Corpus Christi, Texas 78401
sjordan@jhwclaw.com
cc: cmadden@jhwclaw.com