IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | |
|---|---|
| Gary Peterson, Chris Nakashima, John English, Jaquetta English, LT-1 Exchange Trust, LT-2 Exchange Trust, LT-3 Exchange Trust, LT-4 Exchange Trust, LT-5 Exchange Trust, LT-6 Exchange Trust, LT-7 Exchange Trust, LT-8 Exchange Trust, LT-9 Exchange Trust, LT-12 Exchange Trust, LT-14 Exchange Trust, LT-15 Exchange Trust, LT-17 Exchange Trust, LT-18 Exchange Trust, LT-19 Exchange Trust, LT-20 Exchange Trust, on their own behalf and on behalf of all others similarly situated,<br><br>　　　　　Plaintiffs,<br><br>v.<br><br>David R. Jones, Elizabeth Carol Freeman, The Law Office of Liz Freeman, PLLC, Jackson Walker LLP, and Porter Hedges, LLP,<br><br>　　　　　Defendants. | Civil Action No. 4:25-cv-02761 |

**DEFENDANT JACKSON WALKER LLP'S**
**AMENDED MOTION TO DISMISS AND AMENDED RESPONSE TO**
**PLAINTIFFS' "ALTERNATIVE" MOTION FOR DERIVATIVE STANDING**

# TABLE OF CONTENTS

I.    INTRODUCTION ........................................................................................................ 1

II.    FACTUAL BACKGROUND ...................................................................................... 3

III.    STANDARD OF REVIEW ....................................................................................... 16

IV.    LEGAL ANALYSIS................................................................................................... 18

    A.    Plaintiffs' Complaint is a collateral attack on the confirmed Plan, which is legally prohibited by the Fifth Circuit and barred by the Plan and Confirmation Order ...................................................................................... 18

        1.    Plaintiffs may not obtain derivative standing under the Plan's terms........ 20

    B.    Plaintiffs lack Article III standing, requiring dismissal of the Complaint under Rule 12(b)(1)............................................................................................ 21

    C.    Plaintiffs lack prudential standing, requiring dismissal under Rule 12(b)(6)....... 24

    D.    The Complaint alleges harm that Jackson Walker did not proximately cause, requiring dismissal of the Complaint ......................................................... 26

    E.    Plaintiffs' RICO claims cannot withstand a 12(b)(6) motion because the Complaint fails to establish standing, a RICO enterprise, or necessary predicate criminal acts ......................................................................................... 29

        1.    Plaintiffs cannot establish standing for a RICO claim because the Complaint only details purported injury to the bankruptcy estate ............. 30

        2.    The RICO claims are legally impermissible because they rest upon purportedly fraudulent statements in litigation materials.......................... 31

        3.    The Complaint fails to meet RICO's requirement for an enterprise .......... 31

        4.    The Complaint fails to establish the necessary predicate RICO offenses................................................................................................... 33

    F.    Plaintiffs' state law tort claims are barred by Texas's attorney immunity doctrine and the judicial proceedings privilege ..................................................... 35

    G.    The Complaint's failure to prove justifiable or detrimental reliance mandates dismissal of Plaintiffs' state law tort claims ......................................... 38

    H.    The Complaint's conspiracy claims fail since the Complaint lacks specific facts evidencing an agreement among alleged conspirators and the underlying claims themselves cannot be established............................................. 39

    I.    Jackson Walker owed GWG, not Plaintiffs, a fiduciary duty, and Jackson Walker cannot be sued for legal malpractice by Plaintiffs because Jackson Walker represented GWG ................................................................................... 41

    J.    Jackson Walker was not unjustly enriched ......................................................... 42

K.    There is no valid basis for reliance on the theory of *respondent superior* ........... 43

L.    This Court should strike or deny Plaintiffs' class allegations under
      Rule 12(f) as a class action cannot be maintained since Plaintiffs lack
      standing ................................................................................................................ 43

      1.    Members of the proposed class, by definition, lack Article III
            standing ................................................................................................... 44

      2.    The proposed class cannot be certified because there exist inescapable
            individual questions about causation, reliance, injury, and damages......... 45

V.    CONCLUSION ............................................................................................................... 46

## I.    INTRODUCTION

1.    This case represents the third instance in which the Bandas Law Firm, P.C. represents clients lacking the legal standing to properly assert RICO and tort allegations against Jackson Walker under a theory for which Jackson Walker did not proximately cause the alleged harm. Undeterred by this Court's holding in *Van Deelen v. Jones*—a creditor of the bankruptcy estate cannot allege harms based on diminishment of the bankruptcy estate's value—this Complaint asserts identical claims. The Complaint also nefariously seeks to tank a confirmed bankruptcy plan, which Plaintiffs LT Exchange Trusts had endorsed prior to its confirmation.[1]

2.    This litigation is advanced on behalf of what appears to be four named individuals who held L Bonds issued by GWG Holdings, Inc. and its affiliated debtors and debtors in possession (collectively, "GWG").[2] Those people, most likely, are part of the thousands of retail investors who have lost, or will lose, their investments due to GWG's financial demise and eventual bankruptcy. The other Plaintiffs, however, are exchange (or seller) trusts connected with Murray Holland, a former officer and director of GWG who resigned from GWG under questionable circumstances. The GWG Litigation Trustee sued Mr. Holland for breaching his fiduciary duty to GWG.[3] Mr. Holland, along with Bradley Heppner, led GWG between 2018 and 2022. Their mismanagement is what caused GWG to file for bankruptcy, a fact made evident throughout the GWG bankruptcy proceedings.[4] Additionally, Mr. Holland and his former

---

[1] L Bond Management, LLC, ("LBM") acted as the agent for Plaintiffs Exchange Trusts during GWG's bankruptcy. LBM "approved the second amended plan, has agreed to be a proponent of the Second Amended Plan, supports the Second Amended Plan, and urge[d] all bondholders to vote to accept the Second Amended Plan." Doc. No. 1698 at p. 4, *In Re GWG Holdings, Inc.*, Case No. 22-90032 (Bankr. S.D. Tex.).

[2] The Debtors in *In re: GWG Holdings, Inc., et al.*, included: GWG Holdings, Inc., GWG Life, LLC, GWG Life USA, LLC, GWG DLP Funding, IV, LLC, GWG DLP Funding Holdings VI, LLC, and GWG DLP Funding VI, LLC. *See* Doc. No. 1, *In re: GWG Holdings, Inc.*, Case No. 22-90032.

[3] Doc. No. 3, *GWG v. Heppner et. al*, Case No. 24-03090 (Bankr. S.D. Tex. Nov. 11, 2024).

[4] Doc. No. 1253 at ¶ 2, *In re: GWG Holdings, Inc.*, Case No. 22-90032. ("The Committee will not here restate the contents of the Standing Motion and the Proposed Complaint, except to say that the issues raised therein are serious

---

company, MHT Financial LLC ("MHT Financial"), are directly linked to the Exchange Trusts that were part of the first Ponzi scheme involving GWG and Beneficient, the company that eventually drained GWG of its cash and value.[5] During GWG's bankruptcy proceeding, these Exchange Trusts acted through its agent, LBM, which repeatedly and unsuccessfully attempted to subordinate the interests of the 27,000 L Bondholders to the Exchange Trust's financial interests to allow GWG insiders to recover ahead of ordinary investors. The Exchange Trusts eventually lost that argument, which ultimately means that Mr. Holland will recover significantly less money than the 27,000 L Bondholders.

3.    Mr. Holland and others are using various legal proceedings to extract revenge. This group of Plaintiffs moved to recuse Judge Isgur as the presiding judge in the GWG bankruptcy proceedings.[6] That same day, they also moved to remove Liz Freeman as the GWG Wind Down Trustee.[7] And the group also filed this Complaint, advancing Mr. Holland's narrative. The Complaint's arguments about how and why GWG ended up in bankruptcy mirror those Mr. Holland previously asserted when defending against claims brought by the Litigation Trustee.[8] No party other than his former boss, Bradley Heppner, has embraced such theories. Now Mr. Holland wants to serve as a fiduciary with the Complaint seeking his potential appointment as a "special administrator", despite him running GWG into the ground.

4.    This Complaint (which offers an internally inconsistent narrative implicating Jackson Walker) brings forth claims with no basis in law or uncontested facts. The pleading ignores

---

and highly concerning and must be afforded the attention and consideration that they deserve.  Anything short of that would be a disservice to the significant and, in some instances, *life-altering losses suffered by the holders of L Bonds ("Bondholders") at the hands of, among other parties, Mr. Heppner, Ben, their respective affiliated entities, Murray Holland and the Debtors' other former officers and directors, and certain broker-dealers associated with the Debtors*.") (emphasis added); *see also* [Doc. No. 1247](#) at ¶¶ 1-2, *In re: GWG Holdings, Inc.*, Case No. 22-90032.
[5] [Doc. No. 3](#) at ¶ 69, *GWG v. Heppner*, Case No. 24-03090.
[6] [Doc. No. 2733](#), *In re: GWG Holdings, Inc.*, Case No. 22-90032.
[7] [Doc. No. 2734](#), *In re: GWG Holdings, Inc.*, Case No. 22-90032.
[8] [Doc. No. 114](#), *In re: GWG Holdings, Inc.*, Case No. 24-03090.

the financial realities and fraudulent actions that precipitated GWG's bankruptcy filing. The Complaint is little more than another attempt by Mr. Holland and others to divert attention from the true parties responsible for defrauding GWG's L Bondholders of their investments. Allowing this litigation to continue would be a genuine disservice. The Complaint fails to protect the interests of the L Bondholders that the Bandas Law Firm purports to want to represent with a request for derivative standing and, alternatively, class certification.[9] Because of this, the Court should dismiss the litigation with prejudice.

## II.    FACTUAL BACKGROUND

5.    The roots of this case, as with the other two RICO lawsuits brought against Jackson Walker by the Bandas Law Firm,[10] stem from Plaintiffs' dissatisfaction with results in underlying bankruptcy proceedings. Much like the predecessor complaints filed, this is another attempt to re-write history and collaterally attack GWG's confirmed bankruptcy plan.[11]

6.    Until about 2018, GWG and its affiliates had a business model centered on buying life insurance policies through a secondary market and collecting on policies that profitably paid out once the insured died. GWG had funded much of its business with debentures called L Bonds.[12] Starting in 2012, GWG marketed the L Bonds to individual investors across the United States through broker dealers. But by the end of 2018, GWG's management recognized that it was insolvent "to the tune of at least $300 Million."[13] This insolvency was created, in part, because

---

[9] Both requests are also procedurally improper as described in Sections IV.A and IV.L.

[10] *Van Deelen v. Jones*, No. 4:23-cv-03729 (S.D. Tex. Jan. 11, 2024), and *Bouchard v. Jones*, No. 4:24-cv-00693 (S.D. Tex. Feb. 26, 2024).

[11] Similarities exist between Plaintiffs' allegations and those in Mr. Holland's motion to dismiss litigation lodged against him by the GWG Litigation Trustee for his alleged breaches of fiduciary duty. *See* Doc. No. 114, *GWG v. Heppner*, Adv. No. 24-03090 (Bankr. S.D. Tex. Nov. 11, 2024).

[12] Alexander Gladstone, *Asset Manager GWG Files for Bankruptcy as Risky Bond Sales Dry Up*, The Wall Street Journal, April 20, 2022 (available at https://www.wsj.com/articles/asset-manager-gwg-files-for-bankruptcy-as-risky-bond-sales-dry-up-11650459769) (Last visited Sept. 11, 2025).

[13] Doc. No. 1250 at p. 14, *In re: GWG Holdings, Inc.*, Case No. 22-90032.

GWG utilized an increasingly expensive means of obtaining cash—paying commissions to broker dealers who sold the L Bonds that, in turn, increased GWG's expenses for broker commissions, additional life insurance policies, and premium payments on existing policies. [14]

7.    Prior to bankruptcy, to gain cash, GWG entered into a liquidity transaction with a corporation called Beneficient Company Group, LP ("BEN"). Bradley Heppner, a Dallas financier, ran BEN, a company that earned fees and interest by operating a "funds of funds." Initially BEN operated trusts run by Heppner and his family office. In 2017, Heppner divested BEN and shifted to a "new and untested business model focused on a supposedly untapped market, offering liquidity solutions to wealthy individuals and institutions holding illiquid assets."[15] According to Heppner, BEN was intended to operate as "a pawn shop for rich people."[16] Wealthy investors would swap illiquid assets for stock in BEN.[17] But this operating plan required vast capital to maintain liquidity, which BEN could not maintain[18] until BEN discovered GWG.[19]

8.    In September 2017, BEN and MHT Financial agreed to provide liquidity in exchange for the economic rights to several portfolios of alternative assets from various third-party

---

[14] Bruce Kelly, *Silence is not golden for GWG bondholders*, Investment News, Feb. 16, 2022, (available at: https://www.investmentnews.com/alternatives/silence-is-not-golden-for-gwg-bondholders/217357) (Last visited Sept. 11, 2025); *see also*, Alexander Gladstone, *Financial Firm Beneficient Pushed Boundaries Before Bond Program's Collapse*, The Wall Street Journal, Dec. 23, 2022, (available at: https://www.wsj.com/articles/financial-firm-beneficient-pushed-boundaries-before-bond-programs-collapse-11671757459) (Last visited Sept. 11, 2022).

[15] Doc. No. 1250, ¶ 11, *In re: GWG Holdings, Inc.*, Case No. 22-90032.

[16] *Id.*

[17] Later on, Mr. Heppner convinced the Kansas legislature to provide BEN a banking charter. Mr. Heppner touted this asset-swap business model where "big-time investors" would swap illiquid assets for money or stock. That business also went under. Tim Carpenter, *CEO quits struggling Texas company with unique Kansas banking charter*, Kansas Reflector, June 30, 2025. (available at: https://kansasreflector.com/2025/06/30/ceo-quits-struggling-texas-company-with-unique-kansas-banking-charter/) (Last visited Sept. 10, 2025).

[18] Doc. No. 3 at ¶ 6, *GWG v. Heppner*, Case No. 24-03090.

