**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

GARY PETERSON, CHRIS NAKASHIMA,
JOHN ENGLISH, JAQUETTA ENGLISH,
LT-1 EXCHANGE TRUST, LT-2
EXCHANGE TRUST, LT-3 EXCHANGE
TRUST, LT-4 EXCHANGE TRUST, LT-5
EXCHANGE TRUST, LT-6 EXCHANGE
TRUST, LT-7 EXCHANGE TRUST, LT-8
EXCHANGE TRUST, LT-9 EXCHANGE
TRUST, LT-12 EXCHANGE TRUST, LT-
14 EXCHANGE TRUST, LT-15
EXCHANGE TRUST, LT-17 EXCHANGE
TRUST, LT-18 EXCHANGE TRUST, LT-
19 EXCHANGE TRUST, LT-20
EXCHANGE TRUST, ON THEIR OWN
BEHALF AND ON BEHALF OF ALL
OTHERS SIMILARLY SITUATED,

          PLAINTIFFS,

V.

DAVID R. JONES, ELIZABETH CAROL
FREEMAN, THE LAW OFFICE OF LIZ
FREEMAN, PLLC, JACKSON WALKER,
LLP, AND PORTER HEDGES, LLP,
          DEFENDANTS.

CIVIL ACTION NO. 4:25-CV-2761

JURY TRIAL DEMANDED

**PLAINTIFFS' RESPONSE TO DEFENDANT
ELIZABETH CAROL FREEMAN'S AMENDED MOTION TO DISMISS**

# TABLE OF CONTENTS

Introduction ................................................................................................................. 1

Statement of Facts ....................................................................................................... 5

Standard of Review ...................................................................................................... 5

Argument & Authorities .............................................................................................. 6

   I.  This Court Should Deny Freeman's Rule 12(b)(1) Motion. ................................... 6

     A.   Plaintiffs' Complaint Invokes Article III Standing........................................... 6

     B.   Plaintiffs Allege Direct Claims. ...................................................................... 9

     C.   Plaintiffs Intend to Move for Limited Appointment to Purse any Derivative Litigation, or Alternatively, for Derivative Standing. ...................................... 11

     D.   Freeman's Attacks on Murray Holland are an Attempt to Evade Responsibility. ....................................................................................................................14

   II. This Court Should Deny Freeman's Rule 12(b)(6) Motion....................................... 17

     A.   The Complaint Adequately Pleads Causation................................................. 17

     B.   Plaintiffs' 1962(c) RICO Pleadings Survive Rule 12(b)(6)............................. 24

     C.   Plaintiffs sufficiently alleged claims for RICO Conspiracy. ........................... 34

     D.   Plaintiffs adequately pleaded common law fraud and fraud by omission. ........ 36

     E.   Plaintiffs adequately pleaded claims for breach of fiduciary duty and aiding and abetting breach of fiduciary duty. ........................................................................ 40

     F.   Plaintiffs' claims for negligent misrepresentation were sufficiently pleaded......... 42

     G.   Plaintiffs adequately pleaded claims against Freeman for professional negligence. ......................................................................................................... 42

     H.   Plaintiffs adequately pleaded claims for civil conspiracy................................. 43

     I.   Freeman's arguments to escape liability for punitive or exemplary damages fail. ....................................................................................................................45

   III. Plaintiffs Request Leave to Amend their Complaint Prior to Dismissal. ................. 45

Conclusion ................................................................................................................... 46

# INTRODUCTION

1.      If this case feels like "déjà vu all over again"[1] for Freeman, it is only because she corrupted the United States bankruptcy system for over five years and in more than two dozen cases. Since 2018, Freeman repeatedly leveraged her secret, live-in, intimate relationship with the former Chief Bankruptcy Judge to enrich the couple, her law firm, and others. In the process, she and her cohorts wiped out a lifetime of savings for GWG bondholders like Plaintiffs John and Jaquetta English.

2.      Freeman is correct that this case differs in one respect from the regular pattern of Jones-Freeman corruption. Jones was not the presiding judge. Here, the conspiracy was even more cunning and duplicitous because Freeman, Jackson Walker, and Jones *still* secured his influence and control.[2] As described in Plaintiffs' complaint, they interjected Jones into the case at a time when Freeman and Jackson Walker were preparing to amicably and quietly separate rather than finally disclose the relationship.[3] Without disclosing the relationship, Jackson Walker and Freeman moved for Jones' appointment as mediator.[4] They filed their motion at a time when their disclosures indicated "N/A" for the section concerning Bankruptcy Judges for the Southern District of Texas.[5] And Freeman argued during a hearing on the motion that Jones should be appointed to "help keep everybody within the guardrails that would be appropriate."[6] All the while, she kept the disqualifying relationship secret.[7]

---

[1] Freeman Amended Motion to Dismiss (hereinafter "Motion to Dismiss") ¶ 1.
[2] *See also e.g., In re Altera Infrastructure LP*, 22-90130, ECF No. 247 (Jackson Walker submitting joint stipulation for Jones to serve as mediator), ECF NO. 228 (Jackson Walker taking $357,209.50 in fees and Freeman taking $53,445).
[3] Complaint ¶¶ 6–7, 67.
[4] *Id.* ¶ 8.
[5] *Id.* ¶ 52.
[6] *Id.* ¶ 98.
[7] "And isn't it ironic? Don't you think? A little too ironic, and yeah, I really do think." Alanis Morissette, *Ironic*, on *Jagged Little Pill* (1995).

3.      Once Jones took the reins as mediator and declared Judge Isgur would do whatever he suggested, he quickly transformed the case from a restructuring into complete liquidation. The Defendants set Freeman up with a "golden parachute" for her departure from Jackson Walker, with Jones handing her the lucrative position of Wind Down Trustee, which allowed her to collect $100,000 per month for the first six months and $50,000 thereafter.[8]

4.      Freeman's tenure has been disastrous for GWG bondholders, who now hold nearly worthless Wind Down Trust interests. Starting with approximately $2 billion in assets, she and the other defendants have drained the GWG estate completely.[9] Under the best-case scenario, and after the Litigating Trustee pursued claims against former management, other bankruptcy professionals, and anyone other than the elephants in the room, bondholders have lost 96% of their investment while Freeman has budgeted for herself over $600,000 in fees for the next year.

5.      Freeman's response shirks the significance of her hiding the relationship. According to Freeman, bondholders like Plaintiffs signed off on the "fruits of a voluntary mediation," so they cannot be heard to complain now.[10] Lost on Freeman is that Plaintiffs and others would have of course protested had they been informed that their counsel was in an intimate, live-in relationship with the mediator who declared the restructuring would be converted from a restructuring into a liquidation, as part of a broader conspiracy to reap gargantuan professional fees for the nascent Law Office of Liz Freeman, PLLC. By Freeman's own design, they couldn't object because they didn't know.

---

[8] Complaint ¶ 103.
[9] *Id.* ¶ 110.
[10] Motion to Dismiss ¶ 2.

6.      Freeman's response is noteworthy not just for what is says, but what it does not say. It does not contest that she kept the relationship secret for profit. It does not dispute allegations that she conspired with Jones and Jackson Walker to have Jones appointed mediator in the case. Nor does it deny that the only reason Freeman was named Wind Down Trustee is because her live-in boyfriend said so. Of course, the facts must be presumed true at this stage under Rule 12(b)(6). But it is noteworthy that Freeman does not even suggest a counter-narrative other than to deflect with reference to pre-bankruptcy conduct.

7.      Freeman hopes to avoid liability by resorting to this Court's dismissal in *Van Deelen*.[11] If Freeman believes this case is the same as *Van Deelen*, respectfully, her counsel need to re-read the Complaint. As this Court knows, it dismissed Mr. Van Deelen's claims for lack of Article III standing where he was unable to show a concrete injury based on a reduced recovery from the bankruptcy estate. *Id.* at 16–17. Mr. Van Deelen, however, was not a creditor. *Id.* at 16. "Rather, he was an equity shareholder" whose shares were extinguished months before Jones approved the defendants' fees. *Id.* As such, this Court found that Mr. Van Deelen failed to show "that the Defendants' actions deprived him of anything he had not already lost long before" the defendants requested fees. *Id.* at 17.

8.      This case is entirely different. Plaintiffs collectively held bonds worth more than $300 million.[12] They held them when Freeman and Jackson Walker moved to have Jones appointed as mediator yet failed to disclose the relationship. And they subsequently acquired Wind Down Trust interests in the place of the bonds while Freeman assumed the role of Wind Down Trustee (again without disclosing) and whittled away their assets to nearly nothing.[13]

---

[11] *Michael D. Van Deelen v. David R. Jones, et al.*, No. 4:23-cv-3729 (S.D. Tex. Oct. 4, 2023)
[12] Complaint ¶¶ 133–36.
[13] *Id.* ¶¶ 19, 106–110, 128–32.

9.      These are concrete injuries under Article III that harmed Plaintiffs. Plaintiffs still hold interests in the Wind Down Trust that have lost at least 96% of the value because of Freeman's misconduct. For this disaster, Freeman has been paid richly in fees, drawn from the remains of GWG. These losses can and should be redressed through damages awarded in a judgment.

10.     Otherwise, Freeman attempts to interject her own version of the facts leading up to the bankruptcy, which she incorrectly believes eliminates any liability for her role in concealing the relationship with the judge who oversaw mediation and installed her as Wind Down Trustee. Her approach ignores the applicable standard under Rule 12(b)(6). She cannot overcome Plaintiffs' well-pleaded facts by controverting them with her own self-serving narrative or documents not cited by Plaintiffs Complaint. Tellingly, just 5 of the 60 footnotes in Freeman's "Factual Background" cite to the Complaint.

11.     As this Court knows, under Rule 12(b)(6), it accepts "all well-pleaded facts in the complaint as true and views [them] in the light most favorable to the plaintiff." *Raj v. La. State Univ.*, 714 F.3d 322, 330 (5th Cir. 2013). When the Court considers a Rule 12(b)(6) motion to dismiss, it "must limit itself to the contents of the pleadings." *Collins v. Morgan Stanley Dean Witter*, 224 F.3d 496, 498 (5th Cir. 2000). It can only consider extraneous material or "[d]ocuments that a defendant attaches to a motion to dismiss . . . if they are referred to in the plaintiff's complaint and are central to [its] claim." *Causey v. Sewell Cadilac-Chevrolet, Inc.*, 394 F.3d 285, 288 (5th Cir. 2004). Most of Freeman's "facts" fall outside what may appropriately be considered.

12.     The evidence will ultimately refute Freeman's false assertions, which were lodged in an adversary proceeding brought by the Litigation Trustee with Freeman's approval. Notably absent from Freeman's account of the facts is that the SEC investigation upon which the

adversary complaint relied was dropped. Regardless, the motion to dismiss is not the place for Freeman's twist on the facts.

