# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

GARY PETERSON, CHRIS NAKASHIMA, JOHN ENGLISH, JAQUETTA ENGLISH, LT-1 EXCHANGE TRUST, LT-2 EXCHANGE TRUST, LT-3 EXCHANGE TRUST, LT-4 EXCHANGE TRUST, LT-5 EXCHANGE TRUST, LT-6 EXCHANGE TRUST, LT-7 EXCHANGE TRUST, LT-8 EXCHANGE TRUST, LT-9 EXCHANGE TRUST, LT-12 EXCHANGE TRUST, LT-14 EXCHANGE TRUST, LT-15 EXCHANGE TRUST, LT-17 EXCHANGE TRUST, LT-18 EXCHANGE TRUST, LT-19 EXCHANGE TRUST, LT-20 EXCHANGE TRUST, ON THEIR OWN BEHALF AND ON BEHALF OF ALL OTHERS SIMILARLY SITUATED,

          PLAINTIFFS,

V.

DAVID R. JONES, ELIZABETH CAROL FREEMAN, THE LAW OFFICE OF LIZ FREEMAN, PLLC, JACKSON WALKER, LLP, AND PORTER HEDGES, LLP,

          DEFENDANTS.

CIVIL ACTION NO. 4:25-CV-2761

JURY TRIAL DEMANDED

## PLAINTIFFS' RESPONSE TO DEFENDANT JACKSON WALKER'S AMENDED MOTION TO DISMISS

# TABLE OF CONTENTS

Introduction ………………………………………………………………………………1

Statement of Facts ................................................................................................. 6

Standard of Review ............................................................................................... 10

Argument & Authorities ........................................................................................ 11

   I.    Plaintiffs have Article III Standing........................................................ 11

      A.    Plaintiffs adequately alleged a particularized injury......................... 11

      B.    Plaintiffs adequately alleged the injuries were caused by Jackson Walker. ...... 12

   II.    This is Not a Collateral Attack................................................................ 15

   III.   Plaintiffs' Claims are Not Barred by the Confirmation Order............. 16

   IV.   Plaintiffs Assert Direct Claims. ............................................................. 16

   V.    Plaintiffs Intend to Move for Special Limited Appointment and/or Derivative Standing. ........................................................................................ 18

      A.    As Demonstrated, the Litigation Trustee will Never Pursue Claims against Jackson Walker........................................................................... 18

      B.    There is No Impediment to this Court Making Special Limited Appointment or Granting Derivative Standing. .......................................... 20

   VI.   Plaintiffs Adequately Alleged Proximate Cause.................................. 24

   VII.  Any Provision that Can Possibly be Read to Bar Plaintiffs' Claims Should be Set Aside as the Product of Fraud............................................................. 27

   VIII. Plaintiffs Adequately Alleged RICO...................................................... 27

      A.    Plaintiffs adequately allege RICO standing.................................... 27

      B.    Jackson Walker is not shielded from liability because certain predicate acts were committed in the context of litigation proceedings. ......................... 28

      C.    Plaintiffs sufficiently pleaded the existence of the Enterprise. ........ 29

      D.    Plaintiff adequately satisfied the pleading standard for each challenged predicate act…………………………………………………………………………...31

   IX.   Plaintiffs' State Law Claims are Not Barred by the Attorney Immunity Defense or Judicial Proceedings Privilege........................................................... 35

   X.    Plaintiffs Adequately Alleged Reliance and Harm. ........................... 37

   XI.   Plaintiffs adequately alleged the existence of a conspiracy. ............... 38

   XII.  Jackson Walker Owed Fiduciary Duties to the GWG Estate, which Plaintiffs Seek to Represent for Purposes of Pursing Claims against Jackson Walker................ 40

   XIII. Plaintiffs Adequately Pleaded Jackson Walker was Unjustly Enriched. .......... 41

   XIV. Plaintiffs adequately pleaded tort claims to which *respondeat superior* liability may attach. ........................................................................................... 41

XV.     Plaintiffs' Class Allegations Should Not be Stricken under Rule 12(f)............. 42

   A.   The class members have Article III standing.................................................. 43

   B.   This Court should not strike the complaint because Jackson Walker believes
        individual questions will predominate. ........................................................ 44

XVI.    Plaintiffs Request Leave to Amend their Complaint Prior to Dismissal. ......... 44

Conclusion................................................................................................................. 45

# INTRODUCTION

1.      Jackson Walker has a problem with telling the truth. It spent years telling Courts and bankruptcy participants it was disinterested and had no conflicts with bankruptcy judges in the Southern District when the firm knew that was false. It knew its key restructuring partner Elizabeth Freeman was in a long-term, live-in relationship with Chief Bankruptcy Judge David Jones. The firm kept the relationship secret from those interested in the bankruptcies because the relationship allowed it to build a prominent bankruptcy practice and bring in millions of dollars.

2.      This pattern of dishonesty has crept its way into Jackson Walker's briefing and court appearances. On March 4, 2025, Jackson Walker's counsel flatly told this Court in *Bouchard v. Jones, et al.*, that Freeman never appeared before Judge Jones:

> MS. BREVORKA: At the time when she worked -- she did not appear before Judge Jones, but at the time before March of 2021 –
>
> THE COURT: She did appear before Judge Jones.
>
> MS. BREVORKA: No. I believe what the record shows in both the In re Professional Fees and this case is that her name was on fee applications for work done, but she did not appear before Judge Jones.
>
> THE COURT: I think there's some allegations that she did make some appearances.
>
> MS. BREVORKA: I'm unaware of that, and I'm sure the plaintiffs will point it out.[1]

As counsel for Bouchard explained, Jackson Walker's position was misleading at best:

> MR. WEST: …. And as an example in point, at that February 26th hearing alone, seven individuals from Jackson Walker billed and sought fees for attending that hearing, including Elizabeth Freeman.

---
[1] *Bouchard v. Jones, et al.*, 24-00693, ECF No. 73, Transcript of March 4, 2025 at 54.

THE COURT: She attended the hearing?

MR. WEST: She billed, listed in the fee application or the fee reports from Jackson Walker that were submitted to Bouchard Transportation, for attending that hearing.

THE COURT: I thought somebody had indicated that she never attended a hearing.[2]

3.      In fact, Freeman attended not only the referenced hearing before Jones, but several others as well despite Jackson Walker's indication to the contrary.[3]

4.      Jackson Walker is back at it again, attempting to obfuscate Freeman's role in the *GWG* bankruptcy through deceptive statements. According to Jackson Walker's motion to dismiss, at the time of the bankruptcy filing in April 2022, Freeman "worked at Jackson Walker, <u>but she did not bill **or work** on the case until November 2022</u>."[4]

5.      That is a lie. The firm's own billing records show Freeman worked on the case *from the very beginning*—starting on April 20, 2022, when the bankruptcy was filed.[5] Freeman continued to work and strategize in the case, but not bill, in the months that followed.[6] During

---

[2] *Id.* at 263; *see also BTC*, 20-34682, ECF No. 814 at Ex. C. p. 8 (Freeman billing for "attend[ing] the hearing on appointment of CRO" on February 26, 2021).

[3] *BTC*, 20-34682, ECF No. 686 at p. 51 of PDF (Freeman billing for "attend[ing] the status conference" on November 17, 2020), at p. 69 of PDF (Freeman billing for "attend[ing] the sale hearing" on December 2, 2020).

[4] Jackson Walker's Amended Motion to Dismiss, ¶ 25 (emphasis added); *see also* Jackson Walker's Motion to Dismiss, at ¶ 7 (asserting the same lie that Freeman did not work on the case until November 2022).

[5] The day of filing, April 20, 2022, and the next day, April 21, 2022, Jackson Walker attorney Kristhy Peguero billed time for strategizing with "L. Freeman" in connection with the GWG bankruptcy. *GWG*, ECF No. 829, Jackson Walker's First Interim Fee Application, Exhibit A, First Monthly Fee Statement, Exhibit C at 12–13 (pdf pp. 26–27). A few days later, Ms. Peguero billed three consecutive days—April 26–28, 2022—for working with Freeman on the case *Id.* at 13. Ms. Peguero then collaborated with Freeman in *GWG* from May through August, and then October, 2022. *Id.* at 4, 14; Exhibit B, Second Monthly Fee Statement, Exhibit C at 6–8 (pdf. pp. 41, 43); Exhibit C, Third Monthly Fee Statement, Exhibit C at 2–3 (pdf. p. 53–54); *GWG*, ECF No. 1521, Jackson Walker's Second Interim Fee Application, Exhibit A, Fourth Monthly Fee Statement, Exhibit C at 2 (pdf. p. 15); Exhibit C, Sixth Monthly Fee Statement, Exhibit C at 7, 10–11 (pdf. pp. 48, 51–52).

[6] Ms. Peguero then collaborated with Freeman in *GWG* from May through August, and then October, 2022. *Id.* at 4, 14; Exhibit B, Second Monthly Fee Statement, Exhibit C at 6–8 (pdf. pp. 41, 43); Exhibit C, Third Monthly Fee Statement, Exhibit C at 2–3 (pdf. p. 53–54); *GWG*, ECF No. 1521, Jackson Walker's Second Interim Fee Application, Exhibit A, Fourth Monthly Fee Statement, Exhibit C at 2 (pdf. p. 15); Exhibit C, Sixth Monthly Fee Statement, Exhibit C at 7, 10–11 (pdf. pp. 48, 51–52).

that time, Freeman and Jackson Walker were in talks on how to disclose her relationship with Jones, ultimately deciding—over the advice of ethics counsel—not to disclose at all. Jackson Walker chose not to bill Freeman's work to hide her involvement, which it attempts to pass off on this Court.

6.  In *GWG*, Jackson Walker took its deception to another level. Jones was not assigned the case, yet the firm *still* secured his influence and control. Jackson Walker brought Jones into the case by moving to have him appointed as mediator with Freeman still at the firm and when the firm indisputably knew about the relationship. Not only did the firm not disclose the relationship, but it also affirmatively represented the absence of any conflict with a bankruptcy judge in the Southern District.

7.  Once Jackson Walker successfully interjected Jones as mediator, he quickly transformed what had been sold by Jackson Walker as a full recovery restructuring plan into a liquidation. This provided quick cash for the professionals. Meanwhile, Jones and Jackson Walker set Freeman up with a golden parachute severance package—the lucrative position of Wind Down Trustee, netting Freeman more than $1 million and counting. Again, no one disclosed the relationship.

8.  None of this matters to Jackson Walker in its motion to dismiss because it believes the events leading up to the bankruptcy, told through the firm's self-serving narrative, severs any responsibility for the near complete loss that followed Freeman's appointment. Jackson Walker's responsive facts, taken from an adversary complaint instituted by Freeman through the Litigation Trustee to provide cover for the fraud, should not be considered in connection with the Rule 12(b) motion.[7] Regardless, the disputed facts do not entitle Jackson Walker to

---

[7] Plaintiffs did not incorporate by reference into their Complaint any of the records cited by Jackson Walker of any of the other defendants.

dismissal. *See Goodarzi v. Hartzog*, 2013 U.S. Dist. LEXIS 85727, *47–48 (S.D. Tex. May 14, 2013) ("Because a Rule 12(b)(6) review is based on pleadings and documents referenced in them and attached to them, … any factual dispute remains for summary judgment or trial").

