**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

GARY PETERSON, CHRIS NAKASHIMA,
JOHN ENGLISH, JAQUETTA ENGLISH,
LT-1 EXCHANGE TRUST, LT-2
EXCHANGE TRUST, LT-3 EXCHANGE
TRUST, LT-4 EXCHANGE TRUST, LT-5
EXCHANGE TRUST, LT-6 EXCHANGE
TRUST, LT-7 EXCHANGE TRUST, LT-8
EXCHANGE TRUST, LT-9 EXCHANGE
TRUST, LT-12 EXCHANGE TRUST, LT-
14 EXCHANGE TRUST, LT-15
EXCHANGE TRUST, LT-17 EXCHANGE
TRUST, LT-18 EXCHANGE TRUST, LT-
19 EXCHANGE TRUST, LT-20
EXCHANGE TRUST, ON THEIR OWN
BEHALF AND ON BEHALF OF ALL
OTHERS SIMILARLY SITUATED,

          PLAINTIFFS,

v.

DAVID R. JONES, ELIZABETH CAROL
FREEMAN, THE LAW OFFICE OF LIZ
FREEMAN, PLLC, JACKSON WALKER,
LLP, AND PORTER HEDGES, LLP,

          DEFENDANTS.

CIVIL ACTION No. 4:25-CV-02761

JURY TRIAL DEMANDED

**PLAINTIFFS' RESPONSE TO DEFENDANT
DAVID R. JONES' MOTION TO DISMISS**

# TABLE OF CONTENTS

Introduction ....................................................................................................... 1

Statement of Facts Relevant to Claims Against Jones ....................................... 1

    A.   Jones' Relationship with Elizabeth Freeman, a Partner at Jackson Walker, and Plan to Transform the Southern District of Texas into a Center for Bankruptcy Litigation. .................................................................................................2

    B.   GWG Files for Bankruptcy in the Southern District of Texas. ............................ 6

    C.   The Illegal Conspiracy Dismantles GWG, Enriching All Involved Professionals at the Expense of GWG, its Creditors, and Equity Holders. ....................................... 7

    D.   The Freeman-Jones Intimate Relationship Is Made Public. ............................... 10

    E.   The Scope of the Conspiracy is Broad and Encompasses Non-Judicial Acts. ...... 12

Legal Standard .................................................................................................. 13

Argument .......................................................................................................... 14

    I.   Jones Is Not Entitled to Judicial Immunity for Non-Judicial Acts. ....................... 14

        A.   Disclosure of interests and conflicts in a bankruptcy proceeding, including mediation, is an administrative act, not a judicial act. .................................... 15

        B.   Jones Had No Discretion on the Disqualification Issue, an Administrative/ Ministerial Act to Which Judicial Immunity Does Not Apply ........................ 17

    II.   Jones Is Not Entitled to Judicial Immunity for Actions Taken in the Absence of Jurisdiction. ..................................................................................................... 23

    III.   Even if it Applied, the Judge-Made Doctrine of Judicial Immunity is Superseded by the Constitutional Requirements of Due Process. ........................................ 26

    IV.   Plaintiffs Have Standing. .................................................................................. 32

    V.   Plaintiffs Alleged Causation. ............................................................................ 33

    VI.   Alternative Motion for Leave to Amend. ........................................................... 35

Conclusion ........................................................................................................ 35

**<u>INTRODUCTION</u>**

In his Motion to Dismiss, Jones does not deny that he engaged in the corrupt pattern of conduct described in the Complaint—conduct which fatally undermined the very core of the integrity of the judicial process. Indeed, despite years of obfuscation and cover-up, those facts are now well established. Thus, Jones seeks to take refuge behind the doctrine of "judicial immunity," arguing only that neither exception to judicial immunity applies to the facts of this case, as articulated in the Complaint.

His arguments are misplaced. As Jones concedes, there is no judicial immunity for conduct committed outside of the judicial function or where that conduct was committed without jurisdiction to act. In considerable detail, the Complaint alleges that Jones committed acts and omissions that statutorily stripped him of any authority to continue to serve as mediator, acts and omissions falling well outside any reasonable definition of a "judicial act." Jones' bald assertion that "Plaintiffs fail to allege any act atypical of mediation, or performed outside the mediation,"[1] is both wrong and offensive. If Jones' conduct here was "typical," the entire federal judicial system would be fundamentally corrupted to the point of collapse. Moreover, Jones' conduct violated the Due Process Clause of the Fifth Amendment, vitiating the judicial immunity doctrine and requiring, as a matter of constitutional right, the remedy of damages against Jones to vindicate those rights. The Complaint is more than sufficient to plausibly allege facts that overcome any assertion of judicial immunity.

**<u>STATEMENT OF FACTS RELEVANT TO CLAIMS AGAINST JONES</u>**

1.      Plaintiffs' lawsuit is compelled by perhaps the most significant bankruptcy scandal in U.S. history, with the Fifth Circuit having already found probable cause that Jones

---

[1] Motion to Dismiss ("MTD"), Doc. 14, at 13, arguing a lack of causation.

committed judicial misconduct. For years, Jones orchestrated an audacious scheme where he sought to prop up the bankruptcy courts of the Southern District of Texas and then personally enrich himself by using his authority and the manufactured prestige of the Southern District of Texas to steer lucrative appointments to his secretive, live-in girlfriend Freeman, and approve millions of dollars in attorneys' fees to her and her various firms. In this years-long scheme spanning multiple mega-bankruptcies, Freeman and Jackson Walker would represent parties, appear, and argue before Jones. Despite knowledge that this conduct violated numerous ethical rules, procedural rules and laws, and that Jones was statutorily disqualified from acting as mediator, Jones, Freeman, Jackson Walker, The Law Office of Liz Freeman, and Porter Hedges each chose to remain silent.

**A. Jones' Relationship with Elizabeth Freeman, a Partner at Jackson Walker, and Plan to Transform the Southern District of Texas into a Center for Bankruptcy Litigation.**

2.      Prior to Jones' appointment as a bankruptcy judge in 2011, he was a partner with the law firm Porter Hedges where he worked with associate Elizabeth Freeman.[2] It was during Jones' time at Porter Hedges that his intimate, romantic relationship with Freeman began.[3]

3.      After Jones was appointed to the bankruptcy bench, Freeman followed him working as a clerk.[4] Shortly after Jones began his judgeship, he and his wife divorced, his wife citing his infidelity with Freeman as a reason for their divorce.[5] During the time Freeman

---

[2] Complaint (Doc. 1), at ¶¶ 18, 40.

[3] *Id.* at ¶ 40.

[4] *Id.*

[5] *Id.*

served as Jones' clerk, the Jones-Freeman romantic, intimate relationship grew, with Freeman likely moving in with Jones between 2013 and 2014.[6]

4.      In 2015, Jones was appointed Chief Judge of the Bankruptcy Court for the Southern District of Texas.[7] Jones quickly transformed the Southern District of Texas into a nationwide destination for high-dollar complex Chapter 11 bankruptcies, directing all complex cases be assigned to either himself or his mentor and friend, Judge Marvin Isgur.[8]

5.      In 2016, Jones purchased a house in Coldspring, Texas, where Freeman had lived from 2007 until she relocated to Jones' residence.[9] In 2017, Jones and Freeman executed a survivorship agreement as co-owners of a million dollar-plus home in Houston.[10]

6.      Freeman clerked for Jones from 2011 until 2018.[11] After Freeman left her clerkship, she joined Jackson Walker's Houston office.[12] Upon her arrival, Jackson Walker began securing appointments in large Chapter 11 cases in Jones' Court, with Jackson Walker serving as "local counsel" for other firms, even though several of these other firms had Houston offices.[13] By 2019, a year after Ms. Freeman's arrival, Jackson Walker became "the leading counsel firm for corporate debtors filing for bankruptcy in Houston."[14] By 2022,

---

[6] *Id.* at ¶ 41.

[7] *Id.* at ¶ 37.

[8] *Id.*

[9] *Id.* at ¶ 42. Currently, Freeman's parents reside in the Coldspring home. *Id.* at ¶ 43.

[10] *Id.* at ¶ 43.

[11] *Id.*

[12] *Id.* at ¶ 44.

[13] *Id.* at ¶ 45. The firms included Mayer Brown, Kirkland & Ellis, and other large firms. *Id.* Wade Cooper, then managing partner at Jackson Walker, probably explained it best when he said that a primary reason Jackson Walker was retained as "local" counsel was "[Jackson Walker] know[s] a lot about local politics[.]" *Id.*, at ¶ 47.

