IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

GARY PETERSON, CHRIS NAKASHIMA,
JOHN ENGLISH, JAQUETTA ENGLISH,
LT-1 EXCHANGE TRUST, LT-2
EXCHANGE TRUST, LT-3 EXCHANGE
TRUST, LT-4 EXCHANGE TRUST, LT-5
EXCHANGE TRUST, LT-6 EXCHANGE
TRUST, LT-7 EXCHANGE TRUST, LT-8
EXCHANGE TRUST, LT-9 EXCHANGE
TRUST, LT-12 EXCHANGE TRUST, LT-
14 EXCHANGE TRUST, LT-15
EXCHANGE TRUST, LT-17 EXCHANGE
TRUST, LT-18 EXCHANGE TRUST, LT-
19 EXCHANGE TRUST, LT-20
EXCHANGE TRUST, ON THEIR OWN
BEHALF AND ON BEHALF OF ALL
OTHERS SIMILARLY SITUATED,

                PLAINTIFFS,

V.

DAVID R. JONES, ELIZABETH CAROL
FREEMAN, THE LAW OFFICE OF LIZ
FREEMAN, PLLC, JACKSON WALKER,
LLP, AND PORTER HEDGES, LLP,

                DEFENDANTS.

CIVIL ACTION FILE  NO. 4:25-CV-02761

JURY TRIAL DEMANDED

**PLAINTIFFS' RESPONSE TO DEFENDANT
PORTER HEDGES, LLP'S MOTION TO DISMISS**

**TABLE OF CONTENTS**

Introduction ........................................................................................................... 1

Statement of Facts Relevant to Claims Against Porter Hedges ............................. 1

   A.  Jones' Relationship with Elizabeth Freeman, a Partner at Jackson Walker, and Plan to Transform the Southern District of Texas into a Center for Bankruptcy Litigation. .............................................................................................................1

   B.  GWG Files for Bankruptcy in the Southern District of Texas. ................................. 6

   C.  The Illegal Conspiracy Dismantles GWG Enriching All Involved Professionals at the Expense of GWG, its Creditors and Equity Holders. ............................... 7

   D.  The Freeman-Jones Intimate Relationship Is Made Public. ................................... 10

Legal Standard ...................................................................................................... 11

Argument................................................................................................................ 13

   I.  Plaintiffs Have Standing................................................................................ 13

      A.  Plaintiffs Have Direct Standing to Pursue Claims Against Porter Hedges. ...... 13

      B.  Plaintiffs Have Article III Standing. ............................................................. 18

   II.  Plaintiffs Have Prudential Standing to Pursue Claims Against Porter Hedges. ....... 20

   III.  The Complaint Pleads Causation Against Porter Hedges. .................................... 21

   IV.  The Complaint Pleads Detrimental Reliance. ......................................................... 24

      A.  A Breach of Fiduciary Duty Claim Against an Attorney Does not Require Detrimental Reliance. ................................................................................ 24

      B.  The Complaint Pleads Detrimental Reliance for the Remainder of the Claims Against Porter Hedges. ...................................................................... 26

   V.  The Complaint Alleges Facts Sufficient to Impute the Knowledge of the Freeman-Jones Relationship to Porter Hedges................................................................. 28

   VI.  Plaintiffs' Claims Are not Barred by Attorney Immunity or the Judicial Proceedings Privilege. ........................................................................................................ 34

   VII.  Porter Hedges Owed a Duty to the Bondholder Committee and the Constituency of Bondholders. ............................................................................................... 36

   VIII.  Plaintiffs Sufficiently Plead Their Claim of Aiding & Abetting Breach of Fiduciary Duty Against Porter Hedges. ........................................................................ 36

   IX.  Plaintiffs Sufficiently Plead Their Claim for Professional Negligence Against Porter Hedges. ...................................................................................................... 37

   X.  Plaintiffs Sufficiently Plead Their Claim for Negligent Misrepresentation Against Porter Hedges. ........................................................................................... 38

   XI.  Plaintiffs Sufficiently Plead Their Claim for Unjust Enrichment Against Porter Hedges. ...................................................................................................... 40

i

XII.  Plaintiffs Sufficiently Plead Respondeat Superior. ................................................. 40

XIII. The Anti-Fracturing Rule Does Not Bar Plaintiffs' Claims.................................. 41

XIV. Alternative Motion for Leave to Amend.............................................................. 43

Conclusion ...................................................................................................................... 44

## INTRODUCTION

1.      In its Motion to Dismiss, Porter Hedges argues a laundry list of challenges to the Complaint's exhaustive allegations of fact, and none of them are meritorious.  Along the way, Porter Hedges repeatedly misstates the law and mischaracterizes the facts alleged in the Complaint. The Motion should be denied in its entirety.

## STATEMENT OF FACTS RELEVANT TO CLAIMS AGAINST PORTER HEDGES

2.      Plaintiffs' lawsuit follows perhaps the most significant bankruptcy scandal in U.S. history, with the Fifth Circuit finding probable cause that Jones committed misconduct. For years, Jones orchestrated a scheme where he sought to prop up the bankruptcy courts of the Southern District of Texas and then personally enriched himself by using his authority and the prestige of the Southern District of Texas to recommend his secretive, live-in girlfriend, Freeman, to lucrative appointments, and approve millions of dollars in attorneys' fees to her and her various firms.   In this years-long scheme spanning numerous mega-bankruptcies, Freeman would represent parties, appear, and argue before Jones.  Despite knowledge that this conduct violated numerous ethical rules, procedural rules and laws, Jones, Freeman, Jackson Walker, The Law Office of Liz Freeman, and Porter Hedges each chose to remain silent.

### A. Jones' Relationship with Elizabeth Freeman, a Partner at Jackson Walker, and Plan to Transform the Southern District of Texas into a Center for Bankruptcy Litigation.

3.      Prior to Jones' appointment as a bankruptcy judge in 2011, he was a partner with the law firm Porter Hedges where he worked with associate Elizabeth Freeman ("Freeman").[1]  It

---

[1] Complaint (Doc. 1), at ¶¶ 18, 40.

1

was during Jones' time at Porter Hedges that his intimate, romantic relationship with Freeman began.[2]

4.     Prior to the start of the Freeman-Jones relationship, Freeman was married to Nicholas Simms ("Simms"), who was at that time, and remains, a partner at Porter Hedges.[3]  Freeman at some point divorced Simms.[4]  While both Freeman and Jones were at Porter Hedges, Simms learned of the Freeman-Jones relationship.[5]

5.     After Jones was appointed to the bankruptcy bench, Freeman followed him working as his law clerk.[6]  Shortly after Jones began his judgeship, he and his wife divorced, with his wife citing his infidelity with Freeman as a reason for their divorce.[7]  During the time Freeman served as Jones' clerk, the Jones-Freeman romantic, intimate relationship grew, with Freeman likely moving in with Jones between 2013 and 2014.[8]

6.     In 2015, Jones was appointed Chief Judge of the Bankruptcy Court for the Southern District of Texas.[9] Jones quickly transformed the Southern District of Texas into a nationwide center for high-dollar complex Chapter 11 bankruptcies directing all complex cases be assigned to either himself or Judge Marvin Isgur.[10]

---

[2] *Id.*, at ¶¶ 40, 147.

[3] *Id.*, at ¶ 18; *see also* PorterHedges—Professionals—Nicholas A. Simms, located at https://www.porterhedges. com/professionals-NicholasASimms (last visited September 29, 2025).

[4] *Id.*, at ¶ 18.

[5] *Id.*

[6] *Id.*

[7] *Id.*

[8] *Id.* at ¶ 41.

[9] *Id.*, at ¶ 37.

[10] *Id.*

7.    In 2016, Jones purchased a house in Coldspring, Texas, where Freeman had lived from 2007, until she moved in with Jones.[11]   In 2017, Jones and Freeman executed a survivorship agreement as co-owners of a million dollar-plus home in Houston.[12]

8.    Freeman clerked for Jones until from 2011 until 2018.[13]   After Freeman left her clerkship, she joined Jackson Walker's Houston office.[14]   Freeman was quickly elevated to partner and upon her arrival, Jackson Walker began securing appointments in large Chapter 11 cases in Jones' Court, with Jackson Walker serving as "local counsel" for other firms, several of which had Houston offices.[15]   By 2019, a year after Ms. Freeman's arrival, Jackson Walker became "the leading counsel firm for corporate debtors filing for bankruptcy in Houston."[16]   By 2022, Jackson Walker was number one in the nation in local counsel appointments in large bankruptcies.

9.    Publicly, Jackson Walker attributed their success to Freeman's former position as "permanent law clerk to the Chief Bankruptcy Judge for the U.S. Bankruptcy Court for the Southern District of Texas"[17] and the firm's knowledge of local "politics,"[18] but behind closed firm doors, they knew the truth—Jackson Walker secured these local counsel appointments due to the intimate relationship between Jones and Freeman.[19]

---

[11] *Id.*, at ¶ 42.  Currently, Freeman's parents reside in the Coldspring home.  *Id.* at ¶ 43.

[12] *Id.*, at ¶ 43.

[13] *Id.*

[14] *Id.*, at ¶ 44.

[15] *Id.*, at ¶ 45.  The firms included Mayer Brown, Kirkland & Ellis, and other large firms.  *Id.*  Wade Cooper, then managing partner at Jackson Walker, probably explained it best when he said that a primary reason Jackson Walker was retained as "local" counsel was "[Jackson Walker] know[s] a lot about local politics[.]"  *Id.*, at ¶ 47.

[16] *Id.*, at ¶ 46.

[17] *Id.*, at ¶ 44.

[18] *Id.*, at ¶ 46.

[19] *Id.*, at ¶ 47.

10.     Jackson Walker first claimed it found out about the intimate, romantic relationship between Jones and Freeman in March of 2021.[20]  According to Jackson Walker, it conducted an internal inquiry, retained ethics counsel, and instructed Freeman to stop working and billing on any case assigned to Jones.[21]  However, text messages uncovered as a part of a proceeding initiated by the U.S. Trustee indicates that Jackson Walker knew about the Freeman Jones relationship long before March of 2021.[22]

11.     In March of 2021, the Freeman-Jones relationship was discussed at the highest levels of the Jackson Walker firm.[23]  In 2021, Freeman and Jackson Walker did not publicly disclose the Freeman-Jones relationship as a part of any filing (declaration of disinterestedness) or as a part of the record in any proceeding.[24]  From March 2021, both Jackson Walker and Freeman on its behalf continued to accept cases in Jones' Court and appear before Jones, despite Jackson Walker's alleged instruction that Freeman was not to work or bill on matters in Jones.[25]

12.     The issue of the Freeman-Jones relationship again resurfaced in early 2022 when the relationship was again reported to a Jackson Walker partner.[26]  This time, when confronted, Freeman acknowledged the ongoing romance with Jones.[27]  By this point, Freeman had retained personal counsel, who worked with Jackson Walker, their ethics counsel, and an

---

[20] *Id.*, at ¶ 53.  In March 2021, the Freeman-Jones relationship was first questioned publicly with the filing of a recusal motion.

[21] *Id.*, at ¶¶ 53, 55.

[22] *Id.*, at ¶¶ 53-54.

[23] *Id.*, at ¶¶ 58-60.

[24] *Id.*, at ¶¶ 56, 62.

[25] *Id.*, at ¶ 62.

[26] *Id.*, at ¶ 63.