[19] BEN siphoned from GWG at least $174 million in cash, loan repayments, and other benefits. Alexander Gladstone, *An Asset Management Merger Ended in Bankruptcy, While Its Architect Got $174 Million*, The Wall Street Journal, July 29, 2022 (available at: https://www.wsj.com/articles/an-asset-management-merger-ended-in-bankruptcy-while-its-architect-got-174-million-11659103557) (Last visited Sept. 11, 2025).

sellers.[20] MHT Financial, led by Murray Holland,[21] later GWG's CEO, served as middleman. MHT Financial facilitated secondary asset transfers for what the sellers expected would be cash that they could then distribute to investors before winding down funds.[22] "The parties structured the transaction so that MHT Financial, as buyer, purchased assets from a seller and then placed them in an 'Exchange Trust'"[23] (also called the Seller Trust). Those trusts are named Plaintiffs in this litigation.[24] The Exchange Trusts swapped the assets that MHT Financial had "bought for economic interests in BEN common units (the "BEN Units").[25] These BEN Units were then auctioned off for cash, with GWG "winning" the first auction for a bid of $150 million in cash, $250 million in L Bonds, and $150 million in GWG common stock.[26]

9.    The phony auction transaction, which ultimately closed in 2018, is important here. It sets the stage for how Messrs. Heppner and Holland led GWG into financial demise. More importantly, the background aides one's understanding of who Mr. Holland is, why Plaintiffs seek to have him appointed as a "special administrator", and why such a request is galling.

10.    On January 12, 2018, GWG and GWG Life entered the *Master Exchange Agreement* (the "Master Exchange Agreement") to pay for the BEN assets GWG had allegedly

---

[20] The transaction steps are detailed in a helpful graphic from *Paul Capital Advisors, L.L.C. v. Stahl*, No. 2022-0167-SG, 2022 WL 3418769 (Del. Ch. Aug. 25, 2022). *See* Exhibit 2.

[21] GWG's Form-10K states that Mr. Holland served as a trust advisor for the trusts identified as Plaintiffs in this case, which were referred to as the "Exchange Trusts" or "Seller Trusts" in securities filings. GWG Form 10-K, filed on Nov. 5, 2021, at 86 & n.1 (*available at* https://www.sec.gov/ix?doc=/Archives/edgar/data/0001522690/000152269021000008/gwgh-20201231.htm). Mr. Holland resigned as trust advisor before GWG entered bankruptcy, but he indirectly maintained a "pecuniary interest in Seller Trusts' assets resulting from his ownership interest of 30% of the outstanding membership interests of" the Seller Trusts' sole beneficiary, MHT Financial. Doc. No. 1135, p. 54, *In re GWG*, Case No. 22-90032 (Bankr. S.D. Tex.).

[22] Doc. No. 3 at ¶ 84, *GWG v. Heppner*, Case No. 24-03090.

[23] *Id.*

[24] The Plaintiffs at issue are: LT-1 Exchange Trust, LT-2 Exchange Trust, LT-3 Exchange Trust, LT-4 Exchange Trust, LT-5 Exchange Trust, LT-6 Exchange Trust, LT-7 Exchange Trust, LT-8 Exchange Trust, LT-9 Exchange Trust, LT-12 Exchange Trust, LT-14 Exchange Trust, LT-15 Exchange Trust, LT-17 Exchange Trust, LT-18 Exchange Trust, LT-19 Exchange Trust, and LT-20 Exchange Trust.

[25] Doc. No. 3 at ¶ 84, *GWG v. Heppner*, Case No. 24-03090.

[26] Doc. No. 3 at ¶¶ 84-85, 89, *GWG v. Heppner*, Case No. 24-03090.

won at auction. GWG agreed to a series of asset swaps (the "Exchange Transaction"). The Exchange Transactions' allegedly intended to further GWG's relationship with BEN.

11.     The Exchange Transaction occurred with two closings. In the August 10, 2018 closing, Ben LP, as borrower, entered a *Commercial Loan Agreement* (the "Commercial Loan Agreement") with GWG Life, as lender, under which GWG Life made a loan to Ben LP. Upon the completion of that Exchange Transaction, Ben LP owed GWG about $192.5 million in principal.

12.     The second Exchange Transaction closed December 28, 2018. GWG and BEN exchanged securities with the Exchange/Seller Trusts acquiring L Bonds due in 2023 worth about $366.9 million and 27,013,516 shares of GWG's common stock, which was 83% of the outstanding common stock at that time. GWG acquired 40,505,279 Ben LP common units and the option to obtain additional Ben LP common units.[27]

13.     GWG Holdings used proceeds from the Exchange Transaction to issue a $25.7 million special dividend to its shareholders, including GWG's founders, John and Steven Sabres, the individuals responsible for GWG's money-losing L Bond sales plan between 2012 and 2018.[28] After closing, GWG's equity value in BEN sat behind more than $1 billion in preferred equity owned by Mr. Heppner, BEN's founder.

14.     Mr. Holland, whom Plaintiffs' want this Court to designate as an independent fiduciary, was a beneficiary of the Exchange/Seller Trusts. In April 2023, shortly before confirmation of GWG's Plan, those trusts held about $272 million of the $367 million outstanding Seller Trust L Bonds.[29] Upon information and belief, Mr. Holland is still linked to these trusts.

---

[27] Doc. No. 1250, *In re: GWG Holdings, Inc.*, Case No. 22-90032.
[28] Doc. No. 1250, ¶¶ 40–41, *In re: GWG Holdings, Inc.*, Case No. 22-90032.
[29] Doc. No. 1698, p. 69, *In re: GWG Holdings, Inc.*, Case No. 22-90032.

15.    The Exchange Transactions were the first of several dealings between BEN and GWG that depleted GWG's value. By April 2019, Mr. Heppner and his allies (including Mr. Holland) had fully taken over GWG and BEN, with Mr. Heppner buying out GWG's founders for $25 million. After that, GWG's leaders accelerated the flow of money from GWG to BEN.[30]

16.    Included within a timeline[31] of various insider transactions that accelerated GWG's financial ruin is a graphic, attached hereto as Exhibit 1, that details the extent and frequency with which GWG gave or lent money to BEN for worthless BEN equity or, sometimes, nothing.

17.    Under Mr. Heppner's leadership, GWG's relationship with BEN also resulted in an over-reliance on the sale of L Bonds for GWG's cash flow.  The more L Bonds GWG sold, the more cash GWG needed to pay bonds' interest and maturity payments, and broker fees.

18.    Because GWG's life insurance portfolio failed to generate enough cash to cover the L Bond serving costs, GWG opted, from 2018 onward, to double-down on the L Bond model. GWG sold more bonds, which meant GWG incurred more debt to pay old investors. Between January 2018 and the end of 2020, GWG's outstanding L Bonds more than doubled, reaching more than $1.25 billion in 2020.[32]

19.    The voodoo accounting used under Messrs. Heppner's and Holland's leadership had detrimental effects upon GWG. Each of GWG's auditors— since 2018 through the bankruptcy filing—either resigned or declined reappointment.[33] Several independent GWG board members voiced concerns about GWG's cash flow to BEN and the basis for loans or equity purchases. The

---

[30] Doc. No. 1250, *In re: GWG Holdings, Inc.*, Case No. 22-90032; *see also* Alexander Gladstone, *Financial Firm Beneficient Pushed Boundaries Before Bond Program's Collapse*, The Wall Street Journal, Dec. 23, 2022, (available at:    https://www.wsj.com/articles/financial-firm-beneficient-pushed-boundaries-before-bond-programs-collapse-11671757459) (Last visited Sept. 11, 2022).
[31] Doc. No. 1250, p. 30, *In re: GWG Holdings, Inc.*, Case No. 22-90032.
[32] *See supra* n.14 and n.19 (Wall Street Journal articles).
[33] Doc. No. 3 at pp. 12, 20, *GWG v. Heppner*, Case No. 24-03090

BEN-dominated GWG Board ignored these concerns, leading to the resignation of certain GWG board members.[34]

20.    Contrary to the Complaint's false narrative, in 2018, when Mr. Heppner entered the picture, GWG's net debt exceeded the net present value of its portfolio of life insurance policies. But once Mr. Heppner and his BEN allies assumed control of the GWG Board, they transferred much of GWG's cash to pay BEN, vastly accelerating GWG's need to sell L Bonds to keep the Ponzi scheme going. This hastened GWG's financial demise and devalued the L Bonds, which GWG would never fully pay.

21.    Consider this timeline showing GWG's BEN-related transactions compared with the value of GWG's policy portfolio:[35]

---

[34] Three directors (Roy Bailey, Daniel Fine, and Jeffrey MacDowell) resigned.  These directors belonged to GWG's Third Special Committee, which had scrutinized GWG's related party transaction with BEN.  When that committee refused approval of a $48 million capital contribution from GWG to BEN, the then BEN-controlled board of GWG voted to dissolve that committee, removing the roadblock between BEN and its piggy bank, GWG.  Doc. No. 1698, p. 109, *In re: GWG Holdings, Inc.*, Case No. 22-90032; *Id.* at Doc. No. 1027, p. 8:1–17, 9:1–18.
[35] Doc. No. 1250, p. 34, *In re: GWG Holdings, Inc.*, Case No. 22-90032.



Chronology of GWG's Collapse

22.    GWG's dependence upon L Bonds garnered the government's attention, and the SEC commenced an investigation in October 2020. The inquiry had two effects. First, it obstructed GWG's cash flow. The company could not sell L Bonds between April and December 2021. Because of that GWG could not pay the $40 million per month it owed in cash obligations for L Bonds. Second, the SEC investigation opened GWG's and BEN's books to regulators and third parties. Outside accountants and auditors scrutinized how Messrs. Heppner and Holland had created an illegal "Ponzi scheme."[36]

---

[36] Compl. at ¶ 77.

23.    When the SEC permitted recommencement of L Bond sales in Fall 2021, GWG returned to outside broker dealers. The SEC told these dealers that if they sold GWG L Bonds, the government would subpoena their records.[37] This led to a bond sales drop. Because of it, GWG lacked cash flow, and then GWG defaulted on bond-related payments due in January 2022.

24.    At the end of 2021, sensing the financial catastrophe ahead, BEN spun off from GWG, becoming its own independent company again. For this, GWG received BEN equity interests that were "indisputably exchanges for far less than reasonably equivalent value."[38] One party that came out ahead—at the time—was Mr. Heppner, whose BEN gains had allowed him to maintain his fortune at the expense of individual L Bond investors.[39]

25.    GWG and its subsidiaries ultimately filed for bankruptcy in April 2022 in the Southern District of Texas. Mayer Brown LLP served as the Debtors' lead bankruptcy counsel and Jackson Walker served as local and conflicts counsel to the Debtors. At the time, Elizabeth Freeman ("Ms. Freeman") worked at Jackson Walker, but she did not bill or work on the case until November 2022. The proceeding was assigned to Judge Marvin Isgur.

26.    On May 9, 2022, the Office of the U.S. Trustee appointed a seven-member Official Committee of Bondholders (the "Bondholder Committee") to represent the interests of L Bondholders such as Plaintiffs Peterson, Nakashima, and English.[40] Lawyers for the Bondholder Committee included Akin Gump and Porter Hedges LLP.

27.    Throughout the bankruptcy proceedings, the Bondholder Committee clashed with GWG. For example, the Bondholder Committee pushed for a more aggressive approach in an

---

[37] *See e.g.*, Comp. at ¶¶ 81–83.
[38] Doc. No. 1250, p. 9, ¶ 17, *In re: GWG Holdings, Inc.*, Case No. 22-90032.
[39] Mr. Heppner resigned as BEN's CEO and board chair on June 19, 2025, refusing to answer questions from lawyers hired by BEN's audit committee. Beneficent Form 8-K and Ex. 99.1, filed June 25, 2025 (available at: https://www.westlaw.com/Document/Ib688933e64dd49109f040f60361c6737/View/FullText.html?transitionType=Default&contextData=(sc.Default)&VR=3.0&RS=cblt1.0) (Last visited Sept. 11, 2025).
[40] Doc. No. 214, *In re: GWG Holdings, Inc.,* Case No. 22-90032.

adversary proceeding against former GWG officers such as Messrs. Heppner and Holland. As early as December 2022, the Bondholder Committee alleged that these individuals and others had breached their fiduciary duties, engineering actual and constructive fraudulent transfers between GWG and BEN. An adversary proceeding against Messrs. Heppner and Holland eventually commenced in 2024, following the bankruptcy court's confirmation of GWG's Plan.[41]

28.    During the bankruptcy proceedings there existed a second group, LBM, that acted for a select group of L Bondholders who had maintained L Bonds in trusts. That second group constitutes the "Exchange Trust" Plaintiffs here. These trusts, according to GWG's bankruptcy filings, were settled by Mr. Holland and, as of Spring 2023, Mr. Holland had retained "an indirect pecuniary interest" in the Seller Trusts due to his ownership interest in MHT Financial.[42]

29.    LBM asserted claims on behalf of the trusts referred to as the Exchange or Seller Trusts. The Bondholder Committee publicly disputed those claims. That committee linked the $366.9 million in L Bonds held by the Seller Trusts from the 2018 Exchange Transaction to financial misconduct by GWG, BEN, and other parties connected with the Seller Trusts. Because of this, the Bondholder Committee wanted GWG's L Bond Seller Trust debt recharacterized from debt to equity or subordinated to claims held by all other bond holders.

30.    A December 15, 2022 letter to LBM's counsel by the Bondholder Committee laid bare how investigations commenced during GWG's bankruptcy had exposed Mr. Holland's and MHT's direct connection with the Exchange/Seller Trusts, now the named Plaintiffs in this litigation. A copy of that letter is attached hereto as Exhibit 3.[43]

---

[41] *See e.g.*, *Goldberg v. Heppner*, Case No. 24-03090, (Bankr. S.D. Tex. April 19, 2024) Doc. No. 3. The bankruptcy court approved the parties' settlement agreement in June 2025.  *Id.* at. Doc. No. 160.
[42] Doc. No. 1698, p. 89,  *In re: GWG Holdings, Inc.,* Case No. 22-90032.
[43] *See also* Doc. 1250-2, Ex. 2, *In re: GWG Holdings, Inc.,* Case No. 22-90032.

31.    The correspondence described how, before bankruptcy, from 2019 to April 2022, Mr. Holland, GWG, and BEN had viewed the debt from Seller Trust L Bonds as subordinate to the debt from L Bonds sold to individual investors. Once GWG commenced bankruptcy, however, LBM changed course and demanded the Seller/Exchange Trusts receive the same treatment as all other L Bondholders. If successful, the Seller Trusts would have ultimately recovered more money for individuals such as Mr. Holland at the expense of individual L Bondholders.