## STATEMENT OF FACTS

13.     Since Freeman dedicated nearly the entirety of her "Factual Background" section to material outside the Complaint that is immaterial to the Rule 12(b)(1) and (6) motion, Plaintiffs will not burden the Court with a lengthy section on the Facts. Plaintiffs incorporate by reference their Factual Allegations from the Complaint at paragraphs 37–132.

## STANDARD OF REVIEW

14.     Claims may be dismissed under Rule 12(b)(1) based on a lack of subject-matter jurisdiction "when the court lacks the statutory or constitutional power to adjudicate the case." *Home Builders Ass'n v. City of Madison*, 143 F.3d 1006, 1010 (5th Cir.1998) (quotations omitted). A Rule 12(b)(1) motion to dismiss should only be granted if it appears certain that the plaintiff cannot prove a plausible set of facts that establish subject matter jurisdiction. *See Lane v. Halliburton*, 529 F.3d 548, 557 (5th Cir. 2008) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007)).

15.     To survive a Rule 12(b)(6) motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged. *Id.* The plausibility standard is not akin to a probability requirement. *Id.* All well-pleaded facts must be accepted as true and viewed in the light most favorable to the plaintiff. *Anderson v. Valdez*, 845 F.3d 580, 589 (5th Cir. 2016); *see also Lormand*

*v. US Unwired, Inc.*, 565 F.3d 228, 239 (5th Cir. 2009). ("Usually, under Rule 12(b)(6), [courts] must draw all reasonable inferences in the plaintiff's favor.").

16.     Rule 9(b) requires allegations of the particulars of time, place, and contents of the false representations, as well as the identity of the person making the misrepresentation and what he obtained thereby. *Benchmark Elecs., Inc. v. J.M. Huber Corp.*, 343 F.3d 719, 724 (5th Cir. 2003), opinion modified on denial of reh'g, 355 F.3d 356 (5th Cir. 2003). Put simply, Rule 9(b) requires the who, what, when, where, and how to be laid out. *Id.* What is essential is that the defendant be put on notice of the alleged fraudulent conduct. *See id.*

## ARGUMENT & AUTHORITIES

### I.     This Court Should Deny Freeman's Rule 12(b)(1) Motion.

### A. Plaintiffs' Complaint Invokes Article III Standing.

17.     Freeman confuses Article III with prudential standing. While the motion describes constitutional requirements for standing under Article III, it fails to describe how Freeman believes they are not met. Instead, Freeman argues Plaintiffs claims are derivative and that only the Litigation Trustee can bring them. These are questions of prudential, not Article III standing. Nevertheless, out of an abundance of caution, Plaintiffs will address both.

18.     Under Article III, Plaintiffs must show (i) an injury in fact that is concrete, particularized, and actual or imminent; (ii) that was likely caused by the defendant; and (iii) that would likely be redressed by judicial relief. *TransUnion LLC v. Ramirez*, 594 U.S. 413, 423 (2021).

19.     First, Plaintiffs have alleged concrete injuries. They collectively held bonds worth more than $300 million, which are now near-worthless Wind Down Trust interests.[14]

---

[14] Complaint ¶¶ 20–23.

Freeman's participation in the conspiracy and fraud nearly wiped out their value entirely.[15]

Plaintiffs have also funded Freeman's fees as Wind Down Trustee for doing so, which she only collected through fraud. Plaintiffs' losses of nearly $300 million are concrete injuries.[16]

20.     Second, Plaintiffs alleged that these injuries were caused by Freeman.[17] As set forth in detail in the Complaint, Freeman, Jackson Walker, and Jones plotted to hijack the GWG bankruptcy by having Jones appointed mediator.[18] Freeman and the others kept her relationship with Jones secret, despite a mandatory obligation to disclose, because Jones would have been disqualified. Once Freeman and her cohorts had Jones in place, instead of following a restructuring plan that would have put the company's finances on track and allowed bondholders to retain 100% of the value of their bonds,[19] Jones announced there would be no reorganization. GWG would be liquidated. This ensured Jackson Walker, Freeman, and Jones (through Freeman) would be paid handsomely.[20]

21.     Jones then set up Freeman as Wind Down Trustee. Again, Freeman did not disclose her relationship with the mediator. Had Freeman disclosed, she would have been disqualified, both as Wind Down Trustee and as former counsel for debtor-in-possession. *See* 11 U.S.C. § 327 (bankruptcy estate may only employ "attorneys . . . or other professional persons, that do not hold or represent an interest adverse[21] to the estate, and that are disinterested[22] persons,

---

[15] *Id.* ¶¶ 12, 19, 128.

[16] *Id.* ¶¶ 128–32.

[17] *Id.* ¶¶ 100–110, 128, 181, 208, 214, 226, 253, 258, 270, 295.

[18] *Id.* ¶¶ 98–100.

[19] *Id.* ¶¶ 96–97.

[20] *Id.* ¶ 8.

[21] "[An adverse interest] includes any interest or relationship, however slight, that would even faintly color the independence and impartial attitude required by the Code and Bankruptcy Rules." *In re Granite Partners, L.P.*, 219 B.R. 22, 33 (Bankr. S.D.N.Y. Mar. 9, 1998) (cleaned up).

[22] The definition of "disinterested," 11 U.S.C. § 101(14), is sufficiently broad to disqualify any professional with an "interest or relationship that would even faintly color the independence and impartial attitude required by the Code." *In re Crivello*, 134 F.3d 831, 835 (7th Cir. 1998) (quotation omitted).

to represent or assist the trustee in carrying out the trustee's duties under this title").[23] But she remained silent and kept cashing checks from the estate/Wind Down Trust.

22.     She then commenced a fire sale of assets as Wind Down Trustee that, while disastrous for the intended beneficiaries, ensured immediate cash flow for Freeman, Jones, her former law firm, and other professionals.[24] Freeman started with two primary assets—the life settlements portfolio worth $800 million and equity holdings and interests in Beneficient valued at approximately $1.7 billion.[25] Plaintiffs' Complaint describes in painstaking detail how Freeman's actions as Wind Down Trustee eviscerated the value of these assets.[26] "The only benefit of operating in this fashion was to obtain quick and easy cash to pay the fees for Freeman and other bankruptcy professionals—while the bondholders, creditors, and other interested parties were lucky to receive little if anything."[27] Plaintiffs adequately pleaded how Freeman caused their injuries.

23.     Freeman attempts to shift causation to various individuals she claims are responsible for sending GWG into bankruptcy.[28] While her narrative is wrong[29] (and improper to consider at this stage), it is ultimately irrelevant. Regardless of how GWG arrived at at the doors of the bankruptcy court, the point is GWG was a distressed entity, which made it a target for the Jones-Freeman-Jackson Walker Enterprise.[30] Plaintiffs' Complaint alleges that Freeman's

---

[23] Once Jackson Walker (with Freeman as a partner) moved for Jones' appointment and once Jones was appointed, she was not disinterested. Further, Freeman's interest in remaining counsel for the estate and Wind Down Trustee—and her interest in keeping her relationship with Jones secret to avoid challenges to her compensation in cases where Jones presided as a judge or mediator—conflicted with the estate's interest in having an impartial mediator.

[24] Complaint ¶¶ 106–10.

[25] *Id.* ¶ 106.

[26] *Id.* ¶¶ 106–09.

[27] *Id.* ¶ 109.

[28] Motion ¶¶ 36–37.

[29] The declaration of Timothy Evans, former Chief Financial Officer of GWG Holdings, describes the rogue SEC actions that led to the GWG bankruptcy. Complaint ¶ 93.

[30] Complaint ¶ 92 ("The saga of the SEC investigation left GWG a distressed entity, making it an ideal victim for the Enterprise").

dismantling of GWG, and her whittling down of Wind Down Trust assets for her own gain, in tandem with her law firm and live-in boyfriend, caused Plaintiffs' considerable losses.

24.     Third, these losses and the fees wrongfully taken from the bankruptcy estate and/or Wind Down Trust can and should be redressed through damages awarded to Plaintiffs in a judgment.[31] Plaintiffs have Article III standing.

### B. Plaintiffs Allege Direct Claims.

25.     Plaintiffs also have prudential standing because they have alleged direct, non-derivative claims. "A creditor's claim is non-derivative only if some direct legal obligation flowed from the defendants to the creditor." *In re Bernard L. Madoff Inv. Sec., LLC*, 2013 U.S. Dist. LEXIS 143956, *17-18 (S.D.N.Y. Sept. 30, 2013) (citing *Bankers Trust Co. v. Rhoades*, 859 F.2d 1096, 1101 (2d Cir. 1988) (holding creditor's claims against officers of bankrupt corporation were not derivative since officers' fraudulent conduct directly caused creditor harm); *Medkser v. Feingold*, 307 Fed. Appx. 262, 265 (11th Cir. 2008) (holding claims alleging "direct injuries sustained by . . . plaintiffs" as a result of "intentional misrepresentations" were non-derivative)).

26.     The Complaint alleges personal, direct claims that belong to Plaintiffs and not GWG or the post-confirmation trusts. For example, Plaintiffs allege Freeman breached her fiduciary duty owed *directly* to Plaintiffs as beneficiaries of the Wind Down Trust, which became effective after entry of the confirmation order, and not simply as participants in the bankruptcy.[32] These are claims held by Plaintiffs, not the estate or the Litigation Trustee.

---

[31] Complaint ¶¶ 133, 139.
[32] *GWG*, No. 22-90032, ECF No. 1887 at ¶1.4. (describing the "Wind Down Trustee's powers" as "exercisable solely in a fiduciary capacity….").

27.     Thus, Plaintiffs' claims for breach of fiduciary duty, aiding and abetting of breach of fiduciary duty, civil RICO, RICO conspiracy, and civil conspiracy, among others, involve direct harm to beneficiaries of the Wind Down Trust and the bondholders and are non-derivative of claims belonging to the bankruptcy estate. Additionally, although Plaintiffs assert claims for losses that arose in the context of the bankruptcy, those claims are direct (and non-derivative of the estate) because they are part of a larger fraudulent scheme outside any single bankruptcy.

28.     Plaintiffs' damages in the form of lost value in their Wind Down Trust interests are not injuries that arise from the confirmation plan or order. Rather, they are the result of Defendants' conspiracy to keep the Jones-Freeman conspiracy secret from outsiders at any cost. These damages are independent of injuries to GWG and the bankruptcy estate. *See Oakes Farms Food & Distrib. Servs., LLC v. Sch. Dist. of Lee Cty.*, 541 F. Supp. 3d 1334, 1343 (M.D. Fla. May 28, 2021) ("[t]he harm to Mr. Oakes's First Amendment rights is distinct and personal from the economic harm to Oakes Farms").