9.      The controverting allegations are also immaterial. When GWG arrived at the need for Chapter 11 restructuring in April 2022, it was poised for complete recovery. That is, until Jones and then Freeman, in conjunction with Jackson Walker, got hold of the company. As the Complaint describes, the consortium turned $2.5 billion in assets into, at best, less than $70 million.[8] Plaintiffs thus adequately alleged proximate cause.

10.     Jackson Walker is more than a little disingenuous in claiming "[n]o party other than [Holland and] his former boss, Bradley Heppner, ha[ve] embraced" Plaintiffs' recognition that SEC overreach led to the need for Chapter 11 restructuring.[9] Jackson Walker *itself* advanced this theory in the opening papers.[10] As Plaintiffs noted in their Complaint, "[t]he rogue SEC actions that led GWG to bankruptcy were described in the Declaration of Timothy Evans, Chief Financial Officer of GWG Holdings, in Support of First Day Motions."[11] Only after Jackson Walker and Freeman squeezed out management (right around the time Freeman started billing in the case) and Jones stepped in did they flip the narrative and pursue adversary litigation through the Litigation Trustee, who answers to Freeman under the plan. Jackson Walker also neglects to mention that the SEC ultimately dropped the investigation, which the adversary complaint relies on extensively, relating to the so-called "Ponzi scheme" without taking any action.[12]

---

[8] Complaint ¶¶ 106–110,129–32.
[9] Motion ¶ 3.
[10] Jackson Walker was a signatory on opening papers and billed for work in reviewing them. *See e.g.*, *GWG*, No. 22-90032, ECF No. 2 at 7.
[11] Complaint ¶ 93 (citing *GWG*, No. 22-90032, ECF No. 17 at 22–25).
[12] Complaint ¶ 91.

11.     Tucked away in footnote 97 of its motion, Jackson Walker advises the Court (again) that the Litigation Trustee has released all these claims anyways.[13] The firm still has not put its backroom deal before this Court. Perhaps that is because Freeman is on both sides of it. Under the plan, *she* appoints the members of the Litigation Trust Board, which controls whether the Litigation Trustee prosecutes causes of action.[14] The plan also requires the Litigation Trustee to confer with her before bringing any litigation.[15] The purported release, which avoids placing the claims out in the open before the bondholders, smacks of collusion. Jackson Walker is effectively arguing that Freeman has released Jackson Walker and herself for their collective fraud.

12.     Jackson Walker's remaining arguments do nothing more to entitle them to dismissal. The firm is not excused for its fraud because L Bond Management, LLC (LBM) agreed to the plan. Jackson Walker never disclosed the scheme that put LBM in the position of having to accept it. Suffice it to say, had Jackson Walker made the required disclosures, neither LMB nor any reasonable person would have agreed to the plan.

13.     And Jackson Walker over plays its hand on standing. This case is not "nearly identical"[16] to *Van Deelen*[17], where the plaintiff was not a creditor but instead a shareholder whose shares were already extinguished, and failed to show "that the Defendants' actions deprived him of anything he had not already lost long before[.]"[18] Plaintiffs here collectively held bonds worth more than $300 million, which became Wind Down Trust interests post-

---

[13] Motion ¶ 59.
[14] *GWG*, No. 22-90032, ECF No. 1421 ¶ 114.
[15] *GWG*, No. 22-90032, ECF No. 1924 at 42.
[16] Motion ¶ 44.
[17] *Van Deelen v. David R. Jones, et al.*, No. 4:23-cv-3729, 2024 U.S. Dist. LEXIS 148920 (S.D. Tex. Aug. 16, 2024)
[18] *Id.* at *17.

confirmation.[19] Plaintiffs still hold these interests, which have lost at least 96% of their value because of Defendants' misconduct. Meanwhile, Jackson Walker has collected more than $800,000 in fees (with more than $1 million still pending) for its role in the fraud. These concrete losses suffered by Plaintiffs can and should be redressed through damages.

14.     As holders of Wind Down Trust interests, which arose post-confirmation, Plaintiffs claims are direct and belong to them. For example, Freeman as Wind Down Trustee owed a direct fiduciary duty to them and breached that duty repeatedly. Jackson Walker aided and abetted and conspired with Freeman in her breaches. Otherwise, Plaintiffs intend to move for special appointment and/or derivative standing for those claims that are not direct. To be sure, the Litigation Trustee will never bring them. He is already attempting to bury them before they see the light of day. And there is no existing creditor's or bondholder's committee that could bring them.

15.     This lawsuit is not about revenge nor are Plaintiffs seeking to move ahead in line of any other bondholder. They are asking for the right to pursue the claims. The Court can decide how damages should be allocated. Plaintiffs' objective is redress for all bondholders.

## STATEMENT OF FACTS

16.     Since Jackson Walker dedicated nearly the entirety of its "Factual Background" section to material outside the Complaint that is immaterial to the Rule 12(b)(1) and (6) motion and that, at most, controverts Plaintiffs' well-pleaded facts, Plaintiffs will not burden the Court with a lengthy section on the Facts. Plaintiffs incorporate by reference their Factual Allegations from the Complaint at paragraphs 37–132.

---

[19] Complaint ¶¶ 133–36.

17.     Contrary to what Jackson Walker would have the Court believe, Freeman was a key figure in the GWG bankruptcy, working on it from the day it was filed through present. All along, Jackson Walker concealed the Jones-Freeman relationship from those interested in the bankruptcy. Just a week and two days before Jackson Walker moved for Jones' appointment as mediator, Freeman billed for work on "disclosure items for professionals[.]"[20] Despite this work, neither Freeman nor Jackson Walker updated or corrected their disclosure representing that Jackson Walker had no conflict with any bankruptcy judge in the Southern District. Freeman also billed work ahead of the board meeting during which Jackson Walker and Freeman squeezed out management under threat, and billed for "develop[ing] litigation and plan structuring strategy[.]"[21]

18.     From December 2022 through June 2023, Jackson Walker submitted additional billing from Freeman (amounting to more than $200,000) as fees billed through her newly formed entity, The Law Office of Liz Freeman.[22] This included Freeman billing for mediation before Jones.[23]

19.     Once Jones took over as mediator and Freeman was appointed Wind Down Trustee at his suggestion, the Enterprise cashed in its chips. Freeman quickly liquidated the trust assets so there were funds to pay the professionals (including herself at the rate of $50,000 per month), while at the same time wasting away the bondholders' value.

---

[20] *GWG*, ECF No. 1878, Jackson Walker's Third Interim Fee Application, Ex. A, Seventh Monthly Fee Statement, Ex. C at 12 (pdf p. 25).
[21] *GWG*, ECF No. 1878, Jackson Walker's Third Interim Fee Application, Ex. A, Seventh Monthly Fee Statement, Ex. C at 18 (pdf p. 31)
[22] *GWG*, ECF No. 2158, Jackson Walker's Fourth and Final Fee Application, Fourteenth Monthly Fee Statement, Ex. 3 (pdf p. 273).
[23] *GWG*, No. 20-90032, ECF No. 2158 at PDF pp. 179–80, 195.

20.     Jackson Walker offers a contrary, false narrative that Freeman supposedly inherited "worthless BEN stock."[24] In fact, Plaintiffs' well-pleaded facts describe that Freeman inherited a life settlements portfolio worth $800 million and equity holdings and interests in Beneficient valued at approximately $1.7 billion.[25] The BEN stock became worthless because Freeman filed an emergency motion—again without disclosing her conflicts of interest and ulterior motives to Plaintiffs, other stakeholders, or the bankruptcy court—to sell all the stock on the day of the IPO which caused the price to plummet as they simultaneously flooded the market.[26] This despite SEC regulations and lock-up agreements that required a more orderly and responsible divesting of the BEN shares, as well as over proposals by BEN to repurchase its own stock at much higher prices than Freeman sold.[27]

21.     Jackson Walker and Freeman relied on Porter Hedges, counsel for the Bondholder's Committee, to feed the Bondholder's Committee a story concocted to cover for the looting that the RICO Defendants were planning and effectuating. Porter Hedges, through its partner Nicholas Simms, long knew of the relationship—he was Freeman's ex-husband. As such, Jackson Walker and Freeman were able to use Porter Hedges as a curated pipeline of information to the Bondholder's Committee.

22.     Under the plan she and Jackson Walker drafted, Freeman also had control over the Litigation Trustee, allowing the RICO Enterprise to shift focus away from their activities and on to management, whom they squeezed out under threat. The Enterprise's use of a dubious adversary proceeding against prior management that it removed is part and parcel of its scheme to eliminate resistance, liquidate the company, and collect professional fees.

---

[24] Motion at ¶ 40.
[25] Id. ¶ 106.
[26] Id.
[27] Id. ¶¶ 106–08.

23.     Jackson Walker misleads the Court yet again in claiming that "Ms. Freeman has no ability, in her capacity as Wind Down Trustee, to evaluate or act upon GWG's potential litigation claims."[28] In fact, the plan crafted by the RICO Defendants requires that "[t]he Litigation Trustee shall confer with the Wind Down Trustee with respect to the commencement of any litigation…."[29] Further, the Litigation Trustee prosecutes causes of action "subject to the direction of the Litigation Trust Board."[30] Members of the Litigation Trust Board are appointed by none other than Freeman.[31] Thus, any action against Freeman would be vetoed by those subject to her removal.

24.     In an attempt to shoot the messenger, Jackson Walker next takes aim at GWG's former CEO, Murray Holland, to assert that he was a pillaging pirate responsible for GWG's financial distress and that he, as Trust Advisor for the Plaintiff Trusts is out for revenge after the Trusts' bonds were subordinated. To the contrary, Mr. Holland was appointed by the GWG board as CEO after GWG acquired BEN. Despite being forced out of his job by baseless threats in the crucial time frame leading up to mediation, Mr. Holland, along with Plaintiffs, seek to redress the wrongs wrought by Defendants that affected the Plaintiff Trusts and the 27,000 bondholders in kind. Despite Defendants' allegations to the contrary, Plaintiffs do not seek Holland's appointment in any way as Wind Down Trustee or any role in the distribution of funds Plaintiffs hope to recover for the GWG estate. He is simply the most well-informed and experienced individual among Plaintiffs' representatives to serve as the special, limited litigating trustee to pursue the claims in Plaintiffs' Complaint.

---

[28] Motion at ¶ 40.
[29] *GWG*, 22-90032, ECF No. 1924 at 42.
[30] *GWG*, No. 22-90032, ECF No. 1421 ¶ 114.
[31] *Id.* ¶ 113.