[14] *Id.* at ¶ 46.

Jackson Walker was number one in the nation in local counsel appointments in large bankruptcies.[15]

7.      Publicly, Jackson Walker attributed their success to Freeman's former position as "permanent law clerk to the Chief Bankruptcy Judge for the U.S. Bankruptcy Court for the Southern District of Texas"[16] and the firm's knowledge of local "politics,"[17] but behind closed firm doors, they knew the truth—Jackson Walker secured these local counsel appointments due to the concealed intimate relationship between Jones and Freeman.[18]

8.      Jackson Walker first claimed it found out about the intimate, romantic relationship between Jones and Freeman in March of 2021.[19] According to Jackson Walker, it conducted an internal inquiry, retained ethics counsel, and instructed Freeman to stop working and billing on any case assigned to Jones.[20] However, text messages uncovered as a part of a proceeding initiated by the U.S. Trustee indicates that Jackson Walker knew about the Freeman Jones relationship long before March of 2021.[21]

9.      In March of 2021, the Freeman-Jones relationship was discussed at the highest levels of the Jackson Walker firm.[22] In 2021, Freeman and Jackson Walker did not publicly disclose the Freeman-Jones relationship as a part of any filing (declaration of disinterestedness) or as a part of the record in any proceeding.[23] From March 2021, the

---

[15] *Id.*

[16] *Id.* at ¶ 44.

[17] *Id.* at ¶ 46.

[18] *Id.* at ¶ 47.

[19] *Id.* at ¶ 53. In March 2021, the Freeman-Jones relationship was first questioned publicly with the filing of a recusal motion.

[20] *Id.* at ¶¶ 53, 55.

[21] *Id.* at ¶¶ 53-54.

[22] *Id.* at ¶¶ 58-60.

[23] *Id.* at ¶¶ 56, 62.

unlawful scheme continued, both Jackson Walker and Freeman on its behalf continuing to accept cases in Jones' Court and appearing before Jones, despite Jackson Walker's alleged instruction that Freeman was not to work or bill on matters in Jones.[24]

10.    The issue of the Freeman-Jones relationship resurfaced in early 2022 when the relationship was again reported to a Jackson Walker partner.[25]  This time, when confronted, Freeman, according to Jackson Walker, finally acknowledged internally the ongoing romance with Jones.[26]  By this point, Freeman had retained personal counsel, who worked with Jackson Walker, their ethics counsel, and an outside expert on an appropriate disclosure because all parties agreed keeping the situation a secret was wrong.[27]  Discussions surrounding disclosure of the sexual relationship again reached the highest levels of the firm with managing partner Wade Cooper initiating an email exchange discussing the potential impact of the disclosure on Jackson Walker's reputation in the legal community.[28]

11.    Concurrently, Jackson Walker also decided to meet with Jones concerning the disclosure.[29]  Jones, although knowing that disclosure was required but alarmed about the reputational impact he might suffer as a result of it, indicated that he was "unhappy" with Jackson Walker's proposal to disclose the Freeman-Jones relationship and Ms. Freeman's potential exit from the firm.[30]  According to Jackson Walker, Jones already had a counter-disclosure prepared for the meeting which sought to misrepresent further the Freeman-Jones

---

[24] *Id.* at ¶ 62.

[25] *Id.* at ¶ 63.

[26] *Id.*

[27] *Id.* at ¶ 63.

[28] *Id.* at ¶ 64.

[29] *Id.* at ¶ 65.

[30] *Id.*

relationship, characterizing the relationship as "close [and] personal" similar to Jones' and Judge Isgur's social relationships with other Jackson Walker attorneys.[31] Jones' prepared disclosure was not for himself, but for Jackson Walker.[32]

12. Even though Jackson Walker claims that it knew that complete disclosure was required, rather than facing public questions and Jones' ire, Jackson Walker, against the advice of counsel and experts, decided to continue with the secret, foregoing any disclosure whatsoever.[33] Instead of disclosure, Jackson Walker and Freeman decided that Freeman would exit the firm, contractually binding themselves and each other to maintain secrecy.[34] Negotiations over Freeman's departure from Jackson Walker ensued.[35]

**B. GWG Files for Bankruptcy in the Southern District of Texas.**

13. GWG was organized in February 2006 and was formed for the purpose of buying and holding life settlements—life insurance policies purchased from named insureds and held until maturity.[36] Due to a series of unfortunate events perpetrated by an SEC agent exceeding his authority, GWG was forced into bankruptcy in April of 2022.[37] At the time of its bankruptcy filing, GWG's headquarters was in Dallas, Texas.[38]

14. GWG contacted the firm of Mayer Brown to handle its proposed bankruptcy restructuring.[39] Despite GWG's base in Dallas, Mayer Brown insisted to the GWG board

---

[31] *Id.*

[32] *Id.*

[33] *Id.* at ¶¶ 65-67.

[34] *Id.* at ¶ 67.

[35] *Id.*

[36] *Id.* at ¶ 68.

[37] *Id.* at ¶¶ 76 - 90, 93.

[38] *Id.* at ¶ 92.

[39] *Id.*

that they file for bankruptcy in the Southern District of Texas and hire Jackson Walker as "local counsel," even though Mayer Brown maintained offices in Houston.[40]

15.     Following Mayer Brown's recommendation, GWG filed for Chapter 11 bankruptcy protection in the Southern District of Texas on April 20, 2022.[41]  Mayer Brown applied to be debtor's counsel on May 11, 2022, and Jackson Walker applied to be local and (ironically) conflicts counsel on May 19, 2022.[42]  The GWG bankruptcy was assigned to Judge Isgur's court, not Judge Jones.[43]

16.     Freeman worked behind the scenes and appeared on behalf of the debtors on multiple occasions.[44]  Following the bankruptcy filing, GWG, together with Mayer Brown, prepared a reorganization plan to maximize the return and ensure the viability of GWG moving forward.[45]    The GWG management team proceeded with developing the restructuring plan, not knowing that GWG's fate was sealed by closed-door communications happening between and among Jones, Freeman, and Jackson Walker.

**C.  The Illegal Conspiracy Dismantles GWG, Enriching All Involved Professionals at the Expense of GWG, its Creditors, and Equity Holders.**

17.     Unfortunately for GWG, it filed for bankruptcy and retained Jackson Walker as local counsel in the middle of the internal disclosure dispute regarding the Jones-Freeman relationship.[46]    Unbeknownst to GWG, Freeman and Jackson Walker were negotiating

---

[40] *Id.*

[41] *Id.* at ¶ 93.

[42] *Id.* at ¶ 94.

[43] *Id.* at ¶ 93.

[44] *Id.* at ¶¶ 97. Porter Hedges, LLP represented other interested parties, the bond holders.  *Id.*, at ¶¶ 57, 99.

[45] *Id.* at ¶ 96.

[46] *Id.* at ¶¶ 63 – 67.

Freeman's separation from the firm that would keep the Freeman-Jones relationship a secret and, presumably, keep Jones "happy."[47]

18.     Additionally, despite (1) Freeman's failure to affirmatively disclose the relationship from the inception of her employment until 2022 when questioned,[48] (2) the acknowledged impropriety of the relationship and the potential embarrassment to the firm,[49] and (3) Freeman's failure to report the relationship when it was allegedly "rekindled" in 2022,[50] Jackson Walker agreed to obtain lucrative appointments for, co-counsel with, and employ Freeman on a contract basis as a part of Freeman's severance.[51]     Freeman's "departure" from the firm was largely in name only.

19.     On November 30, 2022, the day before Freeman's termination as a partner with the firm, Jackson Walker, with full knowledge of the Freeman-Jones ongoing romantic, intimate relationship, filed a motion to have Jones appointed mediator in the GWG bankruptcy.[52]     Freeman even appeared at the hearing on the mediation motion vocally advocating for Jones' appointment.[53]     Judge Isgur appointed Jones as mediator on January 5, 2023.[54]

20.     The mediation occurred on January 29, 2023.[55]     The parties showed up expecting a multi-day mediation with discussion of a reorganization plan and path for its

---

[47] *Id.*

[48] *Id.* at ¶ 53.

[49] *Id.* at ¶ 64.

[50] *Id.* at ¶ 63.

[51] *Id.* at ¶¶ 10-11, 95, 103.

[52] *Id.* at ¶ 98.