[27] *Id.*

outside expert on an appropriate disclosure because all parties agreed keeping the situation a secret was wrong.[28]   Discussions surrounding disclosure of the sexual relationship again reached the highest levels of the firm with managing partner Wade Cooper initiating an email exchange discussing the potential impact of the disclosure on Jackson Walker's reputation in the legal community.[29]

13.    Concurrently, Jackson Walker also decided to meet with Jones concerning the disclosure.[30]   Jones, both knowing that disclosure was required and upset about the reputational impact he might suffer as a result of it, indicated that he was "unhappy" with Jackson Walker's proposal to disclose the Freeman-Jones relationship and Ms. Freeman's potential exit from the firm.[31]   According to Jackson Walker, Jones already had a counter-disclosure prepared for the meeting which sought to minimize the Freeman-Jones relationship, characterizing the relationship as "close [and] personal" similar to Jones' and Judge Isgur's social relationships with other Jackson Walker attorneys.[32]   Jones' prepared disclosure was not for himself, but for Jackson Walker.[33]

14.    Even though Jackson Walker claims that it knew that complete disclosure was required, rather than facing public questions and Jones' ire, Freeman and Jackson Walker, against the advice of counsel and experts, decided to continue with the secret, foregoing any

---

[28] *Id.*, at ¶ 63.

[29] *Id.*, at ¶ 64.

[30] *Id.*, at ¶ 65.

[31] *Id.*

[32] *Id.*

[33] *Id.*

disclosure whatsoever.[34]  Instead of disclosure, Jackson Walker decided that Freeman would

exit the firm.[35]  Negotiations over Freeman's exit from Jackson Walker ensued.[36]

**B. GWG Files for Bankruptcy in the Southern District of Texas.**

15.     GWG was organized in February 2006 and was formed for the purpose of buying and

holding life settlements—life insurance policies purchased from named insureds and held

until maturity.[37]  To finance its business, GWG issued L Bonds, which are high yield,

privately issued, registered, but not publicly traded, debt instruments.[38]

16.     Due to a series of unfortunate events perpetuated, in large part, by an SEC agent

exceeding his authority, GWG was forced into bankruptcy in April of 2022.[39]  At the time of

its bankruptcy filing, GWG's headquarters was in Dallas, Texas.[40]

17.     GWG contacted the firm of Mayer Brown to handle its proposed bankruptcy

restructuring.[41]  Despite GWG's base in Dallas, Mayer Brown insisted to the GWG board

that they file for bankruptcy in the Southern District of Texas and hire Jackson Walker as

"local counsel," even though Mayer Brown maintained offices in Houston.[42]

18.     Acquiescing to Mayer Brown's insistence, GWG filed for Chapter 11 bankruptcy

protection in the Southern District of Texas on April 20, 2022.[43]  Mayer Brown applied to be

---

[34] *Id.*, at ¶¶ 65-67.

[35] *Id.*, at ¶ 67.

[36] *Id.*

[37] *Id.*, at ¶ 68.

[38] *Id.*, at ¶ 70.

[39] *Id.*, at ¶¶ 76 - 90, 93.

[40] *Id.*, at ¶ 92.

[41] *Id.*

[42] *Id.*

[43] *Id.*, at ¶ 93.

debtor's counsel on May 11, 2022, and Jackson Walker applied to be local and (ironically) conflicts counsel on May 19, 2022.[44]  The GWG bankruptcy was assigned to Judge Isgur's court, not Judge Jones.[45]

19.    An additional committee, the Official Committee of Bondholders (the "Bondholders Committee"), was set up and authorized to protect and preserve the interest of the L Bond holders.[46]  Porter Hedges served as co-counsel for the Bondholders Committee.[47]

20.    Freeman worked behind the scenes and appeared on behalf of the debtors on multiple occasions.[48]  Following the bankruptcy filing, GWG, together with Mayer Brown, prepared a reorganization plan to maximize the return and ensure the viability of GWG moving forward.[49]  The GWG management team proceeded with developing the restructuring plan, not knowing that GWG's fate was sealed by closed-door communications happening between and among Jones, Freeman, and Jackson Walker.

**C. The Illegal Conspiracy Dismantles GWG Enriching All Involved Professionals at the Expense of GWG, its Creditors and Equity Holders.**

21.    Unfortunately for GWG, it filed for bankruptcy and retained Jackson Walker as local counsel in the middle of the internal disclosure dispute regarding the Jones-Freeman relationship.[50]  Unbeknownst to GWG, Freeman and Jackson Walker were negotiating

---

[44] *Id.*, at ¶ 94.

[45] *Id.*, at ¶ 93.

[46] *Id.*, at ¶¶ 18, 57, 99, 147, 245-50.

[47] *Id.*, at ¶¶ 18, 57, 99.

[48] *Id.*, at ¶¶ 97. Porter Hedges, LLP represented other interested parties, the bond holders.  *Id.*, at ¶¶ 57, 99.

[49] *Id.*, at ¶ 96.

[50] *Id.*, at ¶¶ 63 – 67.

Freeman's nominal separation from the firm that would keep the Freeman-Jones relationship a secret and, presumably, keep Jones happy.[51]

22.     Additionally, despite (1) Freeman's failure to affirmatively disclose the relationship from the inception of her employment until 2022 when questioned,[52] (2) the acknowledged impropriety of the relationship and the potential embarrassment to the firm,[53] and (3) Freeman's failure to report the relationship when it was allegedly "rekindled" in 2022,[54] Jackson Walker agreed to obtain lucrative appointments for, co-counsel with, and employ Freeman on a contract basis as a part of Freeman's severance.[55]

23.     On November 30, 2022, the day before Freeman's termination from the firm, Jackson Walker, with full knowledge of the Freeman-Jones ongoing romantic, intimate relationship, filed a motion to have Jones appointed mediator in the GWG bankruptcy.[56]  Freeman even appeared at the hearing on the mediation motion vocally advocating for Jones' appointment.[57]  Likewise, Porter Hedges did not disclose the Freeman-Jones relationship or challenge Jones as the mediator despite his obvious conflict with Freeman, who was counsel for the debtors.[58]  Judge Isgur appointed Jones mediator on January 5, 2023.[59]

---

[51] *Id.*

[52] *Id.*, at ¶ 53.

[53] *Id.*, at ¶ 64.

[54] *Id.*, at ¶ 63.

[55] *Id.*, at ¶¶ 10-11, 95, 103.

[56] *Id.*, at ¶ 98.

[57] *Id.*

[58] *Id.*, at ¶¶ 147, 246.

[59] *Id.*

24.     The mediation occurred on January 29, 2023.[60]  The parties showed up expecting a multi-day mediation with discussion of a reorganization plan and path for its implementation.[61]  The mediation lasted less than four hours.[62]  No meaningful reorganization discussion occurred; Jones entered and simply told the parties that the company was liquidating.[63]  He followed up by threatening the participants that Judge Isgur was a good friend of his and if the parties objected, it would not matter—Judge Isgur would follow his (Jones') recommendation regardless of the parties' desired path forward.[64]  As a part of the Chapter 11 liquidation (there would be no Chapter 7 conversion), Freeman—Jones' live-in girlfriend of approximately 12 years—would be appointed Wind Down Trustee, awarding her a salary of $100,000 per month for the first six months and $50,000 per month thereafter until the bankruptcy concluded.[65]  Porter Hedges again aided and abetted the Freeman-Jones-Jackson Walker scheme, failing to disclose to the Bondholders Committee or the bondholders at large the Freeman-Jones relationship, and failing to challenge Freeman's appointment to the lucrative position as Wind Down Trustee.[66]  As Jones predicted, his liquidation plan was approved by Judge Isgur.[67]

---

[60] *Id.*, at ¶ 100.

[61] *Id.*

[62] *Id.*, at ¶ 101.

[63] *Id.*

[64] *Id.*

[65] *Id.*, at ¶ 103.

[66] *Id.*, at ¶¶ 18, 147, 246.

[67] *Id.*, at ¶ 104.

25.     At no time during or before the mediation did any Defendant disclose the Freeman-Jones relationship.[68]  In fact, the severance agreement with Freeman purportedly prevented Jackson Walker from doing so.[69]

26.     As a result of the Jones liquidation plan, Freeman proceeded to haphazardly manage the Wind Down Trust assets, with the trust ultimately receiving pennies on the dollar due to the manner in which the liquidation occurred.[70]  Freeman, however, received her full fees for the matter—as the U.S. Trustee has not sought recovery of fees paid to her in this matter.[71]

### D. The Freeman-Jones Intimate Relationship Is Made Public.

27.     Judge Jones presided over at least 26 cases in which he awarded Jackson Walker more than $12 million in attorneys' fees and expenses while Freeman was a partner at Jackson Walker and while Freeman and Jones were cohabitating.[72] This includes approximately $1 million in fees billed directly by Freeman herself.[73] Jones also served as mediator in cases in which Jackson Walker and Freeman served as local counsel, including this matter.[74]  None of the Defendants ever disclosed the Jones-Freeman relationship in any of these cases.

28.     Under the rules governing bankruptcy proceedings, for a firm to be employed by a debtor or debtor-in-possession, it must show that it is disinterested and must disclose all connections. 11 U.S.C. §§ 101(14), 327; Fed. R. Bankr. P. 2014 (requiring a verified statement

---

[68] *Id.*, at ¶ 105.

[69] *Id.*, at ¶ 95.

[70] *Id.*, at ¶¶ 106-110.

[71] *Id.*, at p. 9, n. 20.

[72] *Id.*, at ¶ 49.

[73] *Id.*

[74] *Id.*

of the person to be employed setting forth the person's connections with the debtor, creditor, or any other party of interest).[75]

29.    In October 2023, Judge Jones was finally forced to admit both his intimate relationship with Freeman and that he had shared a home with her for years.[76] On October 13, 2023, Chief Judge Priscilla Richman of the Fifth Circuit entered a written order identifying a complaint against Judge Jones.

30.    In the face of the Fifth Circuit investigation, Judge Jones submitted his resignation in October 2023.[77]  Because the GWG bankruptcy matter remains open and the Court has yet to approve Jackson Walker's final fee application, the U.S. Trustee filed an opposition to the fee application.[78]  The opposition seeks to deny Jackson Walker any further fees and seeks to recoup the fees already paid to Jackson Walker in the GWG bankruptcy.[79]  The U.S. Trustee's opposition is limited to only the fees of Jackson Walker and does not seek return of fees paid to Freeman either through the Law Office of Liz Freeman or to her in her capacity as Wind Down Trustee.[80]

31.    Plaintiffs filed this action on June 12, 2025.  On September 25, 2025, Porter Hedges filed its Motion to Dismiss (the "Motion") pursuant to Fed. R. Civ. P. 12(b)(6).

## LEGAL STANDARD

32.    In examining a motion to dismiss under Rule 12(b)(1), the district court is empowered to consider matters of fact which may be in dispute.  *Ramming v. United States*, 281 F.3d 158,

---

[75] *Id.*, at ¶¶ 51, 55, 124, 262.

[76] *Id.*, at ¶ 54.

[77] *Id.*, at ¶ 117.

[78] *Id.*, at ¶ 118.

[79] *Id.*

[80] *Id.*

161 (5th Cir. 2001); *Williamson v. Tucker,* 645 F.2d 404, 413 (5th Cir.1981). Ultimately, a motion to dismiss for lack of subject matter jurisdiction should be granted only if it appears certain that the plaintiff cannot prove any set of facts in support of his claim that would entitle plaintiff to relief. *Ramming*, 281 F.3d at 161; *Home Builders Ass'n of Miss., Inc. v. City of Madison, Miss.,* 143 F.3d 1006, 1010 (5th Cir.1998).