32.    As part of the mediated settlement the Complaint now attacks, the Bondholder Committee obtained protection for individual L Bondholders, in that mom-and-pop investors were paid as creditors before the interests of the L Bond Seller Trust creditors. **The Exchange Trust Plaintiffs, upset that they are subordinate to 27,000 L Bondholders, now seek revenge.**

33.    GWG's bankruptcy shed light on additional misconduct by Messrs. Holland and Heppner and others. An example: in November 2022, during an emergency hearing, GWG's Chief Restructuring Officer and GWG's Investigation Committee informed the Bankruptcy Court that GWG had filed a false and misleading 8-K statement with the SEC in March 2021. That filing failed to disclose the true basis for the resignation of three GWG directors (Bailey, Fine, and MacDowell) who had left "in protest of GWG management and Board activities."[44] By hiding the truth in 2021, GWG had allowed the dispute to avoid discovery by investors or regulators.

34.    The news of the 8-K material omissions resulted in resignations of several GWG directors and officers who had worked with, or served on the Board of, GWG in March 2021. These resignations included: Mr. Holland (President and CEO since April 2019); Timothy Evans; David de Weese; and David Chavenson. Despite the backdrop for these resignations, Plaintiffs' Complaint remarkably asks the Court to anoint Mr. Holland as a Special Administrator to

---

[44] Doc. No. 1250 p. 36, ¶ 68, *In re: GWG Holdings, Inc.*, Case No. 22-90032; *see also Id.* at Doc. No. 1027, p. 8:1-17, 9:1–18, *In re: GWG Holdings, Inc.*, Case No. 22-90032.

potentially pursue alleged claims against Jackson Walker and others.

35.     Also in November 2022, various parties to the GWG bankruptcy circulated draft proposals for a Chapter 11 plan, but due to disagreement regarding releases and subordination of claims, the parties could not reach consensus. On November 30, 2022, GWG moved for the Bankruptcy Court to appoint a mediator, requesting former Judge Jones. On January 5, 2023, Judge Isgur appointed former Judge Jones.[45] The parties attended mediation multiple times in January and February 2023, and again in June 2023.[46] Ms. Freeman was a not partner with Jackson Walker during any part of the mediation.

36.     The Debtors, the Bondholder Committee, and LBM eventually jointly proposed a Second Amended Chapter 11 Plan to the Bankruptcy Court (Judge Isgur) on June 14, 2023.[47] The Debtors' Disclosure Statement, approved by Judge Isgur on April 21, 2023,[48] contained endorsements and support for it by GWG, LBM, and the Bondholder Committee. Ultimately, 99.43% of L Bondholders voted to approve the Plan,[49] and the ad hoc committee of securities brokers and dealers also supported the Plan.[50] None of the Plaintiffs here objected to the Plan, nor did these Plaintiffs appeal the Confirmation Order.

37.     Judge Isgur confirmed the Plan on June 20, 2023, entering his *Findings of Fact, Conclusions of Law, and Order Confirming Debtors' Further Modified Second Amended Joint Chapter 11 Plan* (the "Confirmation Order").[51] The Plan contained a settlement whereby 15% of the LBM claims were subordinated to claims of all other L Bondholders.[52] The Plan also

---

[45] *Id*. at Doc. No. 1323.
[46] *Id*. at Doc No. 1881.
[47] *See* Doc. No. 1924, *In re: GWG Holdings, Inc.*, Case No. 22-90032 (the "Plan").
[48] Doc. No. 1681, *In re: GWG Holdings, Inc.*, Case No. 22-90032.
[49] Doc. No. 1893, p. 6, ¶ 16, *In re: GWG Holdings, Inc.*, Case No. 22-90032.
[50] Doc. No. 1916, *In re: GWG Holdings, Inc.*, Case No. 22-90032.
[51] Doc. No. 1952, *In re: GWG Holdings, Inc.*, Case No. 22-90032.
[52] Doc. No. 1698, p. 32, ¶ II.B.2(a); Doc. No. 1952, pp. 99–100, *In re: GWG Holdings, Inc.*, Case No. 22-90032.

established two trusts to implement the Plan: the Wind Down Trust[53] and the Litigation Trust.[54]

38.    The Plan created the Litigation Trust to "retain and hold all Retained Causes of Action",[55] which was defined broadly to include "all Avoidance Actions, all Causes of Action set forth on a schedule in the Plan Supplement, and any other Causes of Action belonging to the Debtors or their Estates that are not released pursuant to this Plan or other Final Order."[56]

39.    The Plan and Litigation Trust Agreement also expressly provided that the Litigation Trustee "shall have the sole authority" to pursue, release, abandon, or settle any Retained Causes of Action, free from liability for the outcome of those decisions. All estate causes of action— prosecuted or resolved—were centralized in the Litigation Trustee.[57]

40.    The Plan also established a Wind Down Trust to liquidate the Wind Down Trust assets and make creditor distributions. Ms. Freeman was appointed to serve as the Wind Down Trustee. The Plan's Wind Down Trust Agreement[58] provided that Ms. Freeman, as the Wind Down Trustee, could use discretion and "reasonable business judgment"[59] to engage in the "orderly liquidation of the Wind Down Trust Assets"[60], which included GWG's worthless BEN stock. The Wind Down Trust Agreement expressly gave Ms. Freeman, as Wind Down Trustee, the right to "conduct sales or liquidations of the Wind Down Trust Assets on any terms it deems reasonable, without further order of the Bankruptcy Court. . . ."[61] The Complaint noticeably omits the fact that Ms. Freeman has **no** ability, in her capacity as Wind Down Trustee, to evaluate or act upon GWG's

---

[53] _Id_. at Doc. No. 1952, p. 86
[54] _Id_. at Doc. No. 1952, p. 92; _see generally Id_. at _Id_. at Doc. No. 1952, pp. 188–214.
[55] _Id_. at Doc. No. 1952, p. 92, ¶ IV.E.2.
[56] _Id_. at Doc. No. 1952, p. 70, ¶ I.A.163.
[57] _Id_. at Doc. No. 1952, p. 93, ¶ IV.E.2. ("The Litigation Trustee shall have the sole authority to make decisions and take action with respect to the Initial Litigation Trust Assets, the Retained Causes of Action."); _Id_. at p. 104–05.
[58] _Id_. at Doc. No. 1887.
[59] _Id_. at p. 8, Sec. 1.5.
[60] _Id_. at p. 32, Sec. 6.2 ("Powers and Duties of the Wind Down Trustee").
[61] _Id. at_ Doc. No. 1952, p. 88, ¶ IV.A.3; p. 174, Sec. 6.2(a)(v).

potential litigation claims. Ms. Freeman does not, and cannot, make decisions about litigation pursued by the GWG bankruptcy estate. That authority belongs only to the Litigation Trustee.

41.     In addition to the wide discretion provided to Ms. Freeman as the Wind Down Trustee, Ms. Freeman obtained court orders specifically allowing her to sell BEN stock at various times, including those complained of in the Complaint.[62] Plaintiffs' pleading is devoid of details about these orders or the discretion provided to Ms. Freeman under the Wind Down Trust Agreement to liquidate GWG's remaining assets. Similarly, the Complaint fails to mention that no one, including the Plaintiffs, lodged objections to Ms. Freeman's motions seeking the Bankruptcy Court's permission to sell BEN stock.[63]

42.     In October 2023, pro se litigant Michael Van Deelen sued former Judge Jones.[64] A few days later, the Wall Street Journal published an article in which former Judge Jones confirmed he was in an on-going personal relationship with Ms. Freeman.

43.     On November 2, 2023, the U.S. Trustee filed motions that sought, among other relief, the vacatur of orders approving Jackson Walker's retention as counsel and/or Jackson Walker's fee applications pursuant to Rule 60(b)(6) of the Federal Rules of Civil Procedure, in various bankruptcy proceedings where (a) former Judge Jones served as the presiding judge or court-appointed mediator, and (b) Jackson Walker served as estate-retained counsel. That litigation is ongoing before this Court.

44.     Plaintiffs' counsel, the Bandas Law Firm, eventually came to represent Mr. Van Deelen and amended his complaint to add Ms. Freeman, Kirkland & Ellis LLP, Kirkland & Ellis

---

[62] *Id*. at Doc. No. 1957, 2305.
[63] The court approved the settlement agreement, allowing Ms. Freeman to sell BEN stock, on November 16, 2023, more than a month after disclosure of Ms. Freeman's relationship with former Judge Jones in the Wall Street Journal and two weeks after the U.S. Trustee had filed its Rule 60 Motion described in paragraph 45. *Id*. at Doc. No. 2305. None of the Plaintiffs objected prior to the bankruptcy court's November 2023 ruling.
[64] *Van Deelen v. Jones*, No. 4:23-cv-03729, Doc. No. 1 (S.D. Tex.).

International LLP, and Jackson Walker as defendants. That RICO litigation is nearly identical in its claims and fraud allegations as this case. The same is true with the *Bouchard v. Jones*[65] complaint in which the Bandas Law Firm represents another disgruntled stakeholder and bankruptcy participant. This Court dismissed Mr. Van Deelen's Complaint for lack of Article III standing. Such dismissal is equally applicable and appropriate here.

## III.    STANDARD OF REVIEW

47.    Federal courts have limited jurisdiction conferred upon them by statute or Article III of the Constitution.[66] Under Rule 12(b)(1), a claim is "properly dismissed for lack of subject-matter jurisdiction when the court lacks the statutory or constitutional power to adjudicate" the claim.[67] The party asserting jurisdiction bears the burden of establishing standing.[68]

48.    In deciding a Rule 12(b)(1) dismissal motion, a court may rely on: "(1) the complaint alone, presuming the allegations to be true; (2) the complaint supplemented by undisputed facts; or (3) the complaint supplemented by undisputed facts and the court's resolution of disputed facts."[69] When a Rule 12(b)(1) motion is filed in conjunction with other Rule 12 motions, the court should consider the Rule 12(b)(1) jurisdictional attack first.[70]

49.    To survive a Rule 12(b)(6) motion to dismiss, a complaint must contain enough facts "to state a claim to relief that is plausible on its face."[71] A court "must . . . accept all factual allegations in the complaint as true" and "must draw all reasonable inferences in the plaintiff' favor."[72] But "[t]hreadbare recitals of the elements of a cause of action, supported by mere

---

[65] *Bouchard v. Jones*, No. 4:24-cv-00693, Doc. No. 1. (S.D. Tex.).
[66] *In re FEMA Trailer Formaldehyde Prods. Liab. Litig.*, 668 F.3d 281, 286–87 (5th Cir. 2012).
[67] *Home Builders Ass'n, Inc. v. City of Madison*, 143 F.3d 1006, 1010 (5th Cir. 1998) (internal citation omitted).
[68] *Ramming v. United States*, 281 F.3d 158, 161 (5th Cir. 2001).
[69] *Valdery v. Louisiana Workforce Comm'n.*, No. 15-01547, 2015 WL 5307390 at *1 (E.D. La. Sept. 10, 2015) (citing to *Den Norske Stats Ojeselskap As v. HeereMac Vof*, 241 F.3d 420, 424 (5th Cir. 2001)).
[70] *Ramming* 281 F.3d at 161.
[71] *Ashcroft v. Iqbal*, 556 U.S. 662 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 547 (2007)).
[72] *Lormand v. U.S. Unwired, Inc.*, 565 F.3d 228, 232 (5th Cir. 2009).

conclusory statements, do not suffice to state a claim upon which relief can be granted."[73] "Where a complaint pleads facts that are merely consistent with a defendant's liability, it stops short of the line between possibility and plausibility of entitlement to relief."[74]

50.     A court considering a motion to dismiss under Rule 12(b)(6), may refer to matters of public record,[75] and the court may "also consider '[d]ocuments that a defendant attaches to a motion to dismiss . . . if they are referred to in the plaintiff's complaint and are central to [his] claim.'"[76] A court may also rely on "documents incorporated into the complaint by reference, and matters of which a court may take judicial notice."[77] This Court may consider the Confirmation Order and Plan because they are integral to the Complaint's claims and referenced therein.[78]

51.     A heightened pleading standard exists for Plaintiffs' fraud claims. Federal Rule of Civil Procedure 9(b) requires a plaintiff to allege "the who, what, when, where, and how"[79] of the fraud. Here, Rule 9(b)'s strict standards pertain to *all* claims raised by Plaintiffs as they are "based on the same set of alleged facts" relating to Jackson Walker's purported cover up of the Jones-Freeman relationship.[80] In fact, Rule 9(b) goes so far as to require that fraud allegations "state with specificity what representations [a plaintiff] relied upon."[81]

52.     There exist at least five separate legal doctrines requiring dismissal of the entire Complaint under Rule 12(b)(1) or Rule 12(b)(6). They are:

---

[73] *Allen v. Walmart Stores, L.L.C.*, 907 F.3d 170, 177 (5th Cir. 2018) (cleaned up).
[74] *Iqbal*, 556 U.S. 662 (cleaned up).
[75] *Cinel v. Connick*, 15 F.3d 1338, 1343 n.6 (5th Cir. 1994).
[76] *Villarreal v. Wells Fargo Bank, N.A.*, 814 F.3d 763, 766 (5th Cir. 2016) (quoting *Collins v. Morgan Stanley Dean Witter*, 224 F.3d 496, 498–99 (5th Cir. 2000)).
[77] *Dorsey v. Portfolio Equities, Inc.*, 540 F.3d 333, 338 (5th Cir. 2008) (quoting *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308 (2007)).
[78] *Carter v. Target Corp.*, 541 Fed. App'x 413, 416–17 (5th Cir. 2013).
[79] *Benchmark Elecs., Inc. v. J.M. Huber Corp.*, 343 F.3d 719, 724 (5th Cir. 2003).
[80] *Lone Star Fund V (U.S.), L.P. v. Barclays Bank, PLC*, 594 F.3d 383, 387 n.3 (5th Cir. 2010).
[81] *Rangel v. Adtalem Global Educ., Inc.*, No. 5:18-CV-00082-DAE, 2019 WL 13150012, at *4 (W.D. Tex. Apr. 23, 2019).

a.  The Confirmation Order bars estate-owned claims from being asserted by anyone other than the Litigation Trustee.[82] The Confirmation Order and Plan also bar the Plaintiffs' improperly raised "alternative" request for derivative standing. The bankruptcy estate released all claims purported to be asserted by the Plaintiffs derivatively;[83]

b.  The Plaintiffs lack Article III standing;

c.  The Plaintiffs lack prudential standing;

d.  The Complaint fails to plead proximate causation between the highly attenuated chain of events that does not and cannot connect Jackson Walker's conduct with the purported injuries; and

e.  The Complaint's allegations of fraud fail to meet Rule 9(b)'s specificity requirements. The pleading lacks any indicia of whether Plaintiffs read, or relied upon, Jackson Walker's allegedly misleading statements.