29.     Further, in *Alix v. McKinsey & Co.*, 23 F.4th 196, 204 (2d Cir. 2022), the Court of Appeals described that the "district court gave insufficient consideration to the fact that [the defendant's] alleged misconduct targeted the federal judiciary[,]" which requires courts "to focus on the responsibilities that Article III courts must shoulder to ensure the integrity of the Bankruptcy Court and its processes." "If [Defendant's] conduct has corrupted the process of engaging bankruptcy advisors, as [Plaintiff] plausibly alleges, then the unsuccessful participants in that process are directly harmed." *Id*. (emphasis added). Under *Alix*, Plaintiffs were directly harmed as an unsuccessful participant in the bankruptcy process. *Id*.

30.     Plaintiffs' Complaint plausibly states a claim that their injuries are personalized, and not derivative of the bankruptcy.

### C. Plaintiffs Intend to Move for Limited Appointment to Purse any Derivative Litigation, or Alternatively, for Derivative Standing.

31.     Plaintiffs' Complaint alleges their intent to move for special appointment to assert any derivative claims against Freeman and the remaining defendants on behalf of the GWG estate and/or for the benefit of the Wind Down Trust.[33] Alternatively, Plaintiffs intend to move for derivative standing. *See Louisiana World Exposition v. Fed. Ins. Co.*, 858 F.2d 233, 247 (5th Cir. 1988); *In re Cooper*, 405 B.R. 801, 809 (Bankr. N.D. Tex. 2009).

### 1. The Litigation Trustee is Hopelessly Conflicted.

32.     Although Plaintiffs have not yet filed their motion for appointment or derivative standing, Freeman uses her 12(b) motion as an opportunity to file an anticipatory response. According to Freeman, only the Litigation Trustee can bring these claims. For several reasons, however, he is hopelessly conflicted and will never do so. First, he answers to Freeman. Under the bankruptcy plan, the Litigation Trustee prosecutes causes of action "subject to the direction of the Litigation Trust Board."[34] Members of the Litigation Trust Board are appointed by none other than Freeman, the Wind Down Trustee.[35] Thus, any action against Freeman would be vetoed by those subject to her removal.

33.     Second, nearly two years have passed since Jones publicly acknowledged the relationship with Freeman, and the Litigation Trustee has neither brought litigation against Freeman, Jones or Jackson Walker,[36] nor sought Freeman's removal as Wind Down Trustee

---

[33] Complaint ¶ 142.
[34] *GWG*, No. 22-90032, ECF No. 1421 ¶ 114.
[35] *Id.* ¶ 113.
[36] To the extent the Litigation Trustee has reached tentative settlement with Jackson Walker, he never filed any complaint against the firm, a tacit admission that he has no intention of bringing transparency to the process.

despite her undeniable breaches of fiduciary duty. In so doing, the Litigation Trustee has acquiesced to her fraud on the bondholders (now holders of Wind Down Trust interests) and the Court.

34.     Third, the Litigation Trustee is an essential witness for the claims against Freeman, Jones, and Jackson Walker. The plan negotiated by the RICO Defendants requires that "[t]he Litigation Trustee shall confer with the Wind Down Trustee with respect to the commencement of any litigation…."[37] To the extent the Litigation Trustee discussed with Freeman his commencing (or abstaining from) litigation against Jackson Walker, Jones, or Freeman, his testimony is relevant to the claims sought to be asserted herein.

35.     Fourth, the Bondholder Committee appointed the Litigation Trustee; and the Bondholder Committee is represented by Porter Hedges, which knew of the Jones-Freeman conflict but did not disclose it.[38] Each of these conflicts will prevent the Litigation Trustee from ever bringing litigation against Freeman, as evidenced by the fact that he still has not done so and continues to acquiesce to Freeman serving as Wind Down Trustee, while she has collected more than $1 million in fees, and continues not to disclose the disqualifying relationship.

## 2. There is No Legal Impediment to a Special Limited Appointment or Granting Derivative Standing.

36.     Freeman disputes Plaintiffs' ability to pursue derivative standing because the Fifth Circuit in *Cleveland Imaging* indicated in *dicta* that only a creditor's committee may do so.[39] As

---

Presumably, Jackson Walker has negotiated an overly broad release as in the other settlements that Jackson Walker argues wipe out some of Plaintiffs' claims.
[37] *GWG*, 22-90032, ECF No. 1924 at 42.
[38] Complaint ¶ 42.
[39] Motion ¶ 30 (citing *In re Cleveland Imaging & Surgical Hosp.*, LLC, 285, 297 (5th Cir. 2022)). *Cleveland Imaging* was an appeal from a sanctions order, not a motion for derivative standing. *See Cleveland Imaging*, 26 F.4th at 290. The appellants sought to justify the adversary proceeding they brought, after-the-fact, as a derivative action. *Id.* at 297. Since the issue was never pressed in the district court and not included in the issues on appeal, the

Plaintiffs described in their Complaint, "*there is no creditor's committee* and the bondholder's committee has been dissolved with two exceptions, neither of which is applicable."[40] These facts are undisputed by Freeman.

37. Freeman mechanically clings to *Cleveland Imaging* even though it does not speak to derivative standing in the absence of an existing committee. Plaintiffs must be granted derivative standing because no one else can or will pursue the claims, meaning they are the only ones standing in the way of Freeman and her co-conspirators profiting from their fraud. *See In re Clean the Air, LLC*, 631 B.R. 286, 295 (Bankr. S.D. Tex. Jun. 22, 2021) ("a creditor may bring suit on behalf of the bankruptcy estate"); *In re Shelby Motel Group, Inc.*, 123 B.R. 98, 102 (N.D. Ala. Oct. 18, 1990) (where creditor was ready and willing to bring derivative action "[i]t should be allowed to do what nobody else seems willing to do").

38. Of course, even if the Bondholder's Committee were still active, it too would be conflicted. It failed to act on these claims for nearly two years. And again, it was represented by Porter Hedges, a defendant in this suit which had knowledge of the Jones-Freeman relationship yet failed to disclose it.

39. Without citing any authority, Freeman also supposes that *Louisiana World* does not apply post-confirmation unless the plan says so.[41] The Fifth Circuit has never held so and it would defeat derivative standing's purpose. To the extent Freeman argues no one can bring claims against her because she drafted a plan that prevents it, this is the epitome of the fox

---

Fifth Circuit determined the argument was waived. *See id*. Authority within the Fifth Circuit and elsewhere previously recognized that creditors could prosecute actions derivatively under certain circumstances. *See e.g., In re Clean the Air, LLC*, 631 B.R. 286, 295 (Bankr. S.D. Tex. Jun. 22, 2021) ("a creditor may bring suit on behalf of the bankruptcy estate"); *In re Wilson*, 527 B.R. 253, 256 (Bankr. N.D. Tex. 2015) ("With derivative standing, a creditor can pursue an action that belongs to the trustee by, in effect, standing in the trustees shoes"); *see also In re The Gibson Group, Inc.*, 66 F.3d 1436, 1446 (6th Cir. 1995) ("a creditor or creditors' committee may have derivative standing").

[40] Complaint ¶ 147 (emphasis added).

[41] Motion ¶ 32.

guarding the hen house. This Court should not enforce any provision designed to allow Freeman to get away with mass fraud.

**D. Freeman's Attacks on Murray Holland are an Attempt to Evade Responsibility.**

40.     Without the slightest measure of contrition or self-awareness after having lied for years to parties and the Bankruptcy Court so as to boost her bankruptcy practice and collect millions, Freeman uses her Rule 12(b) motion to attack the individual who Plaintiffs indicated they will propose to the Court as appropriate for the limited role of pursuing any derivative claims against the Defendants. In so doing, Freeman relies on false adversarial allegations lodged by the Litigation Trustee in direct consultation with her.[42]

41.     As described in the Complaint, the Litigation Trustee pursued this misguided and distracting adversary proceeding against dozens of defendants, including Mr. Holland, to place the blame for GWG's financial losses elsewhere.[43] The claims "that GWG transfer of funds to Ben were the cause of the bankruptcy . . . is a sham."[44]

42.     Contrary to Freeman's false allegations, Mr. Holland was not allowing Mr. Heppner to pillage GWG as a personal piggy bank. The *prior* Board of GWG approved the transaction in 2018 to buy Ben shares as a responsible investment with knowledge that Ben owed senior debt to a party related to Ben and that GWG would have to fund Ben in the future.[45] Starting in 2018, GWG made public statements to this effect.[46] Had GWG failed to fund Ben, this would cause a breach of the bond indenture and result in a collapse of the entire company.[47]

---

[42] Again, the plan that Jones, Jackson Walker, and Freeman drafted mandates that the Litigation Trustee "shall confer with the Wind Down Trustee with respect to the commencement of any litigation…." *GWG*, 22-90032, ECF No. 1924 at 42. Further, Freeman appoints the Board that oversees the Litigation Trustee's decisions. *Id.* ECF No. 1421 ¶ 113.
[43] Complaint ¶ 144.
[44] *Id.*
[45] *Id.*
[46] *Id.*
[47] *Id.*

Further, mutually beneficial funding transactions flowed both ways between Ben and GWG.[48] Ben funded GWG $84 million, disregarded by Freeman's allegations, meaning that aggregate funds transfers to Ben totaled only $140 million.[49] To protect GWG, the Board always made sure that GWG would retain sufficient cash and borrowing capacity after each transfer.[50] This cash availability never got below $240 million after any such transfer.[51] There was no concern with financial stress from the transfers between Ben and GWG.[52] The sole cause of the bankruptcy filing was the illegal SEC action and the litigation trustee's attempt to find blame elsewhere are a misguided distraction.[53] While the adversary litigation relies on the specter of SEC scrutiny, what Freeman leaves out is that the SEC in 2024 ultimately dropped the investigation against GWG and its officers and directors, including Murray Holland, with no enforcement action recommended.[54]

43.     Regardless, any conflict that might have been presented by these false claims is gone. They were resolved in a settlement with no admission of liability by Mr. Holland; that settlement was approved on June 13, 2025 by Bankruptcy Judge Christopher Lopez. Mr. Holland, who was one of dozens of defendants, only agreed to the settlement, which was funded entirely by D & O insurance proceeds, to provide cash to the Wind Down Trust beneficiaries.

44.     Freeman puts the cart ahead of the horse in characterizing Plaintiffs' description of Mr. Holland's background as inadequate. Plaintiffs have not yet filed their motion for

---

[48] *Id.*
[49] *Id.*
[50] *Id.*
[51] *Id.*
[52] *Id.*
[53] *Id.*
[54] *Id.* ¶ 91.

appointment and/or derivative standing. A discussion of Mr. Holland's background will be provided in the forthcoming motion. For now, Plaintiffs note that Mr. Holland is the Trust Advisor to the LT Exchange Trusts named as Plaintiffs. These trusts lost hundreds of millions of dollars through Freeman's fraud. Mr. Holland as Trust Advisor, along with the individual Plaintiffs, are the only ones who have shown interest in pursuing litigation against Freeman and the other defendants.