<u>**STANDARD OF REVIEW**</u>

25.　　Claims may be dismissed under Rule 12(b)(1) based on a lack of subject-matter jurisdiction "when the court lacks the statutory or constitutional power to adjudicate the case." *Home Builders Ass'n v. City of Madison*, 143 F.3d 1006, 1010 (5th Cir.1998) (quotations omitted). A Rule 12(b)(1) motion to dismiss should only be granted if it appears certain that the plaintiff cannot prove a plausible set of facts that establish subject matter jurisdiction. *See Lane v. Halliburton*, 529 F.3d 548, 557 (5th Cir. 2008) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007)).

26.　　To survive a Rule 12(b)(6) motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged. *Id*. The plausibility standard is not akin to a probability requirement. *Id.* All well-pleaded facts must be accepted as true and viewed in the light most favorable to the plaintiff. *Anderson v. Valdez*, 845 F.3d 580, 589 (5th Cir. 2016); *see also Lormand v. US Unwired, Inc.*, 565 F.3d 228, 239 (5th Cir. 2009). ("Usually, under Rule 12(b)(6), [courts] must draw all reasonable inferences in the plaintiff's favor").

27.　　Jackson Walker's "Factual Background" takes the opposite approach. It contains fifty-five footnotes but cites Plaintiffs' Complaint twice. The rest largely refers to documents and records not mentioned in Plaintiff's Complaint, which should not be considered in connection with the motion to dismiss.[32] Rather, when the Court considers a Rule 12(b)(6) motion to

---

[32] Jackson Walker's reliance on allegations outside Plaintiffs' Complaint includes Wall Street Journal coverage of the GWG bankruptcy (*see e.g.,* Motion at n. 19), that resulted in defamation litigation which survived Rule 12(b)(6) and has now resolved. *See Beneficient v. Gladstone*, No. 23-376, 2024 U.S. Dist. LEXIS 91703, *30 (E.D. Tex. May 22, 2024).

dismiss, it "must limit itself to the contents of the pleadings." *Collins v. Morgan Stanley Dean Witter*, 224 F.3d 496, 498 (5th Cir. 2000). It can only consider extraneous material or "[d]ocuments that a defendant attaches to a motion to dismiss . . . if they are referred to in the plaintiff's complaint and are central to [its] claim." *Causey v. Sewell Cadilac-Chevrolet, Inc.*, 394 F.3d 285, 288 (5th Cir. 2004).

28.     Rule 9(b) requires allegations of the particulars of time, place, and contents of the false representations, as well as the identity of the person making the misrepresentation and what he obtained thereby. *Benchmark Elecs., Inc. v. J.M. Huber Corp.*, 343 F.3d 719, 724 (5th Cir. 2003), opinion modified on denial of reh'g, 355 F.3d 356 (5th Cir. 2003). Put simply, Rule 9(b) requires the who, what, when, where, and how to be laid out. *Id.* What is essential is that the defendant be put on notice of the alleged fraudulent conduct. *See id.*

## ARGUMENT & AUTHORITIES

### I.     Plaintiffs have Article III Standing.

### A. Plaintiffs adequately alleged a particularized injury.

29.     Jackson Walker challenges the "particularized injury" requirement of Article III standing but confuses it with prudential standing,[33] while also misapprehending *Van Deelen v. Jones, et al.*, No. 23-03729, 2024 U.S. Dist. LEXIS 148920 (S.D. Tex. Aug. 16, 2024).[34]

30.     *Van Deelen* does not hold that harm to a creditor cannot constitute a particularized injury under Article III. This Court in Van Deelen found that the plaintiff was not a creditor,

---

[33] For example, the "secondary effect from harm done to [the debtor]," discussed in *SunEdison*, cited by Jackson Walker in its Article III section concerns prudential, not Article III standing. Motion at ¶ 65 (citing *In re SunEdison, Inc.*, Case No. 16-10992 (SMB), 2019 WL 2572250, *6 (Bankr. S.D.N.Y. June 21, 2019). So does Jackson Walker's argument, in its Article III discussion, that "Plaintiffs only assert claims against Jackson Walker belonging to the bankruptcy estate…." Motion at ¶ 65.

[34] Under Article III, Plaintiffs must show (i) an injury in fact that is concrete, particularized, and actual or imminent; (ii) that was likely caused by the defendant; and (iii) that would likely be redressed by judicial relief. *TransUnion LLC v. Ramirez*, 594 U.S. 413, 423 (2021).

but instead an equity shareholder whose shares had been extinguished by the plan. *Id.* at 22. Because the plaintiff had no interest at the time, the Court found he failed to show "that the Defendants' actions deprived him of anything he had not already lost long before[.]" *Id.* at *23.

31.     Here, it is undisputed that Plaintiffs are bondholders/creditors who retain current, existing Wind Down Trust interests. They suffered particularized injuries. They collectively held bonds worth more than $300 million, which are now Wind Down Trust interests.[35] As described in the Complaint, Jackson Walker, Jones, and Freeman's participation in the conspiracy and fraud nearly wiped out their value entirely.[36] Plaintiffs have also funded Freeman's fees as Wind Down Trustee for doing so, which she only collected through Defendants' collective fraud. Plaintiffs' losses of nearly $300 million are concrete injuries.[37] These are particularized damages for each claim asserted by Plaintiffs.

**B.  Plaintiffs adequately alleged the injuries were caused by Jackson Walker.**

32.     Plaintiffs also adequately alleged that these injuries were caused by Jackson Walker.[38] They did not set up an "attenuated chain of possibilities," as Jackson Walker suggests.

33.     Jackson Walker, Jones, and Freeman took a series of steps to carry out their conspiracy. This does not attenuate causation. Plaintiffs described the factual sequence in which the firm, in conjunction with Freeman and Jones, hid the Jones-Freeman relationship, used it to secure unlawful fees, assisted in setting Freeman up with a lucrative severance package (i.e., Wind Down Trustee fees), and wiped out the value of GWG assets in the process. As the Complaint describes, Freeman, Jackson Walker, and Jones plotted to hijack

---

[35] Complaint ¶¶ 20–23.
[36] *Id.* ¶¶ 12, 19, 128.
[37] *Id.* ¶¶ 128–32.
[38] *Id.* ¶¶ 100–110, 128, 181, 208, 214, 226, 253, 258, 270, 295.

the GWG bankruptcy by having him appointed mediator.[39] Jackson Walker kept the Jones-Freeman relationship secret, despite a mandatory obligation to disclose, because Jones would have been disqualified. Once Jackson Walker had Jones in place, instead of following a restructuring plan that would have put the company's finances on track and allowed bondholders to retain 100% of the value of their bonds,[40] Jones announced there would be no reorganization. GWG would be liquidated. This ensured quick cash for the professionals.[41]

34.    Jones then set up Freeman as Wind Down Trustee, which served as a golden parachute from her planned departure from Jackson Walker, which decided she should depart rather than disclose anything. Had Jackson Walker disclosed, it would have been disqualified as counsel for debtor-in-possession. *See* 11 U.S.C. § 327 (bankruptcy estate may only employ "attorneys . . . or other professional persons, that do not hold or represent an interest adverse[42] to the estate, and that are disinterested[43] persons, to represent or assist the trustee in carrying out the trustee's duties under this title").[44] So would have Jones and Freeman.

35.    As planned by Jackson Walker, Jones, and Freeman, Freeman commenced a fire sale of assets as Wind Down Trustee that, while disastrous for the intended beneficiaries, ensured cash flow for Freeman, Jones, her former law firm.[45] Freeman started with two sizeable

---

[39] *Id.* ¶¶ 98–100.
[40] *Id.* ¶¶ 96–97.
[41] *Id.* ¶ 8.
[42] "[An adverse interest] includes any interest or relationship, however slight, that would even faintly color the independence and impartial attitude required by the Code and Bankruptcy Rules." *In re Granite Partners, L.P.*, 219 B.R. 22, 33 (Bankr. S.D.N.Y. Mar. 9, 1998) (cleaned up).
[43] The definition of "disinterested," 11 U.S.C. § 101(14), is sufficiently broad to disqualify any professional with an "interest or relationship that would even faintly color the independence and impartial attitude required by the Code." *In re Crivello*, 134 F.3d 831, 835 (7th Cir. 1998) (quotation omitted).
[44] Once Jackson Walker (with Freeman as a partner) moved for Jones' appointment and once Jones was appointed, she was not disinterested. Further, Freeman's interest in remaining counsel for the estate and Wind Down Trustee—and her interest in keeping her relationship with Jones secret to avoid challenges to her compensation in cases where Jones presided as a judge or mediator—conflicted with the estate's interest in having an impartial mediator.
[45] Complaint ¶¶ 106–10.

primary assets—the life settlements portfolio worth $800 million and equity holdings and interests in Beneficient valued at approximately $1.7 billion.[46] Plaintiffs' Complaint describes in painstaking detail how Freeman's actions as Wind Down Trustee eviscerated the value of these assets.[47] "The only benefit of operating in this fashion was to obtain quick and easy cash to pay fees for Freeman and other bankruptcy professionals—while the bondholders, creditors, and other interested parties were lucky to receive little if anything."[48] Plaintiffs adequately pleaded how Jackson Walker, in conjunction with Freeman, caused their injuries.

36.     There is no speculation that any of these steps led to the harm inflicted on Plaintiffs. This case is nothing like *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 410 (2013), cited by Jackson Walker.[49] The plaintiffs in Clapper alleged damages that depended upon speculative, potential actions to be taken by the government in the future. *Clapper*, 568 U.S. at 410–412, 420. Plaintiffs have alleged concrete injuries that have already manifested because of Jackson Walker's actual misconduct.

37.     Jackson Walker also maintains Plaintiffs cannot connect the dots because Jones was a mediator and only Judge Isgur could make binding decisions or rulings. But Jones dictated the terms of the plan, informing everyone at mediation that it would be a liquidation and Judge Isgur would do whatever he said.[50] Jones did not enter the orders, but he controlled and directed the plan that followed his mediation, including the appointment of Freeman at his direction.

---

[46] *Id.* ¶ 106.
[47] *Id.* ¶¶ 106–09.
[48] *Id.* ¶ 109.
[49] Motion ¶ 66 n. 122.
[50] Complaint ¶ 101.

38. Jackson Walker attempts to shift the blame to various individuals they claim are responsible for sending GWG into bankruptcy. While the narrative is wrong[51] (and at most, raises a fact issue), it is ultimately irrelevant. Regardless of how GWG arrived at having to pursue restructuring, the point is GWG was a distressed entity, which made it a target for the Jones-Freeman-Jackson Walker Enterprise.[52] Plaintiffs' Complaint alleges that Jackson Walker, Jones, and Freeman orchestrated that Freeman would be appointed Wind Down Trustee, and from there, dismantle it for cash, which caused Plaintiffs' considerable losses.

39. And those concrete losses sustained by Plaintiffs that were proximately caused by Jackson Walker, Jones, and Freeman can and should be redressed through damages awarded to Plaintiffs in a judgment.[53] Plaintiffs have Article III standing.