[53] *Id.*

[54] *Id.*

[55] *Id.* at ¶ 100.

implementation.[56]   But the mediation lasted less than four hours.[57]   No meaningful reorganization discussion occurred; Jones entered and simply told the parties that the company was liquidating.[58]   He followed up by threatening the participants that Judge Isgur was a good friend of his and if the parties objected, it would not matter—Judge Isgur would follow his (Jones') recommendation regardless of the parties' desired path forward.[59]   As a part of the Jones-directed Chapter 11 liquidation (there would be no Chapter 7 conversion), Freeman—Jones' live-in girlfriend of approximately 12 years—would be appointed Wind Down Trustee, awarding her a salary of $100,000 per month for the first six months and $50,000 per month thereafter until the bankruptcy concluded.[60]   As Jones predicted, his liquidation plan was approved by Judge Isgur.[61]

21.     At no time during or before the mediation did any of the Defendants disclose the Freeman-Jones relationship.[62]   In fact, the severance agreement crafted by the firm and Freeman contractually bound Jackson Walker and Freeman to continued secrecy.[63]

22.     As a result of Jones' liquidation plan, Freeman proceeded to haphazardly manage the Wind Down Trust assets, with the trust ultimately receiving pennies on the dollar due to the manner in which the liquidation occurred.[64]   Freeman, however, received her full

---

[56] *Id.*

[57] *Id.* at ¶ 101.

[58] *Id.*

[59] *Id.*

[60] *Id.* at ¶ 103.

[61] *Id.* at ¶ 104.

[62] *Id.* at ¶ 105.

[63] *Id.* at ¶ 95.

[64] *Id.* at ¶¶ 106-110.

fees for the matter—as the U.S. Trustee has not sought recovery of fees paid to her in this matter.[65]

**D. The Freeman-Jones Intimate Relationship Is Made Public.**

23.    Judge Jones presided over at least 26 cases in which he awarded Jackson Walker more than $12 million in attorneys' fees and expenses while Freeman was a partner at Jackson Walker and while Freeman and Jones were cohabitating.[66] This includes approximately $1 million in fees billed directly by Freeman herself.[67] Jones also served as mediator in cases in which Jackson Walker and Freeman served as local counsel, including this matter.[68] None of the Defendants ever disclosed the Jones-Freeman relationship in any of these cases.

24.    Under the rules governing bankruptcy proceedings, for a firm to be employed by a debtor or debtor-in-possession, it must show that it is disinterested and must disclose all connections. 11 U.S.C. §§ 101(14), 327; Fed. R. Bankr. P. 2014 (requiring a verified statement of the person to be employed setting forth the person's connections with the debtor, creditor, or any other party of interest).[69]

25.    In October 2023, Jones was forced to finally admit both his intimate relationship with Freeman and that he had shared a home with her for years.[70] Notably, Jones barely references Freeman in his Motion, despite this relationship being the cornerstone of the Enterprise and basis for this lawsuit.

---

[65] *Id.* at p. 9, n. 20.

[66] *Id.* at ¶ 49.

[67] *Id.*

[68] *Id.*

[69] *Id.* at ¶¶ 51, 55, 124, 262.

[70] *Id.* at ¶ 54.

26.    On October 13, 2023, Chief Judge Priscilla Richman of the Fifth Circuit entered a written order identifying a complaint against Judge Jones. Chief Judge Richman found "probable cause to believe that misconduct by Judge Jones has occurred."[71] Further, Chief Judge Richman observed that "Judge Jones is in an intimate relationship with Elizabeth Freeman. It appears that they have cohabited (living in the same house or home) since approximately 2017."[72] She further recognized that Judge Jones had awarded substantial attorneys' fees payable to Jackson Walker for services performed by Freeman, and, even in cases in which it does not appear Freeman provided legal services or advice, there is a reasonable probability that Elizabeth Freeman, as a partner in that firm, obtained a financial benefit from, or had a financial interest in, fees approved by Judge Jones.[73]

27.    In the immediate wake of the Fifth Circuit's findings and the launching of its investigation, Judge Jones submitted his resignation in October 2023.[74] Because the GWG bankruptcy matter remains open and the Court has yet to approve Jackson Walker's final fee application, the U.S. Trustee filed an opposition to the fee application.[75] The opposition seeks to deny Jackson Walker any further fees and seeks to recoup the fees already paid to Jackson Walker in the GWG bankruptcy.[76] The U.S. Trustee's opposition is limited to only the fees of Jackson Walker and does not seek return of fees paid to Freeman either through the Law Office of Liz Freeman or to her in her capacity as Wind Down Trustee.[77] Nor does the U.S.

---

[71] *Id.* at ¶ 114.

[72] *Id.* at ¶ 115.

[73] *Id.* at ¶¶ 50, 115.

[74] *Id.* at ¶ 117.

[75] *Id.* at ¶ 118.

[76] *Id.*

[77] *Id.*

Trustee's pursuit seek to redress the harms visited on Plaintiffs and other unwitting bankruptcy participants.

**E. The Scope of the Conspiracy is Broad and Encompasses Non-Judicial Acts.**

28.     The orchestrated plan spanned years and flowed across multiple cases.[78]  The conspiracy's purposes were (1) to increase the prestige and influence of each actor—for Jones, the increased influence and prestige of the bankruptcy courts in the Southern District of Texas; and for the individual practitioners, to increase the reputational standing of the individuals and firms involved—and (2) pecuniary gain—for Jones, through advancing Freeman's career and the pecuniary gain he would share as that happened; and for the individuals and firms, through increased reputation and business.[79]

29.     Many acts by the participants, including Jones, were non-judicial acts.[80]  The relationship itself was a non-judicial act, as was the agreement to keep the relationship a secret.[81]  Likewise for Jones orchestrating the scheme that he would either preside over or mediate mega-bankruptcies filed by Jackson Walker or where Jackson Walker served as "local counsel," while maintaining the intimate relationship with Freeman, which allowed him, Jackson Walker and Freeman to profit and cement their place as stalwarts in mega-bankruptcy practice.[82]  Jones also conferred with Freeman on how to manipulate the GWG bankruptcy while not having been assigned the case as presiding judge, arranging for Jackson Walker and Freeman to move for his appointment as mediator, which in turn would enable

---

[78] *Id.* at ¶ 49.

[79] *Id.* at ¶ 168.

[80] *Id.* at ¶ 102.

[81] *Id.*

[82] *Id.* at ¶¶ 102, 224.

him to orchestrate a plan that rewarded Freeman, and his himself indirectly, with exorbitant fees as Wind Down trustee.[83]   Jones conducted these proceedings under color of law but with no statutory authority to do so.  None of these were judicial acts.

30.     Plaintiffs filed this action on June 12, 2025.  On September 15, 2025, Jones filed his Motion to Dismiss under Fed. R. Civ. P. 12(b)(6), asserting judicial and quasi-judicial immunity.[84]

## LEGAL STANDARD

**31.**     A motion to dismiss pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure tests whether a complaint states a plausible claim for relief. *See Raj v. Louisiana State Univ.*, 714 F.3d 322, 329-30 (5th Cir. 2013). Construing the complaint liberally in favor of the plaintiffs, a motion to dismiss should be denied where the complaint contains enough facts to "state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal,* 556 U.S. 662, 678 (2009). A claim has facial plausibility when the factual content of the complaint allows the court to draw a reasonable inference that defendant is liable for the harm alleged. *Id.; Backe v. LeBlanc,* 691 F.3d 645, 648 (5th Cir. 2012). These standards are the same when a motion to dismiss is based on an immunity defense. When immunity is asserted, the question is whether the complaint pleads facts that, when taken as true, would overcome the movant's assertion of immunity. *Hinojosa v. Livingston,* 807 F.3d 657, 663 (5th Cir. 2015) (considering a motion to dismiss based on a qualified immunity defense). Because Plaintiffs' Complaint states a plausible factual basis for overcoming Jones' assertion of judicial immunity, the motion to dismiss should be denied.

---

[83] *Id.* at ¶ 283.

[84] Defendant David R. Jones' Motion to Dismiss Under Fed. R. Civ. P. 12(b)(6) (Doc. No. 14).