33.     A motion to dismiss pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure tests whether a complaint states a plausible claim for relief. *See Raj v. Louisiana State Univ.*, 714 F.3d 322, 329-30 (5th Cir. 2013). Construing the complaint liberally in favor of the plaintiffs, a motion to dismiss should be denied where the complaint contains enough facts to "state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal,* 556 U.S. 662, 678 (2009). A claim has facial plausibility when the factual content of the complaint allows the court to draw a reasonable inference that defendant is liable for the harm alleged. *Id.; Backe v. LeBlanc,* 691 F.3d 645, 648 (5th Cir. 2012). These standards are the same when a motion to dismiss is based on an immunity defense. When immunity is asserted, the question is whether the complaint pleads facts that, when taken as true, would overcome the movant's assertion of immunity. *Hinojosa v. Livingston,* 807 F.3d 657, 663 (5th Cir. 2015) (considering a motion to dismiss based on a qualified immunity defense). Because Plaintiffs' Complaint states a plausible factual basis for claims against Porter Hedges, the motion to dismiss should be denied.

## ARGUMENT

**I.    Plaintiffs Have Standing.**

**A.    Plaintiffs Have Direct Standing to Pursue Claims Against Porter Hedges.**

34.    The Motion alleges that Plaintiffs cannot maintain direct standing for their claims against Porter Hedges because Porter Hedges never represented the actual bondholders, only the Committee.[81]  To support that proposition, Porter Hedges argues that "[i]t is undisputed that counsel to a statutory committee in a Chapter 11 case represents the committee and only the committee."[82]  This statement is simply untrue and a cursory review of the applicable case law reveals as much.

35.    First, courts in this district have found the opposite to be true—committee counsel in fact owes fiduciary duties to the class constituency.  In *In re General Homes Corp.*, the bankruptcy court for the Southern District of Texas explicitly noted that "[t]he Committee's counsel, as well, has of course ***a fiduciary relation to all unsecured creditors, not just Committee members***."[83]  To Plaintiffs knowledge, neither the Fifth Circuit nor any court in the Southern District has overruled or even criticized the *General Homes* decision.   In light of the clear holding in *General Homes*, Porter Hedges' bold assertion the case law "undisputed[ly]" states the opposite is inexplicable. As if that was not enough, many courts in other districts have held that counsel to a committee in bankruptcy owes fiduciary duties to not just the committee, but the constituency at large, including the bankrupty court for the Northern

---

[81] Motion, at ¶¶ 37-38.

[82] *Id.*, at ¶ 38.

[83] *In re Gen. Homes Corp.*, 181 B.R. 870, 882 (Bankr. S.D. Tex. 1994)  (emphasis added) (relying on a different section of Collier on Bankruptcy to find that committee counsel has a fiduciary relationship with the constituency the committee represents).

District of Ohio,[84] the district courts for the Northern District of Illinois,[85] the bankruptcy courts for the Middle District of Florida,[86] the bankruptcy courts for the Western District of Pennsylvania,[87] the bankruptcy courts for the Northern District of California,[88] and the bankruptcy courts for the Southern District of New York.[89]  In the N.D.-Illinois case, for example, counsel for the creditors committee allegedly breached its fiduciary duties to the unsecured creditors by making false representations to the unsecured creditors and the court.[90] The largest unsecured creditor—who was not a member of the creditors committee— challenged the fees of committee counsel, alleging that committee counsel had breached its fiduciary duties to the unsecured creditors for its false representations to the court and the unsecured creditors.[91]  Just as Porter Hedges does here, the law firm challenged the creditor's

---

[84] *See In re D.H. Overmyer Telecasting Co., Inc.,* 47 B.R. 823, 824 (Bankr. N.D. Ohio 1985)(" FHF's duty of loyalty and allegiance was owed to the creditors' committee and to the creditors whom that committee was to represent. The malpractice and breach of fiduciary duty claims belong to the creditors' committee or to the unsecured creditors in general"); *In re EBP, Inc.,* 171 B.R. 601, 602 (Bankr. N.D. Ohio 1994)(" Counsel to a creditors' committee undertakes the obligation to represent the interests of the entire class fairly, not just the members of the Committee")(citing *Matter of Arlan's Dept. Stores,* 615 F.2d 925, 932 (2d Cir.1979) and *Berner v. Equitable Office Bldg. Corp.,* 175 F.2d 218 (2d Cir.1949)).

[85] *See In re JMP-Newcor Int'l, Inc.,* No. 95 B 27353, 1998 WL 30674, at *1 (N.D. Ill. Jan. 23, 1998)(finding standing for a member of the unsecured creditor class to assert a breach of committee counsel's fiduciary duties because class member's pecuniary interest in fee award).

[86] *See Matter of Celotex Corp.,* 123 B.R. 917, 921 (Bankr. M.D. Fla. 1991)(" As stated, a creditor's committee has a fiduciary duty to its constituency. Committee counsel has a fiduciary duty to the committee and the creditors it represents")(citing *In re Mesta Mach. Co.,* 67 B.R. 151, 158 (Bankr. W.D. Pa. 1986)).

[87] *See In re Mesta Mach. Co.,* 67 B.R. 151, 157 (Bankr. W.D. Pa. 1986)(" Counsel to a creditors' committee owes a fiduciary duty to the committee and the individual creditors that the committee represents").

[88] *See In re Sonicblue Inc.,* No. 03-51775, 2007 WL 926871, at *14 (Bankr. N.D. Cal. Mar. 26, 2007)(" Professionals retained by an official committee of unsecured creditors owe fiduciary duties to the committee and its constituency"); *but see Schultze v. Chandler,* 765 F.3d 945 (9th Cir. 2014), as amended (Aug. 1, 2014)(affirming dismissal of complaint by unsecured creditor for breach of fiduciary duty by unsecured creditors committee counsel for lack of duty without discussing prior cases finding duty existed).

[89] *See Matter of Levy,* 54 B.R. 805, 807 (Bankr. S.D.N.Y. 1985)(" Counsel for the creditors' committee do not represent any individual creditor's interest in this case; they were retained to represent the entire unsecured creditor class.").

[90] *In re JMP-Newcor Int'l, Inc.,* No. 95 B 27353, 1998 WL 30674, at *1 (N.D. Ill. Jan. 23, 1998).

[91] *Id.,* at *1, 3.

standing.[92]  The court overruled the challenge, holding that the creditor had standing because it had a pecuniary interest in the fee awarded to counsel and because committee counsel owed fiduciary duties to the unsecured creditor, even though it only technically represented the committee.[93]

36.    For such blatant misstatement of the law as "undisputed" on this pivotal point, Porter Hedges' standing arguments should be disregarded in their entirety.  Even Porter Hedges' own cited authority recognizes at least a "dispute" on the issue.  Specifically, the section of Collier on Bankruptcy (7 Collier on Bankruptcy 1103.03[7]) cited by Porter Hedges states that "[s]ome cases have alluded to the concept that a committee professional has a broader duty than simply a duty to the committee."[94]   Porter Hedges' representations of the state of the case law must be approached with great caution, as it repeatedly makes claims of "undisputed" law or of established law without citation to contrary and appropriate authority.[95]   Similarly, Porter Hedges' spartan descriptions of the Complaint's factual averments are difficult to reconcile with the copius facts comprising the 133-page Complaint.

37.    The highly disputed out-of-circuit authority and treatise relied on by Porter Hedges to support its claim that committee counsel owes no duty to the class of constituents is based on the simplistic and inapposite notion that counsel is secured by the committee, so counsel represents only the committee, under the unremarkable proposition that "an attorney

---

[92] *Id.*, at *3.

[93] *Id.*

[94] *See* 7 Collier on Bankruptcy ¶ 1103.03[7]; *see also DiStefano v. Stern (In re JFD Enterprises, Inc.),* 223 B.R. 610 (Bankr. D. Mass. 1998)(cited by Porter Hedges and quoting "[s]ome cases have alluded to the concept that a committee professional has a broader duty than simply a duty to the committee").

[95] *See also* discussion on law of imputation from agent to principal, *infra*, at Sec. VI (Porter Hedges' failure to cite exceptions to rule for imputation and argument as if the exception does not exist), and discussion of omission in negligent misrepresentation, *infra*, at Sec. X. (Porter Hedges' failure to cite authority from the Texas Supreme Court, Texas Courts of Appeal, and the Southern District of Texas directly contradicting their point of law

generally only owes a fiduciary duty to his or her client, and is generally only subject to liability to that party."[96] "Generally," that is true. But the better and much more defensible rule accounts for the unique and differing circum-stances of the bankruptcy context, more akin to class counsel in class action litigation than to the ordinary client hiring a lawyer whose sole duty is to represent the interests of that individual client. Class counsel owes a fiduciary duty to not just the named plaintiffs, but the class as a whole.[97]

38.     In the treatise's analogy, when a client hires a lawyer, that lawyer represents the client who hired him or her and the lawyer owes no duties other than to their client.[98] However, that is where the analogy stops, and then falls apart. In the more apt class action analogy, the committee members closely resemble lead plaintiffs; committee counsel takes on the role of class counsel; and the committee constituency represents the absent class members. In Chapter 11 bankruptcy, the actions taken are more closely related to class action than a normal engagement:

- Invocation of the Committee – in bankruptcy, the committee (other than the creditor's committee which is formed by statute) is formed by the court, not by the client's desire, and the court approves the committee representation. In the normal course of representation, a party does not have to seek court

---

[96] *See* 7 Collier on Bankruptcy ¶ 1103.03[7]; *DiStefano v. Stern* (*In re JFD Enterprises, Inc.*), 223 B.R. 610 (Bankr. D. Mass. 1998)

[97] *See Carlos J. Cuevas,* Due Process and Adequate Representation in a Chapter 11 Case: The Appointment and Removal of Members of a Creditors' Committee in a Reorganization*, 24 New Eng. L. Rev. 333 (1989)(comparing a Chapter 11 reorganization to a class action lawsuit); *see also In re Soniblue Inc.*, No. 03-51775, 2007 WL 926871, at *14 (Bankr. N.D. Cal. Mar. 26, 2007)(constituency committee represents is a class); *In re EBP, Inc.*, 171 B.R. 601, 602 (Bankr. N.D. Ohio 1994)(committee counsel must represent the entire "class" fairly); *In re Mesta Mach. Co.*, 67 B.R. 151, 156–58 (Bankr. W.D. Pa. 1986)(referring to the committee constituency as a "class"); *Matter of Levy*, 54 B.R. 805, 807 (Bankr. S.D.N.Y. 1985)(committee counsel represents entire class).

[98] *See* 7 Collier on Bankruptcy ¶ 1103.03[7]; *DiStefano v. Stern* (*In re JFD Enterprises, Inc.*), 223 B.R. 610 (Bankr. D. Mass. 1998)

approval prior to legal action.  In a class-action however, a class-plaintiff must be deemed adequate to represent the class.

• Approval of Counsel – in a normal engagement, a client is free to choose counsel of his choice.  In bankruptcy, counsel for a committee must petition the court and be approved as counsel—like counsel in class action must demonstrate to the court they can fairly represent the interests of the entire class.

• Claims representative – in a normal representation, the client proceeds with a claim against another party—his or her claim is not a representative claim of a multitude of other persons.  On a bankruptcy committee, by definition, the committee members are representative of others in the committee class.  The same is true in a class action.

• Binding Authority – in the course of normal representation, the attorney and client's representation do not bind the actions of persons not present.  In bankruptcy, actions taken by the committee and in front of the court, its counsel, bind the interests of the committee constituency.   This closely resembles a class action, not a normal representation.