Additionally, there exists no basis for class certification as Plaintiffs lack standing, and pervasive individual questions about causation and injury are inescapable.

## IV.    LEGAL ANALYSIS

### A.    Plaintiffs' Complaint is a collateral attack on the confirmed Plan, which is legally prohibited by the Fifth Circuit and barred by the Plan and Confirmation Order. (All Claims)

53.    The Confirmation Order entered in GWG's bankruptcy proceedings is a final judgment with *res judicata* effect under 11 U.S.C. § 1141(a). Courts consistently reject efforts—like Plaintiffs'—to repackage disagreements with plan terms and administration as new tort/RICO claims in another forum.[84] Plaintiffs' suit attempts precisely that—an impermissible collateral attack on the confirmed Plan and Confirmation Order—under the guise of RICO and fiduciary duty claims. Such claims are barred as a matter of law.[85]

54.    Plaintiffs' case rests on a faulty premise: that the nondisclosure of former Judge Jones's personal relationship with Ms. Freeman caused GWG's collapse and Plaintiffs' investment

---

[82] Doc. No. 1952, *In re: GWG Holdings, Inc.*, Case No. 22-90032.
[83] *Id. at* Doc. Nos. 1924, 1952.
[84] *See* Travelers Indem. Co. v. Bailey, 557 U.S. 137, 152 (2009).
[85] *See also* Matter of LaHaye, 17 F.4th 513, 519 (5th Cir. 2021).

losses.[86] That theory is both factually and legally untenable. GWG's downfall was precipitated—by GWG's and Plaintiffs' own admissions—by the SEC's investigation and by Messrs. Heppner's and Holland's mismanagement of the company and their fiduciary duty breaches. These events occurred before GWG entered bankruptcy and are unrelated to any alleged nondisclosure.[87]

55.    Setting causation aside, Plaintiffs' claims are independently foreclosed by the confirmed Plan, which states that such claims can be pursued, if at all, only by the Litigation Trustee—not by individual creditors.[88]

56.    The confirmed Plan established two trusts to implement the Plan—the Wind Down Trust[89] and the Litigation Trust.[90] The Litigation Trust retains and holds "all Retained Causes of Action"[91] defined broadly to include "all Avoidance Actions, all Causes of Action set forth on a schedule in the Plan Supplement, and any other Causes of Action belonging to the Debtors or their Estates that are not released pursuant to this Plan or other Final Order."[92]

57.    The Plan and Litigation Trust Agreement are unequivocal: the Litigation Trustee has "the sole authority" to decide whether to pursue, release, abandon, or settle any Retained Causes of Action, free from liability for the outcome of those decisions. The Litigation Trust, therefore, centralizes **all** retained estate causes of action—prosecuted or resolved.[93]

---

[86] Doc. No. 1163, pp. 67–71, *In re: GWG Holdings, Inc.*, No. 22-90032.
[87] Nor does Bankruptcy Rule 2014 work here. Rule 2014 requires disclosure of certain connections in connection with the retention of estate professionals, but it does not apply to a mediator, nor does it create a private cause of action. *See In re Steed*, 614 B.R. 395, 411 n.13 (Bankr. N.D. Ga. 2020).
[88] Doc. No. 1952, p. 93, ¶ IV.E, *In re: GWG Holdings, Inc.*, No. 22-90032.
[89] *Id.* at p. 86.
[90] *Id.* at Doc. No. 1952, p. 92; *see generally Id.* Doc. No. 1952, pp. 188–214.
[91] *Id.* at Doc. No. 1952, p. 92, ¶ IV.E.2.
[92] *Id.* at Doc. No. 1952, p. 70, ¶ I.A.163.
[93] *Id.* at Doc. No. 1952, p. 93, ¶ IV.E.2. ("The Litigation Trustee shall have the sole authority to make decisions and take action with respect to the Initial Litigation Trust Assets, the Retained Causes of Action."); *see also* the Litigation Trust Agreement. Doc. No. 1888, *In re: GWG Holdings, Inc.*, Case No. 22-90032.

58.     The Complaint's claims as to Jackson Walker are not personal or direct. They are derivative of alleged injuries to GWG as a corporate entity and its bankruptcy estate. Plaintiffs' alleged harms from Jackson Walker's conduct—such as the pre-confirmation depletion of GWG's assets by professional fee awards and the purported breaches of fiduciary duties—constitute quintessential estate claims belonging to the Litigation Trust. Only the Litigation Trustee has standing to pursue them against Jackson Walker.[94] Further, the Plan did not preserve a RICO cause of action for individual creditors, and nothing in the Plan or Confirmation Order authorizes assertion of such claims.[95] Plaintiffs lack the legal ability to advance the Complaint at issue.

### 1.    Plaintiffs may not obtain derivative standing under the Plan's terms.

59.     Recognizing that their claims are derivative in nature, Plaintiffs appear to request that the Court grant them derivative standing to proceed with their Complaint on behalf of the estates.[96] To the extent requested in the Complaint, derivative standing is improper as it is a narrow, contingent doctrine. It exists "only if the debtor itself could bring the claim." Here, the Litigation Trustee cannot bring the claims Plaintiffs seek to assert because the Plan expressly released the claims. Article VIII of the Plan contains a broad release by the Debtors which extinguished "any and all claims and causes of action" the Debtors or their estates might have had

---

[94] *Id.* at p. 93, ¶ IV.E.2.

[95] *In re United Operating, L.L.C.*, 540 F.3d 351, 355 (5th Cir. 2008) (holding that a debtor or trustee may retain estate claims only if the Plan expressly and unequivocally preserves them).

[96] It is unclear whether Plaintiffs seek derivative standing in this Complaint or are merely asserting that they *may* seek derivative standing. *Compare* Compl. at p. 62 *with* Compl. at ¶ 142.

Plaintiffs have not complied with the Local Rules governing motion practice. The request for derivative standing is buried within the Complaint rather than presented as a separate motion under Local Rule 7 and provides no stand-alone notice of the relief sought. Plaintiffs failed to submit the separate proposed order required by Local Rule 7.1(c) and did not meet and confer with Jackson Walker as contemplated by Local Rule 7.1(d).). *See United States v. An Easement & Right-of-Way Over 3.28 Acres of Land, More or Less, in Lee Cnty., Mississippi*, No. 115-CV-00019-GHD-DAS, 2017 WL 916415, at *5 (N.D. Miss. Mar. 7, 2017) (citing to local rule requirements when refusing to "recognize" a motion that was "solely urged within the body of a pleading; such a motion must be separately urged to be considered by the Court."); *Highpoint Risk Servs. LLC v. Companion Prop. & Cas. Ins. Co.*, No. 3:14-CV-3398-L(BH), 2016 WL 4479511, at *7 (N.D. Tex. Aug. 25, 2016) (citing to local rules as basis for court not considering an objection and request to strike embedded in a footnote in a response to a pending motion).

against "Released Parties," including Jackson Walker and other professionals, arising out of or relating to the GWG bankruptcy. Once the Plan was confirmed via the Confirmation Order, the Debtors and their estate fiduciaries lost standing to assert such claims.[97]

60.    Plaintiffs also cannot obtain derivative standing under Fifth Circuit precedent, which recognizes that only creditors' committees may "assert derivative standing on behalf of a debtor."[98] Plaintiffs, as individual bondholders, are no such committee. The request for derivative standing fails as a matter of law.[99]

### B.    Plaintiffs lack Article III standing, requiring dismissal of the Complaint under Rule 12(b)(1). (All Claims)

61.    A court's consideration of its jurisdiction to hear a case must "begin—and end—with standing."[100] Plaintiffs' bear the "burden of establishing" standing,[101] which includes both constitutional and prudential components. As the Supreme Court held in *Warth v. Seldin*[102]

> [i]n its constitutional dimension, standing imports justiciability: whether the plaintiff has made out a case or controversy between himself and the defendant within the meaning of Art. III. This is the threshold question in every federal case, determining the power of the court to entertain the suit. Of great import when considering standing is whether the plaintiff has 'alleged such a personal stake

---

[97] To the extent such claims sound in actual fraud, willful misconduct, intentional breach of fiduciary duty, or gross negligence—actions carved out of the Debtors' release in the Plan—the Litigation Trust has released those claims against Jackson Walker through a settlement agreement that will be separately presented to this Court for approval.

[98] *In re Cleveland Imaging and Surgial Hosp.*, 26 F.4th 285, 297 (5th Cir. 2022).

[99] Plaintiffs rely on *In re Louisiana World Exposition, Inc.*, 832 F.2d 1391 (5th Cir. 1987) for their derivative standing request. But in *Louisiana World*, the Fifth Circuit held that a creditor's committee pre-confirmation of a plan could obtain derivative standing to pursue claims on behalf of the estate upon meeting certain conditions. *Id.* at 1397–98. Those conditions do not exist here.

Even if the Court applied *Louisiana World* by analogy, Plaintiffs cannot meet its requirements. First, Plaintiffs cannot state a colorable claim, as each count fails on its own merits, as discussed herein, and their alleged injury—the decline in GWG bond value (and all other theories)—is not traceable to Jackson Walker's conduct. Second, Plaintiffs failed to make a formal demand or otherwise satisfy the *Louisiana World* requirement of showing an unjustified refusal. Their attempt to excuse that omission by asserting that any such demand would be futile because the Litigation Trustee is "hopelessly conflicted" is wholly speculative and simply untrue, and in any event not a substitute for compliance with the demand requirement. Finally, Plaintiffs never sought permission from the Bankruptcy Court to pursue claims on the estate's behalf. *Id.* at 1397; *see also, e.g.*, *Cleveland Imaging*, 26 F.4th at 297.

[100] *Murthy v. Missouri*, 603 U.S. 43, 56 (2024).

[101] *Carney v. Adams*, 592 U.S. 53, 59–60 (2020).

[102] 422 U.S. 490, 498–499 (1975).

in the outcome of the controversy as to warrant his invocation of federal-court jurisdiction and to justify exercise of the court's remedial powers on his behalf.[103]

62.    Plaintiffs cannot establish standing "simply based on the intensity of [their] interest" in GWG.[104] Rather, "[a] claimed injury must be real—'it must actually exist.'"[105] "And it must not be 'too speculative for Article III purposes.'"[106] If the line of causation between an injury and the defendant's alleged wrongdoing is "too attenuated," a plaintiff lacks standing under Article III.[107] A particularized injury "must affect the plaintiff in a personal and individual way."[108]

63.    The Supreme Court has explained that Article III standing cannot be considered at a "high level of generality." Rather, a granular consideration of facts pled is required[109] because "standing is not dispensed in gross. . . . [P]laintiffs must demonstrate standing for each claim that they press against each defendant and for each form of relief that they seek."[110]

64.    Plaintiffs fail to meet this standard; they have no particularized injuries. The Complaint asserts harm generally affecting the bankruptcy estate, not Plaintiffs individually.[111] As this Court recognized in *Van Deelen v. Jones*, harm to a creditor—prioritized or not—cannot constitute a particularized injury for Article III standing.[112]

65.    Each claim advanced against Jackson Walker hinges upon Plaintiffs as creditors

---

[103] *Id*. at 498–99 (cleaned up).
[104] *FDA v. Alliance for Hippocratic Medicine, et. al.*, (*Alliance*) 602 U.S. 367, 369–70 (2024).
[105] *Earl v. Boeing Co.*, 53 F.4th 897, 902 (5th Cir. 2022) (quoting *Spokeo*, 578 U.S. at 340)).
[106] *Id.* (quoting *Clapper v. Amnesty Int'l, USA*, 568 U.S. 398, 409 (2013)).
[107] *Hanson v. Veterans Admin.*, 800 F.2d 1381, 1385 (5th Cir.1986) (internal citations omitted).
[108] *Id*. (internal quotations and citations omitted).
[109] *Id.* at 1987 ("We reject this overly broad assertion."), at 1993 ("The plaintiffs treat the defendants as a monolith, claiming broadly that the governmen[t] continues to communicate with the platforms about content-moderation issues. But we must confirm that *each* Government defendant continues to engage in the challenged conduct . . .) (cleaned up), and at 1996 ("This theory is startingly broad, as it would grant all social-media users the right to sue over someone else's censorship—at least so long as they claim an interest in that person's speech. This Court has never accepted such a boundless theory of standing.") (cleaned up).
[110] *Id*. at 1988 (internal citations and quotations omitted).
[111] Compl. at ¶¶ 181, 214, 223, 232, 253, 270.
[112] No. 4:23-cv-03729, 2024 WL 3852349, at * 9–10 (S.D. Tex. Aug. 16, 2024).

of the GWG bankruptcy estate. These creditors also assert a loss in their claim value due to the relationship between Ms. Freeman and former Judge Jones, notwithstanding former Judge Jones's inability to make any binding decisions or rulings as a mediator. Thus, the Complaint's allegations against Jackson Walker *only* contain claims based on a "secondary effect from harm done to the debtor."[113] That does not suffice for Article III standing under *Murthy* and *TransUnion LLC v. Ramirez*,[114] under which the Supreme Court held that a plaintiff must establish standing for **each** claim asserted and **every** damage sought. Here Plaintiffs only assert claims against Jackson Walker belonging to the bankruptcy estate, and they seek damages, such as disgorgement of legal fees, that they legally cannot obtain.