45.     Contrary to Freeman's assertions, Plaintiffs disclosed that Mr. Holland was a CEO of GWG[55] and that management (Mr. Holland included), was squeezed out by Jackson Walker and Freeman during a board meeting "in November 2022 with a range of threats[.]"[56] This was done on the eve of the mediation where Jones announced he was converting GWG's restructuring into a liquidation and that Freeman would be a suitable Wind Down Trustee.[57]

46.     Freeman notes that Holland is not disinterested.[58] However, there is no requirement that an administrator be "disinterested" under the Bankruptcy Code. *See In re MabVax Therapeutics Holdings, Inc.*, No. 19-10603 (JTD), 2023 Bankr. LEXIS 1557, at *9–10 (Bankr. D. Del. 2023). In *MabVax*, certain creditors who were also defendants in litigation brought by the plan administrator moved "several years post-confirmation" to have the plan administrator removed, alleging he was not disinterested as he was formerly the debtor's sole director and was also a shareholder. *Id.* at *2-4. These factors did not preclude his service as an administrator. *Id.* at *9-10. In fact, it is often "beneficial to have a person with knowledge and familiarity of the debtor's business" instead of a stranger appointed for the sole purpose of being disinterested. *Id.* at *9-10. The court also recognized the removal motion for what it

---

[55] *Id.* ¶ 72.
[56] *Id.* ¶¶ 97, 101.
[57] *Id.* ¶ 97.
[58] Motion ¶ 31.

was—a self-serving attempt by defendants to avoid litigation. *Id.* at \*14 ("if prosecution of the California Litigation is to the detriment of certain equity holders it is only because they are defendants in that action."). That too is the purpose of Freeman's argument. Mr. Holland's interest in GWG is an asset, not an impediment to his appointment to pursue litigation against Freeman and the remaining defendants.

## II. This Court Should Deny Freeman's Rule 12(b)(6) Motion.

### A. The Complaint Adequately Pleads Causation.

#### 1. Freeman's Alternative Narrative of What Led to the Bankruptcy is Irrelevant.

47.     Freeman's assertion that she "had nothing to do with the damages that Plaintiffs allege" is a misguided argument for the jury, not a motion under Rule 12(b)(6).[59] Freeman's argument fails to accept Plaintiffs' well-pleaded facts that the rogue SEC investigation led to the bankruptcy and should not be considered at the Rule 12(b)(6) stage. *See Elec. Scripting Prods., Inc. v. Andromeda Ent., Ltd.*, No. 23-CV-00649, 2024 U.S. Dist. LEXIS 175941, \*3 (W.D. Tex. Sept. 27, 2024) ("court accepts all well-pleaded facts as true, views the facts in the most favorable way for the Plaintiff, and indulges all reasonable inferences in the Plaintiff's favor); *Bertrand v. Eli Lilly & Co.*, No. 12-0853, 2013 U.S. Dist. LEXIS 114385, \*3-4 (W.D. Law. Aug. 13, 2013) (court "looks to whether the facts are 'well pleaded' rather than to resolve the disputes or possible arguments suggested by, or, surrounding those facts).

48.     Regardless, Freeman's narrative of what she believes led to the GWG bankruptcy is irrelevant. The fact is GWG was left "a distressed entity, making it an ideal victim for the

---

[59] Motion ¶ 36.

Enterprise."[60] At that point, GWG was still postured to make a full recovery under Chapter 11 restructuring.[61]

49.     That is, until Freeman, Jackson Walker, and Jones took over.[62] The consortium promptly arranged for Jones to serve as mediator, Freeman to act as Wind Down Trustee, and the company to be gutted. All the while, Freeman and the others kept the relationship secret, despite a mandatory obligation to disclose, because Jones would have been disqualified as judge and as a mediator and the lawyers could not continue employment under § 327. Their silence ensured Jackson Walker, Freeman, and Jones (through Freeman) were paid handsomely.[63]

50.     Plaintiffs' Complaint also details how Freeman acting as Wind Down Trustee while concealing the relationship caused their damages. Freeman started with two sizeable assets— the life settlements portfolio worth $800 million and equity holdings and interests in Beneficient valued at approximately $1.7 billion.[64] She quickly "discarded and devalued GWG's primary assets, leaving bondholders and other stakeholders with little more than worthless paper."[65]

51.     Since Jackson Walker (with Freeman at the firm) already squeezed out GWG management,[66] there was no one to manage GWG's assets competently.[67] Freeman recklessly

---

[60] Complaint ¶ 92; *see also id*. ¶ 5 (describing that the investigation required GWG to seek restructuring "in the midst of RICO Defendants' unprecedented corruption of the bankruptcy system").
[61] *Id*. ¶¶ 96–97.
[62] *Id*. ¶¶ 98–100.
[63] *Id*. ¶ 8.
[64] *Id*. ¶ 106.
[65] *Id*. ¶ 12.
[66] *Id*. ¶ 98.
[67] *Id*. ¶ 106.

and rapidly dumped Ben stock, tanking stock price and further devaluing the remaining shares held by GWG.[68]

52.    Freeman refused to talk with market professionals or Ben management to strategize liquidation without diluting the market or devaluing GWG's assets.[69] Freeman also refused to entertain offers from Ben to buy back its stock at higher-than-market prices or even meet with Ben's management.[70] Instead, Freeman sent an agent to present a proposal to Ben's board that Ben's management resign and wholly redirect its own business practices in violation of SEC regulations requiring large shareholders (like GWG was of Ben) to file plans with the SEC before presentation to the Board.[71]

53.    Freeman also took the $760 million life settlements portfolio and $33 million cash (against only $382 million in senior debt) and, with no industry knowledge and having jettisoned all GWG's experienced pre-petition management, wasted away GWG's assets, increasing debt by $277 million and realizing only $10 million through the sale of the life settlements portfolio.[72]

54.    "The *only* benefit of operating in this fashion was to obtain quick and easy cash to pay the fees for Freeman and other bankruptcy professionals—while the bondholders, creditors, and other interested parties were lucky to receive little if anything."[73] Plaintiffs' Complaint plausibly alleges facts that Freeman's non-disclosure, fraud, and participation in the

---

[68] *Id.* ¶¶ 106–07.
[69] *Id.* ¶ 108.
[70] *Id.*
[71] *Id.*
[72] *Id.* ¶ 109.
[73] *Id.* (emphasis added).

conspiracy caused their damages, including a 96% loss on bonds worth $1.6 billion at the time Freeman took over.[74]

## 2. Freeman had a Legal Duty to Disclose.

55.     Freeman attacks causation by suggesting she was not required to disclose in the first place.[75] As described *infra*, she is wrong. Freeman also stands on the notion that non-disclosure under Rule 2014 is not grounds for a private cause of action. This is a strawman. Plaintiffs do not allege a mere rule violation. Instead, they allege a scheme to leverage a secret, intimate live-in relationship between a key restructuring partner and a bankruptcy judge for profit and prestige. Freeman, Jones and Jackson Walker carried out this plan through fraud.

56.     As a component of that fraud, Freeman was under a legal duty to disclose. That duty comes from multiple sources. As co-counsel for debtors, Freeman was required by Bankruptcy Rule 2014 to disclose any facts relevant to the bankruptcy court's determination of eligibility to be retained under 11 U.S.C. § 327. Under Section 327, a bankruptcy estate may only employ "attorneys . . . or other professional persons, that do not hold or represent an interest adverse to the estate, and that are disinterested persons, to represent or assist the trustee in carrying out the trustee's duties under this title." 11 U.S.C. § 327. The definition of "disinterested person" includes a person who "does not have an interest materially adverse to the interest of the estate or of any class of creditors or equity security holders, by reason of any direct or indirect relationship to, connection with, or interest in, the debtor, *or for any other reason*." 11 U.S.C. § 101(14)(C) (emphasis added). "[H]iding a romantic relationship that includes a million-dollar-plus home jointly owned by a judge and a lawyer would fit into the category of 'any other reason." Nancy B. Rappaport, *Am I My Colleague's Keeper When It Comes*

---

[74] *Id.* ¶¶ 128–32.
[75] Motion ¶ 36.

*to Disclosing Connections?*, 40 EMORY BANKRUPTCY DEVELOPMENTS JOURNAL 334, 373 (2024)

Indeed, the definition of "disinterested," 11 U.S.C. § 101(14), is sufficiently broad to disqualify any professional with an "interest or relationship that would even faintly color the independence and impartial attitude required by the Code." *In re Crivello*, 134 F.3d 831, 835 (7th Cir. 1998) (quoting *In re BH & P Inc.*, 949 F.2d 1300, 1308 (3d Cir. 1991)).

57. "The disclosure in the Rule 2014 Affidavit must be explicit enough for the court and other parties to gauge whether the person to be employed is not disinterested or holds an adverse interest." *In re Midway Indus. Contrs., Inc.*, 272 B.R. 651, 662 (Bankr. N.D. Ill. 2001). This applies equally to bankruptcy mediations. The Bankruptcy Court for the Southern District of Texas has held that mediators are "governed by the provisions of the Code and Rules regulating employment of professional persons[,]" including § 327 and Rule 2014. *In re Smith*, 524 B.R. 689, 695 (Bankr. S.D. Tex. 2015).

58. Freeman was not disinterested where she represented a party in a mediation before Jones. Because her relationship with Jones was relevant to whether she continued to meet Section 327's eligibility requirements if Jones was appointed mediator, she was obligated to disclose it under Bankruptcy Rule 2014. And Freeman's interest in remaining counsel for the estate—and her interest in keeping her relationship with Jones secret to avoid challenges to her compensation in cases where Jones presided as a judge or mediator—conflicted with the estate's interest in having an impartial mediator and also required disclosure. That duty was and is ongoing. *See In re W. Delta Oil Co.*, 432 F.3d 347, 355 (5th Cir. 2005). The retention order appointing Jackson Walker (and Freeman as its partner), recognized as much, requiring

counsel "to ensure that no conflicts or other disqualifying circumstances exist or arise" and to "promptly" disclose them if they do.[76]

59.    Freeman also had a duty to disclose the conflict under the Local Rules of the Southern District. Local Rule 16.4.I(2) provides that "[i]ssues concerning potential ADR provider conflicts shall be raised with the judge presiding in the case relating to the ADR proceeding." The Local Rules also make 28 U.S.C. § 455 disqualification standards applicable to mediators. Because Jones was prohibited from serving as a mediator under both 455(a) and (b), Freeman was obligated to disclose the conflict to Judge Isgur. Jones' impartiality would reasonably be questioned under Section 455(a), and Freeman was the equivalent of a spouse under Section 455(b)(5).[77]

60.    Freeman's obligation to disclose is also "founded upon the fiduciary obligation owed by counsel for the debtor to the bankruptcy court." *In re Futuronics Corp.*, 655 F.2d 463, 470 (2d Cir. 1981) (cleaned up); *see also In re EWC, Inc.*, 138 B.R. 276, 279 (Bankr. W.D. Okla. 1992) ("professionals performing duties for the estate are held to high fiduciary standards, and act as officers of the court"). "An attorney retained pursuant to Section 327(a) assumes a fiduciary responsibility to refrain from rendering any unauthorized service in furtherance of an interest adverse to the client he serves by court appointment." *Rome v. Braunstein*, 19 F.3d 54, 62 (1st Cir. 1994). The fiduciary duty includes the duty "to disclose any actual or potential conflicts of interest with the estate." *In re Smitty's Truck Stop, Inc.*, 210 B.R. 844, 850 (B.A.P.