## II.     This is Not a Collateral Attack.

40. Plaintiffs are not collaterally attacking the confirmation order. Their claims are anything but mere "disagreements with plan terms and administration[.]"[54] Instead, Plaintiffs complain of Jackson Walker's scheme—across numerous bankruptcies—to leverage the Jones-Freeman relationship for prestige and profit, while concealing it from the impacted parties.

41. Plaintiffs are also not "raising claims or issues that they could have or should have raised before confirmation." *In re LaHaye*, 17 F.4th 513, 519 (5th Cir. 2021). When the confirmation order was approved, Plaintiffs had no reason to believe it was the product of fraud and collusion between the mediator and counsel for debtor. Nor did they know the

---

[51] The declaration of Timothy Evans, former Chief Financial Officer of GWG Holdings, describes the rogue SEC actions that led to the GWG bankruptcy. Complaint ¶ 93.
[52] Complaint ¶ 92 ("The saga of the SEC investigation left GWG a distressed entity, making it an ideal victim for the Enterprise").
[53] *Id.* ¶¶ 133, 139.
[54] Motion ¶ 53.

mediator was in a longstanding, live-in romantic relationship with counsel for debtor whom he would recommend for Wind Down Trustee. Had Jackson Walker made required disclosures, Plaintiffs could have seen the liquidation plan for what it was and taken appropriate action. This is exactly why Jackson Walker, Jones, and Freeman kept it secret.

### III. Plaintiffs' Claims are Not Barred by the Confirmation Order.

42.     By its own terms, the confirmation order does not bar Plaintiffs' claims arising from fraud, gross negligence, or willful misconduct.[55] Plaintiffs allege all the above. Jackson Walker even admits that claims for "actual fraud, willful misconduct, intention breach of fiduciary duty, or gross negligence" are "actions carved out of the Debtors' release in the Plan."[56]

43.     Jackson Walker argues these claims belong exclusively to the Litigation Trustee. But as described infra, the Litigation Trustee cannot bring Plaintiffs' direct claims that belong to them. As to the derivative claims, the Litigation Trustee is conflicted and will never bring them because he answers to Freeman. In fact, he, Freeman, and Jackson Walker are already attempting to bury the claims through a yet-undisclosed release without any transparency or adversarial action against Jackson Walker or Freeman.

### IV. Plaintiffs Assert Direct Claims.

44.     Plaintiffs have prudential standing because they have alleged direct, non-derivative claims. "A creditor's claim is non-derivative only if some direct legal obligation flowed from the defendants to the creditor." *In re Bernard L. Madoff Inv. Sec., LLC*, 2013 U.S. Dist. LEXIS 143956, *17-18 (S.D.N.Y. Sept. 30, 2013) (citing *Bankers Trust Co. v. Rhoades*, 859 F.2d 1096, 1101 (2d Cir. 1988) (holding creditor's claims against officers of bankrupt corporation were

---

[55] *GWG*, ECF No. 1952 at 70–71, Article VIII, C (releasing all claims "except for any claims related to any act or omission that is determined in a Final Order to have constituted actual fraud, willful misconduct, intentional breach of fiduciary duty, or gross negligence").
[56] Motion ¶ 59 n. 97.

not derivative since officers' fraudulent conduct directly caused creditor harm); *Medkser v. Feingold*, 307 Fed. Appx. 262, 265 (11th Cir. 2008) (holding claims alleging "direct injuries sustained by ... plaintiffs" as a result of "intentional misrepresentations" were non-derivative)).

45.     Jackson Walker is mistaken that each claim against it hinges upon Plaintiffs as creditors of the GWG bankruptcy estate. Plaintiffs allege Jackson Walker aided and abetted Freeman in her breach of fiduciary duty owed directly to Plaintiffs as beneficiaries of the Wind Down Trust, which became effective after entry of the confirmation order, and not simply as participants in the bankruptcy.[57] Plaintiffs also alleged Jackson Walker was part of a civil conspiracy for Freeman to breach her fiduciary duty to them as Wind Down Trusts interest holders.[58] And Plaintiffs pleaded that Jackson Walker was part of a conspiracy, both under RICO and common-law civil conspiracy, in which Freeman wasted and misused assets to the detriment of the Wind Down Trust interest holders.[59] These are claims held by Plaintiffs, not the estate or the Litigation Trustee.

46.     Plaintiffs' damages in the form of lost value in their Wind Down Trust interests are also not injuries that arise from the confirmation plan or order. Rather, they are the result of Defendants' conspiracy to keep the Jones-Freeman conspiracy secret from outsiders at any cost. These damages are independent of injuries to GWG and the bankruptcy estate. *See Oakes Farms Food & Distrib. Servs., LLC v. Sch. Dist. of Lee Cty.*, 541 F. Supp. 3d 1334, 1343 (M.D. Fla. May 28, 2021) ("[t]he harm to Mr. Oakes's First Amendment rights is distinct and personal from the economic harm to Oakes Farms").

---

[57] Complaint ¶¶ 140, 258
[58] *Id.* ¶ 28.
[59] *Id.* ¶¶ 214, 282–91.

47. Further, in *Alix v. McKinsey & Co.*, 23 F.4th 196, 204 (2d Cir. 2022), the Court of Appeals described that the "district court gave insufficient consideration to the fact that [the defendant's] alleged misconduct targeted the federal judiciary[,]" which requires courts "to focus on the responsibilities that Article III courts must shoulder to ensure the integrity of the Bankruptcy Court and its processes." "If [Defendant's] conduct has corrupted the process of engaging bankruptcy advisors, as [Plaintiff] plausibly alleges, then the unsuccessful participants in that process are directly harmed." *Id.* (emphasis added). Under Alix, Plaintiffs were directly harmed as an unsuccessful participant in the bankruptcy process. *Id.*

48. Plaintiffs' Complaint thus plausibly states a claim that their injuries are personalized, and not derivative of the bankruptcy.

**V.  Plaintiffs Intend to Move for Special Limited Appointment and/or Derivative Standing.**

49. Plaintiffs' Complaint alleges their intent to move for special appointment and/or derivative standing to assert any derivative claims against Freeman and the remaining defendants on behalf of the GWG estate and/or for the benefit of the Wind Down Trust.[60] Jackson Walker's response on this matter is premature. Plaintiffs will file their motion in due course. Nevertheless, Plaintiffs will briefly address Jackson Walker's argument.

**A.  As Demonstrated, the Litigation Trustee will Never Pursue Claims against Jackson Walker.**

50. Jackson Walker argues only the Litigation Trustee can bring Plaintiffs' claims.[61] He is utterly conflicted and will never do so. He has already attempted to release the claims with Freeman on both sides of the agreement.

---

[60] *Id.* ¶ 142.
[61] Motion ¶ 57.

51.     There are at least four reasons he is conflicted. First, he answers to Freeman. The plan requires him to communicate with her before pursuing any litigation, and she is responsible for appointing board members who ultimately make the decisions.[62] Any action against Freeman would be vetoed by those subject to her removal.

52.     Second, nearly two years have passed since Jones publicly acknowledged the relationship with Freeman, and the Litigation Trustee has neither brought litigation against Freeman, Jones or Jackson Walker,[63] nor sought Freeman's removal as Wind Down Trustee despite her undeniable breaches of fiduciary duty. In so doing, the Litigation Trustee has acquiesced to her fraud on the bondholders (now holders of Wind Down Trust interests) and the Court.

53.     Third, the Litigation Trustee is an essential witness for the claims against Freeman, Jones, and Jackson Walker. Again, the plan negotiated by the RICO Defendants requires that "[t]he Litigation Trustee shall confer with the Wind Down Trustee with respect to the commencement of any litigation…."[64] To the extent the Litigation Trustee discussed with Freeman his commencing (or abstaining from) litigation against Jackson Walker, Jones, or Freeman, his testimony is relevant to the claims sought to be asserted herein.

54.     Fourth, the Bondholder Committee appointed the Litigation Trustee; and the Bondholder Committee is represented by Porter Hedges, which knew of the Jones-Freeman conflict but did not disclose it.[65] Each of these conflicts will prevent the Litigation Trustee

---

[62] *Supra* n. 14.
[63] To the extent the Litigation Trustee has reached a putative settlement with Jackson Walker, he never filed any complaint against the firm, a tacit admission that he has no intention of bringing transparency to the process. Presumably, Jackson Walker has negotiated an overly broad release as in the other settlements that could theoretically wipe out Plaintiffs' claims.
[64] *GWG*, 22-90032, ECF No. 1924 at 42.
[65] Complaint ¶ 42.

from ever bringing litigation against Freeman, as evidenced by the fact that he still has not done so and continues to acquiesce to Freeman serving as Wind Down Trustee, while she has collected more than $1 million in fees, and continues not to disclose the disqualifying relationship.

**B. There is No Impediment to this Court Making Special Limited Appointment or Granting Derivative Standing.**

55.     Jackson Walker disputes Plaintiffs' ability to pursue derivative standing because the Fifth Circuit in Cleveland Imaging indicated in dicta that only a creditor's committee may do so.[66] As Plaintiffs described in their Complaint, "there is no creditor's committee and the bondholder's committee has been dissolved with two exceptions, neither of which is applicable."[67] These facts are undisputed. The Fifth Circuit has never extended Cleveland Imaging to cases like this where there is no applicable committee.

56.     Plaintiffs must be granted derivative standing because no one else can or will pursue the claims, meaning they are the only ones standing in the way of Jackson Walker profiting from its fraud. *See In re Clean the Air, LLC*, 631 B.R. 286, 295 (Bankr. S.D. Tex. Jun. 22, 2021) ("a creditor may bring suit on behalf of the bankruptcy estate"); *In re Shelby Motel Group, Inc.*, 123 B.R. 98, 102 (N.D. Ala. Oct. 18, 1990) (where creditor was ready and willing to bring derivative action "[i]t should be allowed to do what nobody else seems willing to do").

57.     Of course, even if the Bondholder's Committee were still active, it too would be conflicted. It failed to act on these claims for nearly two years. And again, it was represented by Porter Hedges, a defendant in this suit that had knowledge of the Jones-Freeman relationship yet failed to disclose it.

---

[66] Motion ¶ 60.
[67] Complaint ¶ 147 (emphasis added).