## ARGUMENT

### I.  Jones Is Not Entitled to Judicial Immunity for Non-Judicial Acts.

32.  A judge's immunity from civil liability only extends to acts that are judicial in nature. *Davis v. Tarrant County Tex.,* 565 F.3d 214, 221 (5th Cir. 2009)*, Mireles v. Waco,* 502 U.S. 9, 11 (1991).[85]

33.  A judicial act is defined by the function of the act, not by the office of the person who performed it. *See Forrester v. White,* 484 U.S. 219, 227-29 (1988); *see also Stump v. Sparkman*, 435 U.S. 349, 362 (1978) ("[b]ecause Judge Stump performed the type of *act normally performed only by judges…*") (emphasis added).  The Fifth Circuit has identified four, non-mandatory factors that may aid in determining whether a judge's conduct involved judicial acts:

> (1) whether the precise act complained of is a normal judicial function; (2) whether the acts occurred in the courtroom or appropriate adjunct spaces such as the judge's chambers; (3) whether the controversy centered around a case pending before the court; and (4) whether those acts arose directly out of a visit to the judge in his official capacity.

*Malina v. Gonzales*, 994 F.2d 1121, 1124 (5th Cir. 1993). Cases finding nonjudicial actions commonly involve either administrative acts or highly aberrational behavior. *E.g., Gregory v. Thompson,* 500 F.2d 59 (9th Cir. 1982). Here, much of Jones's conduct that forms the basis for Plaintiff's claims, including his essential role in the corrupt RICO enterprise, was non-judicial. At the heart of the RICO enterprise was the secret Freeman-Jones relationship which enabled Defendants to secure favorable rulings for their clients, boost their professional

---

[85] Plaintiffs agree that the Appointment Order specifies that, as the mediator, Jones "act[ed] in his official capacity as a United States Bankruptcy Judge and is entitled to all the privileges and immunities of a United States Bankruptcy Judge." *See* Motion, at ¶ 15; Doc. No. 1323 filed in *In re GWG Holdings, Inc.*, Ch. 11 Case No. 22-90032 (S.D. Tex. Apr. 20, 2022).

reputations, and collect millions of dollars in fees. Yet, there can be little debate that maintenance *and concealment* of an intimate relationship with a practicing attorney who appears regularly before the judge, is not a normal function of a United States Bankruptcy Judge, even when mediating a case. Plaintiffs' Complaint raises both administrative and highly aberrational acts by Jones that are outside of the range of judicial conduct shielded by judicial immunity. *See Brewer v. Blackwell*, 692 F.2d 387, 397 (5th Cir. 1982) (if the "acts involve both judicial and nonjudicial conduct, the unprotected behavior must be separated from the shielded and judges are liable for the acts that were not judicial);*Crowe v. Lucas*, 595 F.2d 985, 990 (5th Cir.1979). *See also Lopez v. Vanderwater*, 620 F.2d 1229, 1235 (7th Cir.), *cert. denied*, 449 U.S. 1028, 101 S. Ct. 601, 66 L.Ed.2d 491 (1980); *Harris v. Harvey*, 605 F.2d 330, 336 (7th Cir.1979), *cert. denied*, 445 U.S. 938, 100 S. Ct. 1331, 63 L.Ed.2d 772 (1980); *Krueger v. Miller*, 489 F. Supp. 321 (E.D.Tenn.1978), *aff'd mem.*, 617 F.2d 603 (6th Cir.1980).

A. **Disclosure of interests and conflicts in a bankruptcy proceeding, including mediation, is an administrative act, not a judicial act.**

34.     Administrative-type acts performed by a judge are not regarded as judicial in nature. In other words, when a judge's actions do not involve the "performance of the function of resolving disputes between parties, or of authoritatively adjudicating private rights," they are not protected by judicial immunity. *Forrester v. White*, 484 U.S. 219, 227 L.Ed.2d 555, 108 S. Ct. 538 (1988); *Atkinson-Baker & Assoc. v. Kolts,* 7 F.3d 1452, 1454 (9th Cir. 1993). This is so, even if the administrative act might be essential to the functioning of a court. Absolute judicial immunity does not attach to administrative acts performed by judges because such acts do not threaten judicial independence in the adjudicative process.

35.     An early example of an administrative act determined to be non-judicial involved a judge charged with racial discrimination in the selection of jurors. *Ex parte Virgina,*

100 U.S. 339, 348 (1880).[86]  The duty of selecting the jurors, the court pointed out, is a duty that may be performed by non-judicial personnel including county commissioners, supervisors and assessors. *Id.* When done by such individuals, jury selection can hardly be considered a judicial function; thus, the mere fact it is performed by a judge in one instance does not change its essential non-judicial character. *Id.*

36.     The same is true here. The duty to disclose conflicts is something required of *all* professionals in a bankruptcy proceeding. *See* 11 U.S.C. § 101(14), 327; Fed. R. Bankr. P. 2014.[87] Indeed, the duty to disclose interests and conflicts within a bankruptcy proceeding is imposed on litigants, lawyers, and providers of professional service, as well as the presiding judge. *E.g.* Rule 2014(a) (imposing disclosure requirements on "attorneys, accountants, appraisers, auctioneers, agents or other professionals").[88]

37.     The fact that disclosure of conflicts is required of non-judicial participants in a bankruptcy proceeding demonstrates conclusively that disclosure is an administrative act;

---

[86] Although *Ex parte Virginia* involved a criminal charge against a judge, the United States Supreme Court has noted that "the reach of the Court's analysis was not in any obvious way confined by that circumstance." *Forrester*, 484 U.S. at 228.

[87] Plaintiffs and Jones agree that the Court's Local Rules require the same disqualification standards for mediators as for judges. *See* L.R. 16.4.I (ADR "providers are subject to disqualification pursuant to standards consistent with those set forth in 28 U.S.C. § 455"); Motion, at ¶ 23 ("Local Rule 16.4.I. provides that ADR 'providers are subject to disqualification pursuant to standards consistent with those set forth in 28 U.S.C. § 455,' the same statute governing conflicts and recusal for judges."); Complaint, at ¶ 120 (mediators 'are subject to disqualification pursuant to standards consistent with those set forth in 28 U.S.C. § 455'").

[88] Mediators participating in cases before the District Courts of the Southern District of Texas, including its bankruptcy courts must also comply with the State Bar of Texas Alternative Dispute Resolution Section's Ethical Guidelines for Mediators (the "Mediator Guidelines"). L.R. 16.4.I(1). Compliance with these disclosure rules is required whether the mediator is a judge or not. *Id.* The Mediator Guidelines require that "[p]rior to commencing the mediation, the mediator should make full disclosure of any interest the mediator has in the subject matter of the dispute and any known relationships with the parties ***or their counsel*** that may affect or give the appearance of affecting the mediator's neutrality." Mediator Guidelines, Section 4 (emphasis added). Further, Comment (a) to Section 4 provides "[a] mediator should withdraw from am mediation if it is inappropriate to serve," and Comment (b) makes the disclosure obligation continuing by providing, "[i]f after commencement of the mediation the mediator discovers that such a relationship exists, the mediator should make full disclosure as soon as possible." Mediator Guidelines, Section 4, Comments (a) and (b).

rather than a judicial one. Texas courts have recognized the distinction between a judge's administrative and judicial actions in analogous circumstances.

38.     Here, the act of disclosing interests and conflicts that might influence a proceeding or give rise to an appearance of impropriety is an act performed by judges and non-judges alike. Such acts of disclosure, whether made by a judge or another non-judge participant, do not involve the "performance of the function of resolving disputes between parties, or of authoritatively adjudicating private rights"; thus, it should be viewed as an administrative act that does not implicate judicial immunity for judicial acts.

39.     The Fifth Circuit's four-factor test supports viewing conflict disclosure as a non-judicial act. As previously stated, because conflict disclosure is not a judicial function, the first factor weighs decisively against Jones' assertion of judicial immunity. Furthermore, while Jones's secret relationship and non-disclosures became relevant to Plaintiff because Plaintiff was involved in a case in which Jones was the mediator, Jones' acts of concealment were not limited to the mediation or case proceedings – Jones also failed to disclose the relationship to colleagues and to the media. Thus, Jones' non-disclosure conduct went beyond the mediation, the particular case at issue, or any visit to Jones in his official capacity. The second, third, and fourth factors favor a finding that Jones' acts were non-judicial and not subject to judicial immunity.