• Fees – in a normal representation, the client pays the attorneys' fees without court approval or interference as a private matter.  In bankruptcy, committee counsel must submit a fee application and the court must approve

any fees to counsel. This is not unlike a class action where a successful applicant must petition the court and have their fees approved.[99]

39.    This Court should find that committee representation is not like a normal run-of-the-mill attorney-client representation, but more closely resembles that of a class action. In a class action, class counsel—that is, counsel who represents the lead plaintiffs in the matter—owes duties to those claimants who are absent and that the class plaintiffs are supposed to represent. This Court should follow *General Homes* and find that Porter Hedges, as counsel to the Bondholders Committee, owed fiduciary duties to the class as a whole, not just the Committee.

### B.    Plaintiffs Have Article III Standing.

40.    In its Motion, Porter Hedges also asserts that the Plaintiffs fail to allege sufficient facts to establish Article III standing, or subject matter jurisdiction, pursuant to Rule 12(b)(1), an assertion that is belied by the detailed well-pled allegations in the Complaint. Constitutional standing requires three elements: (1) Plaintiff suffered an injury in fact, meaning an injury is of a legally protected interest which is (a) concrete and particularized and (b) actual or imminent; (2) a causal connection between injury and the conduct brought before the court; and (3) it must be likely that a favorable decision by the court will redress the injury. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560-61 (1992).

41.    Porter Hedges bases its 12(b)(1) argument on its insistence that the Complaint fails to allege "a particularized injury for non-estate claims," meaning for its individualized injuries from Porter Hedges' negligent conduct. Porter Hedges' claim that the Complaint fails to

---

[99] *See Cuevas*, *supra*, n. 97, at pps 333-43, 386-88, for a broader discussion of the similarities between a Chapter 11 reorganization and the typical class action suit..

allege "particu-larized injuries sustained by Plaintiffs"[100] cannot be reconciled with the numerous allegations of particularized injuries caused by Porter Hedges' conduct as detailed in the Complaint.  For example, the Complaint alleges that:

> [Porter Hedges] knew that as bondholders/creditors in GWG's bankruptcy proceeding, Plaintiffs were among a limited group that could reasonably have been expected to have access to Defendants' misrepresentations and could reasonably have been expected to act in reliance upon such misrepre-sentations. [Porter Hedges] had a duty to provide professional services that a reasonable and prudent attorney or wind down trustee would have provided under the same or similar circumstances. [Porter Hedges] failed to provide the legal services or the wind down trustee services that a reasonably prudent attorney or wind down trustee would have provided under the same or similar circumstances. [Porter Hedges'] conduct constitutes professional negligence and legal malpractice.  As a direct and proximate result of [Porter Hedges'] negligence and/or malpractice, Plaintiffs suffered damages including but not limited to economic harm and monetary loss.[101]

And the Complaint details the particularized financial injuries sustained by the Plaintiffs.  For example:

> Plaintiffs are former Bondholders of GWG who had their interests in GWG significantly devalued and wasted through the conversion of GWG's bankruptcy proceeding from reorganization into liquidation and the reckless and improper fire sale of GWG's assets that was devised solely to provide short-term gains and dividends for the bankruptcy professionals… . As a result of Defendants' misconduct, the Bondholder Plaintiffs', and others', interests have been rendered entirely or nearly worthless—a loss of at least 96% of the value of their bonds.[102]

42.    Porter Hedges' 12(b)(1) arguments are really nothing more than a standard assertion of failure to state a claim under Rule 12(b)(6).  *See Ramming, supra*, at 161.  "[A] complaint

---

[100]  Complaint, at ¶ 39.

[101]  Complaint, at ¶¶ 278-280.

[102]  Complaint, at ¶ 19.

should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957). *See also, Grisham v. United States,* 103 F.3d 24, 25–26 (5th Cir.1997). A motion to dismiss must be denied where the allegations in the complaint would "provide relief on any possible theory." *Ramming,* 281 F.3d at 162; *Cinel v. Connick,* 15 F.3d 1338, 1341 (5th Cir.1994).

43.     Plaintiffs have adequately pled injury and causation. *See supra,* at Sec. I.B. and *infra*, at Sec. IV. And a favorable decision by this Court granting the relief sought by Plaintiffs would redress the injury caused by Defendants. *Lujan,* 504 U.S. at 560-61. Thus, regardless of which rule applies, Plaintiffs have constitutional standing.

## II. Plaintiffs Have Prudential Standing to Pursue Claims Against Porter Hedges.

44.     Prudential standing is a judicially created doctrine that prohibits third-party claims, generalized grievances, and ensuring the plaintiff's interests fall within a statute's "zone of interests." *St. Paul Fire & Marine Ins. Co. v. Labuzan*, 579 F.3d 533, 539 (5th Cir. 2009). In its Motion, Porter Hedges recasts the allegations in the Complaint, asserting that Plaintiffs are merely complaining of the mismanagement of the GWG bankruptcy estate. While that mismanagement indeed occurred, Porter Hedges ignores the well-pled allegations that the injuries to Plaintiffs only occurred because of the professional negligence of Porter Hedges and its participation in the cover-up of the Jones-Freeman conflict. Because Porter Hedges had a fiduciary duty to Plaintiffs, its violation of that duty caused the injuries. This is not a third party or derivative claim—it is a direct claim against Porter Hedges. That is more than enough to overcome this misplaced invocation of the prudential standing doctrine.

**III. The Complaint Pleads Causation Against Porter Hedges.**

45.    The Complaint Sufficiently pleads causation of harm for claims against Porter Hedges. Specifically, the Complaint pleads:

- Freeman and Jones were involved in a romantic relationship that precluded them from working on any case where the other appeared.[103]

- Only through secrecy of the relationship could Freeman and Jones appear or work on the same case.[104]

- Porter Hedges had knowledge of the Freeman-Jones relationship.[105]

- Porter Hedges owed a duty to the Bondholders Committee and the constituency of the bondholder class to disclose their knowledge of the Freeman-Jones relationship, challenge the request to appoint Jones as mediator, and challenge Freeman's appointment as Wind Down Trustee.[106]

- Porter Hedges violated its duties owed to the Bondholders Committee and the consistency of the bondholder class by (1) never disclosing the [Freeman-Jones]] relationship; (2) not challenging the request to appoint Jones as mediator; and (3) not challenging Freeman's appointment as Wind Down Trustee or seeking her removal.[107]

---

[103] Complaint, at ¶¶ 120-127.

[104] *Id.*, at ¶¶ 3, 18, 52, 57, 120-27, 198, 258, 298.

[105] *Id.*, at ¶¶ 18, 57, 147, 247-50, 277.

[106] *Id.*, at ¶¶ 18, 57, 147, 247-50, 277.

[107] *Id.*, at ¶¶ 18, 57, 147, 247-50, 277.

- Had Porter Hedges disclosed the Freeman-Jones relationship disqualification for Jones was automatic and he would have been immediately removed from the case.[108]

- Prior to the mediation, GWG had prepared a plan for reorganization projected to ensure that GWG investors and bondholders would retain all of the value of their investments.[109]

- In November of 2022, Freeman and Jackson Walker forced all pre-bankruptcy management of GWG to resign.[110]

- Immediately thereafter, on November 30, 2022, Jackson Walker, with full knowledge of the Freeman-Jones conflict, filed a motion to appoint Jones as mediator.[111] Freeman even appeared at the hearing arguing in support of Jones appointment.[112] At the hearing, Porter Hedges did not object to Jones' appointment.[113]

- At the mediation Jones immediately informed the parties that the GWG bankruptcy was no longer a reorganization, but the company would be liquidated.[114] Before any party could voice objection, Jones informed the parties that resistance to his plan was futile, as Judge Isgur would adopt Jones'

---

[108] *Id.*, at ¶¶ 120-124.

[109] *Id.*, at ¶¶ 96, 100.

[110] *Id.*, at ¶¶ 97, 100.

[111] *Id.*, at ¶ 98.

[112] *Id.*, at ¶ 98.

[113] *Id.*, at ¶ 99.

[114] *Id.*, at ¶ 101.

recommendation regardless of whether the parties agreed.[115]  As a part of the new Jones liquidation plan for GWG, Freeman would serve in a role that would be unavailable unless the company were to liquidate, Wind Down Trustee, and collect the $50,000 - $100,000 monthly payment(s) that accompanied the position.[116]

- Even though Freeman participated in the mediation as counsel and Jones as mediator, no one including Freeman, Jones, Jackson Walker, or Porter Hedges disclosed the Freeman-Jones relationship.

- Despite all the hardships and the parade of horribles cited by Porter Hedges,[117] at the time of bankruptcy, the value of GWG's assets totaled approximately $2.5 billion.[118]  This was even true through June of 2023.[119]

- Through the mismanagement of Freeman, the value of the GWG assets entered a freefall ultimately returning approximately 4% of the value of the assets prior to assuming the role of Wind Down Trustee.[120]

- Freeman, Jones, Jackson Walker, and/or Porter Hedges could have stopped this chain of events at any time by disclosing the Freeman-Jones relationship.[121]

---

[115] *Id.*, at ¶ 101.

[116] *Id.*, at ¶ 103.

[117] Motion, at 51; The Complaint does not plead misconduct by GWG, Heppner, or Holland or that the "bankruptcy itself" caused harm to GWG or the value of its assets.  To the contrary, the Complaint pleads that even more than a year into the bankruptcy, GWG's valuation was still approximately $2.5 billion.  Complaint, at ¶ 106.

[118] Complaint, at ¶ 106.

[119] *Id.*, at ¶ 106.

[120] *Id.*, at ¶¶ 106-110, 129-132

[121] *Id.*, at ¶¶ 120-24.

46.    The Complaint clearly pleads proximate and but/for causation for any damages—had Porter Hedges simply made the required disclosures consistent with their fiduciary duties to the Bondholders Committee and the constituency of bondholders, Jones would not have been mediator, Freeman would not have been Wind Down Trustee, and the perpetuators of the scheme would not have looted GWG.

47.    Further, in breach of fiduciary duty cases, a party "need not prove actual damages in order to obtain forfeiture of an attorney's fees for the attorney's breach of fiduciary duty to the client."[122]  Additionally, the fees paid to the attorneys themselves constitute damages for a breach of fiduciary duty claim.[123]

## IV. The Complaint Pleads Detrimental Reliance.

48.    Plaintiffs have sufficiently plead detrimental reliance for claims that require such pleading.

### A.    A Breach of Fiduciary Duty Claim Against an Attorney Does not Require Detrimental Reliance.

49.    The elements for a breach of fiduciary claim are "(1) the existence of a fiduciary duty, (2) breach of the duty, (3) causation, and (4) damages."[124]  Where the equitable remedy of fee forfeiture is sought Plaintiff need not show causation (*e.g.* reliance) or damages.[125]  This is

---

[122] *See Haden v. David J. Sacks, P.C.*, 332 S.W.3d 503, 520 (Tex. App.—Houston[1st Dist.] 2009) (quoting *Burrow v. Arce*, 997 S.W.2d 229, 240 (Tex. 1999); *see also In re Hardwick*, 426 S.W.3d 151, 160 (Tex. App—Houston[1st Dist.] 2012, no pet.) ("limiting forfeiture's availability to instances in which the principal sustains actual harm would conflict with the purposes of the remedy") (citing *Burrow v. Arce*, 997 S.W.2d 229, 238 (Tex. 1999))).

[123] *See Haden*, 332 S.W.3d at 521 (barring attorneys' fees recovery because party did not seek attorneys' fees as damages).

[124] *See First United Pentecostal Church of Beaumont v. Parker*, 514 S.W.3d 214, 220 (Tex. 2017).