66.     Additionally, the Complaint relies upon "a highly attenuated chain of possibilities,"[115] impermissible for Article III standing. The pleading alleges that a rogue SEC investigation (commenced before Jackson Walker's involvement) drove GWG into bankruptcy.[116] Once in bankruptcy proceedings, "pre-bankruptcy management [was] squeezed out" leaving "no one at the helm who knew how to manage GWG's assets."[117] Then former Judge Jones, as mediator, allegedly forced a plan of liquidation on the parties "without warning",[118] and orchestrated the inclusion of a litigation trustee and wind-down trustee as part of that plan, and then placed Ms. Freeman as the Wind Down Trustee.[119] After this, Ms. Freeman, "commence[d] a fire sale of GWG's assets" and "recklessly unloaded Ben stock," which caused Plaintiffs' bond values to plummet.[120] Then, as a result of all that, Plaintiffs suffered damages because Defendants

---

[113] *In re SunEdison, Inc.*, Case No. 16-10992 (SMB), 2019 WL 2572250, *6 (Bankr. S.D.N.Y. June 21, 2019).
[114] 594 U.S. 413, 431 (2021).
[115] *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 410 (2013).
[116] Compl. at ¶ 5; *see also* Compl. at Section X.
[117] Compl. at ¶106. If Plaintiffs had believed that GWG's management was incompetent, they could have sought appointment of an independent chapter 11 trustee. *See* 11 U.S.C. § 1104. Plaintiffs instead did nothing.
[118] Compl. at ¶ 8.
[119] *Id*. at ¶¶ 100, 103.
[120] Compl. at ¶¶ 106–09.

had "enrich[ed] themselves at the expense of the bankruptcy estate and creditors" by improperly submitting, and receiving payment for, fee awards.[121] Plaintiffs' claims sit upon multiple levels of speculation (certain alleged facts of which are simply wrong) and a highly attenuated chain of events that never happened. The Supreme Court has held that such factual allegations cannot suffice for Article III standing.[122]

### C. Plaintiffs lack prudential standing, requiring dismissal under Rule 12(b)(6). (All Claims)

67.    In addition to Constitutional standing, a party litigating in a federal court must have prudential standing. This judicially created limit considers:

> (1) whether a plaintiff's grievance arguably falls within the zone of interests protected by the statutory provision invoked in the suit, (2) whether the complaint raises abstract questions or a generalized grievance more properly addressed by the legislative branch, and (3) whether the plaintiff is asserting his or her own legal rights and interests rather than the legal rights and interests of third parties.[123]

Dismissal for lack of prudential standing is evaluated under Rule 12(b)(6)'s legal standards.[124]

68.    Blackletter law holds that claims involving a creditor's recovery (or lack thereof) in a bankruptcy proceeding due to diminishment of the bankruptcy estate are derivative claims. Thus, these claims belong to the bankruptcy estate and a creditor lacks prudential standing to assert them.[125] This Court recognized that legal principle in *Van Deelen v. Jon*es, concluding: "[e]ven if the Plaintiff was a [] creditor with a prioritized interest in the bankruptcy estate, prudential concerns would defeat standing." [126]

---

[121] Compl. at ¶¶ 109–110, 137–139, 181
[122] *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 410 (2013).
[123] *St. Paul Fire & Marine Ins. Co. v. Labuzan*, 579 F.3d 533, 539 (5th Cir. 2009) (cleaned up).
[124] *Id.*
[125] *In re Lothian Oil, Inc.*, 531 F. App'x 428, 439 (5th Cir. 2013) (creditor had no standing to pursue suit against third parties who allegedly deprived debtor of assets); *Matter of S.I. Acquisition, Inc.*, 817 F.2d 1142, 1153 (5th Cir. 1987) (permitting creditor's claims to directly proceed "undercut[s] the general bankruptcy policy of ensuring that all similarly-situated creditors are treated fairly."); *Stevens v. Lowder*, 643 F.2d 1078, 1050 (5th Cir. 1981).
[126] Doc. No. 101, No. 4:23-cv-03729, 2024 WL 3852349 (S.D. Tex. Aug. 16, 2024).

69.     Plaintiffs are merely creditors of GWG or the bankruptcy estate. The Complaint admits this in paragraphs 19, 109, 110, 128, 139, 181, 214, 232, 253, 270, and others. They hold different bonds issued by GWG that are now allegedly diminished in value as is typical in many chapter 11 cases.[127] Plaintiffs complain these bonds also lost value due to the "fire sale" of BEN stock.[128] But the actions complained of relate to Ms. Freeman's conduct, **not** Jackson Walker's legal work for the Debtor during bankruptcy proceedings.

70.     Furthermore, the Complaint's allegations regarding GWG's assets to pay Jackson Walker's legal fees pertained to work performed up to confirmation, June 20, 2023.[129] The Complaint pleads to no facts that link (nor could it) the sale of BEN stock to pay Jackson Walker's legal fees, all of which the bankruptcy estate had occurred prior to the stock sales.

71.     Under 11 U.S.C. § 541(a)(1) and (a)(7), the estate is comprised of all legal or equitable property interests belonging to the debtor before and after commencement of the bankruptcy case.[130] The Fifth Circuit reinforced this recently in *In re Lothian Oil* where plaintiffs asserted tort claims alleging professional misconduct against Lothian's officers and directors for acts occurring before and during bankruptcy.[131] The Fifth Circuit held "[a]ll these claims are derivative of an injury suffered by Lothian and thus were part of the bankruptcy estate that passed to Lothian under the terms of the confirmed Plan."[132]

72.     The same is true for Jackson Walker. Plaintiffs' claims assert damages due to Jackson Walker's fee awards. Those awards correlated to work performed for GWG between April

---

[127] Compl. at ¶¶ 20–23.
[128] *Id*. at ¶¶ 106-109.
[129] Doc. No. 2158, p. 1, *In re: GWG Holdings, Inc.*, Case No. 22-90032.
[130] *Kane v. Nat'l Union Fire Ins. Co.*, 535 F.3d 380, 385 (5th Cir. 2008); *In re Greenhaw Energy, Inc.*, 359 B.R. 636, 642 (Bankr. S.D. Tex. 2007); *In re Schepps Food Stores, Inc.*, 160 B.R. 792, 799 (Bankr. S.D. Tex. 1993); *In re C-Power Prods., Inc.*, 230 B.R. 800, 803 (Bankr. N.D. Tex. 1998).
[131] 531 F. App'x 428, 441 (5th Cir. 2013).
[132] *Id*.

2022 and the Plan's confirmation date, June 20, 2023. If those fees constitute damages, such harm belongs to the bankruptcy estate, not Plaintiffs. Thus, Plaintiffs lack prudential standing.

**D.    The Complaint alleges harm that Jackson Walker did not proximately cause, requiring dismissal of the Complaint. (All Claims)**

73.    Assuming Plaintiffs have standing to pursue their Complaint (which they do not), Plaintiffs must also establish Jackson Walker's liability "for harms he proximately caused" to survive a dismissal motion relating to tort and RICO.[133] This is because "legal responsibility must be limited to those causes which are so closely connected with the result and of such significance that the law is justified in imposing liability."[134] Specifically for RICO, the Fifth Circuit has held that a RICO claim based on multi-step chain of causation is "beyond the pale of rational causation"[135] and will result in dismissal.[136]

74.    The Complaint attempts to meet this standard alleging that "as a result of Defendants' misconduct, bonds issued by GWG to the bondholder Plaintiffs have been rendered completely or nearly worthless. Defendants have depleted and devalued GWG's assets and rewarded themselves handsomely for doing so."[137]

75.    The problem with such allegations is that Plaintiffs' Complaint is contradictory and replete with independent and superseding causes tied to Plaintiffs' bond value decrease. Namely: the misconduct by GWG officers and directors (including Messrs. Heppner and Holland) that drove GWG into bankruptcy.[138]

---

[133] *Rodriguez v. Blaine Larsen Farms, Inc.*, No. 2:21-CV-52-Z, 2022 WL 484924, at *5 (N.D. Tex. Feb. 15, 2022) (quoting *United States v. Monzel*, 641 F.3d 528, 535 (D.C. Cir. 2011); *Hemi Grp., LLC v. City of New York, N.Y.*, 559 U.S. 1, 9 (2010) (A "plaintiff is required to show that a RICO predicate offense not only was a 'but for' cause of his injury, but was the proximate cause as well.").

[134] W. Page Keeton *et al.*, Prosser & Keeton on the Law of Torts § 41 (5th ed. 1984).

[135] *Nat'l Entrs., Inc. v. Mellon Fin. Servs. Corp. No. 7*, 847 F.2d 251, 254 (5th Cir. 1988).

[136] *Downstream Envtl., LLC v. Gulf Coast Waste Disposal Auth.*, No. H-05-1865, 2006 WL 1875959, at *6-*8 (S.D. Tex. July 5, 2006) (citing to *Anza v. Ideal Steel Supply Corp.*, 126 S.Ct. 1991 (2006).

[137] Compl. at ¶ 128, *see also* Compl. at ¶¶ 19, 109, 139, 181, 223, 251, 258, 270, 284, 286, 293, 295, 296.

[138] *See supra* n. 3, 19, 27.

---

*Jackson Walker's Motion to Dismiss*                                                                    **Page 26**

76.     The Complaint contends that "the company was forced to file Chapter 11 bankruptcy *after* the SEC conducted a lengthy and overreaching investigation during which SEC officers took action to choke off the company's cash flow."[139] And then, in the same breath, the Complaint alleges a host of other intervening causes by actors **other than Jackson Walker** that allegedly reduced the value of the bankruptcy estate, such as:

- Former Judge Jones forcing a liquidation (which he could not as a mediator), as opposed to a reorganization, upon GWG during mediation;[140]

- Judge Isgur confirming the plan because he was "an old dear friend who would do whatever Jones suggested";[141]

- No one at GWG knew how to manage GWG's assets because "pre-bankruptcy management was squeezed out";[142]

- "As the Wind Down Trustee [Ms.] Freeman commenced irreparable damage to GWG as well as other business entities";[143]

- Ms. Freeman "began recklessly unloading Ben stock";[144]

- Ms. Freeman's purported refusal to talk with market professionals or BEN management "to strategize how to liquidate such significant and concentrated stock holdings without diluting the market or devaluing GWG's assets";[145] and,

- A "hopelessly conflicted" Litigation Trustee who has not commenced claims against Ms. Freeman or former Judge Jones and who has "pursued misguided and distracting adversary proceedings seeking to place the blame for GWG's financial losses elsewhere."[146]

77.     The Complaint points to a variety of actions by parties **other than** Jackson Walker that, in the Complaint's own words, devalued GWG or its assets. These acts purportedly led to a loss in value for Plaintiffs' bonds. Yet the Complaint is devoid of facts explaining how or why Jackson Walker "is a more likely, let alone [the] proximate, cause" of Plaintiffs' alleged harms.

---

[139] Compl. at ¶ 5; *see also* Compl. at ¶¶ 90–92,
[140] Compl. at ¶ 101.
[141] Compl. at ¶ 101.
[142] Compl. at ¶ 106.
[143] Compl. at ¶ 106.
[144] Compl. at ¶¶ 106–07.
[145] Compl. at ¶ 108.
[146] Compl. at ¶143–144.

*Jackson Walker's Motion to Dismiss*                                                    **Page 27**

Because of that, the Complaint cannot survive a motion to dismiss.[147]

78.    In RICO fraud cases, like this one, both but-for and proximate causation call for well-pleaded factual allegations "that someone relied on the defendant's misrepresentations."[148] While first-party reliance (or reliance by the plaintiff) is not required, "[i]n most cases, the plaintiff will not be able to establish even but-for causation if no one relied on the misrepresentation" or if there is no third-party reliance somewhere in the decision-making chain.[149] Failure to plead RICO causation warrants dismissal with prejudice of RICO claims.[150]

79.    Plaintiffs do ***not*** allege that they actually relied on any alleged misrepresentation or fraud by Jackson Walker. Rather, the Complaint contends that because of Jackson Walker's purported misconduct, ***GWG*** sustained losses through its bankruptcy proceeding and GWG's payment of fees to Jackson Walker for work performed up to, and including, confirmation.[151] That speculation presumes that someone else, somewhere in the decision-making chain, relied on the alleged fraud. The Complaint does not (nor could it) allege with ***any specificity*** that Plaintiffs relied on Jackson Walker's alleged misrepresentations in their support of GWG's bankruptcy and related Plan. The disconnect between the alleged predicate acts and Plaintiffs' interests in GWG is too attenuated and subject to other independent, intervening factors thwarting the direct causal relationship demanded by RICO. Thus, Plaintiffs fail to allege the necessary reliance and causation, warranting dismissal of their RICO claims.[152]

---

[147] *Rincon v. Covidien*, 2017 WL 2242969, at *1 (S.D.N.Y. May 22, 2017); *Downstream Envtl., LLC v. Gulf Coast Waste Disposal Auth.*, No. H-05-1865, 2006 WL 1875959, at *6-*8 (S.D. Tex. July 5, 2006) (citing to *Anza v. Ideal Steel Supply Corp.*, 547 U.S. 451 (2006).

[148] *See, e.g.*, *Bridge v. Phoenix Bond & Indem. Co.*, 553 U.S. 639, 658 (2008) (emphasis in original).

[149] *Id.*

[150] *Ogden v. Wells Fargo Bank, NA*, 674 F. App'x 650, 652 (9th Cir. 2017), cert. denied sub nom. *Ogden v. Kwok*, No. 17-137, 2017 WL 3218081 (U.S. Oct. 2, 2017).

[151] Doc. Nos. 1046, 1724, 2011, *In re: GWG Holdings, Inc.*, Case No. 22-90032.

[152] Rule 9(b) also requires that Plaintiffs' RICO claims, the predicate acts of which allege fraud, allege facts that plaintiffs "read the misrepresentations" or relied upon the omissions. *Allgood v. R.J. Reynolds Tobacco Co.*, 80 F.3d 168, 171 (5th Cir. 1996); *Rangel*, 2019 WL 13150012, at *4. The Complaint fails to plead such facts.

***Jackson Walker's Motion to Dismiss***                                                                           **Page 28**

80. To the extent Plaintiffs premise their fraud allegations on purported omissions or failures to disclose by Jackson Walker, those claims fail as a matter of law because "[a]bsent an independent duty, such as a fiduciary duty or an explicit statutory duty, failure to disclose cannot be the basis of a [RICO] fraudulent scheme"—and no such duties are alleged to exist here.[153] Plaintiffs cannot legally allege any independent duty between Jackson Walker and themselves.

### E. Plaintiffs' RICO claims cannot withstand a 12(b)(6) motion because the Complaint fails to establish standing, a RICO enterprise, or necessary predicate criminal acts. (Claims I and II)

81. The Complaint's narrative spans beyond the GWG bankruptcy, alleging that Plaintiffs' claims are "direct" and "part of a larger fraudulent scheme outside of any single bankruptcy"[154] and, therefore, appropriate for RICO claims under 18 U.S.C. § 1962(c) and 18 U.S.C. § 1962(d). But the Complaint fails to state a claim upon which relief can be granted because the basic elements of RICO are not met, and Plaintiffs lack RICO standing.