---

[76] *GWG*, No. 22-90032, ECF No. 410 at 2.
[77] *See also* Conflicts Arising Out of a Lawyer's Personal Relationship with Opposing Counsel, ABA Comm. On Ethics & Pro. Resp., Formal Op. 494 (July 9, 2020) ("Lawyers who cohabit in an intimate relationship should be treated similarly to married couples for conflicts purposes. The same is true for couples who are engaged to be married or in exclusive intimate relationships."); ABA Model Code of Judicial Conduct, Model Rule 2.11 (requiring disqualification if a judge's "domestic partner" is "acting as lawyer in the proceeding" or "has more than a de minimis interest that could be substantially affected by the proceeding").

10th Cir. 1997); *see also ICM Notes, Ltd. v. Andrews & Kurth, L.L.P.*, 278 B.R. 117, 123–24 (S.D. Tex. 2002) ("counsel of a debtor-in-possession owes certain fiduciary duties to both the client debtor-in-possession and the bankruptcy court . . . including . . . [a] duty . . . to disclose any actual or potential conflicts of interest with the estate"), *aff'd*, 324 F.3d 768 (5th Cir. 2003).

61.     Freeman continued to have a duty to disclose once she became Wind Down Trustee—both based on the prior misleading disclosures and in light of her new fiduciary obligations as Wind Down Trustee. The Wind Down Trust was "created . . . for the benefit . . . of the Wind Down Trust Beneficiaries," and expressly imposes powers on Freeman as Wind Down Trustee "in a fiduciary capacity."[78]

62.     It is well established that "[a] fiduciary duty consists of the duty of loyalty**,** *the duty to make full disclosure*, and the duty to exercise a high degree of care." *Trevino v. Brookhill Capital Resources, Inc.*, 782 S.W.2d 279, 281 (Tex. App.—Houston [1st Dist.] 1989, writ denied) (emphasis added). And "[w]here a conflict of interest exists, nothing less than full and complete disclosure is required of the [fiduciary]." *TPL Assocs. v Helmsley-Spear, Inc.*, 146 A.D.2d 468, 470, 536 N.Y.S.2d 754 (1st Dept 1989); *see also* Restatement 3d of Trusts, § 78(3) ("[w]hether acting in a fiduciary or personal capacity, a trustee has a duty in dealing with a beneficiary to deal fairly and to communicate to the beneficiary all material facts the trustee knows or should know in connection with the matter"). Similarly, attorneys breach their fiduciary duties by failing to disclose conflicts of interest. *See e.g., Gibson v. Ellis,* 126 S.W.3d 324, 330 (Tex. App.—Dallas 2004, no pet.) ("[a]n attorney breaches his fiduciary duty . . . by, among other things, . . . failing to disclose conflicts of interest"); *Walker v. E & L Transfer, LLC*,

---

[78] *GWG*, Case No. 20-90032, ECF No. 1887 at ¶1.4 (emphasis added).

2018 U.S. Dist. LEXIS 246392, *3 (S.D. Tex. Jan. 28, 2018) ("[b]reach of fiduciary duty by an attorney most often involves the attorney's failure to disclose conflicts of interest").

63.     For the entirety of the bankruptcy and from the inception of the Wind Down Trust through present, Freeman has been in an intimate relationship and has co-owned a home with Jones, the mediator whom she and Jackson Walker moved to bring into the case. As an experienced bankruptcy partner and former clerk to Jones, she knew the law required disclosure but decided against it so she could collect more than $1 million in fees and avoid the consequences that would come with revealing the truth. Plaintiffs adequately alleged Freeman had a legal obligation to disclose but did not do so, and that her fraud, including her concealing the relationship, proximately caused Plaintiffs' injuries.

### B. Plaintiffs' 1962(c) RICO Pleadings Survive Rule 12(b)(6).

#### 1. Plaintiffs sufficiently pleaded the existence of the Jones-Freeman-Jackson Walker Enterprise.

64.     Plaintiffs adequately alleged the existence of the Enterprise and the only way Freeman can argue otherwise is to criticize snippets of the Complaint in isolation.[79] Plaintiffs provided the who, what, when, where, and why of the Jones-Freeman-Jackson Walker Enterprise over the span of ten pages (73–83) and seventeen paragraphs (166–83). And that is without considering the Factual Background section, which also painstakingly describes the Enterprise.[80]

65.     On this point, Freeman's motion poses busy work more than a legal hurdle. Freeman's questions about how the Enterprise was structured, how it functioned, and which defendant served which function are all plainly answered in paragraphs 171–74, and elsewhere.

---

[79] Freeman also jumbles the facts by throwing Porter Hedges into the Enterprise. *See* Motion ¶ 44. Plaintiffs' Complaint does not include Porter Hedges in the RICO counts or reference the firm as part of the Enterprise.
[80] *See e.g.*, Complaint ¶¶ 1-3, 6–16, 92–95, 98, 102–05.

66.     The Complaint describes the Enterprise to include Jones, Freeman, and Jackson Walker as an "ongoing structure of persons and entities that continually associated over an extended period of time [from "2018 and continuing through present"][81] for the shared purpose of enriching themselves and increasing their prestige and influence among bankruptcy lawyers and courts."[82] As described, "[t]he Enterprise was organized in a manner amenable to consensual decision-making between the RICO Defendants and hierarchical decisions or recommendations handed down by Jones."[83]

67.     The Enterprise functioned with regular communications between members "for the purposes of securing appointments in and making decisions regarding bankruptcy cases, getting cases filed in the 'friendly' court of Jones or ensuring that he was appointed as mediator, and using Jones—either directly as the presiding judge or indirectly as the mediator—to obtain favorable decisions and lucrative fees in those cases."[84]

68.     Typically, the Enterprise arranged for cases involving Freeman and Jackson Walker to land before Jones.[85] "That allowed Jones to award Jackson Walker, Freeman, and indirectly himself millions of dollars in attorneys' fees while keeping interested parties in those bankruptcies unaware of the disqualifying conflict. Even in cases where Jones was not presiding, the group arranged for him to serve as a judicial mediator, ensuring liquidation of distressed entities for their pecuniary gain."[86] As further described, the Enterprise operated uniformly by "always denying and concealing the Jones-Freeman relationship."[87]

---

[81] *Id.* ¶ 166.
[82] *Id.* ¶ 170.
[83] *Id.* ¶ 171.
[84] *Id.* ¶ 170.
[85] *Id.* ¶ 2.
[86] *Id.* ¶ 3.
[87] *Id.* ¶ 171; *see also id.* ¶ 3.

69.     Paragraphs 172–74 spell out which functions were performed by each RICO Defendant. Paragraph 172 describes Jackson Walker's role and function; paragraph 173 describes Freeman and Freeman PLLC's role and function; and paragraph 174 describes Jones' role and function. Remarkably, while complaining about the supposed missing details, Freeman neglects to mention paragraph 173, which specifically describes her own role. This includes her "deciding to conceal her relation with Jones[,]" "assisting in the scheme to ensure megabankruptcies either landed before Jones or that he was appointed as mediator to control the outcomes[,]" "appearing and billing in cases . . . in which [Jones] was appointed mediator without disclosing the relationship[,]" "scheming to liquidate distressed entities to ensure sufficient funds to pay professional fees[,]" not disclosing her relationship "with Jones while she was a partner at Jackson Walker and the firm filed a motion to appoint Jones as mediator[,]" "participating in mediation before Jones without disclosing" her relationship with the mediator, and "accepting the position of Wind Down Trustee without disclosing her relationship with Jones and accepting fees as Wind Down Trustee without disclosing her relationship with Jones."[88]

70.     Plaintiffs also adequately described who made the communications among the RICO Defendants, who "were in regular contact with one another via email, phone, and in-person . . . for the purposes of securing appointments in and making decisions regarding bankruptcy cases, getting cases filed in the 'friendly' court of Jones or ensuring that he was appointed as mediator, and using Jones—either directly as the presiding judge or indirectly as the mediator—to obtain favorable decisions and lucrative fees in those cases."[89] Further, text messages referenced in the Complaint show Freeman was communicating with Jones on

---

[88] *Id.* ¶ 173.
[89] *Id.* ¶ 170.

cases, and discussing whether they would be assigned to him, while she was living with Jones and employed by Jackson Walker.[90] The messages demonstrate that the Enterprise depended on things involving Jones and Freeman being kept on the "down looooooooowww[.]"[91]

71.     Freeman overstates the structural requirements for a RICO Enterprise. Plaintiffs alleged an association-in-fact enterprise.[92] The Supreme Court recognizes that an association-in-fact enterprise "need not have a hierarchical structure or a chain of command." *Boyle v. U.S.*, 556 U.S. 938, 948 (2009) (cleaned up). Instead, it "must have at least three structural features: a purpose, relationships among those associated with the enterprise, and longevity sufficient to permit these associates to pursue the enterprise's purpose." *Id.* at 946.

72.     The Complaint easily meets all three requirements. Plaintiffs' Complaint adequately describes its purpose.[93] It describes its longevity—from 2017 to present.[94] And it describes the relationships among the Enterprise members.[95]

73.     The fact that Jones served as a mediator rather than judge in this case does nothing to upend Plaintiffs' well-pleaded allegations on structure. The Complaint describes that when the Enterprise was unable to orchestrate Jones as presiding judge, "the group arranged for him to serve as a judicial mediator, ensuring liquidation of distressed entities for their pecuniary gain."[96]

74.     Freeman relies on a strawman by falsely asserting that the purpose of the Enterprise "was to get Jones appointed as the judge or mediator *and to engage in the alleged RICO predicate*

---

[90] *Id.* ¶ 61.
[91] *Id.* ¶ 61.
[92] *Id.* ¶ 175.
[93] *Id.* ¶¶ 168, 170.
[94] *Id.* ¶¶ 168, 170.
[95] *See e.g.,* Complaint ¶¶ 2–3, 170–74
[96] Complaint ¶ 2; *see also* ¶ 49 & n. 59.