58.     Despite Jackson Walker's spin, Plaintiffs' claims are colorable, and the Complaint adequately traces the firm's scheme to use the Jones-Freeman relationship for its own reputational and pecuniary gain, which caused the diminution of bondholders' interests in GWG.[68]

59.     Jackson Walker attempts to remove itself from the causal chain because it was Freeman who conducted the actual "fire sale" of BEN stock. This ignores Jackson Walker's role in orchestrating the scheme, including its work in bringing Jones into the case and placing Freeman in the position of Wind Down Trustee through fraud.[69] It also ignores that Jackson Walker, in conjunction with co-counsel Freeman, filed the emergency motion for authorization to sell new Beneficient Shares.[70] This was done "the very day of BEN's IPO—broadcasting to the investing public in neon lights that Freeman was planning to cut the legs out from under Ben and sen[t] GWG's largest asset into the gutter."[71]

60.     Jackson Walker also suggests a gap in the causal link between the sale of stock and the payment of Jackson Walker's fees, because its work was performed up to confirmation, on June 20, 2023.[72] In fact, Jackson Walker filed is emergency motion for sale of BEN stock on June 8, 2023, before confirmation.[73] Regardless, they already conspired with Jones and Freeman to liquidate GWG to ensure cash for the professionals. The fact that Jackson Walker used Freeman, in part, to accomplish this end does not cut off their liability. To the extent Jackson Walker pushes back and argues it has only been paid some, but not all, of its fees (with the final motion still pending) does nothing to interrupt causation. Jackson Walker's

---

[68] *Id.* ¶¶ 8, 12 92, 96–100, 106–09, 128–32, 181.
[69] *Id.* ¶¶ 8, 98, 103.
[70] *GWG*, ECF No. 1885.
[71] Complaint ¶ 106.
[72] Motion ¶ 70.
[73] *GWG*, ECF No. 1885.

scheme was to have Jones appointed mediator and Freeman appointed as Wind Down Trustee so the three could convert restructuring into liquidation, make cash available for professionals, and boost their prestige in bankruptcy practice. The fact that they have not been successful in getting all the loot does not absolve their wrongdoing.

61.     Jackson Walker challenges the second Louisiana World requirement, i.e., making a formal demand to bring the claims and showing an unjustifiable refusal.[74] On this point Jackson Walker runs up against blackletter law—futility is indeed "a substitute for compliance with the demand requirement."[75] Where the request would be futile, the "failure to have formally petitioned the Debtor to file suit should not stand as an impediment[.]" *In re Nat'l Forge*, 326 B.R. 532, 545-46 (W.D. Pa. May 26, 2005). It is enough "to plead with particularity why demand is excused." *In re Cooper*, 405 B.R. 801, 811 (Bankr. N.D. Tex. 2009) (quotation omitted); *see In re First Capital Holdings Corp.*, 146 B.R. 7, 13 (Bankr. C.D. Cal. Sept. 18, 1992) (demand on board of directors excused "as futile" where claims were "against the officers, directors and controlling shareholder of the debtor").

62.     As to the third *Louisiana World* element—seeking leave of Bankruptcy Court—Plaintiffs explained that they intend to make their motion for special appointment and/or derivative standing to this Court in the first instance "[i]n light of this Court's prior orders withdrawing the reference to bankruptcy court for matters pertaining to the Jones-Freeman relationship[.]"[76]

63.     Concerning who should be appointed to pursue any derivative claims, Jackson Walker's character assassination on the individual Plaintiffs propose—Murray Holland—is

---

[74] Motion ¶ 60 n. 99.
[75] *Id.*
[76] Complaint ¶ 146.

premature because they have not yet filed their motion. In any case, the attacks are premised upon falsehoods. Mr. Holland successfully operated GWG until an SEC officer conducted an overreaching investigation, which through a series of events described at length in the Complaint led to the need for restructuring. It was Jackson Walker, Freeman, and Jones' preying upon the financially vulnerable entity, as in other mega-bankruptcies, that ran the company into the ground. Mr. Holland did not resign from GWG under questionable circumstances. He resigned after Jackson Walker squeezed out management under threat so they could liquidate the company.[77]

64.     While the adversary litigation brought by Freeman through the Litigation Trustee relies on the specter of SEC scrutiny, what Jackson Walker does not discuss is that the SEC in 2024 ultimately dropped the investigation against GWG and its officers and directors, including Murray Holland, with no enforcement action recommended.[78] Regardless, any conflict that might have been presented by these false claims is gone. They were resolved in a settlement with no admission of liability by Mr. Holland; that settlement was approved on June 13, 2025 by Bankruptcy Judge Christopher Lopez. Mr. Holland, who was one of dozens of defendants, only agreed to the settlement, which was funded entirely by D & O insurance proceeds, to provide cash to the Wind Down Trust beneficiaries. Further, Mr. Holland's interest in GWG is an asset, not an impediment to his appointment to pursue litigation against Jackson Walker and the remaining defendants. *See In re MabVax Therapeutics Holdings, Inc.*, No. 19-10603 (JTD), 2023 Bankr. LEXIS 1557, at *9–10 (Bankr. D. Del. 2023) (it is often "beneficial to have a person with knowledge and familiarity of the debtor's business" instead of a stranger appointed for the sole purpose of being disinterested).

---

[77] *Id.* ¶¶ 7, 98, 100.
[78] *Id.* ¶ 91.

## VI. Plaintiffs Adequately Alleged Proximate Cause.

65.     As described supra in the Article III and derivative standing sections, Plaintiffs adequately pleaded causation. Jackson Walker's third bite at the apple on causation relies on restrictive reading of Plaintiffs' allegations. In the firm's view, Plaintiffs merely alleged non-disclosure of a conflict, which they argue cannot be linked to Defendants' losses.

66.     But the Complaint articulates a much broader scheme in which Jackson Walker, together with Jones and Freeman, targeted massive, distressed entities to bring before Jones, either as judge or mediator. Using Jones' influence, the trio (sometimes with other professionals) liquidated GWG for funds to allocate among themselves and other professionals. Jackson Walker's concealment of the Jones-Freeman relationship was crucial to accomplishing this scheme—had they disclosed (aside from the harm to their collective reputations), Jones would be disqualified, and Freeman and Jackson Walker could no longer be retained under 11 U.S.C. § 327.[79] Because the scheme would not have been possible without the commission of the predicate acts of fraud, the notion that Plaintiffs' injuries flowed from them is not so "far beyond the place of rational causation." *Gonzalez v. North American College, Inc.*, 700 F. Supp. 362, 364 (S.D. Tex. Oct. 3, 1988).[80] Jackson Walker's scheme to use the secret relationship for its own profit and to boost prestige is thus "so closely

---

[79] Under Section 327, a bankruptcy estate may only employ "attorneys . . . or other professional persons, that do not hold or represent an interest adverse to the estate, and that are disinterested persons, to represent or assist the trustee in carrying out the trustee's duties under this title." 11 U.S.C. § 327.

[80] In *Nat'l Entrs., Inc. v. Mellon Fin. Servs. Corp. No. 7*, 847 F.2d 251, 254 (5th Cir. 1988), cited by Jackson Walker, a supplier in a contract sued its purchaser's lender for RICO, alleging it was harmed by the lender's failure to provide financing to the purchaser, who did not pay. The court held that the supplier's injury of non-payment flowed from its contractual relationship with the buyer, "not from the remote corrupt acts of a virtual stranger to that contract and to that relationship." *Id.* at 254. Here, the bondholders were the direct victim of Jackson Walker's fraud.

connected with the result and of such significance that the law is justified in imposing liability."[81]

67. Jackson Walker, Jones, and Freeman took a series of steps to carry out their conspiracy. This does not attenuate causation. Plaintiffs described the factual sequence in which the firm, in conjunction with Freeman and Jones, hid the Jones-Freeman relationship, used it to secure unlawful fees, assisted in setting Freeman up with a lucrative severance package (i.e., Wind Down Trustee fees), and wiped out the value of GWG assets in the process.

68. Jackson Walker takes the actions of Freeman and Jones as intervening causes that interrupt the chain of causation.[82] These so-called intervening actors are in fact co-conspirators. Plaintiffs allege Jackson Walker conspired with them to take the very actions Jackson Walker argues cannot be attributed to them.

69. As to the Litigation Trustee, Plaintiffs have not alleged he proximately caused their damages. The Complaint describes his conflict to demonstrate the need for special appointment or derivative standing.

70. While Judge Isgur confirmed the plan, Plaintiffs allege Jones dictated its terms by informing everyone at mediation that it would be a liquidation and Judge Isgur would do whatever he said.[83] Jones did not enter the orders, but he orchestrated the plan that followed his mediation, including the appointment of Freeman at his direction.

71. Jackson Walker rehashes its argument that pre-bankruptcy conduct, and not its own actions, caused Plaintiffs' harm. Again, the pre-bankruptcy allegations do nothing to interrupt

---

[81] Motion ¶ 73 (quoting W. Page Keeton *et al.*, Prosser & Keeton on the Law of Torts § 41 (5th ed. 1984)).
[82] *Id.* ¶ 76 (discussing Jones' forcing of a liquidation and Freeman's sale of assets resulting in tanking the value of Plaintiffs' interests).
[83] Complaint ¶ 101.

causation because GWG entered Chapter 11 postured to make a full recovery until Freeman, Jackson Walker, and Jones took over. Here again, Jackson Walker relies on its own self-serving version of events to dispute Plaintiffs' well-pleaded facts.

72. Jackson Walker has its facts wrong on reliance. Plaintiffs alleged they relied on Jackson Walker's misrepresentations and fraud.[84] Plaintiffs pleaded that they relied on Jackson Walker's non-disclosure and affirmative representation that they had no conflicts with any bankruptcy judges in the Southern District of Texas.[85] Specifically, they relied on Jackson Walker's May 19, 2022 declaration and supplemental October 6, 2022 declaration of disinterestedness, the latter of which affirmatively indicated the absence of any conflict with bankruptcy judges in the Southern District.[86] Plaintiffs also alleged they relied on Jackson Walker's November 30, 2022 motion to appoint Jones as mediator as representing the absence of any disqualifying conflict with the mediator, particularly in light of its prior declaration affirmatively indicating the absence of any conflict with a bankruptcy judge in the Southern District.[87] Plaintiffs also pleaded they relied on Jackson Walker's filing of the bankruptcy plan and applications for attorneys' fees as filed in good faith, not procured through fraud and entered without a conflict between the mediator and its key restructuring partner.[88]

73. Jackson Walker suggests it had no duty to disclose the conflict. The firm didn't just not disclose. It affirmatively represented to all bankruptcy participants in its supplemental declaration of disinterestedness that it had no conflict with any bankruptcy judge in the Southern District and then moved to appoint Jones. Having made the false representation to

---

[84] *Id.* ¶¶ 220–23, 233, 237, 276.
[85] *Id.* ¶¶ 220–23.
[86] *Id.*
[87] *Id.*
[88] *Id.*

the Court and all bankruptcy participants, the firm had an affirmative duty to correct their false representation. "Full disclosure is a continuing responsibility, and an attorney is under a duty to promptly notify the court if any potential for conflict arises." *Beirne, Maynard & Parson, L.L.P. v. Cypresswood Land Partners*, 2010 U.S. Dist. LEXIS 146549, *25-26 (citing *In re W. Delta Oil Co.*, 432 F.3d 347, 355 (5th Cir. 2005)); *In re Ward*, 894 F.2d 771, 776 (5th Cir. 1990) ("Naturally, if there is a duty to supply correct information it can be breached by omission as well as by affirmative misrepresentation").