**B.     Jones Had No Discretion on the Disqualification Issue, an Administrative/ Ministerial Act to Which Judicial Immunity Does Not Apply.**

40.     Even if an act appears judicial, absolute immunity will not apply where the act is "ministerial." The key elements distinguishing a judicial act from a ministerial one are that a judicial act requires the exercise of discretion and must occur in the adjudication of controversies between the parties. *See Antoine v. Byers & Anderson, Inc.*, 508 U.S. 429, (1993)

(judicial immunity applies when "exercise[ing] a discretionary judgment"); *Supreme Court of Va. V. Consumers Union of U.S., Inc.*, 446 U.S. 719, 731 (1967) (judicial functions arise out of the adjudication of controversies); *Richardson v. Koshiba*, 693 F.2d 911, 914 (9th Cir. 1982) (acts not arising out from the adjudication of controversy is not a characteristic of the "judicial process that gave rise to the recognition of absolute immunity for judicial officers"); *Scott v. Dixon*, 720 F.2d 1542, 1546 (11th Cir. 1983), *cert. denied*, 469 U.S. 832 (1984) (purpose of judicial immunity is to protect the exercise of discretionary power); *Perkins v. U.S. Fidelity & Guaranty Co.*, 433 F.2d 1303, 1305 (5th Cir. 1970) ("[o]fficial action, the result of judgment or discretion, is a judicial act. The duty is ministerial, when the law, exacting its discharge, prescribes and defines the time, mode, and occasion of its performance with such certainty that nothing remains for judgment or discretion."); *Bates v. Kim*, 591 F. Supp. 3d 1355, 1367-68 (N.D. Ga. 2022) (for judicial immunity to apply, action must be discretionary and normally handled by a judge); *Cronovich v. Dunn*, 573 F. Supp. 1330, 1335 (E.D. Mich. 1983) (judicial act requires the exercise of discretion and a judicial proceeding).

41.     28 U.S.C. § 455 ("Section 455") governs disqualification for federal judges and extends to mediators as well. *See*, n. 86 *supra*. "[G]enerally, when an individual judge is disqualified from a particular case by reason of § 455, the disqualified judge simply steps aside and allows the normal administrative processes of the court to assign the case to another judge not disqualified." *United States v. Will*, 449 U.S. 200, 212 (1980).

42.     Section 455(a) requires that a judge "shall disqualify himself [or herself] in any proceeding in which his [or her] impartiality might reasonably be questioned." 28 U.S.C. § 455(a). "The provisions of 28 U.S.C. § 455(a) do not command automatic disqualification of a judge, to the contrary, it is the duty of the judge who is allegedly biased to pass on the

sufficiency of the allegations." *David v. City & County of Denver*, 847 F. Supp. 1094, 1095 (D. Colo. 1993) (citation omitted).

43.     In contrast to Section 455(a), the "per se" conditions of Section 455(b) are "mechanical" and impose "automatic" disqualification. *See Little Rock Sch. Dist. v. Arkansas State Bd. of Educ.*, 902 F.2d 1289, 1290 (8th Cir.), *supplemented*, 907 F.2d 76 (8th Cir. 1990) (disqualification under Section 455(b) "is governed by statute… [and] disqualification would be automatic"); *see also Exxon Mobil Corp. v. U.S.*, 110 Fed. Cl. 407, 411 (2013) (recusal under Section 455(a) "is committed to the Court's sound discretion" but "unlike the reasoned inquiry under § 455(a), the determination under § 455(b)(4) is mechanical"); *U.S. v. Singletary*, 196 Fed. App'x 819, 820 (11th Cir. 2006) (not designated for publication) ("[d]isqualification under § 455(b) is mandatory because 'the potential for conflicts of interest are readily apparent.'") (quoting *U.S. v. Patti*, 337 F.3d 1317, 1321 (11th Cir. 2003)); *In re U.S.*, 158 F.3d 26, 27 (1st Cir. 1998) (disqualification under Section 455(b) is mandatory); *Union Planters Bank v. L & J Dev. Co.*, 115 F.3d 378, 382 (6th Cir. 1997) (disqualification is mandatory under terms of Section 455(b)); *U.S. v. Gipson*, 835 F.2d 1323, 1325 (10th Cir.), *cert. denied* 486 U.S. 1044 (1988) (recusal mandatory under Section 455(b)); *Overseas Private Inv. Corp. v. Anaconda Corp.*, 418 F. Supp. 107, 111, n.6 (D.D.C. 1976) (disqualification mandatory under Section 455(b)); *In re Bellsouth Corp.*, 334 F.3d 941, 958 (11th Cir. 2003) (disqualification under Section 455(b) is a bright line); *Id.* at 969 (Tjoflat, dissenting) ("Congress enumerated the circumstances which it believed were likely to lead to actual bias on the part of the judge in section 455(b), and thus established a per se rule requiring automatic disqualification in any case in which any of the enumerated circumstances is present. *See Summers*, 119 F.3d at 920 ('§ 455(b) establishes a per se rule that lists certain circumstances requiring recusal.')").

44. This Court has previously noted the facts surrounding the Freeman-Jones relationship fit squarely into the mandatory disqualification provisions of Section 455(b). *See* Transcript of Order to Show Cause and Motion Proceedings Heard Before the Honorable Alia Moses Chief United States District Judge, *Bouchard v. Jones*, No. 4:24-CV-00693, at 208-213, 220-222, 229-232 (S.D. Tex. March 4, 2025). In fact, this Court has already found that the Freeman-Jones relationship violated Section 455(b). *See Van Deelen v. Jones*, No. 4:23-cv-03729, 2024 WL 3852349, at *16-17 (S.D. Tex. Aug. 16, 2024). This Court wrote:

> Jones also violated § 455(b), which requires disqualification when a judge's "spouse, or a person within the third degree of relationship to either of them ... is acting as a lawyer in the proceeding." *Id.* § 455(b)(5)(iii). Subsection (b) also requires disqualification where the judge "knows that he ... or his spouse ... has a financial interest in the subject matter in controversy." *Id.* § 455(b)(4). Although Jones and Freeman are unmarried, courts interpret § 455(b) to require disqualification whenever a conflict presents "the functional equivalent of a relationship that creates the objective appearance of a § 455(b) violation." *United States v. Rechnitz*, 75 F.4th 131, 145 (2d Cir. 2023). The disqualifying conflicts outlined in § 455(b) are non-waivable. *See* 28 U.S.C. § 455(e).

*Id.*

45. The following are undisputed and well-pled facts relevant to 455(b) contained in the Complaint:

- Jones and Freeman were involved in an intimate relationship starting as far back as 2011 through the present.

- Jones and Freeman lived together and shared a household likely starting in 2013 or 2014 but were without question from 2017.

- Jones and Freeman jointly participated in real estate transactions during their romantic relationship.

- Jones and Freeman, together with various law firms, in this case Jackson Walker and Porter Hedges, colluded and schemed to prop up the bankruptcy prestige of the Southern District of Texas, provide billings to Freeman and her law firms, enriching her and allowing her to share the funds with Jones.

- The scheme was devised outside the courtroom and spanned many cases across years.

- Secrecy of the Freeman-Jones relationship was the key factor in maintaining the scheme. Jones and Freeman knew about the relationship at all times. Jackson Walker knew about the relationship by March 2021 and likely much earlier. And, Porter Hedges knew about the relationship at all relevant times in the Complaint.

- The only way the scheme continued was with ongoing nondisclosure of the relationship.

46. These facts disqualified Jones per se under Section 455(b)(4), (5)(ii), and (5)(iii). Section 455(b)(4) disqualified Jones because Freeman, had a financial interest in the subject matter in controversy—namely her fee claims and her financial arrangement with Jackson Walker which ultimately led to her appointment as Wind Down Trustee and the payments associated therewith. Section 455(b)(5)(ii) automatically disqualified Jones because Freeman, the woman with whom he was romantically involved, was acting as an attorney for a party in the matter, even advocating that Jones be appointed mediator at the mediation hearing, and for Freeman appearing before Jones at the mediation. Further, Jones was automatically disqualified under Section 455(b)(5)(iii) because he knew that Freeman would have an interest that would be substantially impacted by the outcome of the proceeding in the form of fees. Jones entered into the mediation with the intent of securing a lucrative trustee appointment for Freeman that would net her—his cohabitant—more than a million dollars.