[125] *Id.* at 220-21; *see also Floyd v. Hefner*, 556 F. Supp. 2d 617, 661 (S.D. Tex. 2008) ("Where a plaintiff seeks the remedy of fee forfeiture and proves his claim of breach of fiduciary duty, there is no requirement that he must prove causation or damages.")

because the fee forfeiture in an attorney-client relationship serves a different purpose than damages to a plaintiff:

> First, in principle, a person in a trust relationship who does not provide the loyalty bargained for fails to fulfill his agreement and is not entitled to be paid in full. Therefore, when considering an appropriate remedy for a fiduciary's breach of loyalty, the "agent's breach of fiduciary duty should be deterred even when the principal is not damaged." [*Burrow v. Arce*, 997 S.W.2d 229, 240 (Tex. 1999)]. "It is the agent's disloyalty, not any resulting harm, that violates the fiduciary relationship and thus impairs the basis for compensation." *Id*. at 238. Pragmatically, fee forfeiture also serves as a deterrent. The central purpose of this remedy "is not to compensate an injured principal, even though it may have that effect." *Id*. "Rather, the central purpose of the equitable remedy of forfeiture is to protect relationships of trust by discouraging agents' disloyalty." *Id*.

*Id.* at 221.

50.    In this case, Porter Hedges served as an attorney for the Bondholders Committee.[126] As attorney for the Bondholders Committee, Porter Hedges owed fiduciary duties to both the Committee and the committee constituency, the bond holders.[127]    Porter Hedges has a fiduciary obligation to inform its clients of all conflicts[128] and all material facts[129] related to its representation.

---

[126] A fiduciary relationship exists between attorneys and clients as a matter of law. *Arce v. Burrow*, 958 S.W.2d 239, 246 (Tex.App.—Houston, [14th Dist.] 1997) (*opinion on reh'g*), *aff'd as modified*, 997 S.W.2d 229 (Tex.1999); *Floyd*, 556 F. Supp. 2d at 661 ("An attorney has a fiduciary duty to his client as a matter of law").

[127] For a more detailed discussion of the duties to the committee constituency, *see* Sec. I.A, *infra*.

[128] *See Fleming v. Curry*, 412 S.W.3d 723, 736-37 (Tex. App.—Houston[14th Dist.] 2013, rev. denied) ("An attorney owes a client a duty to inform the client of matters material to the representation. A fact is material if it would likely affect the conduct of a reasonable person concerning the transaction in question. Materiality thus centers on whether a reasonable person would attach importance to and would be induced to act on the information in determining his choice of actions in the transaction in question.") (quotations and citations omitted); *see also Deutsh v. Hoover, Bax & Slovacek, L.L.P.*, 97 S.W.3d 179, 190 (Tex. App.—Houston[14th Dist.] 2002, reh'g overruled) (listing cases where duty to report conflicts found);

[129] *See Crean v. Chozick*, 714 S.w.2d 61, 62-63 (Tex. App.—San Antonio 1986, writ ref'd n.r.e.) ("The attorney/client relationship imposes on the attorney a duty to disclose facts material to his representation.")

51.     Certainly, Porter Hedges is not arguing to this Court that it had no duty to disclose its knowledge that counsel for the debtor, who appeared on record multiple times, was in fact the significant other of the mediator who is presumed "completely neutral and impartial," and should not have any "reasonable hint of bias or partiality."[130] After all, the interests of the debtors and creditors (in this instance the bond holders) are generally adverse to one another in the bankruptcy process.[131]

## B.     The Complaint Pleads Detrimental Reliance for the Remainder of the Claims Against Porter Hedges.

52.     The Complaint establishes that Plaintiffs relied on the non-disclosure of the Freeman-Jones relationship to proceed with the mediation and the non-objection to Porter Hedges' fees.[132]   The Motion complains that Plaintiffs fail to plead the "when, how, or what" with regard to reliance on the omissions of Porter Hedges.[133]   These argument defies logic—the complained of act is an omission.  The when, is for the entire duration of representation.  The complaint alleges that all relevant times (that is the duration of the GWG bankruptcy), Porter Hedges had knowledge of the Freeman-Jones relationship and failed to disclose it.[134]   If they seek a specific point in time, the Complaint alleges that at the hearing on the motion to appoint the mediator, Porter Hedges specifically remained silent when they had an obligation

---

[130] Complaint, at ¶ 126.

[131] *See In re MMA Law Firm, PLLC*, 660 B.R. 128, 136 (Bankr. S.D. Tex. 2024) (debtors and creditors are adverse "as, among other things, the Debtor and its creditors have inapposite goals of repayment and discharge").

[132] Porter Hedges admits that the Complaint makes these allegations.  *See* Motion, at ¶¶ 55-56; *see also* Complaint, at ¶ 249 ("Defendant Porter Hedges knew or should have known that bondholders/creditors such as Plaintiffs relied on their good-faith representation of the Bondholder Committee and the interests of the bondholders and their implicit representation that they were unaware of any disqualifying conflict between the mediator and Freeman.")

[133] *See* Motion, at ¶ 55.

[134] Complaint, at ¶¶ 18, 57, 99, 147, 246, 249, 274, 276-77

to disclose,[135] and at the time of the mediation when Freeman was discussed as the Wind Down Trustee, Porter Hedges also should have disclosed the relationship.[136]  The "how" is also very simple, Porter Hedges had an obligation to disclose and they chose not to; the course of action would have changed had they made disclosure—Jones and Freeman would have been disqualified and their scheme would have come to an end at least in the GWG bankruptcy.[137]  Finally, the "what" (was relied upon) is Porter Hedges silence.[138]

53.    Porter Hedges next alleges that their omissions did not impact the ability of the Plaintiffs to object to their fees (which inexplicably would negate detrimental reliance).[139]  First, Porter Hedges is alleging facts that are not part of the Complaint—under no set of facts in the Complaint or otherwise is it plead that Plaintiffs learned of the extent of the relationship between Freeman and Jones and how it impacted this and the other cases in which Freeman appeared before Jones in October 2023.  Second, even though Porter Hedges and Freeman agreed to postpone the hearing of the Porter Hedges fee application until March of 2024, when Porter Hedges served their fee application on August 21, 2023, it contained in block format on the front page the following directive, "If you object to the relief requested you must respond … within twenty-one days from the date this motion was filed."[140]  This made any objection filed after Wednesday, September 20, 2023, untimely.  Given that the Freeman-Jones relationship did not become public until October 2023, Plaintiffs could not timely file

---

[135] *Id.*, at ¶¶ 18, 99, 147, 246, 249, 276-77

[136] *Id.*, at ¶¶ 18, 147, 246, 249, 276-77

[137] *Id.*, at ¶¶ 120-27.

[138] *Id.*, at ¶¶ 18, 57, 99, 147, 246-50, 274, 276-77, 293-94.  For a more detailed discussion on why Porter Hedges silence constitutes an affirmative representation under applicable Texas law, *see* discussion *infra*, Sec. X.

[139] *See* Motion, at ¶ 55.

[140] GWG Bankruptcy Cases, ECF No. 2146, at Cover Page.

objection to Porter Hedges request.[141]   Finally, Porter Hedges cites no case law for the proposition that because some matter is made "public," it absolves an attorney of responsibility to convey conflict information or material facts related to representation to his or her client.

## V.    The Complaint Alleges Facts Sufficient to Impute the Knowledge of the Freeman-Jones Relationship to Porter Hedges.

54.    Based on the state of law in Texas, the Complaint pleads facts sufficient to impute the knowledge of Freeman-Jones relationship to Porter Hedges.[142]   Porter Hedges spends the better part of five (5) pages of its motion arguing that under Texas law, an agent of Porter Hedges would not have knowledge he gained imputed to Porter Hedges unless such knowledge was gained within his scope of agency for Porter Hedges and even if he had such knowledge, the knowledge would not be imputed unless the agent was staffed on the particular case.[143]   The crux of Porter Hedges argument rests on a case from 1909, *Flynn v. Bank of Mineral Wells*, which they claim is still good law and stands for the proposition that any knowledge gained "outside the partnership business" could not be imputed.[144]   Porter Hedges does not evaluate or inform the court of exceptions to this rule that the Supreme Court of Texas has adopted since 1909.

55.    The Texas Supreme Court first adopted the rule that an agent's knowledge is not imputed to the principal unless such knowledge was acquired while the agent was transacting

---

[141] It would also have required Plaintiffs to have knowledge in October of 2023, of Freeman and Jones past relationships at Porter Hedges, that Porter Hedges knew or had reason to know about the relationship, that Porter Hedges had a legal duty to inform the Plaintiff bond holders of the relationship and that fee forfeiture was an appropriate remedy for Porter Hedges' non-disclosure of such relationship.

[142] *See* Complaint, at ¶¶ 18, 57, 99, 147, 246, and 249.

[143] *See* Motion, at ¶¶ 57-65.

[144] *Id.*, at ¶ 63.

the business of the principal in the 1895 opinion, *Texas Loan Agency v. Taylor*.[145]  Later, in the 1941 case, *Wellington Oil Co. v. Maffi*, the Texas Supreme Court recognized an exception to the rule, "that where the agent is the actor representing his principal in the transaction to which his knowledge relates, the principal will not be permitted to avail himself of the benefits of his agent's services without being charged with his knowledge."[146]  The Texas Supreme Court then later broadened the exception to the *Taylor* rule in the 1965 case of *Fireman's Fund Indemnity Co. v. Boyle General Tire Co.* where it adopted the Restatement (First) of Agency, Section 276, which provides, "except for knowledge acquired confidentially, the time, place, or manner in which knowledge is acquired by a servant or other agent is immaterial in determining the liability of his principal because of it."[147]

56.    In *Pan Eastern Exploration Company v. Hufo Oils*, the Fifth Circuit Court of Appeals addressed the same argument made by Porter Hedges, "even when the agency relationship is established, the acts of an agent will not bind the principal absent proof the agent was acting within the course and scope of its authority and in the best interest of the principal."[148]  The Fifth Circuit finding the argument had no merit because the "exception has swallowed the [*Taylor*] rule" articulated the history of the rule:

> One hundred years ago Texas law concerning the knowledge of an agent acquired outside the scope of his agency was as narrow as the plaintiffs now contend. The law has since changed, however, as the exception has swallowed the rule. The exception began chewing on the rule in cases like *Wellington Oil Co. v. Maffi*, 136 Tex. 201, 150 S.W.2d 60 (1941). In *Maffi*, the Supreme

---

[145] 29 S.W. 1057 (1895); *see also Floyd*, 556 F. Supp. 2d at 655.

[146] 150 S.W.2d 60 (1941); *see also Pan E. Expl. Co. v. Hufo Oils*, 855 F.2d 1106, 1127-28 (5th Cirt. 1988), superseded on other grounds by Tex. Bus. Corp. Act art. 21.223(a)(3).

[147] 392 S.W.2d 352, 356–57 (Tex. 1965); *see also* Restatement (Second) of Agency § 276; *Pan E. Expl. Co.*, 855 F.2d at 1127-28.

[148] *Pan E. Expl. Co.*, 855 F.2d at 1127.

Court's analysis begins by noting the expansive rule of the Restatement of Agency (First) and various legal encyclopedias which stated that the principal is always bound by the actual knowledge of his agent no matter how acquired. The *Maffi* opinions continues:

> This court has not adopted so broad a statement of the rule. The rule has been announced by this court that a principal, whether a corporation or a natural person, is not affected by notice which comes to the agent or officer unless such knowledge came to him while he was transacting the business of his principal. *Texas Loan Agency v. Taylor*, 88 Tex. 47, 49, 29 S.W. 1057 [ (1895) ]; *Teagarden v. Godley Lumber Co.*, 105 Tex. 616, 154 S.W. 973 [ (1913) ]. While this court has announced that as the general rule, it has in subsequent decisions recognized an exception thereto which seems also to be recognized in practically all jurisdictions. That exception is that where the agent is the actor (sometimes designated sole actor), representing his principal in the transaction to which his knowledge relates, the principal will not be permitted to avail himself of the benefits of his agent's services without being charged with his knowledge.