82. A RICO claim has two pre-conditions that a plaintiff must satisfy before consideration of RICO's elements. These are: (1) injury to business or property (RICO standing) and (2) causation.[155] Jackson Walker addressed causation in Section IV.D. For RICO standing, a plaintiff "must prove concrete financial loss." That means "an actual loss of their own money."[156]

83. To establish a claim under § 1962(c), a plaintiff must also show: "(1) the existence of an enterprise that affects interstate or foreign commerce, (2) that the defendant was employed by or associated with the enterprise, (3) that the defendant participated in the conduct of the enterprise's affairs, and (4) that the participation was through a pattern of racketeering activity."[157]

---

[153] *Eller v. EquiTrust Life Ins. Co.*, 778 F.3d 1089, 1092 (9th Cir. 2015); *see infra*, Section IV.I.
[154] Compl. at ¶ 141.
[155] *Price v. Pinnacle Brands, Inc.*, 138 F.3d 602, 607 (5th Cir. 1998).
[156] *HCB Fin. Corp. v. McPherson*, 8 F.4th 335, 244 (5th Cir. 2021) (cleaned up).
[157] *United States v. Delgado*, 401 F.3d 290, 297 (5th Cir. 2005) (internal quotations omitted).

For the existence of a pattern of racketeering activity, the plaintiff must show two or more related predicate offenses that amount to or pose a threat of continued criminal activity.[158] Such a loss must be "directly caused by the alleged predicate acts."[159]

84.     To establish a *prima facie* RICO conspiracy claim under § 1962(d), "[a plaintiff] must establish (1) that two or more people agreed to commit a substantive RICO offense and (2) that the defendant knew of and agreed to the overall objective of the RICO offense."[160] "[B]ecause the core of a RICO civil conspiracy is an agreement to commit predicate acts, a RICO civil conspiracy complaint, at the very least, must allege specifically such an agreement."[161]

> **1.     Plaintiffs cannot establish standing for a RICO claim because the Complaint only details purported injury to the bankruptcy estate.**

85.     The Fifth Circuit has unequivocally held that when a plaintiff lacks damages to his property or business, no injury is sustained, and that plaintiff cannot pursue a RICO claim.[162] Thus, a plaintiff must demonstrate "concrete financial loss"[163] from the complained of conduct.

86.     Plaintiffs claim they suffered injuries "because the bankruptcy estate available to pay creditors . . . was diminished."[164] But these damages are **not** to Plaintiffs' business or property—they are damages to the bankruptcy estate.[165] The RICO injuries detailed in the Complaint as to Jackson Walker include the award of Jackson Walker's fees for work performed up until the Plan's confirmation. But such purported damages derive from injury to the bankruptcy

---

[158] *Word of Faith World Outreach Ctr. Church, Inc. v. Sawyer*, 90 F.3d 118, 122 (5th Cir. 1996) (citing *H.J. Inc. v. Nw. Bell Tel., Co.*, 492 U.S. 229, 239 (1989)); 18 U.S.C. § 1961(5).

[159] *Lewis v. Danos*, 83 F.4th 948, 956–57 (5th Cir. 2023).

[160] *Delgado*, 401 F.3d at 296 (quotations omitted).

[161] *Crowe v. Henry*, 43 F.3d 198, 206 (5th Cir. 1995) (quoting *Tel-Phonic Servs., Inc. v. TBS Int'l, Inc.*, 975 F.2d 1134, 1140 (5th Cir. 1992)).

[162] 18 U.S.C. § 1964(c); *In re Taxable Mun. Bond Sec. Litig.*, 51 F.3d at 521–22; *see also Hughes v. Tobacco Institute, Inc.*, 278 F.3d 417, 422 (5th Cir. 2001).

[163] *Patterson v. Mobil Oil Corp.*, 335 F.3d 476, 492, n.16 (5th Cir. 2003).

[164] Compl. at ¶ 181.

[165] *McPherson*, 8 F.4th at 344.

estate and is not individualized as to Plaintiffs.[166] Because of that, Plaintiffs lack RICO standing and these claims should be dismissed.

### 2. The RICO claims are legally impermissible because they rest upon purportedly fraudulent statements in litigation materials.

87.     The Complaint's RICO fraud claims fail to meet Rule 9(b)'s standards for pleading with particularity. Filing of "allegedly false litigation materials" does not constitute predicate acts for fraud claims.[167] All the Complaint's predicate acts of fraud pertaining to Jackson Walker hinge on the firm's submission of purportedly false statements, or omissions in court filings during the GWG bankruptcy proceedings and in other cases.[168] Plaintiffs want to argue that such conduct violated Bankruptcy Rule 2014 (which Jackson Walker disputes). But that point is legally irrelevant. What matters is that the predicate acts of fraud all revolve around Jackson Walker's court filings, which courts have held cannot constitute a basis for RICO fraud. In fact, courts within the Southern District of Texas have held that a law firm's purportedly improper receipt of "attorney's fees or expenses" cannot constitute "a criminal act for purposes of RICO."[169]

88.     A survey of RICO claims involving similar accusations (*e.g.*, whether litigation activity alone constitutes the basis for wire or mail fraud crimes in RICO suits) demonstrates that federal courts routinely conclude that without details of actual criminal activity, litigation conduct alone *cannot* constitute RICO's predicate criminal acts.[170]

### 3. The Complaint fails to meet RICO's requirement for an enterprise.

89.     Additionally, the alleged RICO enterprise is not separate and distinct from the

---

[166] *Ocean Energy II, Inc. v. Alexander & Alexander, Inc.*, 868 F.2d 740, 744 (5th Cir. 1989).

[167] *Warnock v. State Farm Mut. Auto. Ins. Co.*, 833 F. Supp. 2d 604, 609 (S.D. Miss. 2011)*; Livingston Downs Racing Ass'n Inc., v. Jefferson Downs Corp.*, 257 F. Supp. 2d 819, 832 (M.D. La. 2002).

[168] Compl. ¶¶ 164–209.

[169] *Jones v. Herman & Herman*, PLLC, No. 2:22-CV-00079, 2023 WL 6064790, at *5 (S.D. Tex. Mar. 28, 2023).

[170] *Kim v. Kimm*, 884 F.3d 98, 103–104 (2d Cir. 2018) (holding that signing and filing purportedly false declarations in litigation cannot provide a basis for predicate RICO crimes and listing cases from other circuit courts with similar

purported criminal acts. Section 1962(c) expressly prohibits the conduct of an enterprise's affairs through a pattern of racketeering activity. A RICO plaintiff "must plead specific facts which establish that the association exists for purposes other than simply to commit the predicate acts."[171] Over time, a RICO enterprise also "must function as a continuing unit as shown by a hierarchical or consensual decision-making structure."[172]

90.     This Complaint articulates an enterprise allegedly existing among former Judge Jones, Ms. Freeman, Jackson Walker, and Porter Hedges LLP. The enterprise exists solely to engage in the predicate acts that the Complaint alleges. That is: utilizing "the intimate relationship between" former Judge Jones and Ms. Freeman to "enrich themselves at the expense of the bankruptcy estate and creditors, such as Plaintiffs."[173] The existence of the alleged enterprise—2018 to the present—also matches the period of the alleged pattern of racketeering activities.[174]

91.     The other problem is that as pled in the Complaint, any "financial benefit" and the "prestige and influence" obtained by the enterprise *only* occurred when the Freeman-Jackson Walker-Porter Hedges group appeared or worked with former Judge Jones to commit the purportedly fraudulent acts. The Complaint offers no factual allegations (nor could it) about the enterprise working together in acts falling *outside* the umbrella of the RICO predicate acts. Instead, the Complaint offers only unfounded and conclusory assertions of how the enterprise had the alleged purpose of "increase[ing] the prestige and influence of each actor in bankruptcy practice,

---

holdings)*; Luther v. Am. Nat. Bank of Minn*, No. 12-1085, 2012 WL 5471123 at *6 (D. Minn. Oct. 11, 2012) (listing cases in which courts found no RICO predicate crimes for litigation activities or filings); *Curtis & Assocs., P.C. v. Law Offices of David M. Bushman, Esq.*, 758 F. Supp. 2d 153, 171–72 (E.D.N.Y. 2010) (collecting cases from district courts in Second Circuit); Daddona v. Gaudio, 156 F. Supp. 2d 153, 162 (D. Conn. 2000).

[171] *Allstate Ins. Co. v. Benhamou*, 190 F. Supp. 3d 631, 650 (S.D. Tex. 2016).

[172] *Allstate Ins. Co. v. Planbeck*, 802 F.3d 665, 673 (5th Cir. 2015).

[173] Compl. at ¶ 181; *see also* Compl. at ¶ 214.

[174] *Id*. at ¶ 124.

while enriching the RICO Defendants."[175] Yet, the Complaint lacks facts detailing how the enterprise allegedly engaged in such conduct or achieved such results. The same goes for the purported receipt of economic benefits. The Complaint only details how the enterprise existed to profit from the GWG bankruptcy, which in turn formed the same basis for the predicate acts. These allegations are legally insufficient to establish an enterprise under Fifth Circuit standards.[176]

> **4.    The Complaint fails to establish the necessary predicate RICO offenses.**

92.    A plaintiff must plead "two or more predicate criminal acts" to sustain a RICO claim.[177] The Complaint pleads that Jackson Walker's failure to disclose the firm's purported knowledge about the relationship between former Judge Jones and Ms. Freeman in bankruptcy court filings for attorney's fees constituted: 1) obstruction of justice and 2) wire, mail, bankruptcy, and honest services fraud.[178] Such assertions fail for four reasons.

93.    **First,** the Complaint does not allege facts that demonstrate "use of the mails . . . for the purpose of executing the scheme."[179] The Complaint's mail fraud allegations offer ambiguous descriptions of items that could have been placed in the mail[180] and then provides a list of various legal filings all of which were electronically filed by Jackson Walker or others.[181] The Complaint contains no facts in which Plaintiffs allege these items were mailed. Instead, the Complaint lists the same filings as those provided for wire fraud and the Complaint provides no details alleging how or when Jackson Walker mailed such items or caused such items to be mailed.

94.    **Second**, the Complaint fails to allege facts sufficient for honest services fraud,

---

[175] Compl. at ¶¶ 168, 170, 177.
[176] *Elliott v. Foufas,* 867 F.2d 877, 881 (5th Cir. 1989); *Walker v. Beaumont Indep. Sch. Dist.*, 938 F.3d 724, 728 (5th Cir. 2019) (cleaned up).
[177] *Snow Ingredients, Inc. v. SnoWizard, Inc.,* 833 F.3d 512, 524–25 (5th Cir. 2016).
[178] Compl. at ¶¶164–209.
[179] *Marriott Bros. v. Gage,* 704 F. Supp. 731, 737-740 (N.D. Tex. 1988), *aff'd,* 911 F.2d 1105 (5th Cir. 1990).
[180] Compl. at ¶ 190.
[181] *Id.* at ¶ 191(a)–(d).

which is "limited to bribery and kickback schemes, not other conduct, such as conflict of interest schemes."[182] This limitation means that such payments "were made with the intent of securing a specific type of official action in return."[183] The Complaint puts forth speculative theories, but none of them encompass the *quid pro quo* required for a honest services claim. The Complaint fails to allege any offer or solicitation by Jackson Walker to former Judge Jones with the intent to secure a specific "official action" by former Judge Jones in the GWG bankruptcy proceeding. Nor could it since former Judge Jones served as a mediator, not a judge with the power to make or enter binding orders. Such specifics are needed to survive a motion to dismiss under Rule 9(b)'s pleading standard and the elements of the honest services law.[184]

95.    **Third**, as pled, the predicate act of bankruptcy fraud fails to meet the standard for such fraud under 18 U.S.C. § 152(6). Under that statute, it is a crime to fraudulently give or receive property to a court official for acting or forbearing to act in any chapter 11 case.[185] Here, the Complaint has it backwards. Plaintiffs allege former Judge Jones knowingly gave "Jackson Walker and Freeman favorable treatment at mediation and overseeing mediation of a Plan that provided for Freeman to serve in the lucrative position of Wind Down Trustee."[186] The Complaint details the purported benefits that Ms. Freeman received as the Wind Down Trustee, but the Complaint contains no specifics about what "favorable treatment" Jackson Walker allegedly received at the mediation or from the Plan independently approved by Judge Isgur.[187]

96.    **Fourth,** under 18 U.S.C. § 1503(a), obstruction of justice requires a RICO plaintiff to plead facts that show "the defendant acted corruptly with the specific intent to influence,

---

[182] *United States v. Teel*, 691 F.3d 578, 582 (5th Cir. 2012); *see also Skilling v. United States*, 561 U.S. 358 (2010).
[183] *United States v. Vasquez*, No. 22-10766, 2023 WL 7381427, at *2 (5th Cir. Nov. 7, 2023).
[184] *Id*. at *2–*3.
[185] *United States v. Kaster*, 139 F.3d 902 (7th Cir. 1998).
[186] Compl. at ¶ 207.
[187] *See e.g.*, Compl. at ¶¶ 101–02.

obstruct, or impede the judicial proceeding in its due administration of justice."[188] Here, Complaint

paragraphs 186(b) and 186(c) fail to meet that element.

97.    The Complaint lacks specifics of Jackson Walker influencing former Judge Jones.

Nor does the Complaint provide any level of detail as to the "favorable ruling[]" or "proposal" that

allegedly Jackson Walker obtained from former Judge Jones during the GWG bankruptcy

proceedings (nor could it since former Judge Jones only served as mediator). Such allegations fail

to provide the who, what, where, when, and how required by Rule 9(b) and also miss RICO's

predicate act pleading requirements.[189]

### F.    Plaintiffs' state law tort claims are barred by Texas's attorney immunity doctrine and the judicial proceedings privilege. (Claims III – IX)

98.    The Complaint asserts seven tort claims based on Texas common law.[190] Two

Texas legal doctrines bar all of them. Lawyers and law firms in Texas are generally immune from

third-party liability for legal services provided in the representation of a client[191] under the attorney

immunity defense. And Plaintiffs' tort claims all hinge on communications allegedly made by

Jackson Walker during court proceedings, which Texas law recognizes as privileged.[192] Thus, the

tort claims fail for this additional reason.