*acts….*"[97]  To the contrary, Plaintiffs alleged "the purpose of the Enterprise was to increase the prestige and influence of each actor in bankruptcy practice, while enriching the RICO Defendants."[98] The purpose was not to commit the predicate acts. Rather, the purpose "was accomplished *through* multiple predicate acts[.]"[99]

75.     The distinguishable case Freeman cites where an enterprise was found not to have a separate existence from the racketeering activities involved members who came together for a one-time criminal activity. For example, in *Fernandez-Lopez v. Hernandez*, the RICO claim arose from a single transaction – a 2015 visa application. 2020 WL 9396487, at *1-*2 (W.D. Tex. Nov. 20, 2020). There were no allegations of shared purpose or activities among the two enterprise members other than those related to visa fraud. *See, e.g., id.* at *12.

76.     Here, the Enterprise did not exist merely to perform RICO predicate acts; it existed to further the professional and financial benefits to its members and used RICO predicate acts to improperly inflate those benefits.

### 2. Plaintiffs adequately alleged obstruction of justice.

77.     Freeman's heading on the predicate offense of obstruction of justice indicates the "claim can only apply to Judge Jones."[100] The text that follows cites no authority (or even explanation) for this position and it is plainly wrong.

78.     "Obstruction of justice involves any attempt to impede the due administration of justice." *United States v. Cihak*, 137 F.3d 252, 262 (5th Cir. 1998). Specifically, 18 U.S.C. § 1503(a) prohibits any person from influencing, obstructing, impeding, or intimidating any officer of a federal court in the discharge of his duty. There are three essential elements to

---

[97] *Id.* ¶ 46 (emphasis added).
[98] *Id.* ¶ 168.
[99] *Id.* ¶ 168 (emphasis added).
[100] Motion ¶ 46.

establish a violation of § 1503: (1) that a judicial proceeding was pending; (2) that the defendant had knowledge of the judicial proceeding; and (3) that the defendant acted corruptly with the specific intent to influence, obstruct, or impede that judicial proceeding in its due administration of justice. *United States v. Richardson*, 676 F.3d 491, 502 (5th Cir. 2012). Obstruction includes "threatening, intimidating, or otherwise unlawfully influencing a codefendant . . . or attempting to do so, and providing materially false information to a judge or magistrate judge." *United States v. Hinojosa*, 749 F.3d 407, 416 (5th Cir. 2014) (cleaned up) (quotation omitted).

79.     Plaintiffs devoted numerous pages in the Complaint setting forth how Freeman and the other defendants influenced, obstructed, and impeded the judicial proceedings. Freeman inexplicably labels these as vague and conclusory without citing a single paragraph in Plaintiffs' Complaint. This is meritless, busy-work-creating argument by Freeman.

80.     Plaintiffs specifically alleged "Freeman used her intimate personal relationship with Jones to influence favorable rulings or treatment in cases or mediations before Jones."[101] For example, Plaintiffs alleged Freeman used her intimate, domestic relationship with Jones, who she and her firm moved to appoint as mediator, to secure the lucrative position of Wind Down Trustee.[102] Plaintiffs alleged she did so as part of a "golden parachute" severance for her planned separation from Jackson Walker.[103] Thanks to Jones suggesting Freeman be made Wind Down Trustee, "Freeman has already collected at least $1 million as Wind Down Trustee and (because she somehow continues to serve in this position), she projects she will receive at least $665,000 in the future."[104]

---

[101] Complaint ¶ 186(a).
[102] *Id.* ¶¶ 8, 9, 103–04, 127, 178(q).
[103] *Id.* ¶ 3.
[104] *Id.* ¶ 9.

81.     Additionally, Freeman and the other defendants "knowingly and deliberately concealed or failed to properly reveal the existence of an intimate, personal relationship between Freeman and Jones, thereby influencing officers of the bankruptcy court to permit the assignment of cases involving Defendants Freeman and/or Jackson Walker to Jones' court or to use Jones as a judicial mediator."[105] For example, Freeman did not disclose her relationship with Jones when she and her firm Jackson Walker moved before Judge Isgur for appointment of Jones as mediator.[106] Nor did she disclose it when arguing in favor of Jones' appointment.[107] Plaintiffs adequately alleged Freeman's obstruction of justice.

### 3. Plaintiffs adequately pleaded the predicate acts of mail fraud, wire fraud, and honest services fraud.

#### a. Plaintiffs are not required to plead Freeman personally mailed or issued wire transmissions.

82.     Freeman's primary challenge to mail fraud is Plaintiffs did not allege she personally deposited items in the mail; instead, the examples provided were signed by her then-partner at Jackson Walker, Kristhy Peguero.[108] In fact, mail fraud does not require a party "actually mail[]…anything themselves; it is sufficient that they caused it to be done." *See Pereira v. United States*, 347 U.S. 1, at 8 (1954). "Where one does an act with knowledge that the use of the mails will follow in the ordinary course of business, or where such use can reasonably be foreseen, even though not actually intended, then he 'causes' the mails to be used." *Id.* at 8–9. The same is true for wire fraud. Plaintiffs alleged, with four concrete examples, documents were caused to be mailed or transmitted by wire by the Enterprise—including Freeman—in furtherance of the scheme to enrich themselves at the expense of the GWG estate and

---

[105] *Id.* ¶ 186(d).
[106] *Id.* ¶ 98.
[107] *Id.*
[108] Motion ¶ 47

Plaintiffs. Plaintiffs' Complaint describes the materials sent through the mail and wires in furtherance of the fraud, including declarations of disinterestedness, applications for appointment, and applications for fees.[109] In addition to the specific filings sent via mail and wire, Plaintiffs alleged the mails and wires were used for co-conspirators to communicate with each other regarding the Enterprise, to communicate with clients and potential clients about the opportunities presented by Jones' involvement, to make representations regarding the existence or concealment of the Jones-Freeman relationship, and to send invoices or bills reflecting improperly obtained fee awards.[110]

### b. Plaintiffs have adequately pleaded honest services fraud.

83.     Freeman challenges Plaintiffs' honest services fraud allegation with the notion that the statute has been declared unconstitutionally vague except with respect to bribes and kickbacks. *See Skilling v. U.S.*, 561 U.S. 358 (2010). But that is essentially what Plaintiffs alleged in the form of Jones receiving "financial payments and enhanced opportunities afforded to Freeman[,]" his live-in girlfriend, with whom he shared expenses.[111] In return, Defendants Jackson Walker and Freeman received financial compensation, enhanced status as bankruptcy attorneys, and favorable rulings for their clients[.]"

84.     Jones and the Enterprise knew that such fees would indirectly benefit him in the support of his domestic household. Plaintiffs specifically pleaded that fees to Freeman and Jackson Walker diminished the assets of the GWG estate and the resulting trusts and provided Freeman with access to waste the Wind Down Trust assets in a quick cash grab to fund her

---

[109] Complaint ¶¶ 191, 195.
[110] *Id.* ¶¶ 190, 194.
[111] *Id.* ¶ 198.

fees. These actions directly impacted the value of Plaintiffs' and other stakeholders' Wind Down Trust interests.

### c. Plaintiffs adequately alleged facts to support bankruptcy fraud.

85.     Freeman's arguments on bankruptcy fraud simply ignore Plaintiffs' well-pleaded facts. Plaintiffs repeatedly alleged Freeman and the other RICO Defendants filed false and/or misleading declarations of disinterestedness representing the absence of conflict between Freeman, Jackson Walker, and Jones as related to their respective roles as debtor's counsel, wind down trustee, and mediator.[112] These false and misleading declarations implicate both sections 152(2) as false oaths and 152(3) as false declarations and/or statements.[113] Plaintiffs further alleged that these violations allowed Freeman and the RICO Defendants to perpetuate their scheme through the wasteful and irresponsible liquidation of GWG's assets to fund the RICO Defendants' mounting professional fees, resulting in financial harm to Plaintiffs, the putative class, and the GWG estate.[114] These payments resulted in receipt of moneys by the RICO Defendants, in the form of fees, for their actions undertaken in the course of the GWG bankruptcy proceeding, implicating section 152(6).[115] Plaintiffs further pleaded that Freeman received favorable treatment in the form of her appointment as trustee, resulting in significant fees awarded to her to support the household she shares with Jones.[116] Plaintiffs clearly alleged that Freeman was installed as Wind Down Trustee at Jones' recommendation, and that was made possible by Jones' represented influence with the presiding Judge. Freeman's counter-narrative attempting to whitewash Jones' appointment as mediator and Freeman's selection

---

[112] *Id.* ¶¶ 203-209.
[113] *Id.* ¶¶ 203-204.
[114] *Id.* ¶¶ 19, 208.
[115] *Id.* ¶ 207.
[116] *Id.*

as Wind Down Trustee is inapposite and immaterial given Plaintiffs' well-pleaded facts, which must be accepted as true at this stage of analysis.

### 4. Plaintiffs adequately pleaded facts supporting injury and causation necessary for standing for their RICO claims.

86.     Plaintiffs damages are not speculative; the assets of GWG had concrete, determinable values at the time those assets were handed off to Freeman and subsequently wasted. The putative class held nearly $1.7B in bonds, GWG was holding $1.7 billion in BEN stock and a life settlements portfolio worth $800 million. Freeman challenges Plaintiffs' valuations as speculative. To the contrary, the valuations of both the Ben stock holdings and life settlements portfolio were objectively and concretely determined prior to GWG's bankruptcy filing. While Freeman's denials or counternarrative may be appropriate factual questions for discovery and litigation, they do not entitled her to dismissal under Rule 12(b)(6).

87.     Plaintiffs adequately laid out both but-for and proximate causation. Freeman mischaracterizes Plaintiffs' allegations narrowly as drawing a link from her failure to disclose her disqualifying relationship with Jones to the resulting loss in value to the GWG estate. But the Complaint articulates a much broader scheme in which Freeman, Jackson Walker, and Jones targeted massive, distressed entities to bring before Jones, either as judge or mediator. Using Jones' influence, the trio (sometimes with other professionals) liquidated GWG for funds to allocate among themselves and other professionals. Jackson Walker's concealment of the Jones-Freeman relationship was crucial to accomplishing this scheme—had they disclosed (aside from the harm to their collective reputations), Jones would be disqualified, and Freeman and Jackson Walker could no longer be retained under 11 U.S.C. § 327.[117]

---

[117] Under Section 327, a bankruptcy estate may only employ "attorneys . . . or other professional persons, that do not hold or represent an interest adverse to the estate, and that are disinterested persons, to represent or assist the trustee in carrying out the trustee's duties under this title." 11 U.S.C. § 327.