### VII. Any Provision that Can Possibly be Read to Bar Plaintiffs' Claims Should be Set Aside as the Product of Fraud.

74. In various portions of its motion, Jackson Walker indicates portions of the plan preclude Plaintiffs from pursuing their claims. For example, Jackson Walker suggests the plan releases various claims. Plaintiffs have pleaded that any such provisions, to the extent applicable should be and are void because of the permeating fraud perpetrated by Defendants in the enactment of such provisions. There is ample law allowing this Court to decline to enforce provisions that would amount to an abuse of process or acquiesce to a fraud on the Court. *See In re Thomas*, 223 Fed. Appx. 310, 313–14 (5th Cir. Mar. 1, 2007) (unpubl. op.); *see also* Fed. R. Civ. P. 60(b)(4),(6); Fed. R. Civ. P. 60 (d)(3).

### VIII. Plaintiffs Adequately Alleged RICO.

### A. Plaintiffs adequately allege RICO standing.

75. Jackson Walker's argument on RICO standing is a rehash of its prudential standing argument. As outlined supra in Section IV, Plaintiffs assert various direct claims as interest holders in the Wind Down Trust, formed post-confirmation and with duties owing directly to them. Otherwise, as described supra in Section V, Plaintiffs intend to seek special limited appointment or derivative standing to pursue claims belonging to the estate.

**B. Jackson Walker is not shielded from liability because certain predicate acts were committed in the context of litigation proceedings.**

76.     Jackson Walker's argument that it is effectively immunized from RICO liability because it committed predicate acts in the context of litigation is mistaken. The exclusion of litigation activities from the spectrum of predicate acts is not applicable in the face of corruption.[89] Here, Defendants' corruption of the bankruptcy system is a fundamental theme of Plaintiffs' Complaint. More specifically, Plaintiffs have alleged Jackson Walker and the RICO Defendants corrupted the bankruptcy system by filing fraudulent disclosures, concealing a disqualifying relationship between its key partner and the mediator who is specifically proposed, and continuing to keep it secret when its partner was recommended by the mediator to serve in the lucrative role of Wind Down Trustee. Notably, Jackson Walker still has not updated its declaration of disinterestedness to acknowledge the disqualifying relationship. Because Plaintiffs allege a scheme of corruption, Jackson Walker's filings may serve as a predicate act.[90] That is, in the context of Plaintiffs' allegations of corruption, the fact that these misrepresentations were sometimes made in court filings does not immunize them from constituting predicate acts of frauds.

77.     In *CSX Transp., Inc. v. Gilkison*, lawyers and a doctor conspired to file fraudulent asbestos claims.[91] A civil RICO claim was brought against them, and like Jackson Walker, they argued their filing of fraudulent pleadings and court documents could not be RICO predicate acts. That court disagreed, noting that courts recognize the filing of fraudulent documents in a lawsuit can serve as predicate acts so long as they form part of a larger

---

[89] *Snow Ingredients, Inc. v. SnoWizard, Inc.*, 833 F.3d 512, 525 (5th Cir. 2016) (recognizing corruption as an exception to litigation activity not supporting a predicate offense).
[90] *See Alix*, 23 F.4th at 200-01 (reversing dismissal of RICO claims that were based on fraudulent Rule 2014 disclosures).
[91] *CSX Transp., Inc. v. Gilkison*, 2012 U.S.Dist. LEXIS 61719 (N.D. Va. May 3, 2012).

scheme.[92] Like *CSX*, this case involves a "more complex scheme" beyond the filing of fraudulent court documents. Plaintiffs allege Jackson Walker and the RICO Defendants used the Jones-Freeman relationship, which they kept secret from interested parties like Plaintiffs, "to bolster prestige and collect tens of millions of dollars or more in fees at the expense of those affected by the bankruptcies."[93] They are not immunized because they used the federal bankruptcy system to accomplish their fraud.

### C. Plaintiffs sufficiently pleaded the existence of the Enterprise.

78.     Jackson Walker's challenge to the Enterprise depends on a misreading of the Complaint. To begin with, the firm misstates the facts by throwing Porter Hedges into the Enterprise.[94] While reserving the right to do so should the facts change, Plaintiffs' Complaint does not include Porter Hedges in the RICO counts or reference the firm as part of the Enterprise.

79.     Plaintiffs alleged an Enterprise made up of Jones, Freeman, and Jackson Walker, separate and apart from its predicate acts. Its purpose "was to increase the prestige and influence of each actor in bankruptcy practice, while enriching the RICO Defendants."[95] The purpose was not to commit the predicate acts themselves. Instead, the purpose "was accomplished through multiple predicate acts[.]"[96]

80.     Thus, the Enterprise existed to further professional and financial benefits to its members and used RICO predicate acts to improperly inflate those benefits. The facts alleged in this case are akin to *Diamond Consortium, Inc. v. Manookian*, where enterprise members were

---

[92] *Id.* at 32-33 (citing *St. Paul Mercury Ins. Co. v. Williamson*, 224 F.3d 425, 443 (5th Cir. 2000).
[93] Complaint at ¶ 3.
[94] Motion ¶ 90.
[95] Complaint ¶¶ 168, 170.
[96] *Id.* (emphasis added).

alleged to have provided representation and acted as co-counsel in other litigations. 2017 WL 1495091, at *4 (E.D. Tex. April 26, 2017). The court in Diamond Consortium found the association-in-fact enterprise had an existence separate and apart from the pattern of racketeering. *Id.* The same is true here.

81.    Plaintiffs' pleadings of a separate purpose are not conclusory. The Complaint explains Freeman, Jackson Walker, and Jones associated with one another, in part, to increase prestige in the bankruptcy community. Plaintiffs were not required to go further and describe CLE seminars and award banquets attended by the trio. The Complaint is long enough! The Fifth Circuit in *Elliott v. Foufas*, 867 F.2d 877, 881 (5th Cir. 1989) gave no indication that this kind of detail was required. It simply recognized that where the plaintiff does not allege "the association existed for any purpose other than to commit the predicate offenses[,]" it does not satisfy RICO. *Id.* "The mere fact that the individuals might have joined together to defraud" the defendant is not enough. *Id.*

82.    Cases where enterprises are not separate typically involve members who come together solely for a particular, often one-time criminal activity. For example, in *Fernandez-Lopez v. Hernandez*, 2020 U.S. Dist. LEXIS 253510, *31 (W.D. Tex. Nov. 20, 2020), the plaintiffs failed to allege an enterprise where the members came together for a one-time act of visa fraud. There was nothing indicating "this was Defendants' regular way of doing business[.]" *Id.*

83.    By contrast, the Enterprise was an "ongoing structure of persons and entities that continually associated over an extended period of time [from "2018 and continuing through present"][97] for the shared purpose of enriching themselves and increasing their prestige and

---

[97] *Id.* ¶ 166.

influence among bankruptcy lawyers and courts."[98] The Complaint describes their work together across dozens of mega-bankruptcies.

84. Plaintiffs alleged an association-in-fact enterprise.[99] The Supreme Court recognizes an association-in-fact enterprise "need not have a hierarchical structure or a 'chain of command.'" *Boyle v. U.S.*, 556 U.S. 938, 948 (2009). Instead, it "must have at least three structural features: a purpose, relationships among those associated with the enterprise, and longevity sufficient to permit these associates to pursue the enterprise's purpose." *Id.* at 946; *see Dell Inc. v. Mishra*, No. A-16-CV-00641-SS, 2018 WL 3717119, at *5 (W.D. Tex. Aug. 3, 2018). The Complaint easily meets all three requirements. Plaintiffs' Complaint adequately describes its purpose. It describes its longevity—from 2017 to present.[100] And it describes the relationships among the Enterprise members.[101]

**D. Plaintiff adequately satisfied the pleading standard for each challenged predicate act.**

85. Jackson Walker asserts that Plaintiffs fail to meet Rule 9(b)'s heightened pleading standard in connection with the pleading of predicate acts. Specifically, Jackson Walker challenges: (1) allegations of how the mails were used in connection with mail fraud; (2) allegations of bribes or kickbacks in connection with Plaintiffs' honest service fraud allegations; (3) allegations of favorable treatment in connection with Plaintiffs' bankruptcy fraud; and (4) allegations of how Jackson Walker acted corruptly with the intent to influence, obstruct or impede judicial proceedings in connection with Plaintiffs' obstruction of justice pleadings. Plaintiffs' pleadings on each meets the specificity requirements of Rule 9(b).

---

[98] *Id.* ¶ 170.
[99] *Id.* ¶ 175.
[100] *Id.* ¶¶ 168, 170.
[101] *See e.g., id.* ¶¶ 2–3, 170–74

86.     With respect to mail fraud, the Complaint describes the materials sent through the mails in furtherance of the fraud, including declarations of disinterestedness, applications for appointment as counsel, applications for attorney's fees, and orders awarding fees.[102] Plaintiffs alleged that each of these were "passed by mail[.]"[103] In addition to these specific filings sent via mail and wire, Plaintiffs alleged the mails and wires were used for co-conspirators to communicate with one another regarding the Enterprise, to communicate with clients and potential clients about the opportunities presented by Jones' involvement as judge or mediator with Freeman as counsel, to make representations regarding the existence or concealment of the Jones-Freeman relationship, and to send invoices or bills reflecting improperly obtained fee awards.[104]

87.     Second, with respect to honest services fraud, Plaintiffs outlined the bribery or kickback scheme that Jackson Walker claims is lacking. Under Texas law, allegations of a bribery or kickback scheme or any such "quid pro quo" can support a claim of honest services fraud. *United States v. Teel*, 691 F.3d 578, 582 (5th Cir. 2012). Here, Plaintiffs alleged a kickback in the form of lucrative fees resulting from, among other things, favorable employment as debtor's counsel for both Freeman and Jackson Walker, as well as fees awarded to Freeman as trustee, which flowed back into the Freeman-Jones household.[105] In short, Jackson Walker aided in providing Jones' girlfriend with employment opportunities and, in return, received local counsel appointments, approval of its employment and fee applications, as well as reputational benefits through delivering unwarranted results to clients. Jones aided in delivering those results by recommending Freeman for her position as Wind

---

[102] *Id.* ¶¶ 189-192; 193-196.
[103] *Id.* ¶¶ 191, 195.
[104] *Id.* ¶¶ 190, 194.
[105] *Id.* ¶ 198.

Down Trustee and using his stated influence with the bankruptcy judge to transition the case from a reorganization to a liquidation.[106] Meanwhile, all parties knew that a portion of the fees awarded to Freeman as attorney and as trustee would indirectly benefit Jones as they were available for the support of his domestic household. Plaintiffs adequately alleged a kickback or quid pro quo supporting honest service fraud.