47.     As noted above, there is no "discretion" for disqualification under Section 455(b); it is immediate and automatic—that is to say, it is "ministerial."  Because disqualification under Section 455(b) involves no "discretion," judicial immunity will not shield Jones' acts in looting GWG for his and Freeman's personal gain. *Cf. Jones v. King*, 148 F.4th 296, 302 (5th Cir 2025) (discussing a judge qualifying a venire—where the judge hears statutory qualifications and exemptions from jurors, the acts are administrative because the judge exercised no judicial discretion, as a "prospective juror either satisfies the statutory criteria, or [s]he does not"; however; where the judge determines juror excuse, she exercised discretion because "[j]udges are 'not restricted to excusing prospective jurors for enumerated exemptions only.'")

48.     In addition to Section 455(b), Jones also violated the Mediator Guidelines, which will also fall outside the protection of judicial immunity.  The Mediator Guidelines, which undisputably applied to Jones, provide "***[p]rior to commencing the mediation***, the mediator should make full disclosure of any interest the mediator has in the subject matter of the dispute and any known relationships with the parties ***or their counsel*** that may affect or give the appearance of affecting the mediator's neutrality." Mediator Guidelines, Section 4. (emphasis added).  Pursuant to the Mediator Guidelines, before Jones took any action as mediator, he was required to disclose any relationship with counsel.  Again, this would qualify as a "ministerial" or "administrative" act—certainly it would not qualify as a judicial act as the Rule specifically requires disclosure prior to the commencement of the mediation.  In other words, the disclosure was an administrative or ministerial act that was to occur prior to Jones acting in his official capacity as the mediator between the parties.

## II. Jones Is Not Entitled to Judicial Immunity for Actions Taken in the Absence of Jurisdiction.

49.     "[A] judge is not immune for actions, though judicial in nature, taken in the complete absence of all jurisdiction." *Davis*, 565 F.3d at 214 (quoting *Mireles v. Waco*, 502 U.S. 9, 11 (1991)). As specified in the Complaint, "Jones acted in the absence of jurisdiction by presiding over [the] case when circumstances required his dismissal."

50.     In his Motion, Jones attempts a strawman attack to shift the focus of Plaintiffs' allegations against him to the office of the Bankruptcy Court in order to argue that the Bankruptcy Court has subject matter jurisdiction over bankruptcy cases, therefore anything he did related to any bankruptcy must have been cloaked generically with that court's jurisdiction. Once again, the focus cannot be so narrow.  The Complaint does not allege the Bankruptcy Court had no jurisdiction, and that is not the issue that determines the lack of judicial immunity.

51.     Instead, the determining issue is this: Jones had a mandatory, ministerial duty to recuse himself but did not.  This is so as a matter of both constitutional and statutory law. There is a "presumption of honesty and integrity in those serving as adjudicators." *Withrow v. Larkin,* 421 U.S. 35, 47 (1975). All judges take an oath to uphold the Constitution and apply the law impartially, and unless proven otherwise it is assumed that they live up to this promise. *See Republican Party of Minn. v. White,* 536 U.S. 765, 796 (2002) (Kennedy, J., concurring) ("We should not, even by inadvertence, 'impute to judges a lack of firmness, wisdom, or honor'" (quoting *Bridges v. California,* 314 U.S. 252, 273 (1941))).  But this default presumption is overcome where it is shown that the judge had a pecuniary interest in the outcome of the case.

52.     It is well established, as a matter of due process under the Fifth Amendment, that a judge may not preside over a case in which he has a "direct, personal, substantial, pecuniary interest." *Tumey v. Ohio,* 273 U.S. 510, 523 (1927). This principle is relatively straightforward, and largely tracks the longstanding common-law rule regarding judicial recusal. *See* Frank, Disqualification of Judges, 56 YALE L.J. 605, 609 (1947) ("The common law of disqualification ... was clear and simple: a judge was disqualified for direct pecuniary interest and for nothing else"). For example, a defendant's due process rights are violated when he is tried before a judge who is "paid for his service only when he convicts the defendant." *Tumey, supra,* at 531; *see also, Aetna Life Ins. Co. v. Lavoie,* 475 U.S. 813, 824 (1986) (recusal required when the judge's decision in a related case "had the clear and immediate effect of enhancing both the legal status and the settlement value of his own case"); *Connally v. Georgia,* 429 U.S. 245, 250 (1977) (*per curiam*).

53.     The governing statute provides that "[a]ny justice, judge, or magistrate [magistrate judge] of the United States shall disqualify himself in any proceeding in which his impartiality might reasonably be questioned." 28 U.S.C. § 455(a) (emphasis added).[89] The standard is objective and considers whether a reasonable person with knowledge of all the facts "would harbor doubts concerning the judge's impartiality." *Tejero v. Portfolio Recovery Assocs., L.L.C.*, 955 F.3d 453, 463 (5th Cir. 2020) (quoting *United States v. Jordan,* 49 F.3d 152, 155 (5th Cir. 1995). Here, it is beyond dispute that a reasonable person, with knowledge of the intimate, domestic relationship between Jones and Freeman would have concluded Jones' impartiality was in question. *See* Complaint Identified by the Chief Judge of the Fifth Circuit

---

[89] Additionally, Jones was automatically disqualified under 28 U.S.C. § 455(b). *See*, discussion, *supra*, at ¶¶ 42-48.

Court of Appeals Against United States Bankruptcy Judge David R. Jones, Southern District of Texas, Under the Judicial Improvement Act of 2002 (Oct. 13, 2023) (finding "probable cause to believe that misconduct by Judge Jones has occurred" and noting "[r]ecusal considerations applicable to a judge's spouse should also be considered with respect to a person other than a spouse with whom the judge maintains both a household and an intimate relationship"). In fact, since the disclosure of Jones' relationship with Freeman, many reasonable persons, including the United States Trustee's Office, have raised just that question.

54. When a judge fails to comply with the obligation to disqualify himself or herself, any further actions taken by the judge are taken without jurisdiction. *See U.S. v. Gipson,* 835 F.2d 1323, 1325 (10th Cir.)*, cert. denied* 486 U.S. 1044 (1988) ("§ 455(e) creates what is tantamount to a 'jurisdictional' limitation on the authority of a judge to participate in a given case" where a judge is disqualified under § 455(b))*; e.g., Howell v. Supreme Court of Texas*, 885 F.2d 308, 312 (5th Cir. 1989) ("It is well established, at least in Texas, that the judgment of a disqualified judge is wholly void, of no effect and subject to collateral attack"); *In re Marriage Dickey*, No. 06-23-00004-CV, 2023 Tex. App. LEXIS 6860, *3 (Tex. App.—Texarkana 2023, no pet.) (quoting *Kennedy v. Staples*, 336 S.W.3d 745, 750 (Tex. App.—Texarkana 2011, no pet.) ("[I]f a judge is disqualified, the judge is without jurisdiction to hear the case; therefore, any judgment rendered is void and a nullity"); *accord State ex rel. Carver v. Whipple*, 608 S.W.2d 410, 412 (Mo. 1980) ("Because respondent ignored or improperly refused relator's application for disqualification, his further action to the substantive matters, disposing of the Rule 27.26 motion, was without jurisdiction.... As disqualification is mandatory, he exceeds his jurisdiction when he refuses to do so... .").

55.     In *Tramonte v. Chrysler Corp.*, the Fifth Circuit considered whether a United States District Judge had authority to enter a remand order where she was arguably disqualified from handling the case under 28 U.S.C. § 455(b). 136 F.3d 1025, 1031 (5th Cir. 1998). The Court of Appeals reversed and remanded for a determination on the degree of relationship between the judge and the party. If the relationship triggered application of § 455(b), "her recusal would have been required and her remand to state court would be void." *Id*; *see also Gipson*, 835 F.2d at 1325.

56.     Jones was stripped of any jurisdiction or power to mediate the GWG bankruptcy—to the extent that constitutes a "judicial" function—once he crossed the line by flouting § 455(b)—which served as an absolute and immediate disqualification. This is substantively no different from a probate judge purporting to preside over a felony criminal case—he is simply without any jurisdiction to act. All of Jones' conduct relating to the case was void *ab initio*.

## III.     Even if it Applied, the Judge-Made Doctrine of Judicial Immunity is Superseded by the Constitutional Requirements of Due Process.

57.     The doctrine of judicial immunity is unconstitutional as applied to the facts of this case, asserted as a bar to Plaintiffs' right to seek redress in damages. That is because the Supreme Court has recognized that there are certain instances of judicial malfeasance so "extreme" or "extraordinary" that they violate the dictates of due process. One of those extreme circumstances is proven by evidence that a judicial officer had a pecuniary interest in the outcome of a case. The constitutional violation demands a constitutional damages remedy, which can only be effectuated in this case by abrogation of the judicial immunity doctrine.