*Maffi*, 136 Tex. at 207, 150 S.W.2d at 63 (citations omitted). The *Maffi* "exception" obviously makes an enormous inroad into the "general rule." *See United States Fidelity & Guaranty Co. v. San Diego Bank*, 155 S.W.2d 411, 413 (Tex.Civ.App.—El Paso 1941, writ ref'd w.o.m.) (absent allegation of fraud by agent, notice to person acting for both plaintiff and defendant held to have been notice to both plaintiff and defendant).

By the time of *Fireman's Fund Indemnity Co. v. Boyle General Tire Co.*, 392 S.W.2d 352, 356 (Tex.1965), the Texas Supreme Court still gave lip service to the ancient rule while effectively ignoring it. In *Fireman's Fund* the Court held an insurance company bound by knowledge its insurance agent had acquired while selling policies for another company. It mentioned *Maffi* and recited the old rule, but cited as an unqualified "exception" to the old rule the general rule of the Restatement that Maffi had tried to distinguish. So by the time of *Fireman's Fund* the transformation was complete: Texas now follows the Restatement rule which

imputes all knowledge of an agent (except that acquired in confidence) to his current principal.[149]

Regardless of how or when Mr. Simms obtained such knowledge, that knowledge is imputed to Porter Hedges as long as the knowledge relates to matters within the scope of Mr. Simms agency or employment.

57.    The Complaint pleads that (1) Porter Hedges undertook representation related to the GWG bankruptcy whereby it represented the Bondholders Committee and the bondholder class;[150]  (2) a partner of and lawyer in the firm, Nicholas Simms, had knowledge of material facts and conflicts information relating to Porter Hedges representation in the GWG bankruptcy;[151] (3) by virtue of his stature and position in the firm (partner and lawyer), Mr. Simms' knowledge of the material facts and conflict information relating to Porter Hedges representation in the GWG bankruptcy was imputed to Porter Hedges;[152] (4) Porter Hedges failed to disclose the material facts and conflicts information relating to Porter Hedges representation in the GWG bankruptcy;[153] (5) as a result of the non-disclosure of the material acts and conflicts information relating to Porter Hedges representation in the GWG bankruptcy, Plaintiffs suffered damage at the hands of the fraudulent enterprise orchestrated

---

[149] *Id.*; *see also Floyd*, 556 F. Supp. 2d at 655-56 ("Texas follows the general rule that, except for knowledge obtained confidentially, the knowledge of the agent is the knowledge of the principal irrespective of its source or time of acquisition. *See Fireman's Fund Indem. Co. v. Boyle Gen. Tire Co.*, 392 S.W.2d 352, 356 (Tex.1965) (adopting the Restatement (Second) of Agency section 276 as an "exception" to the rule announced in *Tex. Loan Agency v. Taylor*, 88 Tex. 47, 29 S.W. 1057 (1895), which held that an agent's knowledge is not imputed to his principal unless such knowledge was acquired while he was transacting the business of his principal); *Pan E. Exploration Co. v. Hufo Oils*, 855 F.2d 1106, 1128 (5th Cir.1988) (noting that "exception" swallowed the rule in *Taylor* and that "Texas now follows the Restatement rule which imputes all knowledge of an agent (except that acquired in confidence) to his current principal")."); *Derryberry v. Nationsbank of Texas, N.A.*, No. 01-95-01438-CV, 1998 WL 93275, at *4 (Tex. App.—Houston[1st Dist.] Mar. 5, 1998)

[150] Complaint, at ¶¶ 18, 57, 99, 147, 246, 248-50.

[151] *Id.*, at ¶ 18.

[152] *Id.*

[153] *Id.,* at ¶¶ 18, 57, 99, 147, 249, 261, 276-77.

by Freeman, Jones, and Jackson Walker.[154]    This is sufficient to plead imputation of knowledge from Mr. Simms to Porter Hedges.[155]

58.    The cases cited by Porter Hedges in the motion do not require a different conclusion. The Motion cites *Thomas v. N.A. Chase Manhattan Bank*, for the proposition of a limitation contained within the general rule.[156]    However, unlike *Pan Eastern Exploration, supra*, this opinion simply recites the general rule within the context of New York state law and does not discuss the exceptions to the rule adopted by Texas.[157]    The Motion then cites *La Sara Grain Co. v. First National Bank of Mercedes* for the proposition that Texas recognizes the limitation first established in *Taylor*.[158]    *La Sara Grain* is also of no help to Porter Hedges.    The Court in *La Sara Grain* cites the general rule of agency but then notes that "[t]he bank does not contend that the corporate resolution was filed outside the normal course of business."[159]    As the debated information fell within the rule, the Court had no need to evaluate the exceptions described above in *Pan Eastern Exploration*.    The Motion then cites *Doctors Hospital at Renaissance, Ltd. v. Andrad* for the proposition that an agent only acts as an agent if he were

---

[154] *See* Response discussion, *supra*, at Sec. I.B.

[155] Based on the Motion, it appears that Porter Hedges wants to argue the specifics concerning the scope of Mr. Simms agency and employment.  This is a fact intensive inquiry that is generally reserved for the jury.  *See e.g.*, *Bishop v. Miller*, 412 S.W.3d 758, 783 (Tex. App.—Houston[14th Dist.] 2013, no pet.) (affirming trial court submission to jury on scope of employment and actual authority as agent); *Gruma Corp. v. Mexican Restaurants, Inc.*, No. 4:09-CV-488, 2010 WL 5390139, at *5 (E.D. Tex. Dec. 2, 2010), report and recommendation adopted, No. 4:09-CV-488, 2010 WL 5387624 (E.D. Tex. Dec. 22, 2010) (denying summary judgment because of fact issue on whether scope of employment was broad enough to impute knowledge from employee to employer); *see also Rudolph Automotive, LLC v. Juarez*, No. 08-24-00142-CV, 2025 WL 2415803, at *7 (Tex. App.—El Paso, no pet. hist.) (course and scope of employment is a question of fact for the jury).  It is certainly not appropriate at the dismissal stage.  The Complaint provides adequate notice of the legal theories, claims, and facts supporting the same for the imputation of knowledge from Mr. Simms to Porter Hedges.

[156] *See* Motion, at ¶ 61.

[157] *See Thomas v. N.A. Chase Manhattan Bank,* 1 F.3d 320, 325 (5th Cir. 1993).

[158] *See* Motion, at ¶ 62.

[159] *See La Sara Grain Co. v. First Nat. Bank of Mercedes,* 673 S.W.2d 558, 563 (Tex. 1984).

engaging in the business of the principal.[160]  This case is wholly unapplicable to the case at bar.  *Andrad* was discussing a principal's liability for the acts of its agent—it does not even discuss knowledge of an agent being imputed to a principal.[161]

59.    Porter Hedges next cites three cases for the proposition that courts "routinely" limit the knowledge imputed (1) to knowledge acquired in while engaged in the business of the principal and (2) the authority of the agent extended to the subject matter of the information acquired.[162]  While the recitation of the rule may include two parts, the Texas Supreme Court in *Fireman's Fund* dispensed with any notion that the knowledge must be acquired while engaged in the business of the principal.[163]  Porter Hedges then cites *Flynn v. Bank of Mineral Wells* as authority that knowledge gained outside the partnership business would not be imputed.[164]  As noted above, *Flynn* is a case from 1909 decided under *Taylor*, and prior to the Texas Supreme Court abrogating the requirement that knowledge must have been gained during the course of agency.

60.    Finally, Porter Hedges argues that the Complaint fails to plead facts sufficient to establish an agency relationship.[165]  However, Porter Hedges cites to no authority that requires Plaintiffs to plead anything more specific than what Plaintiffs have already pled.  The Complaint alleges that (1) the Freeman-Jones relationship was material to Porter Hedges' representation of the Bondholders Committee and the bondholders constituency at large; (2)

---

[160] *See* Motion, at ¶ 62, n. 163.

[161] *See Drs. Hosp. at Renaissance, Ltd. v. Andrade,* 493 S.W.3d 545, 549-50 (Tex. 2016).

[162] *See* Motion, at ¶ 62, n. 164.

[163] *See Fireman's Fund Indemn. Co. v. Boyle Gen. Tire Co.,* 392 S.W.2d 352, 356-57 (Tex.1965); see also Restatement (Second) of Agency § 276; Pan E. Expl. Co., 855 F.2d at 1127-28; *Floyd*, 556 F. Supp. 2d at 655-56.

[164] Motion, at ¶ 63.

[165] *Id.* at ¶ 64.

Mr. Simms had knowledge of the Freeman-Jones relationship at all relevant times; and (3) that such knowledge is imputed from Mr. Simms to Porter Hedges.[166]  This is more than sufficient to meet Plaintiffs' pleading requirements.

## VI.    Plaintiffs' Claims Are not Barred by Attorney Immunity or the Judicial Proceedings Privilege.

61.    Texas' attorney immunity defense provides that a lawyer is immune from prosecution by a non-client for conduct committed in the course of representing the lawyer's client. *Taylor v. Tolbert*, 644 S.W.3d 637, 642 (Tex. 2022). Attorney immunity exists to encourage aggressive representation and advocacy by attorneys that might be hindered if attorneys feared being subjected to lawsuits by third parties. *Cantey Hanger, LLP, v. Byrd*, 467 S.W.3d 477, 481 (Tex. 2015). It is not, however, unlimited. Immunity only attaches to "the kind of conduct" attorneys engage in when discharging their professional duties; therefore if an attorney engages in conduct that is not "lawyerly work" or is "entirely foreign to the duties of lawyer" or falls outside the scope of client representation, the defense is inapplicable.  *Taylor*, 655 S.W.3d at 646; *Alpert v. Crain, Caton & James, P.C.*, 178 S.W.3d 398, 405 (Tex.App.—Houston [1st Dist.] 2015, pet. denied). Porter Hedges bears the burden of proving that its actions were the type of conduct involving a "unique lawyerly capacity" and calling upon the attorney's "skills as an attorney." *Taylor*, 655, S.W.3d at 645-46 (movant bears the burden of conclusively proving affirmative defense of attorney immunity applies). No such showing has been made here, and the well-pleaded facts suggest quite the opposite.

62.    Porter Hedges misconstrues the conduct at issue as making court filings, appearing at hearings, and conducting bankruptcy court "business as usual." These are not the facts giving

---

[166] Complaint, at ¶ 18.

rise to Plaintiffs' claims. Instead, Plaintiffs' claims arise from Porter Hedges inexcusable failure to advocate for the bondholders and instead be complicit observers to the most significant fraud to have been wrought upon the bankruptcy system. These are not acts of lawyerly advocacy.

63.     Further, the attorney immunity defense can only be asserted against non-clients. Porter Hedges' argument wholly ignores the fiduciary duties it accepted to Plaintiffs and all bondholders when seeking and accepting their role as counsel for the Bondholder Committee, discussed *supra*.

64.     Nor does Porter Hedges gain any protection from their interpretation of the judicial proceedings privilege. The policy behind this privilege is to protect the integrity of the adversarial litigation process and ensure that a court or jury is able to get the information it needs without witnesses and litigants fearing retaliatory suits for defamation. *James v. Brown*, 637 S.W.2d 914, 916 (Tex. 1982). Consistent with that purpose, although using broad language, Texas courts generally discuss and apply the privilege in relation to defamatory statements. The Texas Supreme Court has declined to extend the privilege beyond libel and slander. *Id.* at 918; *Bird v. W.C.W.*, 868 S.W.2d 767, 771 (Tex. 1994).