99.    Attorney immunity is an affirmative defense "intended to ensure loyal, faithful, and

aggressive representation by attorneys employed as advocates."[193] This immunity is "properly

characterized as a true immunity from suit, not as a defense to liability."[194] Within the Fifth Circuit,

a Rule 12(b)(6) motion may be granted on a successful affirmative defense if that defense appears

---

[188] *United States v. Richardson*, 676 F.3d 491, 506 (5th Cir. 2012) (internal citations and quotations omitted).
[189] *Kariem v. United Parcel Serv., Inc.*, 2006 WL 8437577, at *3 (N.D. Tex. Sept. 18, 2006).
[190] Compl. at ¶¶ 217–298.
[191] *Haynes and Boone, LLP v. NFTD, LLC*, 631 S.W.3d 65 (Tex. 2021).
[192] *Landry's, Inc. v. Animal Legal Def. Fund*, 631 S.W.3d 40, 46 (Tex. 2021).
[193] *Cantey Hanger, LLP v. Byrd*, 467 S.W.3d 477, 481 (Tex. 2015).
[194] *Troice v. Proskauer Rose, L.L.P.*, 816 F.3d 341, 346 (5th Cir. 2016).

on the face of the complaint.[195] "[A]n attorney seeking dismissal based on attorney immunity bears the burden of establishing entitlement to the defense."[196]

100.    Describing the defense, the Texas Supreme Court has held:[197]

[A]ttorney immunity protects an attorney against a non-client's claim when the claim is based on conduct that (1) constitutes the provision of "legal" services involving the unique office, professional skill, training, and authority of an attorney *and* (2) the attorney engages in to fulfill the attorney's duties in representing the client within an adversarial context in which the client and the non-client do not share the same interests and therefore the non-client's reliance on the attorney's conduct is not justifiable.

101.    This defense is applicable in "all adversarial contexts in which an attorney has a duty to zealously and loyally represent a client, including a business-transactional context."[198] When considering the doctrine's application, a court "must look beyond [a party's] characterizations of activity as fraudulent and conspiratorial and focus on the conduct at issue."[199]

102.    That doctrine extends to "when attorneys act in the uniquely lawyerly capacity of one who possesses 'the office, professional training, skill, and authority of an attorney'" and when the actions complained of are "the kind of conduct in which an attorney engages when discharging his duties to his client." "Even when a non-client plaintiff claims an attorney has engaged in acts that were 'fraudulent,' 'conspiratorial,' or otherwise 'wrongful,' as long as the acts were committed while representing a client, the attorney is nevertheless still entitled to immunity."[200]

103.    Jackson Walker disputes the Complaint's assertions that the firm intentionally omitted material information from filings or made fraudulent disclosures. But even if such claims

---

[195] *Kelly v. Nichamoff*, 868 F.3d 371, 375 (5th Cir. 2017).
[196] *Id.*
[197] *Haynes and Boone*, 631 S.W.3d at 78.
[198] *Id.* at 67.
[199] *Youngkin v. Hines*, 546 S.W.3d 675, 682 (Tex. 2018).
[200] *1st & Trinity Super Majority, LLC v. Milligan*, 657 S.W.3d 349, 368–69 (Tex. App.—El Paso 2022, no pet) (quoting *Youngkin*, 546 S.W.3d at 681–82).

were true, those facts are immaterial to this Court's consideration.[201] This is because the Complaint's claims and assertions rest upon Jackson Walker's work, and payments received, as Debtors' counsel. Jackson Walker's statements of disinterest and attorney fee applications for work performed for the Debtor are precisely the activity protected by the doctrine.[202] Under cases such as *Youngkin* and *Cantey-Hanger*, the Complaint's allegations of fraud or material omissions are irrelevant. Jackson Walker's complained of court filings or conduct during mediation constitute "the kind of conduct in which an attorney engages when discharging his duties to his client"[203] and afford the doctrine's protection.

104.    Plaintiffs' tort claims are also barred by the judicial-proceedings privilege, which encompasses statements made by judges, jurors, parties, or witnesses and attaches to all portions of proceedings, "including statements made in open court, pre-trial hearings, depositions, affidavits and any of the pleadings or other papers in the case."[204] The privilege "prohibits any tort litigation based on the content of the" communications put at issue by Plaintiffs' Complaint.[205]

105.    The Texas Supreme Court has considered the doctrine within the context of defamation actions while other Texas appellate courts have held that "this absolute immunity doctrine" means that comments made in litigation proceedings "cannot constitute the basis for a defamation or any other civil action."[206] And Texas courts have upheld a party's assertion of the

---

[201] *Cantey Hanger, LLP v. Byrd*, 467 S.W.3d 477, 483–84 ("[f]raud is not an exception to attorney immunity; rather, the defense does not extend to fraudulent conduct that is outside the scope of an attorney's legal representation of his client, just as it does not extend to other wrongful conduct outside the scope of representation."); *see also Troice v. Proskauer Rose, L.L.P.*, 816 F.3d 341, 348 (5th Cir. 2016).

[202] *Cantey Hanger, LLP v. Byrd*, 467 S.W.3d 477, 481 (Tex. 2015). ("Whether immunity attaches turns on the type of conduct in which the lawyer is engaged, and the dispositive question is whether the attorney's conduct was part of the discharge of his duties in representing a party[.]").

[203] *Cantey Hanger*, 467. S.W.3d at 482.

[204] *Landry's Inc. v. Animal Legal Def. Fund*, 631 S.W.3d 40, 46 (Tex. 2021).

[205] *Id*. (quoting *Collins v. Zolnier*, No. 09-17-00418-CV, 2019 WL 2292333, at *3 (Tex. App.—Beaumont May 30, 2019, pet. denied)).

[206] *Attaya v. Shoukfeh*, 962 S.W.2d 237, 238 (Tex. App.—Amarillo 1998, pet. denied) (citations omitted); *State Fair of Tex. v. Riggs & Ray P.C.*, No. 05-15-00973-CV, 2016 WL 4131824, at *5 (Tex. App.—Dallas, Aug. 2, 2016, no

---

privilege for statements made during bankruptcy proceedings.[207]

106.    The Complaint details purported omissions or misleading statements by Jackson Walker made within court filings, court appearances, or in "the due course of a judicial proceeding." This means such statements are absolutely protected under the judicial proceedings privilege and cannot form the basis for the Complaint's tort claims.

### G.    The Complaint's failure to prove justifiable or detrimental reliance mandates dismissal of Plaintiffs' state law tort claims. (Claims III – IX)

107.    Plaintiffs' tort claims all rest upon a purported reliance on Jackson Walker's misrepresentations in bankruptcy court filings.[208] Yet, the Complaint lacks facts detailing whether, when, or how Plaintiffs read or relied upon the Court filings about which Plaintiffs now complain. Under Rule 9(b)'s heightened pleading standards and Fifth Circuit precedent, the Complaint must specify the precise representations upon which Plaintiffs relied.[209] A "plaintiff cannot assert reliance on a written representation he did not read."[210] The Complaint contains no mention of Plaintiffs reviewing the allegedly fraudulent documents executed by Jackson Walker personnel let alone Plaintiffs relying upon these documents. The Complaint cannot meet this requirement and must be dismissed for failing to state a claim upon which relief can be granted.

---

pet.) (mem. op) (cleaned up) ("The purpose of the privilege is to encourage free communications in judicial and quasi-judicial proceedings. Therefore, [a]ny communication, even perjured testimony, made in the course of a judicial proceeding, cannot serve as the basis for a suit in tort."); *Tervita, LLC v. Sutterfield*, 482 S.W.3d 280, 285 (Tex. App.—Dallas 2015, pet. denied) (citing *in re Hinterlong*, 109 S.W.3d 611, 635–36 (Tex. App.—Fort Worth 2003, orig. proceeding)); *see also* Shell Oil Co. v. Writt, 464 S.W.3d 650, 654–55 (Tex. 2015).

[207] *Collins v. Zolnier*, No. 09-17-00418-CV, 2019 WL 2292333, at *2 (Tex. App May 30, 2019).
[208] Compl. at ¶¶ 164–209.
[209] *Williams v. WMX Techs*, 112 F.3d 175, 177 (5th Cir. 1997) (requiring a plaintiff to specify the statements contended to be fraudulent, identify the speaker, state when and where the statements were made, and explain why the statements were fraudulent); *Weir v. Fed. Asset Disposition Ass'n*, 123 F.3d 281, 289–90 (5th Cir. 1997) (holding that recovery for breach of fiduciary duty depends on establishing reasonable and detrimental reliance upon a material misrepresentation); *F.D.I.C. v. Ernst & Young*, 967 F.2d 166, 170 (5th Cir. 1994) (a professional negligence claim required for proof of proximate causation); *Blankinship v. Brown*, 399 S.W.3d 303, 308 (Tex. App.—Dallas 2013, pet. denied) (claims of common law fraud and negligent misrepresentation claims must plead that a plaintiff actually and justifiably relied upon specific misrepresentations).
[210] *Lafrentz v. Lockheed Martin Corp.*, No. 4:18-CV-4229, 2021 WL 4350175, at *3 (S.D. Tex. Sept. 10, 2021).

### H. The Complaint's conspiracy claims fail since the Complaint lacks specific facts evidencing an agreement among alleged conspirators and the underlying claims themselves cannot be established. (Claims II, VII).

108.    "To survive a motion to dismiss, [Plaintiffs] must allege specific facts to show an agreement"[211] for their conspiracy claims.[212] Conclusory allegations do not work.[213]

109.    Plaintiffs theorize that "Defendants agreed to collect profit through the Jones-Freeman relationship by interjecting Jones into a case by moving for his appointment as mediator to accomplish their objectives (without ever disclosing the disqualifying conflict), with all Conspiracy Defendants profiting directly or indirectly from the arrangement."[214] Plaintiffs also contend that the Defendants "had a meeting of the mind on the object of the conspiracy—collecting millions in attorneys' fees and securing lucrative appointments; and on the course of action—failing to disclose the Jones-Freeman intimate relationship and affirmatively representing disinterestedness."[215]

110.    The limited support for this comes in paragraph 170 of the Complaint (repeated in paragraph 213) with Plaintiffs asserting: "RICO Defendants were in regular contact with one another via email, phone and in-person communications for the purposes of securing appointments in and making decisions regarding bankruptcy cases, getting cases filed in the 'friendly' court of Jones or ensuring that he was appointed as mediator . . . ."[216]

111.    Plaintiffs failed to identify a single communication that led to or involved agreement or meeting of the minds for Defendants. Under Rule 9(b)'s heightened pleading

---

[211] *Rynearson v. United States*, No. DR-12-CV-24-AM, 2013 WL 11309342, at *12 (W.D. Tex. Sept. 30, 2013) (Moses, J.), *aff'd*, 601 F. App'x 302 (5th Cir. 2015) (cleaned up).
[212] *Galindo v. City of Del Rio*, Case No. DR-20-CV-20-AM/CW, 2021 WL 2763033 at *6 (W.D. Tex. Mar. 26, 2021) (Moses, J.) (RICO civil conspiracy); *Erwin v. Russ*, No. W:09-CA-127, 2010 WL 11506838, at *2 (W.D. Tex. July 19, 2010), *aff'd*, 481 F. App'x 128 (5th Cir. 2012) (civil conspiracy).
[213] *Rynearson*, 2013 WL 11309342, at *12.
[214] Compl. at ¶ 286.
[215] *Id*.
[216] Compl. at ¶¶ 170, 213.

standards—which apply to all claims here as they involve allegations of fraud—the Complaint fails.[217] Furthermore, federal courts have concluded that conclusory allegations without specifics cannot form the basis for demonstrating agreement among Defendants for a conspiracy claim.[218]

112.    In Texas, civil conspiracy is a "'derivative tort,' meaning it depends on some underlying tort or other illegal act. [The] use of the word ''derivative' in this context means a civil conspiracy claim is connected to the underlying tort and survives or fails alongside it."[219] The Texas Supreme Court has explicitly stated that "civil conspiracy is not an independent tort", rather it is a "theory of vicarious liability."[220] Plaintiffs have tied this state law tort to their breach of fiduciary duty claim. And as Section IV.I explains, that claim fails. Thus, this one must as well.

113.    The Texas state law conspiracy claim fails for the same reason as the RICO conspiracy claim—lack of specificity about purported agreement. Civil conspiracy's elements are: "'(1) two or more persons; (2) an object to be accomplished; (3) a meeting of minds on the object or course of action; (4) one or more unlawful, overt acts; and (5) damages as the proximate result.'"[221] Here, the Complaint lacks specific facts about the making of an agreement among Defendants or the meeting of the minds as described in paragraph 171 of the Complaint. That lone paragraph lacks details specifying when, where, or with whom alleged conversations occurred. Without such information (and because the underlying tort fails, too) this claim cannot withstand a dismissal motion.

---

[217] *Allgood*, 80 F.3d at 171 (5th Cir. 1996).
[218] *Margetis v. Furgeson*, No. 4:12-cv-753, 2015 WL 6688063, *8 (E.D. Tex. Sept. 29, 2015).
[219] *Agar Corp., Inc. v. Electro Cirs. Int'l LLC*, 580 S.W.3d 136, 140–41 (Tex. 2019) (cleaned up).
[220] *Id.* at 141.
[221] *Id.* (quoting *Massey v. Armco Steel Co.*, 652 S.W.2d 932, 934 (1983)).

I.    **Jackson Walker owed GWG, not Plaintiffs, a fiduciary duty, and Jackson Walker cannot be sued for legal malpractice by Plaintiffs because Jackson Walker represented GWG. (Claims IV, V, and VII)**

114.    An attorney owes a duty of care only to those with whom the attorney has a professional attorney-client relationship. The parties must explicitly agree to that relationship or, by their conduct, have manifested an intention to create this relationship.[222] An attorney does not owe a duty to a non-client and is not liable to a non-client for damages resulting from the negligent performance of legal services for a client.[223] Jackson Walker served as GWG's lawyer,[224] not Plaintiffs' counsel. While a debtor's counsel owes a fiduciary duty to the estate, such a duty "does not, however, extend to individual creditors and equity holders."[225] In fact, Texas bankruptcy courts have expressly held that "a law firm owes no independent duty to creditors of its client."[226]

115.    The Complaint provides no details allowing for the conclusion that Jackson Walker owed a professional duty to Plaintiffs. Paragraph 231 of the Complaint points to *Baron & Newburger, P.C. v. Tex. Skyline, Ltd. (In re Woerner)*[227] when contending that a fiduciary duty existed between Jackson Walker and Plaintiffs. That case is inapplicable. *In re Woerner* discusses how the debtor, not its legal counsel, takes on the rights, powers, and fiduciary duty of a trustee once the debtor files for reorganization under Chapter 11.[228] The case does not support Plaintiffs' proposition that lawyers for a debtor-in-possession owe a fiduciary duty to creditors. Texas federal courts have held the opposite[229] and the caselaw provides legal support for dismissal of this claim.