88.     Plaintiffs alleged that Freeman and her co-conspirators orchestrated: (1) Jones' appointment as judicial mediator; (2) the scheme to manipulate GWG's bankruptcy from a restructuring/reorganization into a total liquidation at Jones' direction; (3) Freeman's appointment as Wind Down Trustee; and (4) Freeman's subsequent intentional and irresponsible fire sale of GWG's significant assets to fund her own continuing professional fees for the next several years. Plaintiffs, as Wind Down Trust interest holders, formerly GWG bondholders, were directly injured by the reckless, wanton, and intentionally wasteful actions taken by Freeman in her role as trustee of the Wind Down Trust. The losses incurred by Plaintiffs, the Class, and the GWG estate were the direct and proximate result of the scheme perpetrated by Freeman and the RICO Defendants and as pleaded by Plaintiffs.

89.     Plaintiffs further incorporate by reference section I.A., I.B., and I.C., *supra*, with regard to standing and derivative standing.

**C. Plaintiffs sufficiently alleged claims for RICO Conspiracy.**

**1. Plaintiffs adequately pleaded an agreement.**

90.     Plaintiffs adequately (and repeatedly) alleged in their Complaint the numerous agreements and external indications and exhibitions of agreements. Freeman's failure to acknowledge or address the well-pleaded facts abounding in Plaintiffs' Complaint and to instead direct the Court to a single sentence is misleading.

91.     First, the law recognizes that agreements to commit illegal acts are rarely proclaimed from the rooftops. For that reason, direct evidence of an agreement is unnecessary. *United States v. Eilliott*, 571 F.2d 880, 903 (5th Cir. 1978). Instead, proof can rest upon "inferences drawn from relevant and competent circumstantial evidence…." *Id.* The existence of an agreement, a defendant's knowledge, and defendant's participation can be inferred from the

circumstances. *U.S. v. Jones*, 873 F.3d 482, 489 (5th Cir. 2017). Plaintiffs alleged ample facts allowing the inference that Freeman agreed to, and did, participate in a scheme to leverage the concealed relationship for financial and reputational benefits. As an initial matter, although Jackson Walker has denied direct knowledge of the ongoing nature of the Freeman-Jones relationship prior to March 2022 (a limitation that Plaintiffs dispute), there is now dispute that by the time the GWG bankruptcy was filed in April 2022, the relationship was fully known to all RICO Defendants.

92. Plaintiffs reference the agreement between the RICO Defendants to conceal the Jones-Freeman relationship in order to provide cover for their mutual appointments as judicial mediator and wind down trustee.[118] Plaintiffs also describe the manufactured (and superficial) separation of Freeman from Jackson Walker, an agreed course of action designed to rationalize their continued failures and refusals to disclose the disqualifying relationship.[119] In Moreso, Freeman and Jackson Walker contractually bound themselves and each other *not* to disclose the relationship and how it lead to her nominal departure from the firm.[120] Plaintiffs pleaded how this agreed pattern of concealment allowed the RICO Defendants to perpetuate their scheme of waylaying distressed entities to cannibalize for exorbitant professional fees.[121]

93. Ultimately, the extent of the knowledge, agreements, motives, and benefits of the concealed relationship will be the subject of discovery. At this point, however, Plaintiffs have met their burden to adequately and specifically plead facts from which the agreement among the RICO Defendants can be inferred.

---

[118] Complaint ¶ 286
[119] *Id.* ¶ 289
[120] *Id.* ¶ 11.
[121] *Id.* ¶¶ 173, 212

**2. Plaintiffs adequately pleaded injury and causation for the conspiracy.**

94.      Plaintiffs adequately pleaded both causation and injury in support of both direct claims as Wind Down Trust interest holders derivative claims on behalf of the GWG estate. Freeman and the other defendants' intentional concealment and complicity therewith enabled the RICO Defendants to effectuate their plan to gain complete and unfettered control of GWG's significant assets and waste them for quick cash to provide financial and reputational advantages for Freeman and the other RICO Defendants. Plaintiffs incorporate sections I.A., and III.B.5, *supra*, with regard to injury and causation.

**D. Plaintiffs adequately pleaded common law fraud and fraud by omission.**

95.      Again, Freeman's refusal to acknowledge or her factual disagreement with the well-pleaded allegations in Plaintiffs' Complaint are not an appropriate basis for a motion to dismiss. Plaintiffs pleaded sufficient facts to support claims against Freeman and the other Fraud Defendants for both fraudulent misrepresentations and fraud by omission.

96.      Although Peguero nominally signed the declarations of disinterestedness and submitted the identified filings on behalf of Jackson Walker, Freeman was a partner at Jackson Walker at the time, not to mention her concealed relationship was the matter that was being misrepresented, and she shares responsibility for the factual misrepresentations therein. In fact, just a week and two days before Jackson Walker and Freeman moved for Jones' appointment as mediator, Freeman billed for work on "disclosure items for professionals[.]"[122] Then, of course, at the hearing on the motion to appoint Jones, Freeman stated that she "[took] comfort in the fact" that Jones would be mediator to help "keep everybody within the guardrails that would be appropriate."[123] These were material

---

[122] *GWG*, No. 22-90032, ECF No. 1878 (pdf p. 31)
[123] *GWG*, No. 22-90032, ECF No. 1272 at 23.

misrepresentation that Jones would be an appropriate, unconflicted mediator and that Freeman and Jackson Walker would be appropriate and unconflicted debtor counsel. Plaintiffs have adequately pleaded that facts establishing that Feeman was responsible—in fact crucial—in the misrepresentations that were made to the bankruptcy court and the Plaintiffs.

97.    Freeman is correct that fraud by omission is a subcategory of fraud. When a plaintiff asserts fraud by omission, "Rule 9(b) typically requires the claimant to plead the type of facts omitted, the place in which the omissions should have appeared, and the way in which the omitted facts made the misrepresentations misleading." *Carroll v. Fort James Corp.*, 470 F.3d 1171, 1174 (5th Cir. 2006). Plaintiffs did so.

98.    Plaintiffs alleged Freeman had a duty to disclose the romantic relationship with a sitting bankruptcy judge and proposed mediator in Jackson Walker's application for employment, the requests for fees, and in any other document filed in order to rectify their prior omissions or misrepresentations.[124] Freeman failed at any point to disclose her disqualifying relationship with Jones—a failure that continues to this day in any formal manner that would provide notice to the interested stakeholders. Plaintiffs alleged Freeman and others knew that Plaintiffs were ignorant of the relationship.[125] In fact, Freeman contractually bound herself and Jackson Walker to continue the non-disclosure, which prevented Plaintiffs from gaining knowledge.[126] While fraud allegations must be stated with particularity under Rule 9(b), allegations about conditions of mind, including knowledge, "may be alleged generally." Fed. R. Civ. P. 9(b); *Rodriguez-Meza*, No. DR-17-CV-54, 2018

---

[124] Complaint ¶ 56.
[125] Complaint ¶¶ 95, 276.
[126] *Id.* ¶ 11, 95.

U.S. Dist. LEXIS 226744, *50 (Moses, J.); *see also Umbrella Inv. Group v. Wolters Kluwer Fin. Servs.,* 972 F.3d 710, 713 (5th Cir. 2020). "If the facts pleaded in a complaint are peculiarly within the opposing party's knowledge, fraud pleadings may be based on information and belief." *Umbrella Inv. Group*, 972 F.3d at 713.

99.     Plaintiffs pleaded that Freeman and the Fraud Defendants were deliberately silent when they had a duty to speak up.[127] Plaintiffs pleaded that Freeman and the Defendants intended to induce Plaintiffs and others into non-objection or lack of scrutiny with regard to the Fraud Defendants' liquidation strategy, bankruptcy plan, and sale of GWG's assets.[128] The intent can be supported by circumstantial facts, including the separation agreement that bound Freeman and Jackson Walker to continue the concealment.[129] Plaintiffs pleaded that they relied on the nondisclosure in the belief that the Fraud Defendants were unconflicted and not disqualified for their positions as debtor's counsel, mediator, and/or trustee.[130] Finally, Plaintiffs pleaded they were injured as a result of acting or failing to object without the concealed knowledge.[131]

100.    Freeman next argues that she isn't responsible for any misrepresentations or omissions related to her role as trustee because she did not "[seek] her appointment as trustee…" and was not the trustee at the time of the plan's proposal.[132] Freeman's argument omits that she was among counsel—through Jackson Walker—for the GWG Debtors and that she therefore participated in seeking her own appointment as trustee. Of course, even after she was appointed trustee, she still made no disclosures. Apparently, that is because Freeman argues

---

[127] *Id.* ¶¶ 120-128.
[128] *Id.* ¶¶ 226, 276.
[129] *Id.* ¶ 95
[130] *Id.* ¶ 223
[131] Complaint ¶¶ 222, 226.
[132] Motion ¶ 62

she had no fiduciary duties to the WDT Interest Holders other than in her actions directly related to liquidating trust assets and distributing the proceeds.[133] The net effect of Freeman's argument is to dispute that she owed any fiduciary duties as attorney participating in her appointment as trustee, and then as trustee she had no fiduciary duties appurtenant to her fraudulent representations and omissions that put her into that very position. Unsurprisingly, Freeman cites no authority for this position other than the bankruptcy plan that she and her co-conspirators drafted and presented to the bankruptcy court—all the while concealing their conflicts of interest. The same is true of the exculpation, release, and non-liability provisions Freeman raises from the Wind Down Trust Agreement.[134] In addition to the exclusions for Plaintiffs' pleadings of intentional fraud, gross negligence, and willful misconduct, this Court has the inherent authority to amend, rewrite, or disapprove of such provisions that were the result of Freeman's and the Fraud Defendants' misrepresentations and omissions. Nor can Freeman claim cover from Judge Isgur's approval of her actions as attorney and wind down trustee when she failed to make the same disclosures before the bankruptcy court.

101. Finally, Freeman argues the only alleged damage or harm to the GWG estate or the Wind Down Trust beneficiaries are the fees she received for her services as trustee, and that any trustee would have charged fees to the estate.[135] Plaintiffs alleged that the fees requested and awarded to Freeman were unreasonable both in amount and in light of the significant fraud and breaches of fiduciary duties perpetrated on Plaintiffs and the GWG estate. Further, Plaintiffs alleged that her fraud upon the bankruptcy system enabled her to waste the assets of the GWG estate and the Wind Down Trust with out objection or scrutiny as a result of the

---

[133] Motion ¶ 63.
[134] Motion ¶ 65.
[135] Motion ¶ 64.