88.    Next, Jackson Walker challenges Plaintiffs' pleadings with regard to bankruptcy fraud under 18 U.S.C. § 152(6), namely when a person "knowingly and fraudulently gives, offers, receives, or attempts to obtain any money or property, remuneration, compensation, reward, advantage, or promise thereof for acting or forbearing to act in any case under title 11."[107] Notably, Jackson Walker interposes giving or receiving property "to a court official"[108]—a clause that is not found in the statute or in Jackson Walker's cited authority. Otherwise, Jackson Walker merely asserts there are no specifics about what favorable treatment Jackson Walker received at mediation or as a result of the Plan. First, Jackson Walker participated in fraudulently giving favorable treatment to Freeman by advocating Jones' plan to install Freeman as Wind Down Trustee. In return for this favor, Jackson Walker received favorable treatment in the form of Jones' orders in other cases authorizing debtors to employ Jackson Walker as local counsel and orders awarding Jackson Walker fees in other cases. Plaintiffs adequately pleaded facts implicating Jackson Walker and the other Defendants in the predicate act of bankruptcy fraud.

---

[106] *Id.* ¶ 101.
[107] Notably, Jackson Walker does not challenge Plaintiffs' allegations under § 152(2) (knowingly or fraudulently making a false oath or account in or in relation to any case under title 11) or § 152(3) (knowingly or fraudulently making a false declaration, certificate, verification, or statement under penalty of perjury in or in relation to any case under title 11).
[108] Motion ¶ 95.

89.     Lastly, with regard to Plaintiffs obstruction of justice allegations, 18 U.S.C. § 1503(a) prohibits any person from influencing, obstructing, impeding, or intimidating any officer of a federal court in the discharge of his duty. Plaintiffs set forth how Jackson Walker and the other Defendants did just that. While it may be true that, lacking discovery at this early state of proceedings, Plaintiffs cannot speak to the details of specific communications between Jackosn Walker and Jones, Plaintiffs can (and do) allege specific patterns of behavior suggesting a scheme and intent by Jackson Walker and the other Defendants to influence Jones as a judicial mediator through the hiring and use of his live-in girlfriend as co-counsel and subsequently as trustee, as well as using Jones' claimed influence with the bankruptcy judge in GWG to effectuate the irresponsible transformation of the GWG proceeding into a liquidation.[109] Conveniently, after Freeman joined Jackson Walker in 2018, the firm skyrocketed to prominence as a favored local debtor counsel in Houston. Further, by enacting Jones' recommendation to have Freeman appointed as the trustee of the GWG Wind Down Trust, Jackson Walker sought to ensure a continuing source of fees for the Jones-Freeman household despite her nominal departure from the firm in November 2022. The scheme to influence Jones as a judge and as a judicial mediator worked to the extent Jones advocated for the transition of the GWG bankruptcy into a liquidation, as well as provided favorable rulings to Jackson Walker in the numerous other cases that were pending before him as judge. These facts sufficiently state a plausible claim that Jackson Walker concealed and leveraged the Jones-Freeman relationship to influence bankruptcy proceedings both in Jones' court and other cases where he was injected at their request, and sufficient to allege a predicate act of obstruction of justice to defeat the motions to dismiss.

---

[109] Complaint ¶ 101.

## IX.    Plaintiffs' State Law Claims are Not Barred by the Attorney Immunity Defense or Judicial Proceedings Privilege.

90.    Texas' attorney immunity defense provides that a lawyer is immune from prosecution by a non-client for conduct committed in the course of representing the lawyer's client. *Taylor v. Tolbert*, 644 S.W.3d 637, 642 (Tex. 2022). Attorney immunity exists to encourage aggressive representation and advocacy by attorneys that might be hindered if attorneys feared being subjected to lawsuits by third parties. *Cantey Hanger, LLP, v. Byrd*, 467 S.W.3d 477, 481 (Tex. 2015). It is not, however, unlimited. Immunity only attaches to "the kind of conduct" attorneys engage in when discharging their professional duties; therefore if an attorney engages in conduct that is not "lawyerly work" or is "entirely foreign to the duties of lawyer" (read: fraud) or falls outside the scope of client representation, the defense is inapplicable. *Taylor*, 655 S.W.3d at 646; *Alpert v. Crain, Caton & James, P.C.*, 178 S.W.3d 398, 405 (Tex.App.—Houston [1st Dist.] 2015, pet. denied). Jackson Walker bears the burden of proving that its actions were the type of conduct involving a "unique lawyerly capacity" and calling upon the attorney's "skills as an attorney." *Taylor*, 655, S.W.3d at 645-46 (movant bears the burden of conclusively proving affirmative defense of attorney immunity applies). No such showing has been made here, and the well-pleaded facts suggest quite the opposite.

91.    Jackson Walker misconstrues the conduct at issue as making court filings, appearing at hearings, and conducting bankruptcy court "business as usual." These are not the facts giving rise to Plaintiffs' claims. Instead, Plaintiffs' claims arise from the scheme to leverage their partner's romantic relationship with a federal judge to obtain employment opportunities, increased fees, and professional standing without the additional scrutiny appropriate to whether Jackson Walker or Jones should have been disqualified or conflicted and whether their proposed plans and bankruptcy strategies should have been approved. These are not acts

of lawyerly advocacy. "An attorney is not immune from suit for participating in criminal or 'independently fraudulent activities' that fall outside the scope of the attorney's representation of a client." *Bethel v. Quilling, Selander, Lownds, Winslett & Moser, P.C.*, 595 S.W.3d 651, 657 (Tex. 2020). Even Defendants' scheme to conceal the relationship in court filings is not uniquely lawyerly as disclosure of conflicts is something required of all participants in a bankruptcy proceeding. *See e.g.,* 11 U.S.C.§§ 101(14), 327; Fed. R. Bankr. P. 2014(a) (imposing disclosure requirements on "attorneys, accountants, appraisers, auctioneers, agents or other professionals"). Attorney immunity does not attach to the administrative act of identifying one's connections with other participants in a bankruptcy case because doing so is not an act of legal advocacy and does not require any particular "lawyerly" skill. Because Jackson Walker's misrepresentation and concealment of the Jones-Freeman relationship was (1) outside the scope of the legal representation it provided to GWG and (2) not a lawyerly act in that it was required of lawyers and non-lawyers alike, attorney immunity should not apply to bar Plaintiffs' claims.

92.     Further, the attorney immunity defense can only be asserted against non-clients. Jackson Walker's argument wholly ignores Plaintiffs' intent to pursue derivative standing and assert claims against Jackson Walker and other Defendants on behalf of Jackson Walker's former client, the GWG estate.

93.     Nor does Jackson Walker gain any protection from their distorted and offensive interpretation of the judicial proceedings privilege. The policy behind this privilege is to protect the integrity of the adversarial litigation process and ensure that a court or jury is able to get the information it needs without witnesses and litigants fearing retaliatory suits for defamation. *James v. Brown*, 637 S.W.2d 914, 916 (Tex. 1982). Consistent with that purpose,

although using broad language, Texas courts generally discuss and apply the privilege in relation to defamatory statements. The Texas Supreme Court has declined to extend the privilege beyond libel and slander. *Id.* at 918; *Bird v. W.C.W.*, 868 S.W.2d 767, 771 (Tex. 1994).

94.     Jackson Walker's false representations of disinterestedness are not defamatory statements. The mere fact that wrongful acts and omissions Jackson Walker made elsewhere were also made in a court filing should not immunize them from liability. Ultimately, while an in-court statement may not form the basis of a defamation action, "the unavailability of a defamation action does not preclude a plaintiff from pursuing other remedies at law." *James*, at 917-18.

## X.     Plaintiffs Adequately Alleged Reliance and Harm.

95.     "A plaintiff establishes reliance by showing the defendants acts and representations induced him to either act or refrain from acting, to his detriment." *Worldwide Asset Purchasing, L.L.C., v. Rent-A-Center E., Inc.*, 290 S.W.3d 554, 566 (Tex. App.—Dallas 2009, no pet.). Here, Plaintiffs allege they relied on the misrepresentation of Jackson Walker (and other Defendants) that there were no conflicts or undisclosed information bearing on the fair and impartial handling of the bankruptcy proceedings.[110] In reliance on those misrepresentations and/or omissions, Plaintiffs did not challenge: (1) the appointment of Jackson Walker (and later the Law Office of Liz Freeman) as debtor's counsel; (2) Jones' appointment as mediator; (3) Freeman's appointment as trustee of the Wind Down Trust; or (4) irresponsible actions taken by Freeman in her disposal of the sizeable trust assets. Nor did Plaintiffs challenge the fees paid from the bankruptcy estate to the various Defendants as being an inappropriate

---

[110] Complaint ¶¶ 223, 237.

product of an undisclosed relationship between one of debtor's attorneys, and subsequent trustee, and a bankruptcy judge. These acts of reliance impacted Plaintiffs, as well as the debtor estate, which Plaintiffs seek to represent derivatively, and are sufficient to support Plaintiffs' direct and derivative claims. Plaintiffs were justified in expecting Jackson Walker to tell the truth about and disclose conflicts of interest. Indeed, Jackson Walker's misrepresentations about the existence of the Jones-Freeman relationship were made for the purpose of inducing Plaintiffs and others not to object to Jackson Walker's and Freeman's representation, not to object to Jones' appointment as mediator or Freeman's appointment as trustee, and not to challenge the fees awarded to Defendants or the actions taken by Freeman in liquidating the Wind Down Trust's assets.

## XI.    Plaintiffs adequately alleged the existence of a conspiracy.

96.    Plaintiffs have properly alleged the elements of both RICO and common law civil conspiracy. Beyond a vague general complaint about Plaintiffs' pleadings, Jackson Walker's argument centers on the premise that Plaintiffs have failed to allege an agreement between Defendants to further the aims of the Enterprise and/or conspiracy is simply untrue. Plaintiffs have plainly alleged that Defendants, including Jackson Walker, agreed to exploit the Jones-Freeman relationship while concealing the relationship from others:

> Defendants had a meeting of the minds on the object of the conspiracy— collecting millions in attorneys' fees and securing lucrative appointments; and on the course of action—failing to disclose the Jones-Freeman intimate relationship and affirmatively representing disinterestedness.[111]

97.    Moreover, Plaintiffs have alleged ample facts showing or allowing for the reasonable inference that Jackson Walker agreed to participate in a fraudulent scheme to leverage the concealed relationship for financial and reputational benefits. Not the least of those facts is

---

[111] *Id.* ¶ 286.

the allegation that Jackson Walker acknowledges it was informed of the relationship in March 2021—and again in March 2022 (though Plaintiffs contend it was known to Jackson Walker earlier).[112] Yet, Jackson Walker's argument requires the Court to believe that they (without discussing disclosure with its partner Freeman or Jones) independently made the wrong decision that it should not reveal an intimate relationship between one of its partners and the federal judge she appeared before and advocated to serve as mediator. To the contrary, Jackson Walker, their ethics counsel, Freeman, her attorney, Jones, and Jackson Walker partner Matthew Cavenaugh had extensive conversations related to the disclosures that none of them ever made.[113] Moreso, Jackson Walker and Freeman contractually bound themselves and each other not to disclose the relationship and how it lead to her nominal departure from the firm, though not from continuing to represent Jackson Walker's clients.[114] In the context of a motion to dismiss, where all reasonable inferences must be indulged in Plaintiffs' favor, the most plausible explanation for why these sophisticated and legally knowledgeable defendants would arrive at the same (wrong) conclusion to not disclose the Jones-Freeman relationship is that they agreed amongst themselves not to do so.