58.     The Supreme Court held a century ago that, as a matter of due process, a judge may not preside over a case in which he has a "direct, personal, substantial, pecuniary interest." *Tumey v. Ohio,* 273 U.S. 510, 523 (1927). This holding largely tracked the longstanding common-law rule regarding judicial recusal, and reflects the maxim that "[n]o man is allowed to be a judge in his own cause; because his interest would certainly bias his judgment, and, not improbably, corrupt his integrity." THE FEDERALIST No. 10, p. 59 (J. Cooke ed.1961) (J. Madison)*; see* Frank, Disqualification of Judges, 56 YALE L.J. 605, 609 (1947) ("The common law of disqualification ... was clear and simple: a judge was disqualified for direct pecuniary interest and for nothing else").    Thus, a defendant's due process rights are violated when he is tried before a judge who is "paid for his service only when he convicts the defendant." *Tumey, supra,* at 531; *see also*, *Aetna Life Ins. Co. v. Lavoie,* 475 U.S. 813, 824 (1986) (recusal required when the judge's decision in a related case "had the clear and immediate effect of enhancing both the legal status and the settlement value of his own case"); *Connally v. Georgia,* 429 U.S. 245, 250 (1977) (*per curiam*).    There are extreme circumstances "in which experience teaches that the probability of actual bias on the part of the judge or decisionmaker is too high to be constitutionally tolerable." *Withrow*, 421 U.S. at 47.

59.     In subsequent cases the Court has applied this doctrine to more than the traditional common-law prohibition on *direct* pecuniary interest, extending it to indirect financial interests where the incentives were of "substantial substance" to tempt the average judge.  In *Ward v. Monroeville*, the Court invalidated a conviction in a mayor's court where the fines the mayor assessed went to the town's general treasury. 409 U.S. 57, 93 (1972). The Court held that "[t]he fact that the mayor [in *Tumey*] shared directly in the fees and costs did not define the limits of the principle." *Id*. at 60. The principle, instead, turned on the "

27

'possible temptation' " the mayor might face; the mayor's "executive responsibilities for village finances may make him partisan to maintain the high level of contribution [to those finances] from the mayor's court." *Id.* (proper constitutional inquiry is "whether sitting on the case 'would offer a possible temptation to the average...judge to...lead him not to hold the balance nice, clear and true'"). As the Court reiterated in another case the next year, "the [judge's] financial stake need not be as direct or positive as it appeared to be in *Tumey.*" *Gibson v. Berryhill,* 411 U.S. 564, 579 (1973) (an administrative board composed of optometrists had a pecuniary interest of "sufficient substance" so that it could not preside over a hearing against competing optometrists).

60.     The Court further defined the scope of the due process violation from "indirect" financial interests in *Aetna Life Ins. Co. v. Lavoie,* 475 U.S. 813, 824 (1986). A justice on a state supreme court had cast the deciding vote to uphold a punitive damages award against an insurance company for bad-faith refusal to pay a claim.  At the time of his vote, the justice was himself the lead plaintiff in a nearly identical lawsuit pending in the state's lower courts. His sitting and voting on the appeal violated the Due Process Clause because his deciding vote "undoubtedly 'raised the stakes" for the insurance defendant in the justice's suit.  *Id.* at 823–824.  The *Lavoie* Court stressed that the constitutional question was an objective one: "whether sitting on the case 'would offer a possible temptation to the average...judge to...lead him not to hold the balance nice, clear and true.'" *Id.* (quoting *Monroeville, supra*, at 60).

61.     Most recently, the Court emphasized the "extreme" or "extraordinary" nature of the circumstances surrounding a judge's pecuniary relationships, even if indirect, in finding that a judge's conduct trampled upon due process rights.  In *Caperton v. A.T. Massey Coal Co.,* a state supreme court justice decided a case against a litigant despite having recently received

enormous financial campaign support from the litigant's opponent, support that was so significant that it was credited with the justice's election win—while the appeal was pending. 556 U.S. 868, 891–92 (2009). In vacating the outcome as a violation of the losing litigant's due process rights, the Court explained how "extreme" circumstances compel application of constitutional principles:

> It is true that extreme cases often test the bounds of established legal principles, and sometimes no administrable standard may be available to address the perceived wrong. But it is also true that extreme cases are more likely to cross constitutional limits, requiring this Court's intervention and formulation of objective standards. This is particularly true when due process is violated. See, *e.g., County of Sacramento v. Lewis,* 523 U.S. 833, 846–847, 118 S.Ct. 1708, 140 L.Ed.2d 1043 (1998) (reiterating the due process prohibition on "executive abuse of power ... which shocks the conscience"); *id.,* at 858, 118 S.Ct. 1708 (Kennedy, J., concurring) (explaining that "objective considerations, including history and precedent, are the controlling principle" of this due process standard.

*Id.* at 887.

62. The Complaint describes a scheme that, in Justice Kennedy's words, truly "shocks the conscience." The Complaint specifically alleges facts that constitute an "extreme" violation of Plaintiffs' constitutional due process rights under the Fifth Amendment, whether Jones' clear financial interest is deemed direct or indirect. The Supreme Court has long held that such violations require a remedy, as a constitutional imperative. "The very essence of civil liberty certainly consists in the right of every individual to claim the protection of the laws, whenever he receives an injury." *Marbury v. Madison*, 1 Cranch 137, 163, 2 L.Ed. 60 (1803). "[T]here is no safety for the citizen, except in the protection of the judicial tribunals, for rights which have been invaded by the officers of the government, professing to act in its name." *Bivens v. Six Unknown Named Agents of Fed. Bureau*

*of Narcotics*, 403 U.S. 388, 397 (1971) (damages available as remedy for Fourth Amendment violation despite officers' qualified immunity). *See also, Carey v. Piphus*, 435 U.S. 247, 248 (1978) (remedies enforced for proceedings conducted in violation of due process rights); *Goldberg v. Kelly,* 397 U.S. 254, 255 (1970) (providing remedy for state procedures for denial of welfare benefits without affording opportunity for an evidentiary hearing prior to termination). In *Davis v. Passman*, a congressional aide sued a congressman for sex discrimination as a Fifth Amendment due process violation. 442 U.S. 228, 245 (1979). The Court applied *Bivens* in holding that she was constitutionally entitled to pursue a claim for damages, noting that "damages have been regarded as the ordinary remedy for an invasion of personal interests in liberty." *Id.,* quoting *Bivens, supra*, at 395.

63.    These constitutional imperatives necessarily trump the judge-made prophylactic doctrine of judicial immunity. The Complaint adequately alleges facts adding up to a due process violation—and an "extraordinary" one at that. This is a unique case where Plaintiffs do not need to speculate about wrongdoing by Jones – Jones, Freeman, Jackson Walker, and Porter Hedges do not deny that an intimate relationship between Jones and Freeman existed and was not disclosed in the GWG bankruptcy case. The extreme misconduct at issue impacts the very integrity of the bankruptcy system and the federal judicial system as a whole, gravely damaging all participants in the process. Aside from violating the Due Process Clause, this breathtaking pattern of illegal conduct intrinsically voids jurisdiction because it corrupts the judicial process at its very core, rendering the conduct as, at best, extra-judicial.

64.    These words from the Supreme Court are particularly apt here:

Our system of jurisprudence rests on the assumption that all individuals, whatever their position in government, are subject to federal law: "No man in

this country is so high that he is above the law. No officer of the law may set that law at defiance with impunity. All officers of the government, from the highest to the lowest, are creatures of the law, and are bound to obey it.

*Butz v. Economou,* 438 U.S. 478, 506 (1978) (quoting *United States v. Lee,* 106 U.S. 196, 220 (1882)).

65.     Jones elected not to obey the clear, ministerial dictates of the law. "Litigants in all our courts are entitled to expect that the rules will be followed, the required disclosures will be made, and that the court's decisions will be based on a record that contains all the information applicable law and regulations require." *Alix v. McKinsey & Co.*, 23 F.4th 196, 204 (2d Cir. 2022). If a judge's acknowledged actions have corrupted the bankruptcy process in ways that are unrelated to and wholly outside of the normal decision-making process of the judiciary, then the usual rationales for judicial immunity do not apply and judicial immunity cannot attach.