65.     Porter Hedges' failures and omissions are not defamatory statements. The mere fact that these omissions were made appurtenant to a bankruptcy proceeding should not immunize them from liability. Ultimately, while an in-court statement may not form the basis of a defamation action, "the unavailability of a defamation action does not preclude a plaintiff from pursuing other remedies at law." *James*, at 917-18.

## VII.    Porter Hedges Owed a Duty to the Bondholder Committee and the Constituency of Bondholders.

66.    As discussed above, *supra*, Porter Hedges did in fact owe a duty to Plaintiffs. *See* Section I.A., *supra*, which is incorporated here by reference.

## VIII.    Plaintiffs Sufficiently Plead Their Claim of Aiding & Abetting Breach of Fiduciary Duty Against Porter Hedges.

67.    While Porter Hedges may disagree with the label, aiding and abetting a breach of fiduciary duty, " it is settled as the law of this State that where a third party knowingly participates in the breach of duty of a fiduciary, such third party becomes a joint tortfeasor with the fiduciary and is liable as such."[167]  Some courts label the cause of action a "knowing participation claim,"[168] others label the claim "aiding and abetting."[169]  Regardless of the label, courts generally treat the claim as falling under Texas law recognizing a knowing participation claim.[170]

---

[167] *See Kinzbach Tool Co. v. Corbett-Wallace Corp.,* 138 Tex. 565, 160 S.W.2d 509, 514 (1942); *see also Straehla v. AL Glob. Servs., LLC,* 619 S.W.3d 795, 804 (Tex. App.—San Antonio 2020, pet. denied)

[168] *See Straehla*, 619 S.W.3d at 804 (listing elements); *O'Donnell v. Roo Inv. Fund II, LLC*, No. 05-23-00238-CV, 2024 WL 469558, at *8 (Tex. App.—Dallas Feb. 7, 2024, no pet.)(mem. op.)

[169] *See Baylor Scott & White v. Project Rose MSO, LLC,* 633 S.W.3d 263, 284 (Tex. App.—Tyler 2021, pet. denied); *Kastner v. Jenkens & Gilchrist, P.C.,* 231 S.W.3d 571, 580 (Tex. App.—Dallas 2007, no pet.)(" The crux of the Kastners' argument is that … Dunlap aided and abetted Box in a breach of fiduciary duty he owed to the Kastners. When a third party knowingly participates in the breach of a fiduciary duty, the third party becomes a joint tortfeasor and is liable as such.")(citing *Kinzbach Tool Co. v. Corbett–Wallace Corp.*, 138 Tex. 565, 160 S.W.2d 509, 513–14 (Tex.1942); *Brewer & Pritchard, P.C. v. Johnson*, 7 S.W.3d 862, 867 (Tex.App.-Houston [1st Dist.] 1999) *aff'd on other gr.*, 73 S.W.3d 193 (2002)); *see also Brewer & Pritchard, P.C. v. Johnson,* 7 S.W.3d 862, 867 (Tex. App. 1999), *aff'd on other grounds*, 73 S.W.3d 193 (Tex. 2002)(using terms "aids and assists").

[170] *See Baylor Scott & White*, 633 S.W.3d at 284; *Kastner*, 231 S.W.3d at 580; *Sec. & Exch. Comm'n v. Faulkner*, No. 3:16-CV-1735-D, 2020 WL 584614, at *4, n. 5 (N.D. Tex. Feb. 6, 2020) ("As this court recently noted in Taylor v. Rothstein Kass & Co., 2020 WL 554583, at *6 n.4 (N.D. Tex. Feb. 4, 2020) (Fitzwater, J.), '[a]lthough the Supreme Court of Texas has not explicitly recognized a cause of action for aiding and abetting, it does recognize a cause of action for knowing participation in a breach of fiduciary duty.'") *but see Fischer v. Fischer,* No. 05-23-00679-CV, 2025 WL 2368877, at *8 (Tex. App.—Dallas Aug. 14, 2025, no pet.) (treating "aiding and abetting" and "knowing participation" as separate legal theories).

68.    The elements of the claim as recognized in Texas are "(1) the existence of a fiduciary duty owed by a third party to the plaintiff; (2) the defendant knew of the fiduciary relationship; and (3) the defendant was aware of his participation in the third party's breach of its duty."[171]

69.    The Complaint pleads the existence of numerous fiduciary duties owed by the Defendants;[172] that the Defendants each knew the fiduciary duties of each other;[173] and by inference that each Defendant was aware of their participation in the third party's breach of duty.[174] The Complaint sufficiently pleads a claim for aiding and abetting a breach of fiduciary duty.

## IX.    Plaintiffs Sufficiently Plead Their Claim for Professional Negligence Against Porter Hedges.

70.    Porter Hedges next argues that no claim for professional negligence exists because "Plaintiffs were not Porter Hedges' clients."  Such a simplistic view of the claim ignores the elements cited by Porter Hedges.  Notably, the element cited by Porter Hedges is "the existence of a legal duty owed by the professional to the plaintiff[s]," not that "Plaintiff was a client of the professional."[175]  While being a client of a professional would certainly create legal duties for the professional, it is not exclusive.  As discussed above, Porter Hedges owed legal duties to the constituency of the bondholder class in this matter.  Porter Hedges breach those duties owed Plaintiffs.  Plaintiffs' professional negligence claim should not be dismissed.

---

[171] *Straehla*, 619 S.W.3d at 804 (citing *Darocy v. Abildtrup*, 345 S.W.3d 129, 138 (Tex. App.—Dallas 2011, no pet.); *see also Baylor Scott & White*, 633 S.W.3d at 284; *Sec. & Exch. Comm'n v. Faulkner*, 2020 WL 584614, at *4.

[172] Complaint, at ¶ 251.

[173] *Id.*, at ¶¶ 256-57.

[174] *Id.*, at ¶¶ 257-58.

[175] *See* Motion, at ¶ 72.

## X.    Plaintiffs Sufficiently Plead Their Claim for Negligent Misrepresentation Against Porter Hedges.

71.    Porter Hedges next argues that under Texas law, an omission does not constitute a misrepresentation, with citation to a single case, *K. Griff Investigations, Inc. v. Cronin*.[176]  In what can be characterized as gamesmanship that this Court has previously admonished, Porter Hedges fails to cite contrary case law directly on point, including numerous cases from the Texas Supreme Court.  It is well settled law in the State of Texas that an omission may constitute a misstatement of existing fact.[177]  Further, there is no question under Texas law that an omission may be the basis of a claim for negligent misrepresentation.[178]  Additionally, the Fifth Circuit and the Southern District of Texas have evaluated this very issue, concluding that a claim for negligent misrepresentation may be predicated on omission.[179]  The Court in *Carduco, supra*, went so far to state when addressing the very issue presented by Porter Hedges:

---

[176] *See* Motion, at ¶ 74, n.187.

[177] *See Schlumberger Tech. Corp. v. Swanson*, 959 S.W.2d 171, 181 (Tex. 1997) ("where a party has a duty to disclose, the non-disclosure may be as misleading as a positive misrepresentation of facts"); *SmithKline Beecham Corp. v. Doe*, 903 S.W.2d 347, 353 (Tex. 1995) ("when a duty to speak exists, silence may be as misleading as the positive misrepresentation of existing facts"); *Spoljaric v. Percival Tours, Inc.*, 708 S.W.2d 432, 435 (Tex. 1986) ("[w]hen the particular circumstances impose on a person a duty to speak and he deliberately remains silent, his silence is equivalent to a false representation"); *Smith v. Nat'l Resort Cmty, Inc.*, 585 S.W.2d 655, 658 (Tex. 1979) ("where there is a duty to speak, silence may be as misleading as a positive misrepresentation of existing facts."); *Brown & Brown of Texas, Inc. v. Omni Metals, Inc.,* 317 S.W.3d 361, 384-86 (Tex. App.—Houston[1st Dist.] 2010, pet. denied)("In the prior appeal of this case, the Fourteenth Court of Appeals pointed out that a misrepresentation need not be an affirmative misrepresentation of fact. It stated, 'Where there is a duty to speak, silence may be as misleading as a positive misrepresentation of existing facts.' Omni Metals, 2002 WL 2331720, at *3 (quoting Smith v. Nat'l Resort Cmty., Inc., 585 S.W.2d 655, 658 (Tex.1979)).") ; *Kelly v. LIN Television of Texas, LP*, 27 S.W.3d 564, 572 (Tex. App.—Eastland 2000, pet. Denied) ("[t]here are times when circumstances impose upon a party a duty to speak; and, if the party remains silent, the silence itself can be a false representation."); *Beggins v. CBRE Cap. Markets of Texas, L.P.*, No. H-17-1541, 2018 WL 3121761, at * (S.D. Tex. Jun. 26, 2018) ("[a] defendant may misrepresent an existing fact by omission.")

[178] *See Brown & Brown*, 317 S.W.3d at 384-86; *Coburn Supply Co. v. Kohler Co.*, 342 F.3d 372, 377 (5th Cir. 2003); *Carduco, Inc. v. Mercedes-Benz, USA, LLC*, No. CV B:11-144, 2011 WL 13341315, at *7 (S.D. Tex. Sept. 15, 2011), report and recommendation adopted, No. CV B-11-144, 2011 WL 13341316 (S.D. Tex. Oct. 19, 2011).

[179] *See Coburn*, 342 F.3d at 377 (noting the existence of a negligent misrepresentation claim under Texas law based on nondisclosure where there is a duty to disclose but finding no duty to disclose under facts of the case); *Compean v. Bank of Am.*, No. CV B: 12-189, 2013 WL 12140278, at *7-8 (S.D. Tex. Mar. 11, 2013), report and recommendation adopted, No. CV B-12-189, 2013 WL 12140279 (S.D. Tex. Apr. 15, 2013) (denying motion to dismiss for failure to state a claim where plaintiff plead negligent misrepresentation by omission); *Carduco*, 2011

> … it is not this Court's role to untangle and define Texas law; the Texas courts are much better equipped to resolve such disputes. Rather, this Court is obligated to determine if Carduco has any reasonable possibility of recovery against Dearing and Oswald. The existence of a decision by a Texas appellate court that allows for recovery for negligent misrepresentation based on silence precludes this Court from finding that the claim is not recognized under Texas law.[180]

72.    Neither the case cited by Porter Hedges, *K. Griff Investigations, Inc.*, nor the case upon which it relies, *Fed. Land Bank Ass'n v. Sloane*, address the issue of an omission constituting a misstatement of existing fact.[181]   A cursory search for applicable case law in either Texas or the Southern District of Texas on this issue would have revealed the true state of the law on the issue.   Instead, Porter Hedges wastes this Court's valuable time and Plaintiffs' resources advancing a claim that has no basis in law or fact.

---

WL 13341315, at *5 (noting that a misrepresentation upon which a negligent misrepresentation claim is based "need not be an affirmative misrepresentation of fact," but may be silence where the duty to disclose exist)(citing and quoting *Brown*, 317 S.W.3d at 384); *see also id.*, at *6 ("even if the Court were to conclude that Oswald and Dearing did not affirmatively misrepresent an existing fact, the Defendants' argument is still unavailing. In *Brown & Brown*, the Court of Appeals of Texas (Houston-1st Dist.) held that the misrepresentation does not need to be an affirmative one. Rather, the misrepresentation can result from silence. So long as the defendant has a duty to disclose, silence can be the basis for negligent misrepresentation. *Brown*, 317 S.W.3d at 384"); *see also In re Soc. Media Adolescent Addiction/Pers. Inj. Prods. Liab. Litig.,* No. 4:22-MD-03047-YGR, 2024 WL 1786290, at *6 (N.D. Cal. Apr. 15, 2024) (Texas recognizes a negligent misrepresentation claim where a duty to disclose exists).