---

[222] *Span Enter. v. Wood*, 274 S.W.3d 854, 858 (Tex. App.—Houston [1st Dist.] 2008, no pet.).
[223] *Barcelo v. Elliott*, 923 S.W.2d 575, 577 (Tex. 1996).
[224] Doc. No. 267, No. 22-90032.
[225] *In re Am. Int'l Refinery, Inc.*, 436 B.R. 364, 376 (Bankr. W.D. La. 2010), *aff'd*, 676 F.3d 455 (5th Cir. 2012).
[226] *In re TOCFHBI, Inc.*, 413 B.R. 523, 538–39 (Bankr. N.D. Tex. 2009)
[227] 783 F.3d 266, 271 (5th Cir. 2015).
[228] *Id*. at 271.
[229] *ICM Notes, Ltd. v. Andrews & Kurth, L.L.P.*, 278 B.R. 117, 126 (S.D. Tex. 2002) ("A finding that debtor's counsel owes a particular duty to an individual creditor in a Chapter 11 bankruptcy proceeding would prevent counsel from representing his client in accordance with the provisions of the Bankruptcy Code.")

116.    The Complaint also contends that Jackson Walker aided and abetted a breach of fiduciary duty. The Complaint has an inability to establish the underlying breach claim as a matter of law. Thus, that means the aiding and abetting claim is defunct. Additionally, the Fifth Circuit has held that this is unrecognizable by federal courts as the Texas Supreme Court "'has yet to expressly adopt'" such a claim.[230] "'When sitting in diversity, a federal court exceeds the bounds of its legitimacy in fashioning novel causes of action not yet recognized by the state courts.'"[231] This claim should be dismissed.

### J.    Jackson Walker was not unjustly enriched. (Claim IX)

117.    The Complaint contends that the Bankruptcy Court improperly awarded professional fees to Jackson Walker[232] thereby diminishing Plaintiffs' recovery as creditors.[233] But Plaintiffs' Complaint has not, and cannot, show that any funds Jackson Walker received rightfully belonged to them, nor can Plaintiffs demonstrate that they are in a worse position than Plaintiffs would have been absent Jackson Walker's alleged conduct.[234] Both are required to allege a *prima facie* case of unjust enrichment.

118.    Even if the fees previously awarded to Jackson Walker were returned to the

---

[230] *Midwestern Cattle Mktg., L.L.C. v. Legend Bank, N.A.*, 800 F. App'x 239, 250 (5th Cir. 2020) (citing to *In re DePuy Orthopaedics, Inc., Pinnacle Hip Implant Prod. Liab. Litig.*, 888 F.3d 753, 781–82 (5th Cir. 2018); *see also Reynolds v. Sanchez Oil and Gas Corp.*, No. 01-18-00940-CV, 2023 WL 8262764, *9 (Tex. App.—Houston [1st Dist.] Nov. 30, 2023, no pet.).

[231] *Id.* at 250 (quoting *In re DePuy Orthopaedics, Inc., Pinnacle Hip Implant Prod. Liab. Litig.*, 888 F.3d 753, 781 (5th Cir. 2018)).

[232] Compl. at IV, V.

[233] Compl. at ¶¶ 140, 181, 214, 253, 258, 270, 277, 293.

[234] It is unclear whether unjust enrichment is a valid separate cause of action in Texas, or a quasi-contractual, restitution doctrine based on principles of equity. The claim's purpose, when validly asserted, is to place an aggrieved plaintiff in the position he occupied prior to his dealings with the defendant. *Hancock v. Chicago Title Ins. Co.*, 635 F. Supp. 2d 539, 560–61 (N.D. Tex. 2009) ("The Supreme Court of Texas and other courts still occasionally refer to an 'unjust enrichment claim.' These opinions do not, however, characterize unjust enrichment as a separate cause of action from money had and received; they consider it to be a general theory of recovery for an equitable action seeking restitution.") (citing *Elledge v. Friberg–Cooper Water Supply Corp.*, 240 S.W.3d 869 (Tex. 2007); *HECI Expl. Co. v. Neel*, 982 S.W.2d 881 (Tex. 1998); *Mowbray v. Avery*, 76 S.W.3d 663, 680 (Tex. App.—Corpus Christi–Edinburg 2002, pet. denied)).

---

*Jackson Walker's Motion to Dismiss*                                                      **Page 42**

bankruptcy estate, Plaintiffs would likely recover nothing for their bond holding interests. Alternatively, Plaintiffs' ability for recovery as an unsecured creditor, as proposed in the Plan,[235] is highly attenuated. Prior to this lawsuit Plaintiffs had no objections to Jackson Walker's fees. Nor have Plaintiffs alleged that during bankruptcy Jackson Walker did not perform the legal services for which it was paid (or that had Jackson Walker not been employed, another law firm would have been required to perform the same legal services—thereby incurring the same legal fees). The Complaint lacks facts allowing for the conclusion that Jackson Walker's work was anything other than beneficial for its clients, the bankruptcy estate. The Court, therefore, should dismiss this unjust enrichment claim as a matter of law due to such pleading flaws.

### K.    There is no valid basis for reliance on the theory of *respondent superior*.

119.    To hold a defendant vicariously liable, the plaintiff must prove that he was injured because of a tort.[236] There can be no vicarious liability absent an underlying tort. Plaintiffs have failed to state a claim for any tort, whether intentional or negligent. Without establishing such torts, they cannot establish the *respondent superior* claim against Jackson Walker. Because Plaintiffs cannot establish this basic element, this claim, too, should be dismissed.

### L.    This Court should strike or deny Plaintiffs' class allegations under Rule 12(f) as a class action cannot be maintained since Plaintiffs lack standing.

120.    Under Rule 12(f), the court may strike from any pleading "an insufficient defense or any redundant, immaterial, impertinent, or scandalous matter."[237] In putative class actions, a defendant may move to strike class allegations prior to discovery in rare cases where the complaint itself demonstrates that the requirements for maintaining a class action cannot be met."[238] A court

---

[235] Doc. No. 1924, Case No. 22-90032.
[236] *G & H Towing Co. v. Magee*, 347 S.W.3d 293, 296 (Tex. 2011); *GTE Southwest, Inc. v. Bruce*, 998 S.W.2d 605, 617–18 (Tex. 1999).
[237] Fed. R. Civ. P. 12(f).
[238] *Delarue v. State Farm Lloyds*, No. 1:09-CV-237, 2010 WL 11530499, at *2 (E.D. Tex. Mar. 10, 2010) (Giblin, J.)

may strike class allegations when the issues are "plain enough from the pleadings" that a class cannot be maintained."[239] This is such a case.

### 1.   Members of the proposed class, by definition, lack Article III standing.

121.   The Plaintiffs attempt to categorize the Complaint as a class action if they are unsuccessful in their attempt to obtain derivative standing (which is improper for the reasons set forth herein). Their proposed class is as follows: "Any person or entity who was a holder of Public L Bonds, Liquidity Bonds, and Seller Trust L Bonds issued by GWG and outstanding at the time the GWG bankruptcy petition was filed on April 20, 2022, and whose bond interests have been converted into WDT Interests in the GWG Wind Down Trust."[240] This proposed class, by definition, includes individuals and entities that lack Article III standing to bring any of the underlying RICO and state law claims, barring class certification of the proposed class.[241]

122.   Whether a lawsuit is a class action doesn't change standing rules. Named plaintiffs still have to show that *they themselves* were harmed—they can't rely only on harm suffered by other, unnamed members of the class.[242]Article III standing requires: (1) an injury in fact, (2) fairly traceable to the defendant's conduct, (3) that can be redressed by a favorable decision of the court.[243] An "injury in fact" must be "(a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical."[244]

123.   The damages described in this Complaint pertain to Jackson Walker's conduct on behalf of the Debtor, GWG, and the receipt of fees from the bankruptcy estate, which allegedly

---

(citing *Rios v. State Farm Fire & Cas. Co.*, 469 F. Supp. 2d 727, 740 (S.D. Iowa 2007)); *see also See John v. Nat'l Sec. Fire & Cas. Co.*, 501 F.3d 443, 445 (5th Cir. 2007).
[239] *Gant v. Whynotleaseit, LLC*, No. CV H-13-3657, 2014 WL 12606313, at *1 (S.D. Tex. Dec. 11, 2014), report and recommendation adopted, 2015 WL 12804639 (S.D. Tex. Jan. 16, 2015).
[240] Compl. at ¶ 153.
[241] *Singh v. RadioShack Corporation*, 882 F.3d 137 (5th Cir. 2018).
[242] *Id.* at 151 (quoting *Simon v. E. Ky. Welfare Rights Org.*, 426 U.S. 26, 40 n. 20).
[243] *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61 (1992).
[244] *Id.* at 560.

diminished the amount the putative class could receive as creditors. As described in Sections IV.A through IV.C, that harm *only* belongs to the bankruptcy estate, not creditors.

124.    Additionally, the putative class members lacking Article III standing are persons or entities who held bonds issued by GWG outstanding at the time of the bankruptcy petition. They did not rely on or were not exposed to any alleged misrepresentations by Jackson Walker regarding the Jones-Freeman relationship. Such people by definition were not defrauded or deceived. Jackson Walker owed a duty **only** to GWG; it is only GWG that could have been defrauded or deceived by Jackson Walker's alleged misrepresentations. Any other alleged harm is derivative of the alleged harm to GWG's valuation. Plaintiffs' proposed class includes broad categories of individuals and entities lacking Article III standing, rendering the class unmaintainable. The class allegations should be stricken with prejudice.

### 2.    The proposed class cannot be certified because there exist inescapable individual questions about causation, reliance, injury, and damages.

125.    Rule 23(b)(3)'s strict requirements also warrant striking the class allegations. Plaintiffs' fraud claims—brought under federal RICO standards and various state laws—necessitate individualized inquiries into first- or third-party reliance for each unnamed class member, destroying any notion that the proposed class is certifiable.[245]

126.    Such individualized inquiries include: (1) Whether a particular individual lacked an opportunity to have a motion determined on the merits because of the existence of the Jones-Freeman relationship; (2) whether any particular individuals themselves knew of the Jones-Freeman relationship; and, (3) whether any particular individual relied on the alleged non-disclosure of the Jones-Freeman relationship in deciding whether to act in the bankruptcy case or in deciding whether to invest in L Bonds. Plaintiffs cannot plead claims that avoid individualized

---

[245] *Anza*, 547 U.S. at 461; *Hemi Grp., LLC*, 559 U.S. at 2; *Bridge*, 553 U.S. at 658.

inquiries and proof on numerous issues that undeniably overwhelm common questions. The class allegations should be stricken.

127.    Alternatively, Jackson Walker reserves the right to file a supplemental objection contesting Plaintiffs' purported class allegations at such time.

## V.    CONCLUSION

128.    This motion offers the Court an opportunity to end another lawsuit commenced by the Bandas Law Firm in which that firm lodges claims by disgruntled bankruptcy proceeding actors lacking the necessary legal standing for their complaint. In yet another complaint (the firm's third), the pleading alleges harm, which Jackson Walker did not proximately cause, and seeks damages, which Plaintiffs lack the ability to collect (*e.g.*, the disgorgement of Jackson Walker's fees). This litigation is little more than a backdoor attempt by GWG insiders (the Exchange Trust Plaintiffs) to attack a confirmed bankruptcy plan. This is a confirmed Plan, to which these Plaintiffs did not object, subordinating their interests to those of 27,000 L Bondholders out millions due to misfeasance by certain GWG insiders such as Messrs. Heppner and Holland.

129.    The Complaint fails to meet Article III or prudential standing requirements, and based on its theory of fraud, which involves only harm to the bankruptcy estate, it is unlikely that Plaintiffs could ever achieve such standing. Additionally, the Complaint's failure to meet pleading standards under Rule 9(b), *Iqbal,* and *Twombly*, make dismissal with prejudice appropriate.

130.    The factual allegations underpinning former Judge Jones' resignation are serious and Jackson Walker is treating them as such. But the contentions' severity fail to provide Plaintiffs with the legal right to pursue the baseless tort claims contained in the Complaint. Jackson Walker, therefore, respectfully requests that this Court dismiss Plaintiffs' claims with prejudice.

Respectfully submitted,

**NORTON ROSE FULBRIGHT US LLP**

Jason L. Boland (SBT 24040542)
William R. Greendyke (SBT 08390450)
Julie Harrison (SBT 24092434)
Maria Mokrzycka (SBT 24119994)
1550 Lamar, Suite 2000
Houston, Texas 77010
Telephone: (713) 651-5151
Email: jason.boland@nortonrosefulbright.com
Email:william.greendyke@nortonrosefulbright.com
Email: julie.harrison@nortonrosefulbright.com
Email: maria.mokrzycka@nortonrosefulbright.com

-and-

Paul Trahan (SBT 24003075)
Emily D. Wolf (SBT 24106595)
98 San Jacinto Boulevard, Suite 1100
Austin, Texas 78701
Telephone: (512) 474-5201
Fax: (512) 536-4598
Email: paul.trahan@nortonrosefulbright.com
Email: emily.wolf@nortonrosefulbright.com

*Counsel for Jackson Walker LLP*

**Rusty Hardin & Associates, LLP**

   /s/ Russell Hardin, Jr.
Russell Hardin, Jr. (SBT 08972800)
Leah M. Graham (SBT 24073454)
Jennifer E. Brevorka (SBT 24082727)
Emily Smith (SBT 24083876)
5 Houston Center
1401 McKinney, Suite 2250
Houston, Texas  77010
Telephone: (713) 652-9000
Email: rhardin@rustyhardin.com
Email: lgraham@rustyhardin.com
Email: jbrevorka@rustyhardin.com
Email: esmith@rustyhardin.com

*Co-Counsel for Jackson Walker LLP*

## CERTIFICATE OF SERVICE

I hereby certify that on September 25, 2025, I electronically filed the foregoing document with the Clerk of the Court using the CM/ECF system, which will send notification of such filing *via* electronic mail to all counsel of record.

   */s/ Russell Hardin, Jr.*
Russell Hardin, Jr.