Fraud Defendants' concealment of her disqualifying relationship with Jones.[136] Specifically, the sale of the Ben shares that were conducted "with the express approval by orders of the bankruptcy court."[137] Plaintiffs have alleged, however, that the actions of Freeman and Jackson Walker as debtor's counsel and Freeman as trustee, including the "emergency" motion to fire sell the Ben stock, were not granted appropriate opportunity for scrutiny of their motives by the bankruptcy court or objection by the stakeholders due to the concealed conflict of interest.[138]

102.    Plaintiffs' fraud claims, both affirmative and by omission, are well pleaded and Freeman's motion should be denied.

### E. Plaintiffs adequately pleaded claims for breach of fiduciary duty and aiding and abetting breach of fiduciary duty.

103.    With regard to the fiduciary duties that Freeman owed to Plaintiffs and to GWG— duties which she breached repeatedly—Plaintiffs incorporate by reference section III.A.2, *supra*.

104.    Freeman's reliance on the business judgment rule is wholly misplaced. As Freeman argues, the business judgment rule protects fiduciaries in the "honest exercise of their business judgment and discretion."[139] Freeman ignores Plaintiffs' allegations that her actions were quite the opposite of an "honest" exercise whatsoever, much less prudent business judgment and discretion. To the contrary, Plaintiffs pleaded that Freeman placed her own financial and reputational interests over those of the trust beneficiaries and, as a result, made decisions to conduct a fire-sale of the WDT assets with a goal of obtaining immediate cash for her own

---

[136] Complaint ¶ 106, 226.
[137] Motion ¶ 64.
[138] Complaint ¶ 106.
[139] Motion ¶ 68.

and others' professional fees—actions clearly incompatible with an "honest exercise of business judgment." The business judgment rule is inapplicable in the face of Plaintiffs' well-pleaded facts.

105. Additionally, Freeman overlooks that Plaintiffs seek to bring derivative claims on behalf of the GWG estate, to which Freeman owed the same fiduciary duties of disclosure, candor, and professional responsibility while she served as debtor's co-counsel with Jackson Walker and later with Freeman, PLLC.

106. Freeman's motion to dismiss the causes of action for aiding and abetting breach of fiduciary duty likewise fails. Plaintiffs allegations of the duties owed by Jackson Walker, Freeman, and Freeman, PLLC as debtor's counsel, and the duties owed by Freeman as wind down trustee, were painstakingly laid out in the Complaint, as well as in section III.A.2., *supra*. Plaintiffs' allegations establish that Freeman, Jackson Walker, and Freeman, PLLC, were each primary actors with respect to the breach of their respective fiduciary duties, and that they each assisted and encouraged each other in their breaches by continuing to conceal the relationship, even going so far as to contractually bind themselves and each other to keep the relationship and the reasons for Freeman's departure from Jackson Walker under wraps. Plaintiffs alleged that the cooperation between the Defendants to maintain the unified front of nondisclosure was a substantial factor in maintaining the effectiveness of the scheme.

107. Freeman's motion to dismiss Plaintiffs claims related to breach of fiduciary duty must be denied.

**F. Plaintiffs' claims for negligent misrepresentation were sufficiently pleaded.**

108. Freeman challenges Plaintiffs pleadings of negligent misrepresentation asserting that she made no affirmative misrepresentation or specific false information.[140] Freeman was a partner at Jackson Walker when they filed disclosures indicated "N/A" for the section concerning Bankruptcy Judges for the Southern District of Texas, affirmatively representing no conflicts with Jones, whom she would later advocate for appointment at mediator.[141] To that end, Plaintiffs alleged Freeman affirmatively represented Jones would help "keep everybody within the guardrails that would be appropriate."[142] As she knew, Jones' and the other Defendants' definition of "appropriate" included quid pro quo appointments as mediator and trustee of the Wind Down Trust, as well as hundreds of thousands of dollars in fees funneled to the Jones-Freeman household. Freeman's motion to dismiss Plaintiffs' negligent misrepresentation claims should be denied.

**G. Plaintiffs adequately pleaded claims against Freeman for professional negligence.**

109. Freeman's claimed defenses of attorney immunity and professional negligence are misplaced. First, Plaintiffs have alleged derivative claims, and seek to obtain derivative standing, on behalf of the GWG estate, for claims that the Litigating Trustee has refused and/or failed to bring due to the intertwining of the Litigating Trustee's authority to Freeman's supervision as Wind Down Trustee. In that regard, Plaintiffs' claims for professional negligence are not being brought by an adversary in litigation, but putatively on behalf of the GWG estate—Freeman's former client—and are thus not subject to Freeman's misplaced claim of immunity.

---

[140] Motion ¶¶ 71-72.
[141] Complaint ¶ 52.
[142] *GWG*, No. 22-90032, ECF No. 1272 at 23.

110. Freeman's reliance upon the judicial proceedings privilege beggars belief and strains any reasonable reading of the case law on the subject. The judicial proceedings privilege is premised on the concept that litigants and attorneys will not be held liable for defamatory statements made in the context of a judicial proceeding. *James v. Brown*, 637 S.W.2d 914, 916 (Tex. 1982) ("Communications in the due course of a judicial proceeding will not serve as the basis of a civil action for libel or slander, regardless of the negligence or malice with which they are made."). Although the case cited by Freeman generally states the privilege applies to "any tort litigation based on the content of the communication," Freeman would extend this privilege to provide her and others with license to fabricate facts out of whole cloth or make serious and intentional factual misrepresentations to a court and litigants with absolute impunity. *Collins v. Zolnier*, No. 09-17-00418-CV, 2019 WL 22923333, at *3 (Tex. App.—Beaumont May 30, 2019, pet. denied). Freeman's interpretation of the judicial proceedings privilege as applicable to her conduct is both incorrect and offensive and she provides no legal support for such an extension.

**H. Plaintiffs adequately pleaded claims for civil conspiracy.**

111. Regarding agreement to support civil conspiracy, Freeman fails to acknowledge or address the well-pleaded facts and instead directs the Court to a single sentence. Plaintiffs adequately alleged agreements and external indications and exhibitions of agreements.

112. The law recognizes agreements to commit illegal acts are rarely proclaimed from the rooftops. For that reason, direct evidence of agreement is unnecessary. *United States v. Eilliott*, 571 F.2d 880, 903 (5th Cir. 1978). Instead, proof can rest upon "inferences drawn from relevant and competent circumstantial evidence[.]" *Id.* The existence of an agreement, a

defendant's knowledge, and defendant's participation can be inferred from the circumstances. *U.S. v. Jones*, 873 F.3d 482, 489 (5th Cir. 2017).

113. Plaintiffs allege ample facts allowing the inference that Freeman agreed to, and did, participate in a scheme to leverage the concealed relationship for financial and reputational benefits. As an initial matter, although Jackson Walker has denied direct knowledge of the ongoing nature of the Freeman-Jones relationship prior to March 2022 (a limitation that Plaintiffs dispute), there is now no dispute that by the time the GWG bankruptcy was filed in April 2022, the relationship was fully known to all RICO Defendants.

114. Plaintiffs reference the agreement between the RICO Defendants to conceal the Jones-Freeman relationship to provide cover for their mutual appointments as judicial mediator and wind down trustee.[143] Plaintiffs also describe the manufactured (and superficial) separation of Freeman from Jackson Walker, an agreed course of action designed to rationalize their continued failures and refusals to disclose the disqualifying relationship.[144] Plaintiffs pleaded how this agreed pattern of concealment allowed the RICO Defendants to perpetuate their scheme of waylaying distressed entities to cannibalize for exorbitant professional fees.[145]

115. Freeman argues that the conspiracy allegations fail because the torts of breach of fiduciary duty and fraud are unsupported. Plaintiffs incorporate by reference sections III.E. and III.D, *infra*, with regard to the torts of breach of fiduciary duty and common law fraud.

116. Ultimately, the extent of the knowledge, agreements, motives, and benefits of the concealed relationship will be the subject of discovery. At this point, however, Plaintiffs have

---

[143] Complaint ¶ 286
[144] Complaint ¶ 289
[145] Complaint ¶¶ 173, 212

met their burden to adequately and specifically plead facts from which the agreement among the RICO Defendants can be inferred.

**I. Freeman's arguments to escape liability for punitive or exemplary damages fail.**

117.    Freeman argues that she is immune from liability for punitive, exemplary, special, or other damages for the alleged breaches of the WDT agreement "or any other matter relating to this Agreement under any circumstances" and also again relies on the various exculpation or release provisions in the WDT Agreement and the bankruptcy plan.[146] Freeman's argument ignores the obvious flaw in that she and the RICO Defendants procured through fraud each of the documents as a pre-emptive shield against their misconduct. Freeman's arguments further ignore this Court's authority to amend, modify, or otherwise supersede these provisions to address the abuse of process and fraud wrought by the Freeman and her co-conspirators.

118.    Nor can Freeman rely on the uninformed consent of L Bond Management as another victim duped by Freeman and her co-defendants deliberate concealment of the romantic relationship that was the linchpin in their scheme to systematically dismantle and auction off a multi-billion-dollar business for their financial and reputational benefit.

**III. Plaintiffs Request Leave to Amend their Complaint Prior to Dismissal.**

119.    Should this Court find the Complaint deficient in any regard, Plaintiffs respectfully requests leave to amend or supplement his Complaint. "The court should freely give a complainant … leave to amend defective allegations in a pleading. … Thus, the appropriate remedy when granting a motion based on nonconforming or deficient pleadings is to grant the complainant time within which to amend the complaint." *McClellon v. Lone Star Gas Co.*,

---

[146] Motion ¶ 78.

66 F.3d 98, 103 (5th Cir. 1995). Granting Plaintiffs leave to amend their Complaint would not prejudice Defendants, who are already on notice of the claims.

**CONCLUSION**

120. For the foregoing reasons, Plaintiffs respectfully request that this Court deny Freeman's Motion to Dismiss. To the extent this Court is inclined to dismiss any claim based on a determination that it is derivative of the estate's claims, Plaintiffs respectfully request that the Court do so without prejudice so that he may move for special limited appointment and/or for derivative standing. Plaintiffs request such other and further relief to which they may be entitled at law or in equity.

Dated: October 2, 2025

Respectfully submitted,

By:   /s/ Mikell A. West
Mikell A. West
Texas State Bar No. 24070832
S.D. Tex. Bar No. 1563058
Robert W. Clore
Texas State Bar No. 24012426
S.D. Tex. Bar No. 2032287
BANDAS LAW FIRM, P.C.
555 N. Carancahua Street, Suite 1200
Corpus Christi, Texas 78401
Telephone: (361) 698-5200
Facsimile: (361) 698-5222
mwest@bandaslawfirm.com
rclore@bandaslawfirm.com

**Certificate of Service**

I hereby certify that on October 2, 2025, I electronically filed the foregoing document with the Clerk of the Court using the CM/ECF system, which will send notification of such filing via electronic mail to all counsel of record.

*/s/ Mikell A. West*