98.     Ultimately, questions regarding the extent and timing of Jackson Walker's knowledge, its motives, and its agreements are uniquely within Jackson Walker's control and will be a subject of discovery. At this point, it is sufficient that Plaintiffs have alleged Jackson Walker's agreement to the conspiracy and alleged facts from which it can be inferred that Jackson Walker agreed with the other Defendants to conceal and benefit from the Jones-Freeman relationship.

---

[112] *Id.* ¶¶ 10, 53, 56.
[113] *Id.* ¶¶ 63-67.
[114] *Id.* ¶ 11.

99. In what appears to be an afterthought, Jackson Walker argues that Plaintiffs' conspiracy claims fail as a result of deficient pleadings for the underlying torts of breach of fiduciary duty. As set forth in Section XII, infra, and Plaintiffs' response to Freeman's Amended Motion to Dismiss, incorporated here by reference, Plaintiffs adequately pleaded facts to support claims for the underlying torts of breach of fiduciary duty, aiding and abetting breach of fiduciary duty, and common law fraud.

### XII. Jackson Walker Owed Fiduciary Duties to the GWG Estate, which Plaintiffs Seek to Represent for Purposes of Pursing Claims against Jackson Walker.

100. Jackson Walker acknowledges that it served as GWG's lawyer.[115] It's only response to Plaintiffs' allegations of breach of fiduciary duty is that it only owed such a duty to the GWG estate—its client. What Jackson Walker's arguments ignore is that Plaintiffs seek to represent the GWG estate derivatively.[116] If this Court grants Plaintiffs request to pursue the claims that the current Litigating Trustee has all but ignored—likely resulting from his obligations to confer with Freeman as the trustee of the Wind Down Trust—then Jackson Walker's arguments with regard to breach of fiduciary duty are inapplicable.

101. With regard to Plaintiffs' allegations of aiding and abetting a breach of fiduciary duty, Jackson Walker makes a vague argument that Plaintiffs' complaint has an inability to establish the underlying breach of claim as a matter of law but fails to explain why. Plaintiffs alleged that, as trustee of the Wind Down Trust, Freeman owed fiduciary duties directly to Plaintiffs as beneficiaries of the Wind Down Trust and that, through her improper attainment of that position, as well as her reckless and intentionally wasteful liquidation of GWG's assets,

---

[115] Motion ¶ 114.
[116] Complaint ¶¶ 133-149

she breached those duties. Plaintiffs pleaded throughout the Complaint the numerous ways in which Jackson Walker aided Freeman in that course of conduct.

**XIII.   Plaintiffs Adequately Pleaded Jackson Walker was Unjustly Enriched.**

102.   Jackson Walker does not challenge the adequacy of Plaintiffs' pleadings with regard to its receipt of benefits (e.g., appointments, fees, and status) or its use of fraud and undue advantages (concealing the romantic relationship between one of its partners and the mediator who was a sitting bankruptcy judge). Instead, the firm contends Plaintiffs' claims of unjust enrichment should be dismissed because, in its opinion, Plaintiffs are no worse off than if Jackson Walker had not been unjustly enriched, or would not be improved by the disgorgement of any or all of the fees Jackson Walker collected. Jackson Walker's subjective and disputed view of the harm it caused to Plaintiffs or the value of its own work are not grounds for dismissal on the pleadings.

103.   The amount of profits attributable to Jackson Walker's misconduct is for the factfinder to decide. Whether Jackson Walker would have been hired without the Jones-Freeman connection and whether they would have been awarded the same amount of fees are likewise issues for a jury to decide. But, it is at least plausible that Jackson Walker profited unduly by concealing and capitalizing on the Jones-Freeman relationship. Accordingly, Jackson Walker's motion to dismiss Plaintiffs' unjust enrichment claim should be denied.

**XIV.   Plaintiffs adequately pleaded tort claims to which *respondeat superior* liability may attach.**

104.   Jackson Walker contends that Plaintiffs' respondeat superior theory is dependent on the existence of a tort. Because Plaintiffs have adequately stated tort claims against Jackson Walker and the other Defendants, Plaintiffs' claim for attribution of liability to Jackson Walker under a theory of respondeat superior also survive.

**XV.    Plaintiffs' Class Allegations Should Not be Stricken under Rule 12(f).**

105.    "Both because striking a portion of a pleading is a drastic remedy, and because it often is sought by the movant simply as a dilatory tactic, motions under Rule 12(f) are viewed with disfavor and are infrequently granted." *FDIC v. Niblo*, 821 F. Supp. 441, 449 (N.D. Tex. 1993). Jackson Walker puts the cart ahead of the horse in its challenge to Plaintiffs' class allegations. Plaintiffs have not yet moved for certification. Tellingly, Jackson Walker's own authority recognizes a Rule 12(f) motion to strike is generally not the appropriate mechanism for this type of challenge. *See Delarue v. State Farm Lloyds*, 2010 U.S. Dist. LEXIS 151646, *5 (E.D. Tex. Mar. 10, 2010) (denying motion to strike as premature and noting "motions to strike are often denied early in the litigation as premature, and favoring discovery before striking class action allegations"); *see also Thorpe v. Abbott Labs., Inc.* 534 F. Supp. 2d 1120 (N.D. Cal. 2008) ("motions to strike class allegations are disfavored because a motion for class certification is a more appropriate vehicle for the arguments"); *Pinero v. Jackson Hewitt Tax Service, Inc.*, 638 F. Supp. 2d 632, 641 (E.D. La. 2009) (court found that motion to strike class action allegations is premature because defendants had not answered complaint and discovery had been stayed: "the [c]ourt simply does not have enough evidence to ascertain whether plaintiff's class claims are appropriate"); *Hibbs-Rines v. Seagate Technologies, LLC*, No. 08-05430, 2009 U.S. Dist. LEXIS 19283, 2009 WL 513496 (N.D. Cal. March 2, 2009) (citing other cases for proposition that motions to strike class action allegations are disfavored and rare before commencing discovery). As in Delarue, the motion to strike is premature and should be denied because "the Defendant here has not answered, discovery has not commenced, and no motion for class certification has been filed. The Plaintiff has also not had an opportunity to amend her

pleadings, … and [n]o scheduling order is even on file[.]" *Delarue*, 2010 U.S. Dist. LEXIS 151646, *12.

## A. The class members have Article III standing.

106.    Plaintiffs allege a class with Article III standing. Jackson Walker mistakenly believes that all claims and damages belong to the GWG estate, and not the bondholder/Wind Down Trust interest holder class articulated. In fact, everyone in the class has sustained direct injuries from Jackson Walker's actions. Plaintiffs allege direct harm from Jackson Walker's misconduct in their aiding and abetting and civil conspiracy allegations, in which the firm assisted Freeman in her breach of fiduciary duty owed directly to them.[117] Plaintiffs also pleaded that Jackson Walker was part of a conspiracy, both under RICO and common-law civil conspiracy, in which Freeman wasted and misused assets to the detriment of the Wind Down Trust interest holders.[118]

107.    Jackson Walker assumes that since the bondholders were not clients of the firm, they "did not rely on or were not exposed to any alleged misrepresentations by Jackson Walker regarding the Jones-Freeman relationship."[119] That is false. Plaintiffs allege they relied on Jackson Walker's affirmatively representation in its supplemental declaration of disinterestedness to the Bankruptcy Court and all interested parties that it had no conflict with bankruptcy judges in the Southern District.[120] Plaintiffs also alleged they relied on Jackson Walker's motion to appoint Jones as mediator as representing the absence of any disqualifying conflict with the mediator.[121] And they relied on Jackson Walker's filing of the bankruptcy

---

[117] Complaint ¶¶ 140, 255–59.
[118] *Id.* ¶¶ 214, 282–91.
[119] *Id.* ¶ 124.
[120] *Id.* ¶¶ 220–23.
[121] *Id.* ¶¶ 220–23.

plan and applications for attorneys' fees as filed in good faith, not procured through fraud and entered without a conflict between the mediator and its key restructuring partner.[122]

108.    Plaintiffs adequately alleged all class members have Article III standing. Jackson Walker's motion to strike is meritless, and in any event, premature.

**B.  This Court should not strike the complaint because Jackson Walker believes individual questions will predominate.**

109.    Jackson Walker's Rule 23(b)(3) challenge, as included in a Rule 12(f) motion to strike, is borderline frivolous. The motion does not discuss or even cite the paragraph where Plaintiffs articulated how at least seven common issues will predominate over any questions affecting individual class members, with Plaintiffs articulating at least seven common issues.[123] In fact, Jackson Walker's motion to strike Plaintiffs' Complaint on this basis does not cite the Complaint at all.

110.    Likewise, it fails to cite a single case where a court struck a class complaint under Rule 12(f) based on a defendant's argument that individualized issues will predominate. It is far too premature for the Court to resolve this issue.

**XVI.  Plaintiffs Request Leave to Amend their Complaint Prior to Dismissal.**

111.    Should this Court find the Complaint deficient in any regard, Plaintiffs respectfully requests leave to amend or supplement his Complaint. "The court should freely give a complainant … leave to amend defective allegations in a pleading. … Thus, the appropriate remedy when granting a motion based on nonconforming or deficient pleadings is to grant the complainant time within which to amend the complaint." *McClellon v. Lone Star Gas Co.*,

---

[122] *Id.* ¶¶ 220–23.
[123] *Id.* ¶ 156.

66 F.3d 98, 103 (5th Cir. 1995). Granting Plaintiffs leave to amend their Complaint would not prejudice Defendants, who are already on notice of the claims.

**CONCLUSION**

112. For the foregoing reasons, Plaintiffs respectfully request that this Court deny Jackson Walker's Motion to Dismiss. To the extent this Court is inclined to dismiss any claim based on a determination that it is derivative, Plaintiffs respectfully request that the Court do so without prejudice so that he may move for special limited appointment and/or for derivative standing. Plaintiffs request such other and further relief to which they may be entitled at law or in equity.

Dated: October 2, 2025

Respectfully submitted,

By:  /s/ Mikell A. West
Mikell A. West
Texas State Bar No. 24070832
S.D. Tex. Bar No. 1563058
Robert W. Clore
Texas State Bar No. 24012426
S.D. Tex. Bar No. 2032287
BANDAS LAW FIRM, P.C.
555 N. Carancahua Street, Suite 1200
Corpus Christi, Texas 78401
Telephone: (361) 698-5200
Facsimile: (361) 698-5222
mwest@bandaslawfirm.com
rclore@bandaslawfirm.com

**Certificate of Service**

I hereby certify that on October 2, 2025, I electronically filed the foregoing document with the Clerk of the Court using the CM/ECF system, which will send notification of such filing via electronic mail to all counsel of record.

*/s/ Mikell A. West*