66.     In this case Jones' conduct did not just violate a mandatory statutory prohibition, but his actions spilled over into criminal violations for which he is currently under investigation by the U.S. Department of Justice. *See, e.g.*, 18 U.S.C. § 1503 (obstruction of justice); 18 U.S.C. § 242 (deprivation of rights under color of law. *See also, United States v. Lanier*, 520 U.S. 259 (1997) (judge convicted of deprivation of rights); *United States v. Aguilar*, 515 U.S. 593 (1995) (judge convicted of obstruction).  The doctrine of judicial immunity does not apply to a judge who presides without jurisdiction, having been statutorily disqualified, eschews adherence to basic due process requirements, and then while so disqualified proceeds to commit federal felonies in a corrupt self-enrichment scheme designed to steer money to his own household and destroy the investments of innocent victims.

## IV. Plaintiffs Have Standing.[90]

67.     Jones asserts that Plaintiffs' claims should be dismissed for lack of standing because "[Plaintiffs'] position is not materially different from the plaintiffs in *Van Deelen* and *Bouchard*." Motion, at ¶41.  However, this case is markedly different than *Van Deelen*, and Plaintiffs do not stand in the same position as the Plaintiff in *Van Deelen*.

68.     This Court dismissed Mr. Van Deelen's claims for lack of Article III standing where he was unable to show a concrete injury based on a reduced recovery from the bankruptcy estate.  *See Van Deelen v. Jones*, No. 4:23-cv-03729, 2024 WL 3852349, at *8 (S.D. Tex. Aug. 16, 2024).  Mr. Van Deelen, however, was not a creditor to the bankruptcy estate. *Id.*  "Rather, he was an equity shareholder" whose shares were extinguished months before Jones approved the defendants' fees. *Id.*  As such, this Court found that Mr. Van Deelen failed to show "that the Defendants' actions deprived him of anything he had not already lost long before" the defendants requested fees. *Id.*

69.     This case is entirely different. Plaintiffs collectively held bonds worth more than $300 million.  Complaint ¶¶ 133–36.  They held them when Freeman and Jackson Walker moved to have Jones appointed as mediator yet failed to disclose the relationship. And they subsequently acquired and held Wind Down Trust interests in the place of the bonds while Freeman assumed the role of Wind Down Trustee (again without disclosing) and whittled away their assets to the point that they are now nearly worthless,  and while Freeman collected substantial fees, again without disclosing the fraud that allowed her to collect them. Complaint ¶¶ 98-112.

---

[90] For a more detailed discussion of the standing issue, *see* Plaintiffs' Responses to the other Defendants' Motions to Dismiss.

70. These are concrete injuries under Article III that harmed Plaintiffs. Plaintiffs have lost at least 96% of the value of their bonds because of Defendants' misconduct. For this disaster, Freeman has been paid richly in fees, drawn from the estate and/or Wind Down Trust, that she collected through fraud. These losses and fees wrongfully taken from the bankruptcy estate and/or Wind Down Trust can and should be redressed through damages awarded in a judgment.

71. Additionally, Plaintiffs' claims are direct and non-derivative. As described in further detail in Plaintiffs' Responses to other Defendants' Motions to Dismiss, *supra*, n. 91, the Complaint alleges personal, direct claims that belong to Plaintiffs and not GWG or the post-confirmation trusts. Specifically, the Complaint pleads certain breaches of fiduciary duty, aiding and abetting breaches of fiduciary duty, civil RICO, RICO conspiracy, and civil conspiracy claims, among others, that harmed the beneficiaries of the Wind Down Trust and the bondholders. Additionally, Plaintiffs' Complaint alleges their intent to move for special appointment to assert any derivative claims against Freeman and the remaining defendants on behalf of the GWG estate and/or for the benefit of the Wind Down Trust. FN Alternatively, Plaintiffs intend to move for derivative standing.[91]

## V. Plaintiffs Alleged Causation.[92]

72. The complaint adequately alleges causation. GWG was left "a distressed entity, making it an ideal victim for the Enterprise." Complaint ¶ 92. Until Freeman, Jackson Walker, and Jones took over the case, i*d.* at ¶¶ 98–100, GWG was postured to make a full recovery under Chapter 11 restructuring. *Id.* at ¶¶ 96–97.

---

[91] Complaint ¶ 142.
[92] For a more detailed discussion of the causation issue, *see* Plaintiffs' Responses to the other Defendants' Motions to Dismiss.

73. The consortium promptly arranged for Jones to serve as mediator, Freeman to act as Wind Down Trustee, and the company to be gutted. All the while, Freeman and the others kept the relationship secret, despite a mandatory obligation to disclose, because Jones was disqualified as judge and as a mediator and the lawyers were disqualified for employment under § 327. Their silence ensured Jackson Walker, Freeman, and Jones (through Freeman) could continue to unlawfully commandeer the case and, as a result, were paid handsomely. *Id.* at ¶ 8.

74. Plaintiffs' Complaint also describes how Jones, by interjecting himself as mediator even though (1) he was disqualified under Section 455(b); (2) required to recuse himself under Section 455(a); and (3) required to disclose his relationship with Freeman under the Mediator Guidelines which he did not do, unilaterally effectuated a change in the bankruptcy from a restructuring with likelihood of recovery to a liquidation. *Id.* at ¶¶ 96-104. In doing so he quickly secured Freeman's appointment as a Wind Down Trustee and the lucrative payments that accompanied the position. *Id.* at ¶¶ 8-9, 103. He accomplished this by intimidation and threatening the parties at mediation that Judge Isgur would accept only his recommendation regardless of what the parties wanted. *Id.* at ¶ 101. Jones' actions in securing Freeman's appointment, whether she was qualified or not, guaranteed a steady stream of income to Freeman since her position at Jackson Walker. GWG, at least on paper, had become a casualty of their relationship. *Id.* at ¶¶ 8, 103.

75. Plaintiffs' Complaint also details how Freeman—installed and empowered as Wind Down Trustee by the actions of Jones while concealing the relationship—caused the damages to Plaintiffs. Freeman started with two primary assets—the life settlements portfolio worth $800 million and equity holdings and interests in Beneficient valued at approximately

$1.7 billion.  *Id.* at ¶ 106.  She quickly "discarded and devalued GWG's primary assets, leaving bondholders and other stakeholders with little more than worthless paper."  *Id.* at ¶ 12.  But she and the lawyers profited handsomely.

76.     The Complaint alleges facts sufficient to show that the Jones' and the other Defendants' non-disclosure, flouting of mandatory disqualification, breaches of fiduciary duties, and participation in the conspiracy caused their damages, including a 96% loss on bonds worth $1.6 billion at the time Freeman took over.  *Id.* at ¶¶ 128-32.

## VI.     Alternative Motion for Leave to Amend.

77.     In the alternative, should this Court find Plaintiffs' Complaint deficient in any regard, Plaintiffs respectfully request leave to amend or supplement their Complaint.  "The court should freely give a complainant…leave to amend defective allegations in a pleading. … Thus, the appropriate remedy when granting a motion based on nonconforming or deficient pleadings is to grant the complainant time within which to amend the complaint."  *Mclelloon v. Lone Star Gas Co.*, 66 F.3d 98, 103 (5th Cir. 1995). Giving Plaintiffs leave to amend their Complaint would not prejudice Defendants, who are already on notice of the claims Plaintiffs brings.  Further, since the filing of Plaintiffs' Complaint and during the briefing, Plaintiffs have learned additional facts which could be alleged to support Plaintiffs' claims.

<u>CONCLUSION</u>

Plaintiffs respectfully request that the Court deny Defendant David R. Jones's Motion to Dismiss Under Fed. R. Civ. P. 12(b)(6) and grant unto Plaintiffs all other and further relief to which they are justly entitled.

**Dated October 2, 2025**

Respectfully submitted,

By:  /s/ Mikell A. West
Mikell A. West
Texas State Bar No. 24070832
S.D. Tex. Bar No. 1563058
Robert W. Clore
Texas State Bar No. 24012426
S.D. Tex. Bar No. 2032287
BANDAS LAW FIRM, P.C.
555 Carancahua Street, Suite 1200
Corpus Christi, Texas 78401
Telephone: (361) 698-5200
Facsimile: (361) 698-5222
mwest@bandaslawfirm.com
rclore@bandaslawfirm.com

## Certificate of Service

I hereby certify that on October 2, 2025, I electronically filed the foregoing document with the Clerk of the Court using the CM/ECF system, which will send notification of such filing via electronic mail to all counsel of record.

/s/ Mikell A. West