[180] *See Carduco*, 2011 WL 13341315, at *7.

[181] *See K. Griff Investigations, Inc. v. Cronin,* 633 S.W.3d 81, 99 (Tex. App.—Houston[14th Dist.] 2021, no pet.)(finding no evidence supporting negligent misrepresentation claim because in one instance, no representation was made and, in other instances, representations were a promise of future conduct).  Further, in *K. Griff Investigations*, appellants complicated the matter by failing to respond to the negligent misrepresentation issue on cross-appeal making it "unclear what fact or facts appellants believe that [appellee] misrepresented or what damages those representations caused." *Id.*  Likewise, *Fed. Land Bank Ass'n v. Sloane*, concerned affirmative statements made, not omissions. 825 S.W.2d 439, 442 (Tex. 1991)("[t]he Sloanes claim that the bank has a duty to use reasonable care whenever it provides information to its customers or potential customers, and that the bank breached this duty when it allegedly encouraged the Sloanes to incur expenses in reliance on the information related to their loan application").

## XI.    Plaintiffs Sufficiently Plead Their Claim for Unjust Enrichment Against Porter Hedges.

73.    Porter Hedges next claims that "Plaintiffs have not met the requisite pleading standard to require Porter Hedges to return the fees it properly earned."[182]   In their citation, Porter Hedges cites authority criticizing Texas Courts for referring to "unjust enrichment claims" and characterize such claims as equitable seeking restitution.[183] However, "[a] Party may recover under the unjust enrichment theory when one person has obtained a benefit from another by fraud, duress, or the taking of undue advantage."[184]   Such a claim may also be predicated on the breach of fiduciary relations.[185]   Here, the Complaint pleads that Defendants, including Porter Hedges, obtained benefits as a result of their fraud, misrepresentations, and breaches of fiduciary duties owed to the Court and Plaintiffs.   The fees paid to Porter Hedges are subject to forfeiture for its actions in this matter and in equity should be returned to the bankruptcy estate.

## XII.    Plaintiffs Sufficiently Plead Respondeat Superior.

74.    "[T]o succeed on a respondeat superior theory, plaintiffs bear the burden of establishing that an employee acted within the course and scope of his or her employment."[186] The Complaint pleads that Porter Hedges through its various agents represented the

---

[182] *See* Motion, at ¶ 75.  Whether Porter Hedges fees were "properly" earned is a matter of contention.  The Complaint alleges they were not and any consideration of whether they were proper or not should be stricken from the Motion.  *See* Complaint, at ¶¶ 18, 57, 99, 147, 245-50, 261, 274, 276-77, 293-94.

[183] *See Motion*, at n. 194.

[184] *Heldenfels Bros., Inc. v. City of Corpus Christi*, 832 S.W.2d 39, 41 (Tex. 1992) citing *Pope v. Garrett*, 211 S.W.2d 559, 560, 562 (1948); *Austin v. Duval*, 735 S.W.2d 647, 649 (Tex.App.—Austin 1987, writ denied).

[185] *See Pope*, 211 S.W.2d at 560 (noting the "violation of confidence of fiduciary relations" as basis for equitable remedies).

[186] *20801, Inc. v. Parker*, 249 S.W.3d 392, 397, n. 6 (Tex. 2008)(citing *leadon v. Kimbrough Bros. Lumber Co.*, 484 S.W.2d 567, 569 (Tex. 1972)); *see also Porter v. Sw. Christian College*, 428 S.W.3d 377, 381 (Tex. App.—Dallas 2014, no pet.)("A plaintiff pleading respondeat superior bears the burden of establishing that the employee acted within the course and scope of his employment.").

Bondholders Committee and the bondholder constituency and owed various duties to Plaintiffs.[187]  Thus, the actions taken by Porter Hedges' employees within the scope of their employment may be attributed to Porter Hedges.

75.    Porter Hedges argues that Plaintiffs there must be damages because of a tort for vicarious liability to apply.[188] The Complaint pleads the following tort claims against Porter Hedges, each with damages: breach of fiduciary duty,[189] aiding and abetting (or knowing participation in) a breach of fiduciary duty,[190] negligent misrepresentation,[191] and professional negligence.[192]  The Complaint sufficiently pleads allegations necessary to invoke the theory of respondeat superior as it pertains to claims against Porter Hedges.

## XIII.  The Anti-Fracturing Rule Does Not Bar Plaintiffs' Claims.

76.    In its Motion, Porter Hedges tries to invoke the "anti-fracturing" rule in an effort to convince the Court that all of Plaintiffs' non-professional negligence claims—breach of fiduciary duty, aiding and abetting breach of fiduciary duty, negligent misrepresentation, and unjust enrichment—should be dismissed, since they are really all one and the same.[193]  Porter Hedges misreads the Texas law on anti-fracturing, which does not bar parallel claims grounded in deception or other form of fraudulent intent.

77.    The Texas Supreme Court recognizes that there are cases against professionals that warrant a fraud, breach of fiduciary duty or other claim *in addition to* a professional negligence

---

[187] *See e.g., W.T.grant v. Wilson Indus., Inc.*, 346 S.W.2d 629, 630 (Tex. App.—Texarkana 1961) (corporation can only act through its officers and agents).

[188] *See* Motion, at ¶ 77.

[189] *See* Complaint, at ¶¶ 245-254.

[190] *See id.*, at ¶¶ 255-259.

[191] *See id.*, at ¶¶ 260-271.

[192] *See id.*, at ¶¶ 272-281.

[193]  *See* Motion, at ¶ 78-82.

or malpractice claim. In *Latham v. Castillo,* the court allowed a Deceptive Trade Practices claim to go forward against an attorney who affirmatively misrepresented a fact related to the rendition of legal services. 972 S.W.2d 66, 69 (Tex. 1998). There is a "difference between negligent conduct and deceptive conduct," and in a case involving genuine allegations of fraud, "[t]o recast th[e] claim as one for legal malpractice is to ignore this distinction." *Id.*

78.    Under Texas law, the anti-fracturing rule does not apply to bar deceptive breach of fiduciary duty claims, going beyond what traditionally has been characterized as legal malpractice. *Duerr v. Brown*, 262 S.W.3d 63, 70–71 (Tex. App. 2008); D*eutsch v. Hoover, Bax & Slovacek*, 97 S.W.3d 179, 189 (Tex.App.–Houston [14th Dist.] 2002, no pet.). The *Duerr* Court explained the difference:

> A legal malpractice claim focuses on whether an attorney represented a client with the requisite level of skill, while a breach of fiduciary duty claim encompasses whether an attorney obtained an improper benefit from the representation. Breach of fiduciary duty involves conduct including failure to disclose conflicts of interest; a failure to deliver funds belonging to the client; placing personal interests ahead of a client's interests; misuse of client confidences; taking advantage of the client's trust; engaging in self-dealing; and making material misrepresentations.

262 S.W.3d at 71.  In *Deutsch*, the court further explained:

> If the gist of a client's complaint is that the attorney did not exercise that degree of care, skill, or diligence as attorneys of ordinary skill and knowledge commonly possess, then that complaint should be pursued as a negligence claim, rather than some other claim. If, however, the client's complaint is more appropriately classified as another claim, for example, fraud, DTPA, breach of fiduciary duty, or breach of contract, then the client can assert a claim other than negligence.

97 S.W.3d at 189 (citations omitted).

79.    Texas courts have long recognized that fiduciary duties are owed by an attorney to a client due to the special nature of the attorney client relationship, *see Johnson v. Brewer &*

*Pritchard, P.C.*, 73 S.W.3d 193, 199 (Tex. 2002), and such breaches arising from fraudulent conduct, not mere negligence.   As explained in *Johnson*, attorneys occupy positions of confidence towards their client and are obligated to act with "integrity and fidelity." *Id.*  The relationship "contemplates fair dealing and good faith, rather than legal obligation, as the basis of the transaction." *Id.*  A claim that an attorney breached a fiduciary duty owed to a client focuses on whether the attorney obtained an improper benefit from representing the client. *See Kemp v. Jensen*, 329 S.W.3d 866, 871–72 (Tex.App.—Eastland 2010, pet. denied) (citing *Gibson v. Ellis*, 126 S.W.3d 324, 330 (Tex.App.—Dallas 2004, no pet.)). For example, an attorney may breach a fiduciary duty when the attorney benefits improperly from the attorney-client relationship by "subordinating his client's interest to his own, retaining the client's funds, engaging in self-dealing, improperly using client confidences, failing to disclose conflicts of interest, or making misrepresentations to achieve these ends." *Id.* (citing *Goffney v. Rabson*, 56 S.W.3d 186, 193 (Tex.App.—Houston [14th Dist.] 2001, pet. denied)).

80.    The Complaint alleges voluminous facts which lay out a plausible claim that Porter Hedges engaged in deceptive and fraudulent conduct, putting its own interest above the interests of the Plaintiff bondholders, not simply a series of common professional mistakes. To cite one example, Porter Hedges affirmatively misrepresented that it did not know of any disqualifying conflicts.[194]  This precludes application of the anti-fracturing rule.

**XIV.  Alternative Motion for Leave to Amend.**

81.    In the alternative, should this Court find Plaintiffs' Complaint deficient in any regard, Plaintiffs respectfully request leave to amend or supplement their Complaint. "The court should freely give a complainant…leave to amend defective allegations in a pleading. …

---

[194]  See *GWG*, No. 22-90032, ECF No. 508 at 3 (requiring Porter Hedges to "review its files periodically during Chapter 11 Cases to ensure that no conflicts or other disqualifying circumstances exist or arise").

Thus, the appropriate remedy when granting a motion based on nonconforming or deficient pleadings is to grant the complainant time within which to amend the complaint." *Mclelloon v. Lone Star Gas Co.*, 66 F.3d 98, 103 (5th Cir. 1995). Giving Plaintiffs leave to amend their Complaint would not prejudice Defendants, who are already on notice of the claims Plaintiffs brings. Further, since the filing of Plaintiffs' Complaint and during the briefing, Plaintiffs have learned additional facts which could be alleged to support Plaintiffs' claims.

**CONCLUSION**

82.     Plaintiffs respectfully request that the Court deny Defendant Porter Hedges' Motion to Dismiss Under Fed. R. Civ. P. 12(b)(1)and 12(b)(6) and grant unto Plaintiffs all other and further relief to which they are justly entitled.

**Dated October 2, 2025**

Respectfully submitted,

By:    */s/ Mikell A. West*
Mikell A. West
Texas State Bar No. 24070832
S.D. Tex. Bar No. 1563058
Robert W. Clore
Texas State Bar No. 24012426
S.D. Tex. Bar No. 2032287
BANDAS LAW FIRM, P.C.
555 N Carancahua Street, Suite 1200
Corpus Christi, Texas 78401
Telephone: (361) 698-5200
Facsimile: (361) 698-5222
mwest@bandaslawfirm.com
rclore@bandaslawfirm.com

## Certificate of Service

I hereby certify that on October 2, 2025, I electronically filed the foregoing document with the Clerk of the Court using the CM/ECF system, which will send notification of such filing via electronic mail to all counsel of record.

*/s/ Mikell A. West*